1  ROSS WERSCHING & WOLCOTT LLP
   William C. O'Neill / Bar No. 251071
2    WCO@RossLLP.com
   3151 Airway Avenue, Building S-1
3  Costa Mesa, California 92626
   Telephone:  (714) 444-3900
4  Facsimile:   (714) 444-3901

5  HAYNES AND BOONE, LLP
   Mark D. Erickson / Bar No.104403
6    mark.erickson@haynesboone.com
   Kenneth G. Parker / Bar No. 182911
7    kenneth.parker@haynesboone.com
   Martin M. Ellison / Bar No. 292060
8    martin.ellison@haynesboone.com
   Christopher B. Maciel / Bar No. 300733
9    chris.maciel@haynesboone.com
   600 Anton Boulevard, Suite 700
10 Costa Mesa, California 92626
   Telephone:  (949) 202-3000
11 Facsimile    (949) 202-3001

12 Attorneys for Defendant
   PHOENIX FIBERS, INC.

13

14          UNITED STATES DISTRICT COURT

15   CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| 16  SWEET PEOPLE APPAREL, INC. d/b/a MISS ME, a California corporation, et al., | Case No. 2:16-cv-00940-TJH-JC |
| 17 | Hon. Terry J. Hatter, Jr. |
| 18          Plaintiffs, | **DEFENDANT PHOENIX FIBERS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT THEREOF** |
| 19          v. | |
| 20  PHOENIX FIBERS, INC., an Arizona corporation, et al., | |
| 21 | |
|          Defendants. | |
| 22 | |
| 23 | *[Statement of Uncontroverted Facts; Appendix of Evidence; [Proposed] Judgment and [Proposed] Order Filed Concurrently Herewith]* |
| 24 | |
| 25 | Date:      January 30, 2017 |
| 26 | Time:      Under submission Location:  Courtroom 9B |
| 27 |                First Street Courthouse |
| 28 | |

**TO THE HONORABLE COURT AND ALL PARTIES AND THEIR**

**ATTORNEYS OF RECORD:**

    **PLEASE TAKE NOTICE** that on January 30, 2017, or as soon thereafter as this matter may be heard, in Courtroom 9B of the First Street Courthouse, located at 350 W. 1st Street, 9th Floor, Los Angeles, California 90012, Defendant Phoenix Fibers, Inc. ("Phoenix Fibers") shall and hereby does move, pursuant to Federal Rule of Civil Procedure 56 and all other applicable law, for an order granting its Motion for Summary Judgment or, in the Alternative, Motion for Summary Judgment as to Plaintiffs Sweet People Apparel, Inc. and RCRV, Inc.'s (collectively, "Defendants") Claims as follows:

    1.    For summary judgment in favor of Phoenix Fibers; or

    2.    Alternatively, if for any reason summary judgment cannot be had, for an order granting partial summary judgment as to the following claims and issues in this action, or any of them, in favor of Phoenix Fibers:

        a.  Plaintiffs' First Claim for breach of contract fails because a contract between Plaintiffs and Phoenix Fibers never existed.

        b.  Plaintiffs' First Claim for breach of contract fails because a contract between Plaintiffs and Phoenix Fibers never existed that required Phoenix Fibers to destroy all items donated by Plaintiffs and, as a result Phoenix Fibers did not breach any contract by failing to destroy items donated by Plaintiffs.

        c.  Plaintiffs' First Claim for breach of contract fails because a contract between Plaintiffs and Phoenix Fibers never existed that required Phoenix Fibers to destroy any items donated by Plaintiffs and, as a result Phoenix Fibers did not breach any contract by failing to destroy items donated by Plaintiffs.

1

DEFENDANT PHOENIX FIBERS, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT

    d. Plaintiffs First Claim for breach of contract fails because, to the extent a contract existed, it is invalid and void due to mutual mistake.

    e. RCRV's First Claim for breach of contract fails because RCRV was not a party to any discussion, conversation, or e-mail that Plaintiffs claim formed the purported contract.

    f. Plaintiffs' Second Claim for trademark infringement fails because Phoenix Fibers' alleged use of the asserted trademarks was not likely to cause confusion, cause mistake, or to deceive.

    g. Plaintiffs' Second Claim for trademark infringement fails due to the first sale doctrine.

    h. Plaintiffs' Third Claim for false designation of origin fails because Phoenix Fibers' alleged use of the asserted trademarks was not likely to cause confusion, cause mistake, or to deceive.

    i. Plaintiffs' Third Claim for false designation of origin fails due to the first sale doctrine.

    j. Plaintiffs' Fourth Claim for statutory unfair competition fails because it is founded on Plaintiffs' other claims, which fail.

    k. Plaintiffs' Fifth Claim for dilution fails due to the first sale doctrine.

    l. Plaintiffs' Sixth Claim for common law trademark infringement and unfair competition fails because Phoenix Fibers' alleged use of the asserted trademarks was not likely to cause confusion, cause mistake, or to deceive.

    m. Plaintiffs' Sixth Claim for common law trademark infringement and unfair competition fails due to the first sale doctrine.

n. Plaintiffs' claim that Phoenix Fibers is jointly and severally liable for disgorgement of the other defendants' profits as to any claim fails.

o. Plaintiffs' claim for punitive damages fails.

This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points of Authorities attached hereto, the Statement of Uncontroverted Facts, the Appendix of Evidence, [Proposed] Judgment and [Proposed] Order filed concurrently herewith, and such other evidence and argument as the Court deems fit and proper to consider under the law. This motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place on December 16 and 23, 2016.


DATED: December 30, 2016          HAYNES AND BOONE, LLP

                                  By:  /s/ Kenneth G. Parker
                                     Kenneth G. Parker
                                     Attorneys for Defendant
                                     Phoenix Fibers, Inc.

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ........................................................................iii

I.   INTRODUCTION............................................................................1

II.   BACKGROUND...............................................................................3

     A.   Phoenix Fibers, along with the rest of the clothing and textile
           recycling industry, provides a service of substantial importance..........3

     B.   Sweet People and RCRV ...........................................................4

     C.   The Interaction Between Plaintiffs and Phoenix Fibers .......................4

     D.   Post-donation recycling ............................................................5

     E.   Plaintiffs' allegations ...............................................................6

III.   LEGAL STANDARD ......................................................................7

IV.   DISCUSSION ................................................................................7

     A.   Plaintiffs' breach of contract claim fails as a matter of law ..............7

          1.   There was no contract between Plaintiffs and Phoenix Fibers.....8

          2.   To the extent a contract exists, destruction was not a
               term of the contract ................................................10

          3.   To the extent a contract exists, it is invalid and void ................13

          4.   To the extent the Alleged Contract exists, RCRV is
               not a party.............................................................15

     B.   Plaintiffs' second through sixth claims fail because there was no
           likelihood of confusion and because the first sale doctrine applies .16

          1.   Phoenix Fibers cannot be held liable for trademark
               infringement because there was no likelihood of confusion .....17

          2.   Plaintiffs' claims are also barred by the first sale doctrine........21

     C.   Phoenix Fibers cannot be held jointly and severally liable for the
           disgorgement of other defendants' profits.......................................23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

D.     Punitive damages are improper .........................................................23

V.     CONCLUSION ...................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Accuride Int'l, Inc. v. Accuride Corp.,*
    871 F.2d 1531 (9th Cir. 1989) ................................................................. 18

*AMF, Inc. v. Sleekcraft Boats,*
    599 F.2d 341 (9th Cir. 1979) .................................................................. 18

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ................................................................................ 7

*In re Apple iPod iTunes Antitrust Litig.,*
    796 F. Supp. 2d 1137 (N.D. Cal. 2011) .................................................. 17

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,*
    603 F.3d 1133 (9th Cir. 2010) .......................................................... 21, 22

