# Exhibit D

```
 1                    UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3

 4    SWEET PEOPLE APPAREL, INC.        )
      d/b/a MISS ME, a California       )
 5    corporation, et al.,             )
                                        )
 6                    Plaintiffs,       )
                                        ) Case No.
 7          vs.                         ) 2:16-cv-00940-TJH-JC
                                        )
 8    PHOENIX FIBERS, INC., an          )
      Arizona corporation, et al.,     )
 9                                      )
                      Defendants.       )
10    _____)

11

12

13

14

15                        DEPOSITION OF

16                         LILLY KIM

17                  COSTA MESA, CALIFORNIA

18                    OCTOBER 12, 2016

19

20

21

22

23
      Reported by:
24    LORI S. TURNER
      CSR 9102
25    No. 16-45825
```

```
1    APPEARANCES OF COUNSEL:

2
     For Plaintiffs:
3

4           ARNOLD & PORTER LLP
            BY MATTHEW T. SALZMANN
5           399 Park Avenue
            New York, New York 10022
6           212.715.1012
            matthew.salzmann@aporter.com
7

8    For Defendant PHOENIX FIBERS, INC.:

9
            HAYNES AND BOONE, LLP
10          BY KENNETH G. PARKER and MARTIN M. ELLISON
            600 Anton Boulevard, Suite 700
11          Costa Mesa, California 92626
            949.202.3000
12          kenneth.parker@haynesboone.com
            martin.ellison@haynesboone.com
13

14   Also Present:   CHRISTIAN RESENDIZ, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit D
78

| | | |
|---|---|---|
| 09:35 | 1 | Q. And was that contract entered into between |
| | 2 | Phoenix Fibers and Sweet People? |
| | 3 | A. Yes. |
| | 4 | Q. Was there also a contract between Phoenix |
| 09:35 | 5 | Fibers and Rock Revival? |
| | 6 | A. Yes. |
| | 7 | Q. Who entered into that contract, or those |
| | 8 | contracts, on behalf of Sweet People and Rock Revival? |
| | 9 | A. Was Lisa Song, under my direction. |
| 09:36 | 10 | MR. PARKER: This will be 26. |
| | 11 | (Exhibit 26 was marked for identification by |
| | 12 | the reporter.) |
| | 13 | Q. Can you take a look at Exhibit 26 and tell me |
| | 14 | whether you recognize it or not. |
| 09:36 | 15 | A. Yes. |
| | 16 | Q. What is Exhibit 26? |
| | 17 | A. The first amended complaint. |
| | 18 | Q. Is that the active complaint in this action? |
| | 19 | A. I believe so. |
| 09:36 | 20 | Q. Did you review the first amended complaint that |
| | 21 | is Exhibit 26 before your attorneys signed and filed it? |
| | 22 | A. I think so. |
| | 23 | Q. Can you take a look at Paragraph 56 of the |
| | 24 | first amended complaint on page 14. |
| 09:37 | 25 | A. Yes. |

Exhibit D

```
09:40      1    again, we don't know when the shipping window will open,
           2    and we don't know what the pricing will be at any given
           3    time.
           4         Q.  Do you have any personal knowledge of the terms
09:41      5    of the offer that led to what you've referred to as the
           6    overall contract?
           7         A.  I've read the e-mails, and I had discussions
           8    with Lisa.
           9         Q.  What discussions?  And when did you have
09:41     10    discussions with Lisa?
          11         A.  2011.
          12         Q.  Can you please tell me what Lisa -- And when
          13    you say "Lisa," you mean Lisa Song?
          14         A.  Yes.
09:41     15         Q.  Please tell me what Lisa Song told you in those
          16    conversations in 2011?
          17         A.  We had discussions.  We were looking for a
          18    company that recycled denim so that we could recycle our
          19    products, rather than sending them to the landfill.  So
09:42     20    we discussed, you know, that Phoenix Fibers was a
          21    recycling company that was going to do this.
          22              We discussed how, you know, pricing would work.
          23              And we discussed, you know, basically a little
          24    bit of timing of the first shipment.
09:42     25         Q.  And did you discuss anything else with Lisa
```

| | | |
|---|---|---|
| 09:43 | 1 | Q.   To your knowledge, did anyone have any |
| | 2 | discussions, verbal discussions, with anyone from |
| | 3 | Phoenix Fibers on behalf of Rock Revival or Sweet People |
| | 4 | in 2011 other than Ms. Song? |
| 09:44 | 5 | A.   I don't recall.  It may be possibly the |
| | 6 | shipping people. |
| | 7 | Q.   And who are the shipping -- Who were the |
| | 8 | shipping people at that time? |
| | 9 | A.   I think, at that time, Steve Kim may have been |
| 09:44 | 10 | a little bit involved as our COO, but I don't know if he |
| | 11 | had any direct correspondence with Phoenix Fibers. |
| | 12 | And then Samuel Kae, I believe, was the |
| | 13 | shipping -- person conducting the shipping on our |
| | 14 | behalf. |
| 09:44 | 15 | Q.   And is that K-a-e? |
| | 16 | A.   Yes. |
| | 17 | Q.   And is Mr. Kim still with one or both of the |
| | 18 | companies? |
| | 19 | A.   No. |
| 09:45 | 20 | Q.   And what about Mr. Kae?  Is he -- |
| | 21 | A.   No. |
| | 22 | Q.   Do you know where Mr. Steve Kim is today? |
| | 23 | A.   Not exactly.  I mean, I know he lives in |
| | 24 | Fullerton. |
| 09:45 | 25 | Q.   Do you know where he went to work after |

Exhibit D

09:45   1    leaving -- Well, which entity or entities did he work

2    for?

3          A.  He worked for both.

4          Q.  And do you know where he went to work after he

09:45   5    left Sweet People and Rock Revival?

6          A.  I don't believe he works.

7          Q.  Did he retire?

8          A.  I think he was going to do his own business

9    venture, but I don't know what the status is or

09:45   10   anything.

11         Q.  Did he resign from the Rock Revival and Sweet

12   People entities, or was he terminated?

13         A.  He resigned.

14         Q.  What about Mr. Kae?  Do you know where he went

09:45   15   to work after he left the entities?

16         A.  No, I don't.

17         Q.  Do you have any idea where he's geographically

18   located today?

19         A.  No, I don't.

09:46   20         Q.  Do you know whether HR kept a forwarding

21   address for him when he left?

22         A.  Probably.

23         Q.  What -- We were talking about Topics 24, 25 and

24   26 of the deposition notice, Exhibits 24 and 25.

09:46   25         What did you do to prepare for this deposition

THE SULLIVAN GROUP OF COURT REPORTERS                21

Exhibit D
82

| 09:51 | 1 | Q. Why is it that you believe that those contracts |
|---|---|---|
| | 2 | were breached? |
| | 3 | A. So we had an overall arrangement, as we |
| | 4 | discussed, for them to recycle the products. |
| 09:52 | 5 | When we recover goods, some of the goods went |
| | 6 | back to 2012. |
| | 7 | Q. And what contracts do you believe Phoenix |
| | 8 | Fibers breached between Phoenix Fibers and Rock Revival? |
| | 9 | A. The same. |
| 09:52 | 10 | Q. So same years? |
| | 11 | A. Yes. |
| | 12 | Q. To your knowledge and based on your |
| | 13 | investigation, has anyone employed by Sweet People |
| | 14 | discussed with anyone at Phoenix Fibers the contractual |
| 09:52 | 15 | term requiring that the donated products that Phoenix |
| | 16 | Fibers donated -- excuse me -- that Sweet People donated |
| | 17 | be destroyed? |
| | 18 | A. Sorry. Could you repeat that. |
| | 19 | Q. Sure. |
| 09:53 | 20 | To your knowledge and based on your |
| | 21 | investigation -- |
| | 22 | A. Uh-huh. |
| | 23 | Q. -- has anyone employed by Sweet People |
| | 24 | discussed with anyone at Phoenix Fibers the contractual |
| 09:53 | 25 | term requiring that the donated products that Sweet |