*Binder v. Disability Grp., Inc.,*
    772 F.Supp. 2d. 1172 (C.D. Cal. 2011) .................................................. 24

*Bleecher v. Conte,*
    29 Cal.3d 345 (1981) ............................................................................... 8

*Brown v. Kinross Gold U.S.A., Inc.,*
    531 F. Supp. 2d 1234 (D. Nev. 2008) .................................................... 15

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................. 7, 9

*Citadel Grp. v. Wash. Reg'l Med. Ctr.,*
    692 F.3d 580 (7th Cir. 2012) ................................................................... 8

*Dreamwerks Prod. Grp., Inc. v. SKG Studio,*
    142 F.3d 1127 (9th Cir. 1998) ................................................................ 18

*Eclipse Assoc. Ltd. v. Data Gen. Corp.,*
    894 F.2d 1114 (9th Cir. 1990) ................................................................ 18

*Enesco Corp. v. Price/Costco Inc.*,
   146 F.3d 1083 (9th Cir. 1998) ................................................20, 21, 22

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
   618 F.3d 1025 (9th Cir. 2010) .............................................................18

*Groupion, LLC v. Groupon, Inc.*,
   859 F. Supp. 2d 1067 (N.D. Cal. 2012) .............................................23

*Gutierrez v. Kaiser Found. Hosps., Inc.*,
   No. C 11-3428 CW, 2012 U.S. Dist. LEXIS 155462 (N.D. Cal.
   Oct. 30, 2012) ....................................................................................16

*Herbal Care Sys., Inc. v. Plaza*,
   2009 WL 692338 (D. Ariz. Mar. 17, 2009) .......................................15

*Johnson v. Hewlett-Packard Co.*,
   809 F. Supp. 2d 1114 (N.D. Cal. 2011) .............................................7, 9

*Kingsbury, Inc. v. GE Power Conversion UK, Ltd.*,
   78 F. Supp. 3d 611 (E.D. Pa. 2014) ...................................................8, 10

*KTS Karaoke, Inc. v. Sony/ATV Music Publ'g LLC*,
   No. CV-12-00014-MWF, 2014 U.S. Dist. LEXIS 190492 (C.D.
   Cal. Jan. 14, 2014) .............................................................................23

*Ladas v. Cal. State Auto. Assn.*,
   19 Cal. App. 4th 761 (1993) ...............................................................8, 13

*Lindy Pen Co. v. Bic Pen Corp.*,
   982 F.2d 1400 (9th Circ. 1993) ..........................................................23

*Local Motion v. Niescher*,
   105 F.3d 1278 (9th Cir. 1997) ...............................................8, 13, 14, 15

*MCA, Inc. v. Wilson*,
   677 F.2d 180 (2d Cir. 1981) ...............................................................23

DEFENDANT PHOENIX FIBERS, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT

*Motorola, Inc. v. Elec. Lab. Supply Co.,*
    Civil Action No. 88-2452, 1990 U.S. Dist. LEXIS 8225 (E.D. Pa.
    July 3, 1990) ...........................................................................18, 19, 20

*Network Automation, Inc. v. Hewlett-Packard Co.,*
    No. CV 08-4675-JFW, 2009 U.S. Dist. LEXIS 125835 (C.D. Cal.
    Sep. 14, 2009) .......................................................................................18

*Rearden LLC v. Rearden Commerce, Inc.,*
    683 F.3d 1190 (9th Cir. 2012) ........................................................17, 18

*Reichert v. Gen. Ins. Co. of Am.,*
    68 Cal. 2d 822 (1968) ..............................................................................8

*Russell v. Union Oil Co.,*
    7 Cal. App. 3d 110 (1970) ...................................................................8, 12

*Sammons v. Colonial Press, Inc.,*
    126 F.2d 341 (1st Cir. 1942)...................................................................23

*Sebastian Int'l, Inc. v. Longs Drug Stores Corp.,*
    53 F.3d 1073 (9th Cir. 1995) ...............................................16, 20, 21, 22

*SEC v. JT Wallenbrock & Assocs.,*
    440 F.3d 1109 (9th Cir. 2006) ................................................................23

*SEC v. Wilde,*
    2012 U.S. Dist. LEXIS 183252 (C.D. Cal. Dec. 17, 2012)....................23

*Toho Co., v. Sears, Roebuck & Co.,*
    645 F.2d 788 (9th Cir. 1981) .............................................................16, 17

*Ty Inc. v. Perryman,*
    306 F.3d 509 (7th Cir. 2002) ............................................................16, 20

*Warner-Lambert Co. v. Northside Dev. Corp.,*
    86 F.3d 3 (2d Cir. 1996) .........................................................................21

*Wood v. Apodaca,*
    375 F. Supp. 2d 942 (N.D. Cal. 2005)...................................................17

DEFENDANT PHOENIX FIBERS, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT

1

**Statutes**

2    15 U.S.C § 1114 ................................................................................... 16

3    15 U.S.C. § 1125(a) ............................................................................ 16

4    Bus. & Prof. Code § 14247 ........................................................... 16, 21

5    Bus. & Prof. Code § 17200 ................................................................. 16

6    Cal. Civ. Code § 1645 ......................................................................... 15

7    California Business & Professions Code §§ 17200 et seq. ................... 16

8

   Lanham Act ............................................................................. 16, 17, 20

9

**Other Authorities**

10    Fed. R. Civ. P. 56 ................................................................................. 7

11    Restatement of Contracts ......................................................... 8, 10, 13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.     **INTRODUCTION**

Sweet People Apparel, Inc. ("Sweet People") and RCRV, Inc. ("RCRV")[1] have filed suit against Phoenix Fibers, Inc. ("Phoenix Fibers") for breach of contract and a myriad of trademark-based claims.  Plaintiffs have failed to produce facts that either establish a contract or that a contract containing terms that were breached.  Moreover, Phoenix Fibers' later sale of some of the donated products never caused confusion and Plaintiffs' claims are barred by the first sale doctrine. For these reasons, and the others stated below, summary judgment is proper.

Phoenix Fibers is a clothing and textile recycling company formed in 2011. In the clothing and textile recycling industry, the term "recycle" simply means to reuse.  Thus, Phoenix Fibers engages in three types of clothing and textile recycling.  Phoenix Fibers (1) accepts donations of clothing that it then sells as "credential" (an industry term that means clothes or other items sold in bulk by the pound); (2) accepts donations of clothing, turns it into shoddy or filler fiber, and then sells the fiber to companies that use the fiber for various purposes (e.g., for housing insulation); and (3) *for a fee*, destroys certain clothing items and produces a certificate to the customer or other documentation.

In 2011, a human resources manager from Sweet People contacted Phoenix Fibers to coordinate donations that Sweet People wanted to make to Phoenix Fibers.  Between 2011 and 2015, both Plaintiffs donated items to Phoenix Fibers. Except for items that were later reclaimed by Plaintiffs, Phoenix Fibers recycled all of the donated items.  Some of these donated items were turned into shoddy fiber and some of them were sold, as is common and proper in the clothing and textile recycling industry, as credential, by the pound and in bulk, to another recycling company, Defendant U.S. General Export, Inc. ("U.S. General").  Plaintiffs allege that some of the products donated to Phoenix Fibers ended up being sold by internet retailers.

---

[1] Sweet People and RCRV are collectively referred to as the "Plaintiffs."

1

Plaintiffs allege that somehow a contract between both Plaintiffs and Phoenix Fibers was formed in 2011 (the "Alleged Contract"), and that the Alleged Contract required destruction of items donated by Plaintiffs.  However, even the Sweet People human resources manager that purportedly entered into the Alleged Contract with Phoenix Fibers, Lisa Song, has testified that she never formed a "specific agreement" with Phoenix Fibers.  Moreover, to the extent that the Alleged Contract does exist, it never obligated Phoenix Fibers to destroy items donated by Plaintiffs, it is invalid, and RCRV is not a party to it.