```
09:53    1    People donated be destroyed?
         2         A.  I believe we thought they would be destroyed
         3    and recycled.
         4         Q.  Okay.  And I understand what your -- what you
09:53    5    thought.
         6              But the question is, to your knowledge and
         7    based on your investigation, has anyone employed by
         8    Sweet People discussed with anyone at Phoenix Fibers the
         9    contractual term requiring that the donated products
09:53   10    that Sweet People donated be destroyed?
        11         A.  I believe there's e-mail correspondence to that
        12    effect.
        13         Q.  What about verbal discussions?  Do you know of
        14    any verbal discussions?
09:53   15         A.  I don't know if the word "destroyed" was used
        16    in the verbal discussions.
        17         Q.  And with that testimony, would the answer to
        18    the previous two questions be the same for Rock Revival?
        19         A.  That's correct.
09:54   20         Q.  To your knowledge and based on your
        21    investigation, did Rock Revival or Sweet People
        22    explicitly place a restriction on the items that they
        23    donated to Phoenix Fibers requiring that those items be
        24    destroyed?
09:54   25         A.  Yes.  We did require that the items be
```

THE SULLIVAN GROUP OF COURT REPORTERS                    27

**Exhibit D**
84

| | | |
|---|---|---|
| 09:54 | 1 | destroyed and recycled. |
| | 2 | I think we believed that during the recycling |
| | 3 | process, the items would naturally be destroyed as they |
| | 4 | were made into shoddy fiber.  So that's why it's a |
| 09:55 | 5 | little confusing.  We just focus on "destroyed." |
| | 6 | Q.  And -- |
| | 7 | THE REPORTER:  I'm sorry? |
| | 8 | THE WITNESS:  Oh, sorry. |
| | 9 | But that's why it's a little bit confusing when |
| 09:55 | 10 | he focuses on the word "destroyed." |
| | 11 | MR. PARKER: |
| | 12 | Q.  And I understand that -- I understand your |
| | 13 | testimony about what the understanding was on your side. |
| | 14 | The question is, did anyone at Sweet People or |
| 09:55 | 15 | Rock Revival place a requirement on the donated items or |
| | 16 | express a requirement based on the donated items to |
| | 17 | Phoenix Fibers that the donated items be destroyed? |
| | 18 | A.  Yes. |
| | 19 | Q.  And when do you think that was done? |
| 09:55 | 20 | A.  2011. |
| | 21 | Q.  And how do you think that was done? |
| | 22 | A.  Verbally. |
| | 23 | And I guess in e-mail correspondence. |
| | 24 | Q.  Both? |
| 09:55 | 25 | A.  I believe so. |

**Exhibit D**
85

| | | |
|---|---|---|
| 09:55 | 1 | Q.   What's the basis for your understanding that it |
| | 2 | was done verbally? |
| | 3 | A.   After my discussions with Lisa following her |
| | 4 | discussions with Matt Graham. |
| 09:56 | 5 | Q.   And those are the discussions that you |
| | 6 | testified about earlier? |
| | 7 | A.   Correct. |
| | 8 | Q.   And did you describe those conversations as |
| | 9 | best you could earlier this morning? |
| 09:56 | 10 | A.   I think generally, yeah. |
| | 11 | Q.   Do you have anything to add to the content of |
| | 12 | those communications other than what you testified to |
| | 13 | earlier? |
| | 14 | A.   Not that I remember. |
| 09:56 | 15 | Q.   Do you have any reason to believe that Steve |
| | 16 | Johnson knew about what you've expressed this morning, |
| | 17 | that is, your employers' understanding that the donated |
| | 18 | materials would be destroyed? |
| | 19 | A.   I don't know. |
| 09:57 | 20 | Q.   Why is it that Sweet People and Rock Revival |
| | 21 | wanted the donated products destroyed? |
| | 22 | A.   Most of the goods are unfinished goods or |
| | 23 | damaged goods, goods that we don't want into the |
| | 24 | mainstream market because they're not as a good a |
| 09:57 | 25 | quality as our first-run goods.   So therefore we wanted |

THE SULLIVAN GROUP OF COURT REPORTERS                29

**Exhibit D**
86

| | | |
|---|---|---|
| 09:57 | 1 | to find a way to environmentally, soundly destroy the |
| | 2 | items, which is why we came up with the destruction and |
| | 3 | recycling.  We thought it was a much more environmental |
| | 4 | friendly way to dispose of the products. |
| 09:57 | 5 | We were part of a organization called One |
| | 6 | Percent for the Planet.  I don't know if you know this, |
| | 7 | but denim is highly pollutive, so it -- |
| | 8 | Q.  I did not know that. |
| | 9 | A.  Well, it's like the washing and the blasting, |
| 09:57 | 10 | and so it's actually very highly pollutive. |
| | 11 | So one of the ways we wanted to give back, sort |
| | 12 | of make up for the pollution was we joined One Percent |
| | 13 | for the Planet, which means 1 percent of our gross |
| | 14 | proceeds at the time went to environmental |
| 09:58 | 15 | organizations.  So along with that program that we put |
| | 16 | in place, our directive was to find a much more |
| | 17 | environmentally friendly way to dispose of the products. |
| | 18 | Q.  Prior to shipping materials to Phoenix Fibers, |
| | 19 | what -- what were Rock Revival and Sweet People doing to |
| 09:58 | 20 | get rid of their unwanted products? |
| | 21 | A.  So one of two things could happen when they |
| | 22 | could be destroyed, in Asia, at the factories, or if |
| | 23 | they were here in the U.S., then we would cut up the |
| | 24 | product, and then they would be sent to landfill |
| 09:59 | 25 | essentially. |

**Exhibit D**
**87**

09:59   1      Q.  And when it was sent a landfill, was there a

2  cost associated with that beyond the shipping cost to

3  the landfill?

4      A.  I don't think so.

09:59   5      Q.  You don't recall whether Sweet People and Rock

6  Revival had to pay a fee at the landfill for disposal?

7      A.  I don't recall.

8      Q.  If such a fee were paid, would it be reflected

9  in the financial books and records of the company?

09:59  10      A.  Maybe.  It might be kind of blended in there.

11      Q.  Do you know what the shipping costs were

12  approximately for shipping things to a landfill in the

13  United States or the landfill the entities were using?

14      A.  No.

09:59  15      Q.  Is it correct that by shipping the unwanted

16  products to Phoenix Fibers, that Sweet People and Rock

17  Revival were saving money by avoiding disposal fees?

18      A.  I don't know 'cause I don't know what the

19  original disposal fees were.

10:00  20      Q.  Was that anything that you recall anyone

21  discussing in 2011, 2012?

22      A.  No.  It really was part of the environmental

23  friendly directive that the company was heading in.

24      Q.  When did you start working for Sweet People and

10:00  25  Rock Revival?

| | | |
|---|---|---|
| 10:00 | 1 | A.   April 2010. |
| | 2 | Q.   And do you work for both entities? |
| | 3 | A.   I do. |
| | 4 | Q.   And were you the first lawyer employed there? |
| 10:00 | 5 | A.   Yes. |
| | 6 | Q.   What was your title? |
| | 7 | A.   General counsel. |
| | 8 | Q.   The -- did Phoenix -- Excuse me. |
| | 9 | Did Sweet People and Rock Revival have any |
| 10:00 | 10 | contracts of any kind in place when you arrived to work |
| | 11 | there? |
| | 12 | A.   Yes. |
| | 13 | Q.   Did you sign a contract to work there? |
| | 14 | A.   No.  It's an at-will employment. |
| 10:01 | 15 | Q.   Did you do anything, once you arrived -- Strike |
| | 16 | that. |
| | 17 | Did you do anything, once you arrived as a |
| | 18 | general counsel at Sweet People and Rock Revival, to |
| | 19 | assess and organize the state of the contracts that they |
| 10:01 | 20 | already had? |
| | 21 | A.   I don't know if I purposely went around and |
| | 22 | redid contracts.  I think it was just as new contracts |
| | 23 | came up -- |
| | 24 | Q.   Do you think revised -- I apologize. |
| 10:01 | 25 | Do you have a contracts database at the |

THE SULLIVAN GROUP OF COURT REPORTERS                    32

10:01    1   entities?

         2       A.   I would be the contracts database.

         3       Q.   And what do you do to keep track of contracts,

         4   then?

10:01    5       A.   They're basically all in my hard drive.

         6       Q.   And how do you organize them on your hard

         7   drive?

         8       A.   They're separated by company and then just by

         9   topic or name of contract.

10:02   10       Q.   Okay.  And so I assume that the companies

        11   have -- have vendors that make the product?

        12       A.   Yes.

        13       Q.   And so there's a folder with the name or names

        14   of those entities?

10:02   15       A.   If they have a contract, then it would be like,

        16   yeah, Sweet People manufacturing agreement with so and

        17   so.

        18       Q.   Okay.  And on your hard drive, is there a

        19   folder for Phoenix Fibers?

10:02   20       A.   I don't think so.

        21       Q.   Why not?

        22       A.   I didn't have anything to go in there.  There

        23   might be an e-mail folder, but not a contracts folder.

        24       Q.   Do you recall having in your mind the

10:02   25   understanding in 2011 that there was a contract between

Exhibit D
90

| | | |
|---|---|---|
| 10:02 | 1 | Phoenix Fibers on the one hand and Sweet People and Rock |
| | 2 | Revival on the other? |
| | 3 |     A.  Yes. |
| | 4 |     Q.  Why is it that you did not draft a contract for |