Also, despite the fact that Plaintiffs *donated* items to Phoenix Fibers unencumbered, Plaintiffs allege a host of trademark-based claims.  These claims are also subject to summary judgment.  First, Plaintiffs cannot prove that Phoenix Fibers' sale of donated items to U.S. General was likely to cause confusion.  In fact, U.S. General knew exactly what they were buying, and Plaintiffs' 30(b)(6) witness admits as much.  Second, Plaintiffs' trademark claims are barred by the first sale doctrine.  After Phoenix Fibers became the rightful owner of the items donated by Plaintiffs, it was free to do with them as it wished.  Phoenix Fibers' choosing to recycle the donated items by selling them as credential to U.S. General is not a violation of any intellectual property law.

Plaintiffs also believe that Phoenix Fibers is jointly and severally liable for disgorgement of *all* the profits of *every* defendant, that Plaintiffs are entitled to punitive damages, and that Phoenix Fibers violated California's statutory unfair completion law.  The case law and the facts say otherwise.

Given the undisputed facts in this case, Plaintiffs' six causes of action against Phoenix Fibers cannot succeed as a matter of law.  Phoenix Fibers therefore requests that the Court grant this Motion for Summary Judgment or, in the alternative, Partial Summary Judgment.

## II.   BACKGROUND

### A.   Phoenix Fibers, along with the rest of the clothing and textile recycling industry, provides a service of substantial importance

Phoenix Fibers is an Arizona-based clothing and textile recycling company that was founded in July 2011.  (Statement of Uncontroverted Facts ("SUF") 1.)  Phoenix Fibers only provides recycling services.  (SUF 2-5.)  In the context of the clothing and textile recycling industry, the word "recycle" simply means to reuse.  (SUF 2-4.)  And, any means of reusing clothes is considered to be recycling them.  (SUF 2-4.)  For example, in the clothing and textile recycling industry, one common way of recycling clothes is by reusing or reselling them.  (SUF 2-4.)  This often happens through consignment and other second-hand clothing stores, like Buffalo Exchange.  (SUF 3.)  Another means of recycling clothing and textiles is to sell the clothes and scrap textiles as "credential," which simply means the selling of clothes in bulk and by the pound (as opposed to by the item).  (SUF 2.)  A third way of recycling clothing and textiles is to turn them into something else entirely (e.g. shoddy fiber).  (SUF 4.)

Phoenix Fibers' business consists of three recycling components.  (SUF 5.)  First, Phoenix Fibers accepts donations of clothing and other textile that it then sells, by the pound and in bulk, as credential.  (SUF 5.)  Second, Phoenix Fibers accepts donations of clothing and scrap material, turns that material into shoddy or filler fiber through a proprietary shredding process, and then sells it to companies that use this fiber for various purposes (e.g., for housing insulation, automotive insulation, and punching bag filler).  (SUF 5.)  Third, *for a fee*, Phoenix Fibers will agree to destroy certain clothing items, after which it provides a certificate of destruction to the customer.  (SUF 5.)  As explained on Phoenix Fibers' website, "Phoenix Fibers collects and recycles textiles in a variety of ways. We maintain a zero waste philosophy whenever feasible.  The items we do not use in our shredding process are resold to other recycling companies."  (SUF 25.)

3

1

    **B.**    **Sweet People and RCRV**

2

      Sweet People and RCRV are denim and apparel companies that each sell,

3

among other things, jeanswear. (SUF 10-11, 16-18.) Despite being affiliated

4

companies, Sweet People and RCRV are distinct. (SUF 16-21.) While Sweet

5

People sells certain products under the Miss Me brand name, RCRV sells products

6

under the Rock Revival brand name. (SUF 10, 17.)

7

      Lisa Song was employed by Sweet People, but not RCRV, from sometime in

8

2009 until February 2014. (SUF 21-23.) She worked as a human resource

9

manager during her entire tenure at Sweet People. (SUF 12.) Meanwhile, Lily

10

Kim is the General Counsel for both Sweet People and RCRV, and has held those

11

positions since 2010. (SUF 13, 19.)

12

    **C.**    **The Interaction Between Plaintiffs and Phoenix Fibers**

13

      In 2011, Ms. Song, the human resources manager, at the direction of Ms.

14

Kim, called Phoenix Fibers to coordinate some denim donations for recycling.

15

(SUF 26, 28, 53-54.) Ms. Song coordinated with then Phoenix Fibers employee,

16

Matt Graham, apparently via telephonic conversations and e-mail. (SUF 26, 28,

17

53-54.) Ms. Song reported to Ms. Kim with respect to arranging the denim

18

donations. (SUF 41.) Importantly, *Ms. Kim* never spoke to Mr. Graham and, in

19

fact, did not speak to anyone from Phoenix Fibers until October 2015. (SUF 31-

20

32.) Ms. Song, the only person that coordinated the donation of denim to Phoenix

21

Fibers, cannot recall whether, based on the conversations she had with Mr.

22

Graham, a contract was formed between Phoenix Fibers and Plaintiffs. (SUF 36.)

23

And, Ms. Song does not recall any communications between herself and Mr.

24

Graham where Mr. Graham agreed, on behalf of Phoenix Fibers, to destroy any

25

(much less, all) material donated to Phoenix Fibers by Plaintiffs. (SUF 37-38.)

26

Moreover, leading up to Plaintiffs' first shipment of denim donations, Ms. Song

27

never reported to Ms. Kim that Phoenix Fibers had agreed to destroy any (much

28

less, all) material donated to Phoenix Fibers by Plaintiffs. (SUF 42.) As Ms. Kim

1  put it, "I don't know if the word 'destroyed' was used in the verbal discussions"

2  between Ms. Song and Mr. Graham." (SUF 40.) Further, all that *Ms. Song* did

3  recall was that the alleged "understanding," whatever it was, was in place on or

4  before November 7, 2011, well before the first shipment. (SUF 29, 47-48.)

5        Nonetheless, following the conversations between Ms. Song and Mr.

6  Graham, Sweet People and RCRV began donating denim to Phoenix Fibers. (SUF

7  53-54.) Some of the material donated to Phoenix Fibers by Plaintiffs was Miss Me

8  and Rock Revival brand clothing. (SUF 53-54.) However, damaged or defective

9  items that Plaintiffs donated to Phoenix Fibers were marked as either damaged or

10 defective. (SUF 55.) Plaintiffs continued making donations until 2015. (SUF 69;

11 Dkt. 34.)

12     **D.    Post-donation recycling**

13       Some of the items donated by Plaintiffs were turned into shoddy fiber. (SUF

14 59.) However, in 2015, Phoenix Fibers began selling certain material donated by

15 Plaintiffs, along with materials donated by other companies, to U.S. General, a

16 recycling company. (SUF 59.) Phoenix Fibers always sold material to U.S.

17 General as credential, in bulk and by the pound. (SUF 58, 61-62.) Kamel Mroueh

18 was the representative from U.S. General with whom Phoenix Fibers employees,

19 primarily Steven Johnson, communicated to facilitate the sale of credential. (SUF

20 60.) U.S. General, through Mr. Mroueh, only purchased credential from Phoenix

21 Fibers at Phoenix Fibers' warehouse. (SUF 61.) Mr. Mroueh never inquired into

22 which brands of credential Phoenix Fibers had in its warehouse, nor did Mr.