| 10:03 | 5 | mutual signature between the parties to reflect the |
| | 6 | terms of the contract that you understood existed? |
| | 7 |     A.  We asked Phoenix Fibers if there's any |
| | 8 | paperwork or documents that need to be executed.  They |
| | 9 | said, "No." |
| 10:03 | 10 |     Given that the items were made for destruction |
| | 11 | and recycling, we didn't really feel a necessity to |
| | 12 | write a formal agreement, written agreement. |
| | 13 |     Q.  Do you have any understanding one way or the |
| | 14 | other as to whether Rock Revival and Sweet People |
| 10:03 | 15 | required, as a term of the contract that you've |
| | 16 | testified existed, a certification requirement that the |
| | 17 | products were recycled? |
| | 18 |     A.  We didn't need it for any third party.  It |
| | 19 | wasn't like for litigation or anything. |
| 10:04 | 20 |     We didn't request -- or require any |
| | 21 | certification of destruction. |
| | 22 |     Q.  When your -- Since you've been at the company, |
| | 23 | when your Asian vendors destroy unwanted product -- |
| | 24 |     A.  Uh-huh. |
| 10:04 | 25 |     Q.  -- how do you ensure that that product has been |

THE SULLIVAN GROUP OF COURT REPORTERS 34

**Exhibit D**
91

| | | |
|---|---|---|
| 10:06 | 1 | A.   It's really like low income areas in Chicago |
| | 2 | metro or Detroit metro area. |
| | 3 | Q.   What kind of volumes? |
| | 4 | A.   It's not a large volume, but we're having some |
| 10:06 | 5 | complaints from the competing accounts. |
| | 6 | Q.   Returning to 2011 and 2012, despite the -- I |
| | 7 | understand that Mr. Graham said that they didn't need a |
| | 8 | contract. |
| | 9 | Why was it that you believe you did -- Or |
| 10:07 | 10 | strike that. |
| | 11 | You've testified a contract existed. |
| | 12 | Mr. Graham said that he didn't need anything further in |
| | 13 | writing. |
| | 14 | Why is it, in your opinion, that your clients, |
| 10:07 | 15 | Phoenix Fibers and Rock Revival, didn't need anything |
| | 16 | further in writing? |
| | 17 | MR. SALZMANN:   Objection. |
| | 18 | THE WITNESS:   You mean Sweet People? |
| | 19 | MR. PARKER: |
| 10:07 | 20 | Q.   Sweet People.   Strike that.   So let me ask the |
| | 21 | question again. |
| | 22 | Understanding that Mr. Graham on his end didn't |
| | 23 | need anything further, why is it -- why was it, in your |
| | 24 | opinion, that Sweet People and Rock Revival didn't need |
| 10:07 | 25 | anything further in writing? |

THE SULLIVAN GROUP OF COURT REPORTERS                    37

**Exhibit D**
92

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
| 10:07   | 1  | A.  I think it was a couple of reasons.                      |
|         | 2  | One was it was sort of my understanding, having              |
|         | 3  | talked to multiple, you know, recycling companies, that      |
|         | 4  | most did not have a written agreement.                       |
| 10:08   | 5  | Secondly, because it was just for recycling and              |
|         | 6  | destruction, we really didn't feel like it was necessary     |
|         | 7  | to have a formal written agreement.  The terms were          |
|         | 8  | relatively simple, and they really weren't for, you          |
|         | 9  | know, manufacturing or resale or anything like that.  So     |
| 10:08   | 10 | it was really just recycling.                                |
|         | 11 | Q.  What other recycling companies were you aware            |
|         | 12 | of at the time that provided -- that you understood          |
|         | 13 | provided these types of services?                            |
|         | 14 | A.  I don't recall.  But we had another recycler             |
| 10:08   | 15 | for other, you know, like canned goods and stuff like        |
|         | 16 | that.                                                        |
|         | 17 | Q.  Another recycler for canned goods, but not for           |
|         | 18 | any of the fashion items that the company --                 |
|         | 19 | A.  Correct.                                                 |
| 10:08   | 20 | Q.  -- sold.                                                 |
|         | 21 | What was your understanding of what that other               |
|         | 22 | recycler would do with those canned goods?                   |
|         | 23 | A.  They would just recycle the products into -- I           |
|         | 24 | don't know, whatever it is that aluminum and bottles and     |
| 10:09   | 25 | such get recycled into.                                      |

**Exhibit D**
93

| | | |
|---|---|---|
| 10:09 | 1 | Q.  So you're referring to like empty cans?  Empty |
| | 2 | bottles? |
| | 3 | A.  Empty cans, bottles, all that kind of thing. |
| | 4 | Just waste.  Paper goods. |
| 10:09 | 5 | Q.  Do you have an understanding of the difference |
| | 6 | between the term "recycling" and "destroying"? |
| | 7 | MR. SALZMANN:  Objection.  Form. |
| | 8 | THE WITNESS:  I understood -- I still understand, I |
| | 9 | guess -- that the process was that in the process of |
| 10:09 | 10 | recycling, the goods would be destroyed because they |
| | 11 | would be pulled apart and made into -- at the time, we |
| | 12 | believed it was going to be shoddy fiber. |
| | 13 | MR. PARKER: |
| | 14 | Q.  And how did you have that understanding? |
| 10:09 | 15 | A.  That is what Matt Graham told us. |
| | 16 | Q.  And to be specific, he didn't tell you that; |
| | 17 | right? |
| | 18 | A.  Correct. |
| | 19 | Q.  He told Ms. Song that? |
| 10:10 | 20 | A.  Correct. |
| | 21 | Q.  And how do you know he told Ms. Song that? |
| | 22 | A.  She told me, and there were e-mails. |
| | 23 | Q.  Any other ways? |
| | 24 | A.  I don't think so. |
| 10:10 | 25 | Q.  I want to understand some terms of what you |

THE SULLIVAN GROUP OF COURT REPORTERS                    39

**Exhibit D**
94

| | | |
|---|---|---|
| 10:11 | 1 | Strike that. |
| | 2 | Did you understand that Phoenix Fibers was the |
| | 3 | one carrying out this contract? |
| | 4 | A.   I didn't really understand the relationship |
| 10:11 | 5 | between Phoenix Fibers and Bonded Logic, so I didn't |
| | 6 | really understand which was doing which part exactly. |
| | 7 | I understood them to be affiliated companies |
| | 8 | working together. |
| | 9 | Q.   Do you think Rock Revival and Sweet People are |
| 10:11 | 10 | affiliated? |
| | 11 | A.   Yes. |
| | 12 | Q.   How are they affiliated? |
| | 13 | A.   They have overlapping shareholders and |
| | 14 | directors and officers. |
| 10:12 | 15 | Q.   Any other ways? |
| | 16 | A.   Primarily that's -- I think that's the primary |
| | 17 | way they're affiliated. |
| | 18 | Q.   When Ms. Song was having discussions with |
| | 19 | Mr. Graham and then carrying out the shipping of the |
| 10:12 | 20 | products to Phoenix Fibers, was she an employee of Rock |
| | 21 | Revival, Sweet People or both? |
| | 22 | A.   Both. |
| | 23 | Q.   And was she paid by both? |
| | 24 | A.   What happens is her paycheck comes from Sweet |
| 10:12 | 25 | People Apparel, but her time is allocated between the |

**Exhibit D**
95

| 10:12 | 1 | two companies.  Well, actually, all the affiliates. |
|---|---|---|
| | 2 | Q.  Is Ms. Song related to anybody that has an |
| | 3 | ownership interest in either Sweet People or Rock |
| | 4 | Revival? |
| 10:12 | 5 | A.  No. |
| | 6 | Q.  Is she related to anybody that works for the |
| | 7 | company? |
| | 8 | A.  Not anymore. |
| | 9 | Q.  Was she at one time related to someone -- |
| 10:13 | 10 | Strike that.  Better way. |
| | 11 | Was she -- Is she related to someone who once |
| | 12 | worked at the company? |
| | 13 | A.  Yes. |
| | 14 | Q.  And who was that person who once worked at the |
| 10:13 | 15 | company? |
| | 16 | A.  I think his name is Brian Ahn. |
| | 17 | Q.  And what's her relationship to Mr. Ahn? |
| | 18 | A.  I think they're cousins. |
| | 19 | Q.  Have you been deposed before? |
| 10:13 | 20 | A.  Yes. |
| | 21 | Q.  How many times have you been deposed? |
| | 22 | A.  I'm not sure. |
| | 23 | Q.  Are you able to approximate? |
| | 24 | A.  Less than five. |
| 10:13 | 25 | Q.  And do you recall what kinds of -- were you a |

**Exhibit D**
96

| | | |
|---|---|---|
| 10:13 | 1 | party -- Have you ever been a party to a litigation? |
| | 2 | A.   No.   I don't think so. |
| | 3 | Q.   What kind of cases did you testify in? |
| | 4 | A.   Copyright cases primarily, copyright trademark. |
| 10:14 | 5 | Q.   And were those cases involving Sweet People and |
| | 6 | Rock Revival -- and/or Rock Revival? |
| | 7 | A.   Yes. |
| | 8 | Q.   When was the last time you were deposed? |
| | 9 | A.   Maybe 2014. |
| 10:14 | 10 | Q.   And do you recall what law firm represented |
| | 11 | Sweet People and Rock Revival in that most recent |
| | 12 | litigation in 2014? |
| | 13 | A.   It probably would have been Arnold & Porter. |
| | 14 | Q.   So we've taken a look at Exhibits 24 and 25, |
| 10:14 | 15 | which are the Rule 30(b)(6) notices for Sweet People and |
| | 16 | Rock Revival. |
| | 17 | Which -- And the corporate name for Rock |
| | 18 | Revival is RCRV, comma, Inc.; is that right? |
| | 19 | A.   Yes. |
| 10:15 | 20 | Q.   So when I say "Rock Revival," you'll know we'll |
| | 21 | be talking and have been talking about RCRV, Inc.? |
| | 22 | A.   Yes. |
| | 23 | Q.   What did you do to prepare for this 30(b)(6) |
| | 24 | deposition? |
| 10:15 | 25 | A.   I reviewed e-mails, correspondence, documents |

THE SULLIVAN GROUP OF COURT REPORTERS                    43