23 Mroueh ever state that he was interested in certain brands of credential. (SUF 61.)

24 U.S. General paid the market rate for credential for all items it purchased from

25 Phoenix Fibers, which was approximately 30¢ to 60¢ per pound. (SUF 62.) U.S.

26 General never paid a premium for credential that included Sweet People or Rock

27 Revival donated material. (SUF 62.)

28

On October 27, 2015, Ms. Kim contacted Tod Kean, an owner of Phoenix Fibers, to complain about certain Miss Me and Rock Revival denim that was being sold on eBay.  (SUF 67.)  From that point on, Phoenix Fibers never sold any products that Plaintiffs donated to Phoenix Fibers as credential to anyone.  (SUF 67.)  And, in December 2015, with the cooperation of Phoenix Fibers, Plaintiffs removed all the remaining products, totaling no less than 130,000 pounds, that they had previously donated to Phoenix Fibers from Phoenix Fibers' warehouse.  (SUF 69.)

**E.      Plaintiffs' allegations**

Plaintiffs allege that they entered into a non-written contract with Phoenix Fibers (the "Alleged Contract") before November 7, 2011.  (SUF 26, 29.)  According to Plaintiffs' 30(b)(6) witness, Ms. Kim, who never spoke with Mr. Graham, the Alleged Contract obligated Phoenix Fibers to recycle and destroy all items donated to Phoenix Fibers by Plaintiffs.  (SUF 31-32.)  Further, Ms. Kim, as Plaintiffs' corporate designee, testified that Plaintiffs believed that recycling and destruction are synonymous in the context of clothing.  (SUF 46.)

Plaintiffs assert that, after the purported formation of the Alleged Contract, Plaintiffs and Phoenix·Fibers entered into a series of other contracts, the terms of which pertained *only to the shipment* of the items that Plaintiffs would donate to Phoenix Fibers pursuant to the Alleged Contract (the "Shipment Contracts").  (SUF 49.)  Plaintiffs allege that the Shipment Contracts, which only governed the *terms of the shipment*, were negotiated by numerous individuals, including Ms. Kim and Plaintiffs' warehouse manager, Felipe Salgado, on behalf of Plaintiffs, and Mr. Graham and Mr. Johnson, on behalf of Phoenix Fibers.  (SUF 49.)

On February 10, 2016, Plaintiffs filed a Complaint in this Court against Phoenix Fibers, and others, for breach of contract and various trademark related claims.  (Dkt. 1).  Plaintiffs amended their Complaint on May 18, 2016, to add

1   certain defendants.  (Dkt. 32).  Phoenix Fibers now moves for summary judgment

2   or, in the alternative, partial summary judgment.

3   **III.   LEGAL STANDARD**

4        A district court shall grant summary judgment if the movant shows there is

5   no genuine dispute on any material fact and the movant is entitled to judgment as a

6   matter of law.  Fed. R. Civ. P. 56.  Further, if the record lacks evidence supporting

7   any essential element of a claim, summary judgment should be granted on that

8   claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986).  As the United

9   States Supreme Court explained, where a party fails to make a showing of

10  sufficient evidence to establish a claim, "there can be 'no genuine issue as to any

11  material fact,' since a complete failure of proof concerning an essential element of

12  the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at

13  323.  On a motion for summary judgment, the Court must view the evidence

14  through the prism of the substantive evidentiary burden.  *Anderson v. Liberty*

15  *Lobby, Inc.*, 477 U.S. 242, 254 (1986).

16       An issue of fact is "material" if, under the substantive law of the case,

17  resolution of the factual dispute might affect the outcome of the claim.  *Anderson*,

18  477 U.S. at 248.  Factual disputes are genuine only if they "properly can be

19  resolved in favor of either party."  *Id.* at 250.  "If the evidence is merely colorable,

20  or is not significantly probative, summary judgment may be granted."  *Id.* at 249-

21  50 (internal citations omitted).

22  **IV.   DISCUSSION**

23       **A.    Plaintiffs' breach of contract claim fails as a matter of law**

24       "To survive summary judgment on a breach of contract claim, Plaintiffs

25  must (1) establish the existence of a contract; (2) show that they performed; (3)

26  show that [Phoenix Fibers] failed to perform; and (4) show that they were

27  damaged."  *Johnson v. Hewlett-Packard Co.*, 809 F. Supp. 2d 1114, 1127 (N.D.

28

Cal. 2011); *see also Reichert v. Gen. Ins. Co. of Am.*, 68 Cal. 2d 822, 830 (1968). Plaintiffs' breach of contract claim fails for a variety of reasons.

### 1. There was no contract between Plaintiffs and Phoenix Fibers

Whether a contract exists is properly decided on summary judgment if there is no genuine dispute as to the underlying facts. *Local Motion v. Niescher*, 105 F.3d 1278, 1280 (9th Cir. 1997) ("*Local Motion*"). Put another way, "[w]hen the material facts are not in dispute, the existence and interpretation of a contract are questions of law that the court may decide on a motion for summary judgment." *Citadel Grp. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 587 (7th Cir. 2012).

A contract requires mutual consent, which requires that the parties exchange promises that represent legal obligations. *Bleecher v. Conte*, 29 Cal.3d 345, 350 (1981). Mutual consent first requires an offer. *Ladas v. Cal. State Auto. Assn.*, 19 Cal. App. 4th 761, 770 (1993). And, "[u]nder basic contract law an offer must be sufficiently definite, or must call for such definite terms in the acceptance that the performance promised is reasonably certain." *Id.* (internal citations omitted). Indeed, "[i]t is basic contract law that one cannot suppose, believe, suspect, imagine or hope that an offer has been made. An offer must be *intentional*, *definite*, in its terms and communicated; otherwise, no meeting of the minds can occur." *Kingsbury, Inc. v. GE Power Conversion UK, Ltd.*, 78 F. Supp. 3d 611, 619 (E.D. Pa. 2014) (emphasis added). After an offer, there must be acceptance, which "must be expressed or communicated by the offeree to the offeror." *Russell v. Union Oil Co.*, 7 Cal. App. 3d 110, 114 (1970). Importantly, though, "[i]t is essential to a bargain that each party manifest assent with reference to the manifestation of the other." Restatement (Second) of Contracts § 23 (1981). In short, each party must know that they are entering into a legally binding agreement, and intentionally enter into that agreement, for a contract to exist.

DEFENDANT PHOENIX FIBERS, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT

1    Here, Plaintiffs allege that Ms. Song, the human resources manager, and no
2    one else, at the direction of Ms. Kim entered into the Alleged Contract on behalf of
3    both Plaintiffs.  (SUF 28, 36.)  But Ms. Song, the person who allegedly entered in
4    to the Alleged Contract and only person who talked to anyone at Phoenix Fibers,
5    Inc. before the Alleged Contract was supposedly formed, could not recall any oral
6    communications in which she entered into the Alleged Contract.  (SUF 36, 38, 47-
7    48.)  No written communications dated prior to the date Ms. Song testified the
8    Alleged Contract was formed, November 7, 2011, reflect that there was a definite
9    offer and definite acceptance of such offer.  (SUF 27.)  Therefore, Plaintiffs have
10   failed to show that a contract exists, and summary judgment is proper.  *Celotex*
11   *Corp*, 477 U.S. at 322–25.
12       Even more problematic for Plaintiffs than their lack of evidence is the
13   evidence that affirmatively proves that no contract existed.  First, Ms. Song stated
14   that she could not recall whether any part of the Alleged Contract was based on her
15   own conversations with Phoenix Fibers.  (SUF 36, 38, 47-48.)  Second, later in her
16   deposition, Ms. Song, without prompting, objected to the use of the word
17   "agreement" to characterize any of her communications with Phoenix Fibers:

18           Q: Do you recall whether your understanding of the agreement
19       between Sweet People and Phoenix Fibers changed in any way after
         the first shipment of goods to Phoenix Fibers?

20
21           A: No, I don't - - sorry.  I'm a little confused on the word
         "agreement."  It's - - I just want to say that it's more of - - that's what
22       the company said they did, *not a specific agreement*.