```
10:28   1    did not involve a signed agreement between the parties?

        2         A.  Not a merger.

        3         Q.  Have you done an acquisition that involved a

        4    contract that was not signed by both parties?

10:28   5         A.  I don't know.  I don't -- It's possible.

        6         Q.  And I said "acquisition."

        7              Same question for a sale of assets.  Have you

        8    advised a client in connection with a sale of assets

        9    that involved no written signed contract between the

10:29  10    buyer and seller?

       11         A.  It's possible.

       12         Q.  You agree with me that would be unusual?

       13         A.  It would be.

       14         Q.  At Reed Smith, is it correct you were of

10:29  15    counsel there from April 2006 to April 2009?

       16         A.  Yes.

       17         Q.  And while there, you drafted, negotiated and

       18    advised on merger and acquisition transactions; right?

       19         A.  Correct.

10:29  20         Q.  And you drafted, negotiated and advised on

       21    venture capital transactions; right?

       22         A.  Correct.

       23         Q.  Venture capital transactions -- I'll ask it

       24    this way:

10:29  25              Is it correct that venture capital transactions
```

THE SULLIVAN GROUP OF COURT REPORTERS                    55

**Exhibit D**
98

| | | |
|---|---|---|
| 10:29 | 1 | always involve a written and signed agreement between |
| | 2 | the parties to the transaction? |
| | 3 | A.   I believe so. |
| | 4 | Q.   Is it correct, at Reed Smith, that you drafted |
| 10:29 | 5 | and negotiated commercial agreements, including license |
| | 6 | agreements, NDAs and distribution agreements? |
| | 7 | A.   Yes. |
| | 8 | Q.   And is it correct that you worked for |
| | 9 | Sonnenschein Nath & Rosenthal from 2005 to 2006? |
| 10:30 | 10 | A.   Yes. |
| | 11 | Q.   And at Brobeck Phleger & Harrison from 1997 to |
| | 12 | 2003? |
| | 13 | A.   Yes. |
| | 14 | Q.   What did you do at Brobeck? |
| 10:30 | 15 | A.   I was an associate, so I worked in the |
| | 16 | corporate group.  So corporate advice, public |
| | 17 | securities, mergers and acquisitions, venture capital |
| | 18 | work, some technology work. |
| | 19 | Q.   Were you a summer associate at Brobeck as well? |
| 10:30 | 20 | A.   I was. |
| | 21 | Q.   What did you do between 2003 and 2005? |
| | 22 | A.   2003. |
| | 23 | Q.   Between Brobeck and Sonnenschein? |
| | 24 | A.   Oh, I was at Squire Sanders & Dempsey. |
| 10:31 | 25 | Q.   Did you graduate from Loyola Law School with a |

**Exhibit D**
99

| | | |
|---|---|---|
| 10:31 | 1 | JD in '98? |
| | 2 | A.   I did. |
| | 3 | Q.   Did you take contracts at Loyola? |
| | 4 | A.   Yes. |
| 10:31 | 5 | Q.   Do you have -- Are you aware of a treatise |
| | 6 | called "Witkin" on contracts? |
| | 7 | A.   Not really. |
| | 8 | Q.   Do you recall the identity of any contractual |
| | 9 | treatises that you heard of while at Loyola or in your |
| 10:31 | 10 | practice at any time? |
| | 11 | A.   No. |
| | 12 | Q.   You graduated from Penn with a BS in finance |
| | 13 | and policy in '93; is that right? |
| | 14 | A.   Correct. |
| 10:31 | 15 | Q.   You currently work -- So who do you receive |
| | 16 | your W-2 from, Ms. Kim? |
| | 17 | A.   Sweet People Apparel. |
| | 18 | Q.   And is your salary apportioned between Rock |
| | 19 | Revival and Sweet People? |
| 10:32 | 20 | A.   Correct. |
| | 21 | Q.   There's a company called Deodar Brands, LLC. |
| | 22 | Are you familiar -- aware of the aegis in that |
| | 23 | company? |
| | 24 | A.   Yes. |
| 10:32 | 25 | Q.   What is that company? |

**Exhibit D**
**100**

| 10:32 | 1 | A. It's one of the affiliates, and it's the brand |
|---|---|---|
| | 2 | MEK Denim. |
| | 3 | Q. And does it operate out of the Rock Revival |
| | 4 | address? |
| 10:32 | 5 | A. It doesn't really operate that much anymore, |
| | 6 | but it used to have its own facility, and then, as it |
| | 7 | was closing, it came into the Rock facility. |
| | 8 | Q. Explains why I can't find the jeans. |
| | 9 | The -- What's Go Apparel, LLC? |
| 10:32 | 10 | A. Go Apparel. Oh. I can't recall offhand. It's |
| | 11 | some -- I don't know if it was -- who Rock Revival |
| | 12 | purchased the name from, or if it was an affiliated |
| | 13 | company. |
| | 14 | Q. The original -- Well, the trademark |
| 10:33 | 15 | registration for the Rock Revival text mark reflects the |
| | 16 | owner as Go Apparel, LLC. |
| | 17 | Do you -- Are you aware, sitting here today, |
| | 18 | whether that trademark has been assigned to Rock |
| | 19 | Revival? |
| 10:33 | 20 | A. Yes. It was purchased from them. |
| | 21 | Q. And has that assignment been produced? |
| | 22 | A. I don't know. |
| | 23 | Q. Have you performed any -- Strike that. |
| | 24 | Did Ms. Song do any work for Deodar Brands |
| 10:33 | 25 | doing business as MEK? |

| | | |
|---|---|---|
| 10:33 | 1 | A.   I don't recall. |
| | 2 | She might have -- Yeah.  She would have had to |
| | 3 | do some.  That's correct. |
| | 4 | Q.   Who do you report to? |
| 10:33 | 5 | A.   Eric Choi. |
| | 6 | Q.   Do you have any direct reports? |
| | 7 | A.   People who report to me? |
| | 8 | Q.   Yes. |
| | 9 | A.   Yes. |
| 10:33 | 10 | Q.   Who are they? |
| | 11 | A.   HR, marketing and legal all report to me. |
| | 12 | Q.   Who at -- Who in HR reports to you? |
| | 13 | A.   HR manager. |
| | 14 | Q.   Who is that? |
| 10:34 | 15 | A.   Jamie Chu. |
| | 16 | Q.   Who in marketing reports to you? |
| | 17 | A.   Sharon Bong. |
| | 18 | Q.   Can you spell that last name, please. |
| | 19 | A.   B-o-n-g. |
| 10:34 | 20 | Q.   And does anybody in legal report to you? |
| | 21 | A.   Yes. |
| | 22 | Q.   Who reports to you in legal? |
| | 23 | A.   Jay Roberts. |
| | 24 | Q.   Is Mr. Roberts an attorney? |
| 10:34 | 25 | A.   No. |

Exhibit D
102

| | | |
|---|---|---|
| 10:44 | 1 | although she functions as my assistant at times as well. |
| | 2 | Q.  Have you discussed any of the facts related to |
| | 3 | this case with Ms. Flores? |
| | 4 | A.  I don't think so. |
| 10:45 | 5 | Oh, maybe, yes. |
| | 6 | Q.  What have you discussed with her? |
| | 7 | A.  She made some purchases early on, and then she |
| | 8 | helps store things for me. |
| | 9 | Q.  Purchases from where? |
| 10:45 | 10 | A.  So when we got some of the complaints regarding |
| | 11 | the donated goods that were out in the stream of |
| | 12 | commerce, she would sometimes make contact and make the |
| | 13 | purchases on my behalf at my direction. |
| | 14 | Q.  And documents related to those purchases have |
| 10:45 | 15 | been produced in this case? |
| | 16 | A.  Yes. |
| | 17 | Q.  And are the products that were purchased still |
| | 18 | in your possession? |
| | 19 | A.  Yes. |
| 10:45 | 20 | Q.  Have they been produced for inspection in this |
| | 21 | case? |
| | 22 | A.  I don't think anyone has requested an |
| | 23 | inspection on those yet. |
| | 24 | Q.  Mr. Choi is the chief executive officer of Rock |