23       I don't know if that makes a difference in what you're asking.

24   (SUF 47-48; Deposition of Lisa Song ("Song Depo. (App. Ex. D)") 62:19-63:5)
25   (objections omitted).  As it turns out, whether or not there was a *specific agreement*
26   does make a difference.  Namely, a party cannot succeed in a claim for breach of
27   contract if there was no contract to begin with.  *Johnson*, 809 F. Supp. 2d at 1127
28   (N.D. Cal. 2011).  Moreover, an individual cannot accidently enter into a contract;

an offer and acceptance of that offer must be intentional. *Kingsbury, Inc.*, 78 F.

Supp. 3d at 619. As concisely explained by the Restatement of Contracts, "[i]t is

essential to a bargain that each party manifest assent with reference to the

manifestation of the other." Here, Ms. Song merely had an understanding of what

Phoenix Fibers did. (SUF 47-48). And, a significant portion of Ms. Song's

"understanding" of what Phoenix Fibers did came from third parties, not Phoenix

Fibers. (SUF 47-48). As Ms. Song testified at her deposition:

> Q:      What portion of your understanding of what the program [with
> Phoenix Fibers] would entail, if any, came from reviewing the Bonded
> Logic website?
>
> A:      The website was integral in looking further into and creating
> the program [with Phoenix Fibers].

(SUF 47-48; Song Depo. (App. Ex. D) 46:14-21 (objections omitted)).

From this, Ms. Song reported her understanding that "Phoenix Fibers was a

recycling company," along with her understanding of how shipments would

work to Ms. Kim. (SUF 41-42; Rule 30(b)(6) Deposition of Lilly Kim

("Rule 30(b)(6) Depo. (Kim) (App. Ex. E)") 18:15-19:3). Finally, Plaintiffs

began donating items to Phoenix Fibers. (SUF 53-54). But, in her own

words, Ms. Song never negotiated or agreed to "a specific agreement" with

Phoenix Fibers, and there was no written agreement.   There was simply an

understanding that Ms. Song had based, at least in part, on a third party

website. Because Ms. Song did not characterize the parties as having

entered into an agreement, neither should this Court. Summary judgment on

Plaintiffs' contract claim is proper.

### 2.      To the extent a contract exists, destruction was not a term of the contract

Based on the cases cited above, destruction was not an explicit term of the

Alleged Contract. Here, Phoenix Fibers' argument is simple: even if the Alleged

Contract does exist, because the parties did not agree that Phoenix Fibers was

1  obligated to destroy all items that were donated by Plaintiffs, destruction of

2  Plaintiffs' donated items by Phoenix Fibers is not a term of the contract and the

3  contract was not breach.

4        Plaintiffs' 30(b)(6) witness, Ms. Kim, testified without proper foundation

5  that the destruction requirement was discussed "verbally" (between Ms. Song and

6  Ms. Graham) "[a]nd I guess in e-mail correspondence." (SUF 27; Rule 30(b)(6)

7  Depo. (Kim) (App. Ex. E) 28:12-29:7). As for the e-mail correspondence,

8  Plaintiffs have failed to produce, and cannot show, *any* e-mail where Phoenix

9  Fibers explicitly agreed to this destruction requirement, much less an e-mail prior

10  to November 7, 2011, the last possible date the Alleged Contract was formed.

11  (SUF 27.) With respect to the verbal communications, Ms. Song, the human

12  resources manager and apparent negotiator of the Alleged Contract for Plaintiffs,

13  does not remember the specific contents of her communications with Phoenix

14  Fibers. (SUF 36, 38, 47-48.) As for Ms. Kim, the extent of Ms. Kim's personal

15  knowledge of the terms of the Alleged Contract was discussed during her

16  deposition:

17      Q.    Do you have any personal knowledge of the terms of the offer
    that led to [the Alleged Contract]?

18

19      A.    I've read the e-mails,[2] and I had discussions with Lisa [Song].
    ...

20      Q.    Please tell me what Lisa Song told you in those conversations
    in 2011?

21      A.    We had discussions. We were looking for a company that

22  recycled denim so that we could recycle our products, rather than
sending them to the landfill. So we discussed, you know, that

23  Phoenix Fibers was a recycling company that was going to do this.
    We discussed how, you know, pricing would work.

24      And we discussed, you know, basically a little bit of timing of
the first shipment.

25      Q.    And did you discuss anything else with Lisa Song in 2011
regarding the events or offer that led to [the Alleged Contract]?

26

27      A.    Not that I can recall.

28  _____

[2] As previously discussed, no e-mail shows that destruction is one of the terms of
an "offer."

1  (SUF 41-42; Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:3).  And later,

2  Ms. Kim, in her capacity as corporate designee, testified: "I don't know if the word

3  'destroyed' was used in the verbal discussions" between Ms. Song and Mr.

4  Graham.  (SUF 40.)  Ms. Kim continued, "I think we believed that during the

5  recycling process, the items would naturally be destroyed as they were made into

6  shoddy fiber.  So that's why it's a little confusing.  We just focus on 'destroyed.'"

7  (SUF 40; Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:20-28:5).  However, Ms.

8  Kim admits that the basis for her belief that the parties verbally agreed to the

9  destruction term was her conversation with Ms. Song, which is set forth above—a

10  conversation where recycling, not destruction, was mentioned and to which Ms.

11  Kim was not a party.  (SUF 40-42)  In summary, Plaintiffs allege: "So we had an

12  overall arrangement [the Alleged Contract], as we discussed, for them to *recycle*

13  the [donated] products."  (SUF 40-42; Rule 30(b)(6) Depo. (Kim) (App. Ex. E)

14  26:3-4) (emphasis added).  Therefore, the basis for Plaintiffs' belief that items they

15  donated would be destroyed was purportedly because the Alleged Agreement

16  required Phoenix Fibers to "recycle" the donated items.  In essence, Plaintiffs

17  equate "recycle" and "destroy."  But, the word "destroy," or any iteration thereof,

18  was not explicitly used in the Alleged Contract, or even in the alleged negotiations

19  leading up to the execution of the Alleged Contract; at most, the term "recycle"

20  was used.

21       Thus, Phoenix Fibers did not have any obligation to destroy all items

22  donated by Plaintiffs, as no such term was ever used in alleged negotiations or

23  offers.  *Russell*, 7 Cal. App. 3d at 114 (contract terms must be expressly

24  communicated and accepted).  Because such a term did not exist in the Alleged

25  Contract, Phoenix Fibers' selling of items donated by Plaintiffs to U.S. General

26  could not have breached this term.  Plaintiffs will likely double down on their

27  contention that they believed "recycle" and "destroy" are synonymous in the

28  clothing and textile recycling industry, meaning that an agreement to recycle is an

1  agreement to destroy.  To the extent Plaintiffs believed the two terms are

2  synonymous, as discussed immediately below, the Alleged Contract is invalid and

3  void due to a lack of a meeting of the minds on a key term and mistake.

4        **3.**     **To the extent a contract exists, it is invalid and void**

5        Whether an agreement is "a *valid* enforceable contract is a matter of law,

6  and therefore it was proper for the court to determine this issue on summary

7  judgment." *Local Motion*, 105 F.3d at 1280.  Indeed, "[w]here a contract is so

8  uncertain and indefinite that the intention of the parties in material particulars

9  cannot be ascertained, the contract is void and unenforceable." *Ladas v. Cal. State*

10  *Auto. Assn.*, 19 Cal. App. 4th 761, 770 (1993).  Further, "[t]he presence of an

11  ambiguous material term may indicate that no meeting of the minds occurred when

12  the document was signed." *Id.*; Restatement (Second) of Contracts § 20 (1981)

13  ("There is no manifestation of mutual assent to an exchange if the parties attach

14  materially different meanings to their manifestations and . . . neither party knows

15  or has reason to know the meaning attached by the other . . . .")  Thus, where a

16  contract term is uncertain such that the intention of the parties cannot be

17  ascertained, or where the parties to a contract attach a different meaning to a

18  material term, then the contract is void and summary judgment is proper.  *See, e.g.,*

19  *Local Motion*, 105 F.3d at 1278.