| 10:46 | 25 | Revival and Sweet People? |

Exhibit D
103

| | | |
|---|---|---|
| 10:46 | 1 | A.   Yes. |
| | 2 | Q.   Is he also on the board of directors? |
| | 3 | A.   Yes. |
| | 4 | Q.   Is he the chairman of the board of directors? |
| 10:46 | 5 | A.   I don't recall. |
| | 6 | Q.   Is he also -- Does he also have an ownership |
| | 7 | interest in each company? |
| | 8 | A.   Yes. |
| | 9 | Q.   Does he have an ownership interest in Deodar |
| 10:46 | 10 | Brands? |
| | 11 | A.   Yes. |
| | 12 | Q.   Do you know if his interest in any of those |
| | 13 | three entities is a majority interest? |
| | 14 | A.   I don't believe so. |
| 10:46 | 15 | Q.   Have there been any board meetings -- Strike |
| | 16 | that. |
| | 17 | Have there been any discussions at any board |
| | 18 | meetings regarding this case or the facts leading up to |
| | 19 | this case? |
| 10:46 | 20 | A.   Not that I'm aware of. |
| | 21 | Q.   But you've discussed this case with Mr. Choi; |
| | 22 | correct? |
| | 23 | A.   Correct. |
| | 24 | Q.   Did you supervise the collection of documents |
| 10:47 | 25 | in this case? |

Exhibit D
104

| | | |
|---|---|---|
| 11:41 | 1 | Q. What did you discuss with him? |
| | 2 | A. That's when we discussed wanting to put the |
| | 3 | recycling program in place rather than sending the goods |
| | 4 | to a landfill or having them destroyed in Asia. |
| 11:41 | 5 | So we had discussed the -- that the recycling |
| | 6 | of the goods would be more in line with our |
| | 7 | environmental initiatives. |
| | 8 | Q. Anything else? |
| | 9 | A. That was probably it. |
| 11:41 | 10 | Q. Did you look at the Bonded Logic website? |
| | 11 | A. I don't recall. |
| | 12 | Q. Do you recall whether you looked at the Phoenix |
| | 13 | Fiber website in or around November of 2011? |
| | 14 | A. I did not. |
| 11:42 | 15 | Q. Do you recall if you looked at |
| | 16 | cottonfrombluetogreen.org in or around November of 2011? |
| | 17 | A. I don't recall. |
| | 18 | Q. Do you recall if you responded to this e-mail |
| | 19 | in -- by "e-mail" -- Sorry. Strike that. |
| 11:42 | 20 | Do you recall if you sent an e-mail back to |
| | 21 | Mr. Choi in response to his e-mail of November 1st, |
| | 22 | 2011? |
| | 23 | A. No, I did not. |
| | 24 | Q. Did you discuss any of the financial benefits |
| 11:42 | 25 | of denim recycling with Mr. Choi? |

THE SULLIVAN GROUP OF COURT REPORTERS                    98

**Exhibit D**
**105**

| | | |
|---|---|---|
| 11:42 | 1 | A.  No. |
| | 2 | I mean, actually, it's a loss for us generally |
| | 3 | speaking 'cause we have to bring the goods that are |
| | 4 | unfinished from Asia, ship them here, and then package |
| 11:42 | 5 | them and send them for recycling, where we pay the |
| | 6 | delivery charge. |
| | 7 | Q.  I need to get a better understanding of what |
| | 8 | the practice was -- Well, strike that.  Let me make sure |
| | 9 | I understand from the -- from the time frame from 2012 |
| 11:43 | 10 | to 2015. |
| | 11 | From -- from -- In 2012, 2013 and 2014, is it |
| | 12 | correct to say that all of the unfinished, damaged, |
| | 13 | non-first-quality, obsolete, returned denim products of |
| | 14 | Miss Me and Rock Revival were going to Phoenix Fibers? |
| 11:43 | 15 | A.  I would say that's probably accurate. |
| | 16 | Q.  So there was no incidence of any vendors |
| | 17 | destroying such items in Asia? |
| | 18 | A.  No, not during that time period. |
| | 19 | Q.  The -- you testified earlier that Sweet |
| 11:44 | 20 | People -- I'm not sure we distinguished between the two |
| | 21 | companies, but that there was a requirement that the |
| | 22 | vendors return the unfinished goods to the United |
| | 23 | States. |
| | 24 | Do you recall that? |
| 11:44 | 25 | A.  The vendors return -- Yes. |

Exhibit D
106

11:44   1        Q.  Isn't that requirement a requirement that
        2   relates to simply ensuring that they're not going to
        3   resell them in Asia?
        4        A.  No, because part of that, we didn't necessarily
11:44   5   require them to send the unfinished goods here.
        6        Q.  So what -- why would you have them send the
        7   unfinished goods back to the United States?
        8        A.  Because we wanted to recycle them instead of
        9   having them destroyed in a landfill or lit on fire.  We
11:44  10   wanted to be more environmentally sound.
       11        Q.  And there are no recycling options in Asia?
       12        A.  It's very difficult, as I understand.  We
       13   looked recently.
       14        Q.  I'm going to ask you about damages later.  But
11:45  15   do you intend to -- Do you intend to seek the amounts of
       16   money spent to ship those products from Asia as a
       17   component of damages?
       18        A.  I'm not sure we've made a final determination,
       19   but that would be a part of actual damages, yes.
11:45  20        Q.  And have you produced any of those documents in
       21   this case?
       22        A.  I don't know.
       23        Q.  With respect to these two websites that
       24   Mr. Choi sent you in the e-mail that is part of
11:45  25   Exhibit 30, did you ask anybody else to look at those

THE SULLIVAN GROUP OF COURT REPORTERS                100

**Exhibit D**
**107**

| | | |
|---|---|---|
| 11:50 | 1 | eventuality that occurred after Exhibit 30? |
| | 2 | A. I believe Lisa did some investigation. Then |
| | 3 | she talked with or e-mailed with or both -- with people |
| | 4 | at Bonded Logic and Phoenix Fibers. |
| 11:51 | 5 | Q. And what are your sources for -- what's your |
| | 6 | basis for knowing that? |
| | 7 | A. Conversations that I recall with Lisa, and |
| | 8 | e-mail correspondence. |
| | 9 | Q. Anything else? |
| 11:51 | 10 | A. That's all I can remember. |
| | 11 | Q. Do you recall who Jerry Westin is? |
| | 12 | A. No. |
| | 13 | Q. Have you ever spoken to anyone named Jerry |
| | 14 | Westin? |
| 11:51 | 15 | A. Not that I recall. |
| | 16 | Q. With respect to the legal department, have you |
| | 17 | ever adopted any written policies requiring that |
| | 18 | contracts be in signed writings? |
| | 19 | A. No. |
| 11:52 | 20 | Q. Why not? |
| | 21 | A. It's still a relatively small company, so |
| | 22 | sometimes we don't formalize everything. It depends on |
| | 23 | the contract and the manager, et cetera. Circumstance. |
| | 24 | Q. Approximately how many employees, both |
| 11:52 | 25 | full-time and part-time, does Sweet People have right |

THE SULLIVAN GROUP OF COURT REPORTERS                    105

**Exhibit D**
**108**

| | | |
|---|---|---|
| 11:52 | 1 | now? |
| | 2 | A.  Right now? |
| | 3 | Q.  Yeah. |
| | 4 | A.  Probably about a hundred. |
| 11:52 | 5 | Q.  And approximately how many does Rock Revival |
| | 6 | have? |
| | 7 | A.  Around 50, maybe a little less. |
| | 8 | Q.  And do some of the employees that work for both |
| | 9 | entities perform services for the other? |
| 11:53 | 10 | A.  Yes. |
| | 11 | Q.  And is there a written contract about cost |
| | 12 | sharing related to that? |
| | 13 | A.  No. |