20        For instance, in *Local Motion*, the Ninth Circuit affirmed a district court's

21  granting of summary judgment on the basis of mutual mistake. *Id.*  There, the

22  parties entered into a distribution agreement that included that following term: if

23  the buyer purchases a certain dollar value of merchandise, she "[would] be granted

24  the option to extend her distribution rights to three more years *at the same terms*."

25  *Id.* at 1279.  The district court found that the parties attached a different meaning to

26  the phrase "at the same terms." *Id.*  The buyer "understood the renewal

27  arrangement to apply indefinitely for as long as she satisfied the volume

28  requirements," while the seller "viewed the phrase as referring to a one-time only

13

DEFENDANT PHOENIX FIBERS, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT

three-year extension." *Id.*  The district court granted summary judgment for the
seller, as it "concluded that because both interpretations were reasonable, and
because neither party had reason to know the meaning the other side attached to
the phrase until after the document was executed, the contract was entered into on
the basis of mutual mistake." *Id.*  On appeal, the buyer argued "that evidence of
differing understandings created a triable issue of fact." *Id.* at 1280.  But, as the
Ninth Circuit pointed out "[t]he issue before the district court was not how an
existing agreement should be interpreted, but whether a material difference of
understanding had prevented the manifestation of mutual assent necessary to create
a contract at all." *Id.*  Therefore, if there are two reasonable interpretations to a
term of a contract, each held by a different party, then the contract is void for
mutual mistake and summary judgment is proper. *See id.*

Here, as established above, to the extent the Alleged Contract exists, it never
explicitly contained a destruction requirement.  (SUF 40-42).  Thus, at most, the
Alleged Contract required Phoenix Fibers to "recycle" the items that Plaintiffs
donated.

Plaintiffs assert that they believed the word "recycle" is synonymous with
the word "destroy."  (SUF 46).  As Plaintiffs' 30(b)(6) witness testified, "we
believed that during the recycling process, the items would naturally be destroyed."
(SUF 40-42,46; Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:20-28:4).

However, "recycle" is a term of art used in the clothing and textile recycling
industry.  (SUF 2-4).  It simply means "to reuse."  (SUF 2-4).  Indeed, national
stores selling second-hand clothes, like Buffalo Exchange, say that they are in the
business of recycling.  (SUF 3; App. Ex. K).  As one research article in the
Clothing & Textiles Research Journal found, forty-eight percent of the clothing
and textile *recycling market* is comprised of the *used clothing market*.  (SUF 3;
App. Ex. M).  Therefore, as the term is used in the clothing and textile recycling
industry, "recycle" can, and does, refer to selling used, second-hand, or second-

quality clothing or otherwise reselling clothing.  (SUF 2-4).  This broader meaning of the word "recycle" is the meaning that Phoenix Fibers does, and has always, attributed to it.  (SUF 2-5).

Phoenix Fibers asserts that recycling can include, but does not require, destruction.  Moreover, Phoenix Fibers believes that this Court should adopt Phoenix Fibers' interpretation of the word "recycle."  *See* Cal. Civ. Code § 1645 ("[t]echnical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense.")  If this Court adopts Phoenix Fibers' interpretation of the word "recycle," then, to the extent the Alleged Contract exists, Phoenix Fibers fulfilled its obligation to Plaintiffs by selling the donated items to U.S. General.

However, if this Court does not adopt Phoenix Fibers' interpretation of the word "recycle," this Court must recognize, at the very least, that "both interpretations [of 'recycle' are] reasonable."  *Local Motion*, 105 F.3d at 1279.  Indeed, Phoenix Fibers' interpreting the word "recycle" consistent with the industry standard, and the industry in which the purported Alleged Contract related, cannot be unreasonable.  And, if this Court finds that both Plaintiffs' and Phoenix Fibers' interpretation of the word "recycle" are reasonable, then, as in *Local Motion*, this Court should grant summary judgment for Phoenix Fibers on the breach of contract claim, as there was no meeting of the minds.

### 4.   To the extent the Alleged Contract exists, RCRV is not a party

"For a plaintiff to bring a breach of contract action against a defendant, the plaintiff and defendant must have a contractual relationship."  *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1240 (D. Nev. 2008).  Indeed, it is axiomatic that non-parties have no rights or duties under a contract.  *Herbal Care Sys., Inc. v. Plaza*, 2009 WL 692338, at *2 (D. Ariz. Mar. 17, 2009).

1   Here, Ms. Song was not an employee for RCRV.  (SUF 21.)  During all

2   communications she had with Phoenix Fibers, she never represented herself to be

3   an agent or an employee of RCRV.  (SUF 23.)  When she communicated with

4   Phoenix Fibers via e-mail, her signature block only ever said Sweet People.  (SUF

5   21-23.)  Moreover, Plaintiffs cannot prove that she ever represented to Phoenix

6   Fibers that she was negotiating the Alleged Contract on behalf of RCRV.  As such,

7   RCRV is not a party to the Alleged Contract, to the extent it exists, and cannot

8   enforce any rights under it.  Thus, Phoenix Fibers requests that this Court grant

9   summary judgment against RCRV.

10      **B.    Plaintiffs' second through sixth claims fail because there was no**

11           **likelihood of confusion and because the first sale doctrine applies**

12   In their Second through Sixth claims, Plaintiffs plead trademark

13   infringement (15 U.S.C § 1114), false designation of origin (15 U.S.C. § 1125(a)),

14   unfair competition (Bus. & Prof. Code § 17200), dilution (Bus. & Prof. Code §

15   14247), and common law trademark infringement and unfair competition.  (Dkt.

16   32).  As described in the subsections below, if Phoenix Fibers' use of Plaintiffs'

17   mark was not likely to cause confusion, then the trademark claims fail.  In that

18   way, California trademark is coterminous with the Lanham Act.  *Toho Co., v.*

19   *Sears, Roebuck & Co.*, 645 F.2d 788, 791 (9th Cir. 1981).  Moreover, the first sale

20   doctrine acts as a complete defense to all Plaintiffs' claims, with the exception of

21   their Fourth claim for statutory unfair competition.  *See Sebastian Int'l, Inc. v.*

22   *Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995); *Ty Inc. v. Perryman*,

23   306 F.3d 509, 513 (7th Cir. 2002).

24   As to Plaintiffs' fourth claim for violation of Section 17200 of the California

25   Business and Profession Code, Plaintiffs' unfair competition claims are tied to the

26   other causes of action asserted in their Complaint.  (Dkt. 32) ("Defendants'

27   aforesaid acts constitute unlawful, unfair, or fraudulent acts of unfair competition

28   in violation of California Business & Professions Code §§ 17200 et seq.").  As a

result, Plaintiffs' unfair competition claim rises and falls with the other claims. *See*
*Gutierrez v. Kaiser Found. Hosps., Inc.*, No. C 11-3428 CW, 2012 U.S. Dist.
LEXIS 155462, at *31 (N.D. Cal. Oct. 30, 2012) ("Because Defendants are entitled
to summary judgment on all of Plaintiff's other claims, they are also entitled to
summary judgment on Defendants' UCL claim."); *cf. In re Apple iPod iTunes*
*Antitrust Litig.*, 796 F. Supp. 2d 1137, 1147 (N.D. Cal. 2011) ("[I]f the same
conduct is alleged to be both an antitrust violation and an 'unfair' business act or
practice for the same reason, then the determination that the conduct is not an
unreasonable restraint of trade necessarily implies that the conduct is not 'unfair'
toward consumers.) (citations omitted) (internal quotations omitted). If this Court
finds that summary judgment is appropriate on the other claims, then summary
judgment is proper on Plaintiffs' unfair competition claim.