| | 14 | Q.  That apportionment just happens based on no |
| 11:53 | 15 | written agreement? |
| | 16 | A.  No written agreement. |
| | 17 | Q.  When did you first learn of unfinished, |
| | 18 | damaged, obsolete, returned or otherwise second-quality |
| | 19 | goods showing up in the marketplace that you thought at |
| 11:54 | 20 | the time or later learned were associated with Phoenix |
| | 21 | Fibers? |
| | 22 | A.  I think it was summer of 2015. |
| | 23 | Q.  And what happened when you first learned that |
| | 24 | information? |
| 11:54 | 25 | A.  We had received complaints about those kind of |

Exhibit D
109

| | | |
|---|---|---|
| 11:54 | 1 | goods being out there, and so we began to -- you know, |
| | 2 | they'd appoint us to specific people or websites or |
| | 3 | whatever it was, so we started to make some purchases. |
| | 4 | Q.  And was that prior to receiving -- Well, strike |
| 11:54 | 5 | that. |
| | 6 | Who were those complaints from? |
| | 7 | A.  It would have been from customers, sales reps. |
| | 8 | Q.  Sales reps that worked for Miss Me or Rock |
| | 9 | Revival, or other sales reps? |
| 11:55 | 10 | A.  Sales reps that work for Miss Me and Rock |
| | 11 | Revival. |
| | 12 | Q.  And were any of those sales rep complaints -- |
| | 13 | Strike that. |
| | 14 | Were any of those sales rep complaints |
| 11:55 | 15 | contained in e-mails? |
| | 16 | A.  I don't know. |
| | 17 | Q.  Do you recall how you learned of the sale -- of |
| | 18 | the sales reps concerns? |
| | 19 | A.  Either the internal salespeople would tell me |
| 11:55 | 20 | or the sales reps would tell me themselves. |
| | 21 | Q.  Which sales reps told you themselves? |
| | 22 | A.  It was out of Chicago or Dallas.  I can't |
| | 23 | recall which one. |
| | 24 | Q.  How many sales reps are there for both Rock |
| 11:55 | 25 | Revival and Miss Me? |

**Exhibit D**
**110**

| | | |
|---|---|---|
| 11:55 | 1 | A.   I don't know how many individual sales reps |
| | 2 | there are, but there are offices -- We contract with |
| | 3 | independent sales reps. |
| | 4 | And Miss Me has one, two -- I think four across |
| 11:56 | 5 | the country. |
| | 6 | And Rock Revival, I think, has five. |
| | 7 | (Exhibit 31 was marked for identification by |
| | 8 | the reporter.) |
| | 9 | MR. PARKER: |
| 11:56 | 10 | Q.   So I've asked the court reporter to place in |
| | 11 | front of you what's been marked as Exhibit 31. |
| | 12 | Do you recognize Exhibit 31? |
| | 13 | A.   Yes. |
| | 14 | Q.   What is it? |
| 11:57 | 15 | A.   It's an e-mail from Felipe to myself. |
| | 16 | Q.   Why -- Well, do you recall independent about |
| | 17 | why Mr. Salgado sent you this e-mail, Exhibit 31? |
| | 18 | A.   Right.  So Lola Willard was selling goods that |
| | 19 | were supposed to have been donated on her -- I don't |
| 11:57 | 20 | know if it was her Facebook or her website or something |
| | 21 | like that. |
| | 22 | Q.   How did you determine that Lola Willard was |
| | 23 | selling jeans that you believe were supposed to be |
| | 24 | donated? |
| 11:57 | 25 | A.   We looked at it.  Then we made a purchase. |

**Exhibit D**
**111**

| | | |
|---|---|---|
| 11:57 | 1 | Q.  Who made the purchase? |
| | 2 | A.  I believe I did.  Or someone under my |
| | 3 | direction. |
| | 4 | Q.  Have the documents related to that purchase |
| 11:57 | 5 | been produced? |
| | 6 | A.  I believe so. |
| | 7 | Q.  Was the purchase from Ms. Willard the first |
| | 8 | purchase you made that relates to this case? |
| | 9 | A.  No.  I believe it was one of the last. |
| 11:58 | 10 | Q.  Okay.  How many -- Setting aside the purchase |
| | 11 | by Investigative Consultants, how many purchases of |
| | 12 | goods did Rock Revival or Sweet People make prior to |
| | 13 | filing this lawsuit? |
| | 14 | A.  Individual purchases or -- |
| 11:58 | 15 | Q.  Yeah.  Let's talk about individual purchases. |
| | 16 | A.  I want to say maybe half a dozen.  I could be |
| | 17 | wrong about the number. |
| | 18 | Q.  And then the -- Of that approximate half a |
| | 19 | dozen, do you know how many units were involved total? |
| 11:58 | 20 | A.  I believe over 9,000. |
| | 21 | Q.  So I saw -- In a report earlier, I saw an |
| | 22 | Investigative Consultants report they ended up with |
| | 23 | 29,000 units. |
| | 24 | Did I get that right?  I don't think I have |
| 11:59 | 25 | that right. |

Exhibit D
112

| | | |
|---|---|---|
| 12:01 | 1 | consumer complaints you received? |
| | 2 | A.  I don't. |
| | 3 | Q.  And were there -- Do you recall whether those |
| | 4 | consumer complaints were received in writing, verbally |
| 12:01 | 5 | or both? |
| | 6 | A.  I know some were in writing. |
| | 7 | Q.  And those have been produced? |
| | 8 | A.  Those have been. |
| | 9 | Q.  Exhibit 31 refers to jeans being "'stamped' |
| 12:02 | 10 | defective" on page 2 in the third line down. |
| | 11 | The sentence says, "She says that she gets the |
| | 12 | jeans from the factory that are 'stamped' defective due |
| | 13 | to missing labels and such items." |
| | 14 | Does Miss Me -- Do Miss Me or Rock Revival |
| 12:02 | 15 | stamp jeans with the word "Defective"? |
| | 16 | A.  The factory may. |
| | 17 | Q.  Do you know one way or the other whether they |
| | 18 | do? |
| | 19 | A.  I know that -- I don't know if they do it for |
| 12:02 | 20 | every single one, but I know I've seen jeans stamped |
| | 21 | "Defective" on the inside lining. |
| | 22 | Q.  And where did you see those jeans? |
| | 23 | A.  Some of them when we repurchase them from these |
| | 24 | different websites and such. |
| 12:02 | 25 | Some of them I've seen probably around. |

**Exhibit D**
113

| | | |
|---|---|---|
| 12:05 | 1 | Q.  Do any of the retailers that -- such as Ross |
| | 2 | Dress for Less that sometimes sell Miss Me or Rock |
| | 3 | Revival obsolete, returned or second-quality goods offer |
| | 4 | them for sale online? |
| 12:05 | 5 | A.  No. |
| | 6 | Q.  Have either Miss Me or Rock Revival ever |
| | 7 | authorized, in your view, any company or individual to |
| | 8 | sell obsolete inventory, returned goods or |
| | 9 | second-quality goods online? |
| 12:06 | 10 | A.  No, not that I'm aware of. |
| | 11 | Q.  Do you know -- Well, strike that. |
| | 12 | What, if any, retailers other than Ross Dress |
| | 13 | for Less buy obsolete inventory, returned goods or |
| | 14 | otherwise second-quality goods from Miss Me or Rock |
| 12:06 | 15 | Revival? |
| | 16 | A.  I believe the only closeouts might be Nordstrom |
| | 17 | Rack.  Maybe Marshalls and T.J.Maxx. |
| | 18 | Q.  Do you recall -- other than the seller Lola |
| | 19 | Willard, they were selling online -- in 2015, they were |
| 12:07 | 20 | selling the goods that led to the purchases that led to |
| | 21 | this case or they were part of leading to this case, do |
| | 22 | you recall what websites they were selling on? |
| | 23 | A.  I remember some were on eBay.  I think some |
| | 24 | were on Facebook. |
| 12:07 | 25 | But that's all I can remember offhand. |

THE SULLIVAN GROUP OF COURT REPORTERS            115

**Exhibit D**
114