### 1. Phoenix Fibers cannot be held liable for trademark infringement because there was no likelihood of confusion

To prevail on a claim for trademark infringement, it is essential for a
plaintiff to prove that the defendant's use of a mark creates a likelihood of
confusion. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1199 (9th
Cir. 2012) ("*Rearden*"). Likelihood of confusion is not only a necessary element
in proving trademark infringement under the Lanham Act, it is also a requirement
in asserting a trademark infringement claim under California Common Law. *Wood*
*v. Apodaca*, 375 F. Supp. 2d 942, 947 (N.D. Cal. 2005); *see also Toho Co.*, 645
F.2d at 791 ("Without likelihood of confusion there is no infringement under the
California common law of trademarks.")

"The 'likelihood of confusion' inquiry generally considers whether a
reasonably prudent consumer in the marketplace is likely to be confused as to the
origin or source of the goods or services bearing one of the marks or names at issue
in the case." *Rearden*, 683 F.3d at 1209. And, "a plaintiff must show more than
simply a possibility of such confusion." *Id.* Indeed, the Ninth Circuit has

enumerated eight factors to consider in determining likelihood of confusion: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979).  However, these factors are "not a rote checklist" and should be weighted appropriately based on the facts of the case.  *Rearden*, 683 F.3d at 1209; *see also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010) ("This eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts."); *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) ("The factors should not be rigidly weighed; we do not count beans"); *Eclipse Assoc. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990) ("These tests were not meant to be requirements or hoops that a district court need jump through to make the determination.").

Despite the aforementioned test, courts have routinely held plaintiffs to a heightened standard in certain cases.  For example, "confusion is unlikely" when the alleged purchaser is sophisticated, where the goods are expensive, or where the goods are purchased after a lengthy sales cycle by a knowledgeable consumer. *Network Automation, Inc. v. Hewlett-Packard Co.*, No. CV 08-4675-JFW (RZx), 2009 U.S. Dist. LEXIS 125835, at *26 (C.D. Cal. Sep. 14, 2009) ("*Network Automation*"); *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989) (likelihood of confusion is unlikely where purchasers are highly specialized professionals).  In *Network Automation*, the Central District granted summary judgment for the defendant despite the fact that the plaintiff and defendant used identical marks for their computer software. *Id.*  In particular, the *Network Automation* Court concluded that "[g]iven the products' high price, the high degree

1    of sophistication of the customers, and the lengthy sales cycles, . . . consumers will

2    not be confused as to the source of the goods." *Id.* at *27.

3         The contextual nature of likelihood of confusion analysis is demonstrated in

4    *Motorola, Inc. v. Elec. Lab. Supply Co.*, Civil Action No. 88-2452, 1990 U.S. Dist.

5    LEXIS 8225 (E.D. Pa. July 3, 1990) ("*Motorola*").  There, Motorola, the plaintiff,

6    contracted with ELSCO to remove and destroy Motorola's defective

7    semiconductor devices. *Id.* at *2.  Instead of destroying Motorola's defective

8    semiconductors, ELSCO sold the semiconductors as scrap material, by the pound,

9    to one company in Hong Kong and another in New Jersey. *Id.* at *9-12.  Motorola

10   sued for trademark infringement and ELSCO moved for summary judgment on the

11   basis that there was no likelihood of confusion. *Id.* at *3-6.  In response to the

12   motion for summary judgment, Motorola presented a number of arguments in an

13   attempt to demonstrate likelihood of confusion, including (1) the semiconductors

14   shipped by ELSCO were in boxes "clearly labeled as Motorola parts" and (2) the

15   invoice for the semiconductors was for "TO-92 Mot. transistors." *Id.* *9-10.

16   Nonetheless, the Court granted summary judgment in favor of ELSCO. *Id.* at *11-

17   12.  The *Motorola* Court reasoned that "the fact that [the buyer] was purchasing

18   such *a large quantity by the pound instead* of by the item strongly suggests that

19   [the buyer] knew that he was purchasing Motorola scrap material as opposed to

20   first-rate material." *Id.* at *10 (emphasis added).  In short, there was no genuine

21   dispute of material fact that "the Motorola scrap material in the present case was

22   sold as scrap material and not first-rate Motorola semiconductor devices," meaning

23   that summary judgment was proper. *Id.* at *9.

24        *Motorola* is factually similar to this case.  Here, it is alleged that Phoenix

25   Fibers sold denim donated by Plaintiffs to U.S. General.  Importantly, U.S. General

26   is a clothing recycling company. (SUP 57.)  U.S. General's representative, Kamel

27   Mroueh, would call Steven Johnson, a Phoenix Fibers' employee, whenever U.S.

28   General wanted to purchase credential material from Phoenix Fibers. (SUP 60.)

1   Then, Mr. Mroueh would physically come to Phoenix Fibers' warehouse and

2   choose what credential he wanted to purchase from Phoenix Fibers.  (SUP 61).

3   The credential that Mr. Mroueh would purchase came in large "bins" or "boxes."

4   (SUP 61).  And, Mr. Mroueh would purchase the credential by the pound, and

5   would pay "a credential price."  (SUP 62).  Phoenix Fibers never charged a higher

6   price for Miss Me or Rock Revival denim; it was always sold at a standard

7   credential price.  (SUP 62).

8        Given the facts of this case, Phoenix Fibers' selling of the denim donated by

9   Plaintiffs to U.S. General did not cause U.S. General to be confused.  (SUP 63-64.)

10  First, U.S. General does not deal in first-rate clothing; it only deals in used and

11  second-hand clothing.  (SUP 57).  Thus, U.S. General was never under the

12  impression it was purchasing genuine, first-rate denim from Phoenix Fibers.

13  Second, U.S. General "was purchasing such a large quantity [of denim] by the

14  pound instead of by the item."  *Motorola* at *10; (SUP 61-62).  This "strongly

15  suggests" that U.S. General knew the items it was purchasing from Phoenix Fibers

16  were not first-rate material; in fact, no other inference is possible given these facts.

17  *Id.*  Moreover, U.S. General always paid a credential price, often between 30¢ and

18  60¢ per pound.  (SUP 61-62).  These factors strongly indicate that U.S. General

19  was never confused as to the source of the material it was buying.  In the words of

20  Sweet People's General Counsel and 30(b)(6) witness, Ms.  Kim, "everyone knew

21  what they were buying."  (SUP 63-64; Rule 30(b)(6) Depo. (Kim) (App. Ex. E)

22  199:2-12).  There was no confusion and therefore there is no trademark

23  infringement.  And, Plaintiffs have submitted no evidence of confusion or

24  likelihood of confusion created by Defendants.  Accordingly, like *Motorola*, this

25  Court should grant Phoenix Fibers' motion for summary judgment with respect to

26  Plaintiffs' trademark claims.

27

28

## 2.      Plaintiffs' claims are also barred by the first sale doctrine

In general, a trademark owner has exclusive control over the sale of products containing its trademark.  However, "[a] trademark owner's right under the Lanham Act to control distribution of its own products is limited by the 'first sale' doctrine." *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998) ("*Costco*"); *see also Sebastian Int'l, Inc.*, 53 F.3d at1074 (9th Cir. 1995).  This doctrine is also applied to antidilution statutes (*see, e.g., Ty Inc. v. Perryman*, 306 F.3d 509, 513 (7th Cir. 2002)) and, therefore applies to Plaintiffs' claim under Business & Professions Code Section 14247.  Under the First Sale Doctrine doctrine, resale of the "original article under the producer's trademark is generally neither trademark infringement nor unfair competition." *Id.*  The reasoning behind the first sale doctrine is clear: a consumer is not confused or deceived about the origin of a product if the product originated with the owner of the mark. *Id.*  For this reason, "[a]pplication of the 'first sale' doctrine has generally focused on the likelihood of confusion among consumers." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 603 F.3d 1133, 1136 (9th Cir. 2010).  Therefore, a rightful owner of goods bearing another's trademark can resell those goods without fear of committing trademark infringement. *Sebastian Int'l, Inc.*, 53 F.3d at 1074.