```
12:08    1         Q.  Of the approximately half dozen purchases, at
         2    least one of them was a wholesale purchase, wholesale
         3    price type purchase?
         4         A.  Yes.
12:08    5         Q.  How many -- When did that occur?
         6         A.  I want to say summer.
         7         Q.  And do you recall approximately how many units?
         8         A.  That was a large one.  That was about 9,000
         9    units, I believe.
12:08   10         Q.  So were all the other purchases kind of
        11    onesie-twosie purchases?
        12         A.  I think so.
        13         Q.  The 9,000 units, are they in that same
        14    warehouse?
12:08   15         A.  I think they're in a different warehouse.
        16    Generally goods that I purchased were in a different
        17    warehouse.
        18         Q.  Have you inspected -- Strike that.
        19             Have you or anybody else inspected the 9,000
12:08   20    units, each one of them?
        21         A.  Not every single one, but I did inspect the --
        22    I inspected some of them.
        23         Q.  (Indicating.)
        24         A.  I inspected some of them.
12:09   25         Q.  So 9,000 units, how many -- approximately how
```

THE SULLIVAN GROUP OF COURT REPORTERS          116

**Exhibit D**
115

| | | |
|---|---|---|
| 12:46 | 1 | A.   I'm pretty sure. |
| | 2 | Q.   -- made? |
| | 3 | A.   I'm pretty sure we did. |
| | 4 | Q.   Did Investigative Consultants' investigation |
| 12:46 | 5 | reveal that anybody associated with Sac International, |
| | 6 | Comak even knew who Phoenix Fibers was? |
| | 7 | A.   I don't know. |
| | 8 | Q.   You don't know one way or the other? |
| | 9 | A.   I don't know one way or the other. |
| 12:46 | 10 | Q.   But sitting here today, you can't point me to |
| | 11 | the result of that investigation that leads you to |
| | 12 | believe that Comak Trading or Sac International or |
| | 13 | Ms. Cho or this gentleman named Ali even knew who |
| | 14 | Phoenix Fibers was? |
| 12:47 | 15 | A.   No.  I can't point you to anything. |
| | 16 | Q.   Now, prior to these investigative reports, you |
| | 17 | had a -- you had at least one conversation with Tod |
| | 18 | Kean; is that right? |
| | 19 | A.   I think so. |
| 12:47 | 20 | Q.   Who do you understand Mr. Kean to be? |
| | 21 | A.   I understood him to be the owner and -- one of |
| | 22 | the owners and CEO. |
| | 23 | Q.   Why did you -- And did you call him, or did he |
| | 24 | call you? |
| 12:47 | 25 | A.   I called him. |

Exhibit D
116

| | | |
|---|---|---|
| 12:47 | 1 | Q.  Why did you call him? |
| | 2 | A.  I was looking for someone, and that's who |
| | 3 | reception pointed me to. |
| | 4 | Q.  And when did you call him? |
| 12:47 | 5 | A.  I actually don't recall the exact date. |
| | 6 | Q.  And when you reached him, what did you say to |
| | 7 | him, and what did he say to you? |
| | 8 | A.  I told him who I was.  I introduced myself.  I |
| | 9 | told him that we had found goods we believed were |
| 12:48 | 10 | possibly coming from his location, that had been sent |
| | 11 | there for destruction and recycling. |
| | 12 | Q.  And what did he say? |
| | 13 | A.  He said that they would look into it.  They |
| | 14 | would investigate.  It is possible that there was some |
| 12:48 | 15 | leakage. |
| | 16 | Q.  And do you understand what the word "leakage" |
| | 17 | means, or did you understand at the time what "leakage" |
| | 18 | meant? |
| | 19 | A.  They actually explained it to me. |
| 12:48 | 20 | So Phoenix Fibers was the one who told me that |
| | 21 | what happens is that they have a secure cage to which |
| | 22 | the products are put in.  But because our product takes |
| | 23 | sometimes longer to recycle due to the embellishments on |
| | 24 | them, that sometimes goods would be left out of the cage |
| 12:49 | 25 | while they're being processed, or that sometimes the |

THE SULLIVAN GROUP OF COURT REPORTERS                146

**Exhibit D**
117

| | | |
|---|---|---|
| 12:49 | 1 | cage was full and that goods were sometimes left outside |
| | 2 | the secure cage.  And it's possible, due to that, that |
| | 3 | some might have leaked out. |
| | 4 | Q.  And what did you understand "leaking" to mean, |
| 12:49 | 5 | or "leak"? |
| | 6 | A.  So they were saying that basically they were |
| | 7 | stolen -- |
| | 8 | Q.  All right.  Then -- |
| | 9 | A.  -- and shipped off. |
| 12:49 | 10 | Q.  -- has Rock Revival or Miss Me ever experienced |
| | 11 | any theft of their inventory? |
| | 12 | A.  I'm sure we have. |
| | 13 | Q.  You just -- Do you call it "leakage," or do you |
| | 14 | call it "theft"? |
| 12:49 | 15 | What do you guys call it? |
| | 16 | A.  We just call it "theft" or "SOB," like |
| | 17 | employees trying to steal it. |
| | 18 | Q.  Have you ever heard the term "shrinkage"? |
| | 19 | A.  "Shrinkage," yes. |
| 12:49 | 20 | Q.  And "shrinkage" refers to people stealing |
| | 21 | inventory; right? |
| | 22 | A.  Uh-huh. |
| | 23 | Q.  Did you mention the possibility that there were |
| | 24 | being -- that items were being stolen from Phoenix |
| 12:49 | 25 | Fibers' warehouse, or was it Mr. Kean that raised the |

**Exhibit D**
**118**

| 12:49 | 1 | issue? |
|---|---|---|
| | 2 | A.  Mr. Kean.  I just raised that we had found |
| | 3 | goods outside. |
| | 4 | Q.  How many goods at that time that you called him |
| 12:50 | 5 | had you found? |
| | 6 | A.  Not that many. |
| | 7 | Q.  What else did Mr. Kean say beyond what you |
| | 8 | already recounted? |
| | 9 | A.  That he referred me to Steve Johnson as well. |
| 12:50 | 10 | Q.  Who did you understand Mr. Johnson to be? |
| | 11 | A.  I was told he was a plant manager. |
| | 12 | Q.  Did you call Mr. Johnson? |
| | 13 | A.  Yes. |
| | 14 | I'd actually called him earlier in the day to |
| 12:50 | 15 | get a general idea of what happened to the products, |
| | 16 | generally, like what the process was from him. |
| | 17 | Then I talked to Mr. Kean, and then I went back |
| | 18 | to Mr. Johnson. |
| | 19 | Q.  Okay.  So let's talk about the first |
| 12:50 | 20 | conversation you had with Mr. Johnson. |
| | 21 | You called him for that conversation? |
| | 22 | A.  Yes. |
| | 23 | Q.  And what did he say, and what did you say in |
| | 24 | that conversation? |
| 12:50 | 25 | A.  I said I was trying to figure out generally |

**Exhibit D**
119

| | |
|---|---|
| 12:50 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 12:51 | 5 |

12:50   1   what happened at the -- throughout the process, at the

2   time, I said I was trying to figure out.

3          And he told me basically, you know, the goods

4   are received.  You know, they're put in a secure

12:51   5   location.

6          And then, you know, they are taken out, and

7   then metal and bags, et cetera, are taken off, and then

8   they're processed for recycling into shoddy fiber.

9       Q.   In that first conversation with Mr. Johnson,

12:51   10   did anybody discuss -- Strike that.

11          In that conversation with Mr. Johnson, did you

12   tell him why you were calling?

13       A.   I don't think so.  I think I was just trying to

14   figure out literally what the process was.

12:51   15       Q.   Did you tell him that you were the general

16   counsel of Miss Me?

17       A.   Yes.

18       Q.   How long did your first conversation with

19   Mr. Johnson last?

12:51   20       A.   Less than five minutes, maybe.

21       Q.   Why is it in the first conversation you had

22   with him that you did not tell him the reason you were

23   calling?

24       A.   We were still trying to figure things out.

12:52   25       Q.   Did either you or Mr. Johnson mention anything

**Exhibit D**
120

| | | |
|---|---|---|
| 12:53 | 1 | A. No. I mean, I think we got an idea from the |
| | 2 | general process that maybe there had been some sort |
| | 3 | of -- it -- It could have come from that facility, given |
| | 4 | the way that the process was done. |
| 12:53 | 5 | So that's when we called Mr. Kean to see -- |
| | 6 | Actually, we didn't know who we were calling at that |
| | 7 | level, but the receptionist then referred us to |
| | 8 | Mr. Kean, and that's when he mentioned the leakage. |
| | 9 | Q. Were you -- Were you dissatisfied in any way |
| 12:53 | 10 | with anything you learned or heard in the conversation |
| | 11 | you had with Mr. Johnson, the first conversation? |
| | 12 | A. No. |
| | 13 | Q. And when you talked to -- So you talked to |
| | 14 | Mr. Kean. |
| 12:53 | 15 | And then you talked to Mr. Johnson again after |
| | 16 | you talked to Mr. Kean? |
| | 17 | A. Correct. |
| | 18 | Q. Did the conversation -- the second conversation |
| | 19 | with Mr. Johnson occur the same day you talked to |
| 12:53 | 20 | Mr. Kean, or a different day? |
| | 21 | A. I think the same day. |
| | 22 | Q. And did you call Mr. Johnson, or did he call |
| | 23 | you? |
| | 24 | A. I called Mr. Johnson. |
| 12:53 | 25 | Q. And how long was that conversation with |

THE SULLIVAN GROUP OF COURT REPORTERS                    151

**Exhibit D**
121

| | | |
|---|---|---|
| 12:53 | 1 | Mr. Johnson? |
| | 2 | A.   Less than ten minutes. |
| | 3 | Q.   Less than ten? |
| | 4 | A.   Uh-huh. |
| 12:54 | 5 | Q.   What did you say in that conversation, and what |
| | 6 | did Mr. Johnson say? |
| | 7 | A.   I said I talked to Mr. Kean, that he referred |
| | 8 | me to him. |
| | 9 | I explained that we were experiencing -- we had |
| 12:54 | 10 | found product that were donated to Phoenix Fibers that |
| | 11 | were outside that we'd found purchased. |
| | 12 | And then he also talked about that they were |
| | 13 | adding security cameras, that he would investigate and |
| | 14 | that he also mentioned leakage. |
| 12:54 | 15 | Q.   Did he tell you whether or not he had talked to |
| | 16 | Mr. Kean about Mr. Kean's conversation with you prior to |
| | 17 | his second conversation with you? |
| | 18 | A.   He did not mention that. |
| | 19 | Q.   Did you mention the possibility of leakage to |
| 12:54 | 20 | Mr. Johnson in that phone call? |
| | 21 | A.   I don't think so. |
| | 22 | Q.   Can you recall with certainty whether or not |
| | 23 | you mentioned that possibility? |
| | 24 | A.   I can't recall. |
| 12:55 | 25 | Q.   Do you have any opinion one way or the other |

THE SULLIVAN GROUP OF COURT REPORTERS                    152

Exhibit D
122

| | | |
|---|---|---|
| 12:57 | 1 | Have you had any conversation with Mr. Kean |
| | 2 | since that conversation you had with him? |
| | 3 | A.   No. |
| | 4 | Q.   Have you had any conversation with Mr. Johnson |
| 12:57 | 5 | since you had that conversation with him? |
| | 6 | A.   No. |
| | 7 | Q.   Have you attended any of the depositions in |
| | 8 | this case? |
| | 9 | A.   Oh, actually, I did go to Mr. Kean's.  We |
| 12:57 | 10 | didn't really speak, but I saw him. |
| | 11 | THE REPORTER:  I'm sorry? |
| | 12 | THE WITNESS:  I didn't really speak to him, but I |
| | 13 | saw him there. |
| | 14 | MR. PARKER: |
| 12:57 | 15 | Q.   So you attended Mr. Kean's deposition, or part |
| | 16 | of it, but not any of Mr. Johnson's? |
| | 17 | A.   Correct. |
| | 18 | MR. PARKER:  Now's as good of time as any for a |
| | 19 | short lunch. |
| 12:58 | 20 | MR. SALZMANN:  Sure. |
| | 21 | THE VIDEOGRAPHER:  The time is 12:58 p.m., and we |
| | 22 | are off the record. |
| | 23 | (A lunch recess is taken.) |
| | 24 | (Exhibit 36 was marked for identification by |
| 12:58 | 25 | the reporter.) |

THE SULLIVAN GROUP OF COURT REPORTERS                    155

Exhibit D
123

| 14:10 | 1 | the reporter.) |

14:10    1    the reporter.)

2         MR. PARKER:

3         Q.  Can you take a look at Exhibit 38.

4         A.  Yes.

14:11    5    Q.  Do you recognize Exhibit 38?

6         A.  I think I've seen it.

7         Q.  Do you know one way or the other whether the

8    web content on Exhibit 38, which was printed out

9    today -- Do you know whether this web content in

14:11   10   Exhibit 38 differs in any way from the web content that

11   existed in 2011?

12        A.  I have no idea.

13        Q.  And you don't know whether the web content on

14   Exhibit 38 differs from the web content as it existed

14:11   15   on -- in the year 2012?

16        A.  I have no idea.

17        Q.  Was -- Strike that.

18            Is the destruction of these unfinished,

19   obsolete and otherwise secondhand goods and damaged

14:12   20   goods -- is the destruction of them important to the

21   companies?

22        A.  It's very important.

23        Q.  Why is it -- Why is it important?

24        A.  I mean, there are multiple reasons.  The

14:12   25   primary reason is we don't want the goods in the market

THE SULLIVAN GROUP OF COURT REPORTERS              166

**Exhibit D**
124

14:12    1    in the first place.

         2            I mean, the reason that they are being sent for

         3    destruction and recycling is so they do not enter into

         4    the stream of commerce because we don't believe that

14:12    5    they're up to the standard of Rock Revival and Miss Me.

         6    So the reason they're sent there is for the destruction

         7    so they don't get into the stream of market so the

         8    brands aren't damaged or harmed reputationally,

         9    quality-wise.  So, yeah, it's important.

14:13   10            And then, you know, like I said, we had this

        11    whole environmental program.  That was really the point

        12    of sending them to be destroyed and recycled is that we

        13    wanted to adhere to those values.

        14            That's why we took the time to bring them from

14:13   15    China.  If we really wanted to have them in the stream

        16    of commerce, we would have sold them ourselves.

        17            And it was sort of ridiculous that we were

        18    sending them to Arizona, paying for the shipping to get

        19    them there, and then they were being shipped back to a

14:13   20    half mile from our facility.

        21        Q.  Do you know whether Rock Revival and Miss Me

        22    received any certificates of recycle from Phoenix

        23    Fibers?

        24        A.  I think we -- I think -- No.  I don't think

14:13   25    Rock Revival or Miss Me did.