One exception to the first sale doctrine that Plaintiffs are likely to raise is the "quality control exception." *Costco*, 146 F.3d at 1087.  Under the quality control theory, the first sale doctrine does not apply where the product being distributed does not meet the trademark holder's quality control standards. *Id.*; *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996).  However, as with many exceptions, there is an exception to the quality control exception. *Id.*  This was explained in *Costco*.  There, Costco began selling porcelain figurines bearing a trademark owned by the plaintiff, Enesco. *Id.* at 1084.  However, instead of selling the figurines in their original packaging, Costco repackaged them in a material that "allegedly [did] not provide adequate protection from damage." *Id.* at

1085. The *Costco* Court found that "[i]f the public were adequately informed that []Costco repackaged the figurines and the figurines were subsequently chipped, *the public would not likely be confused as to the cause of the chipping*." *Id.* at 1087. Thus, so long as the public is not deceived into believing that a trademark holder caused damage to the goods or approved of the damaged goods, the quality control exception does not apply. *Id.*

Here, Phoenix Fibers is protected by the first sale doctrine. As a preliminary matter, the crux of Plaintiffs' Complaint is that Phoenix Fibers sold units of denim and apparel bearing Plaintiffs' Miss Me and Rock Revival trademarks that Plaintiffs had donated to Phoenix Fibers. (SUP 53-54; Dkt. 32). Therefore, the first sale doctrine applies because *the origin of the goods sold by Phoenix Fibers was Plaintiffs*. Of course, Plaintiffs are going to argue that the quality control exception applies. Not so. As explained above, there is no risk of confusion because, just as in *Costco*, the buyer (U.S. General) knew that the product it was purchasing was not first-rate Miss Me and Rock Revival jeans. (SUF 55.) And, because the application of the first sale doctrine focuses on likelihood of confusion, a lack of confusion is indicative of the fact that Phoenix Fibers is protected by the first sale doctrine. *Au-Tomotive Gold, Inc.*, 603 F.3d at 1136. Moreover, defective or damaged Miss Me and Rock Revival jeans are marked as such. (SUP 55.) Thus, to the extent U.S. General was purchasing jeans marked as defective, the quality control exception of the first sale doctrine does not apply because U.S. General was aware it was purchasing jeans that did not pass Plaintiffs' quality control measures. On the other hand, jeans that did not contain the "Defective" stamp presumably passed any quality control measures Plaintiffs had put into place. For such products, the first sale doctrine certainly applies as they are genuine goods originating from Plaintiffs. *Sebastian Int'l, Inc.*, 53 F.3d at 1074. For these reasons, the first sale doctrine shields Phoenix Fibers from liability for trademark infringement, and summary judgment is proper.

**C.      Phoenix Fibers cannot be held jointly and severally liable for the disgorgement of other defendants' profits**

Plaintiffs have asserted that they intend to seek to hold Phoenix Fibers jointly and severally liable for the profits of other defendants.   But the law on disgorgement of profits is clear that joint and several liability is only appropriate when individuals have a very close relationship such as co-partners.  *See Sammons v. Colonial Press, Inc.*, 126 F.2d 341, 346 (1st Cir. 1942) ("co-infringers, unless they are partners, are severally accountable only for the profits each has received"); *MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2d Cir. 1981) ("Insofar as there is liability for illegal profit, the liability is several; one defendant is not liable for the profit made by another"); *KTS Karaoke, Inc. v. Sony/ATV Music Publ'g LLC*, No. CV-12-00014-MWF (JEMx), 2014 U.S. Dist. LEXIS 190492, at \*15 (C.D. Cal. Jan. 14, 2014); *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1117 (9th Cir. 2006); *SEC v. Wilde*, 2012 U.S. Dist. LEXIS 183252, \*12 (C.D. Cal. Dec. 17, 2012). Plaintiffs cannot prove, nor have they even alleged, that Phoenix Fibers conspired with other defendants and certainly not to such an extent as to be co-partners with them.  (SUP 70.)  As a result, Phoenix Fibers is not jointly and severally liable for disgorgement of other defendants' profits; only its own, subject to proof of liability and willfulness which Plaintiffs cannot prove.

**D.      Punitive damages are improper**

Plaintiffs' Complaint requests "punitive damages as provided under the common law of the State of California."  (Dkt 32.)  The claim for punitive damages only appears in Plaintiffs' sixth cause of action for common law trademark infringement and unfair competition.  (Dkt 32.)  "Although under some circumstances, punitive damages may be recoverable under a California common law claim, in California common law unfair competition claims are limited to cases in which a party passes off their goods as another."  *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1083 (N.D. Cal. 2012).  Phoenix Fibers did not pass off

1 any of its own goods as being those of Plaintiffs.  In fact, Phoenix Fibers does not

2 even have any of its own goods to pass off.  (SUP 5.)

3 　　　　To the extent Phoenix Fibers did infringe Plaintiffs trademarks, Plaintiffs

4 cannot prove that such infringement was willful, a necessary element for punitive

5 damages.  *See Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Circ.

6 1993); *Binder v. Disability Grp., Inc.*, 772 F.Supp. 2d. 1172, 1183 (C.D. Cal.

7 2011).  At worst, Phoenix Fibers acted in good faith and under the mistaken belief

8 that "recycle" included reselling. Thus, Plaintiffs have no claim to punitive

9 damages and their request for such damages fails as a matter of law.

10 **V.　CONCLUSION**

11 　　　　For the foregoing reasons, Phoenix Fibers respectfully requests that the

12 Court grant this Motion for Summary Judgment or, in the alternative, Partial

13 Summary Judgment.

14

15 DATED:  December 30, 2016　　　　HAYNES AND BOONE, LLP

16

17 　　　　　　　　　　By:  */s/ Kenneth G. Parker*
　　　　　　　　　　　　Kenneth G. Parker

18 　　　　　　　　　　　　Attorneys for Defendant
　　　　　　　　　　　　Phoenix Fibers, Inc.

19

20

21

22

23

24

25

26

27

28

DEFENDANT PHOENIX FIBERS, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT

1

## CERTIFICATE OF SERVICE

2

3

4

       I, the undersigned, declare that I am over the age of 18 years and not a party to the within action. I am employed in the County of Orange, State of California, within which county the subject service occurred.  My business address is 600 Anton Boulevard, Suite 700, Costa Mesa, California 92626.

5

6

7

8

       On December 30, 2016, I served the following document described as: **DEFENDANT PHOENIX FIBERS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT THEREOF** on the interested parties in this action in the manner identified below:

9

10

11

12

13

14

       **[XXX]**     **BY ELECTRONIC FILING.** I caused such document(s) to be electronically filed and served through the United States District Court's CM/ECF System for the within action. This service complies with the Federal Rules of Civil Procedure. The file transmission was reported as complete and a copy of the Court's Notice of Electronic Filing will be maintained with the original document(s) in our office.  Participants in the case who are registered CM/ECF users will be served by the District CM/ECF System.

15

16

       I declare that I am employed in the offices of a member of the bar of this Court at whose direction this service was made, and that this service complies with the Federal Rules of Civil Procedure.

17

18

       Executed on December 30, 2016, at Costa Mesa, California.

19

20

         /s/ Breean Cordova
         Breean Cordova

21

22

23

24

25

26

27

28