```
14:13    1           Q.  There's one -- There's one given to a company
         2    called Maurice.
         3           Is that -- Do you know what Maurice is?
         4           A.  Yes.  So we were in litigation with Maurices.
14:14    5           As part of their settlement, they agreed to
         6    send the products to Phoenix Fibers to be destroyed and
         7    recycled.  Therefore they needed a certificate of
         8    destruction to give to us as evidence.
         9           Q.  Is there a reason why you never directed --
14:14   10    someone or yourself requested a certificate of
        11    destruction and recycle from Phoenix Fibers?
        12           A.  I really didn't think it was necessary.  We had
        13    an agreement.  We assumed that the goods were being
        14    recycled as we were told they were.
14:14   15           And we didn't need it as evidence for anything
        16    else.  It's not like we were in litigation where we had
        17    to present to a third party or we were getting a, you
        18    know, nonprofit tax credit or something where we needed
        19    evidence that that was occurring.
14:14   20           Q.  Why was it that you needed a certificate of
        21    destruction and recycle from Maurice?
        22           A.  That was the litigation.  Actually it was a
        23    part the settlement agreement that they provided,
        24    Maurices provided.
14:15   25           Q.  Why wasn't it enough that they simply certified
```

Exhibit D
126

14:43    1    non-denim?

2       A.   No.   I mean, generally speaking, our place is

3    primarily denim, so, you know, we don't have that much

4    non-denim.

14:43    5       Q.   Do you know if there was anything besides

6    apparel in the boxes that were shipped from Sweet People

7    to Phoenix Fibers in 2015?

8       A.   Not that I'm aware of.

9       Q.   Of the boxes that you've looked in at

14:44    10    Investigative Consultants' warehouse, have you found

11    anything other than apparel?

12       A.   I don't think so.

13       Q.   Of the boxes -- Strike that.

14       Of the boxes that were retrieved from Phoenix

14:44    15    Fibers in December 2015, had you found anything in the

16    boxes other than apparel?

17       A.   I don't think so.   Not that I'm aware of.

18       Q.   Approximately how many of those boxes, the ones

19    that were transported back from Phoenix Fibers in

14:44    20    December 2015, have you looked in?

21       A.   I don't know how many were looked in.

22       A lot of the boxes that came back from Phoenix

23    Fibers were already cut open in one corner where

24    somebody had -- from Phoenix Fibers had already looked

14:45    25    through the boxes.   So I don't know.