1   JOHN C. ULIN (State Bar No. 165524)
    John.Ulin@apks.com
2   ERIC D. MASON (State Bar No. 259233)
    Eric.Mason@apks.com
3   LOUIS S. EDERER (*Pro Hac Vice*)
    Louis.Ederer@apks.com
4   MATTHEW T. SALZMANN (*Pro Hac Vice*)
    Matthew.Salzmann@apks.com
5   ARNOLD & PORTER KAYE SCHOLER LLP
    777 South Figueroa Street, 44th Floor
6   Los Angeles, California 90017-5844
    Telephone: (213) 243-4000; Facsimile: (213) 243-4199
7

8   *Attorneys for Plaintiffs*

9
                    **UNITED STATES DISTRICT COURT**
10
                    **CENTRAL DISTRICT OF CALIFORNIA**
11
                         **WESTERN DIVISION**
12

13  SWEET PEOPLE APPAREL, INC. d/b/a          )   Case No.:  2:16-cv-00940-TJH-JC
    MISS ME, a California corporation, and     )
14  RCRV, INC. d/b/a ROCK REVIVAL, a          )   Hon. Terry J. Hatter Jr.
    California corporation,                     )
15                                              )   **PLAINTIFFS' STATEMENT OF**
                          Plaintiffs,           )   **GENUINE DISPUTES OF**
16                                              )   **MATERIAL FACT**
            v.                                  )
17                                              )   Hearing Date: January 30, 2017
                                                )
18  PHOENIX FIBERS, INC., an Arizona          )   Hearing Time: Under submission
    corporation, U.S. GENERAL EXPORT,         )
19  INC., a California corporation, SAC        )   Place of Hearing: Courtroom 9B
    INTERNATIONAL TRADERS, INC., a            )                     First Street
20  California corporation, SHAUKAT ALI       )                     Courthouse
    CHOHAN, an individual, COMAK              )
21  TRADING, INC., a California                )
    corporation, LYDIA EVILSA                  )
22  TERRAZAS CHO, an individual,              )
    MYUNG KWON CHO, an individual,            )
23  TIFFANY ALANA WOLFF, an                    )
    individual d/b/a MISS V LANE, XYZ         )
24  COMPANIES 1-10, and JOHN AND              )
    JANE DOES 1-10,                            )
25                                              )
                                                )
26                        Defendants.           )
                                                )
27                                              )
                                                )
28                                              )

1    Plaintiffs Sweet People Apparel, Inc. d/b/a MISS ME ("Sweet People") and
2    RCRV, Inc. d/b/a ROCK REVIVAL ("RCRV") (collectively, "Plaintiffs")
3    respectfully submit this statement of genuine disputes of material fact in support of
4    their opposition to defendant Phoenix Fibers, Inc. ("Phoenix Fibers")'s motion for
5    summary judgment, pursuant to Local rule 56-2.

6    **I.    PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF**
7    **MATERIAL FACT**

8    **A.    Defendant Phoenix Fibers' Business**

9    1.    Defendant Phoenix Fibers is an Arizona-based clothing and textile
10   recycling company that was founded in July 2011. (Appendix of Exhibits ("App. Ex.")
11   LL; Declaration of Tod Kean ("Kean Decl. (App. Ex. A)") ¶ 2.)  In the textile
12   recycling industry, clothes are recycled in various ways. One way in which clothes are
13   recycled within the clothing recycling industry is to sell them as "credential."
14   (Declaration of Steven Johnson ("Johnson Decl. (App. Ex. B)") ¶ 3; Kean Decl. (App.
15   Ex. A) ¶ 6).

16   **Plaintiffs' Response:**  Disputed.  Phoenix Fibers was founded "[t]o make
17   shoddy [fiber]."  (Salzmann Decl. ¶3, Ex. A (Quinn 39:8-17); ¶38, Ex. JJ
18   ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).  Specifically,
19   "Phoenix Fibers was founded to provide a stable source of raw material for
20   Bonded Logic's business of manufacturing denim cloth-based insulation under
21   the name UltraTouch Denim."  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding*
22   *Clothing Nets Big Rewards for Phoenix Fibers*")).  Phoenix Fibers and Bonded
23   Logic are affiliated companies owned by the Kean family.  (Salzmann Decl. ¶38,
24   Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*"); ¶39, Ex.
25   KK ("*Chandler firm grows; recycles denim material into insulation*")).  Bonded
26   Logic is in the business of manufacturing insulation products, including its
27   flagship product, UltraTouch Denim Insulation.  Shoddy fiber created from
28   recycled denim is the raw material that Bonded Logic uses to manufacturer

2

UltraTouch Denim Insulation.  (Salzmann Decl. ¶24, Ex. V (SP/RCRV005629); ¶39, Ex. KK ("*Chandler firm grows; recycles denim material into insulation*"); ¶40, Ex. LL ("*Green Chandler company looks to bask in solar savings*"); ¶41, Ex. MM ("*Chandler company turns worn-out blue jeans into insulation, more*")).  Prior to launching Phoenix Fibers, Bonded Logic sourced shoddy fiber from a shredding company in Brownsville, Texas.  (Salzmann Decl. ¶5, Ex. C (Kean 65:10-66:21)).  As Tod Kean explained:  "We used to procure our raw material for the production of insulation from other shredders.  But because of instability in both prices and supply, we decided to open Phoenix to become vertically integrated by controlling our own source of raw materials." (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).  Today, Phoenix Fibers receives clothing "by the truckload" from various sources for shredding, and processes 900 to a million pounds of denim and cotton products into shoddy fiber every month.  (Salzmann Decl. ¶4, Ex. B (Johnson 77:2-4); ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

Phoenix Fibers was not in the business of selling "credential" when the company was launched in July 2011.  That aspect of Phoenix Fibers' business only came into existence at a later date.  There is no evidence that Phoenix Fibers was engaged in the sale of credential in November 2011, at the time Plaintiffs and Phoenix Fibers came to an agreement to convert Plaintiffs' second-quality denim products into shoddy fiber.  (Salzmann Decl. ¶5, Ex. C (Kean 17:20-18:9); ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

2.      In the context of recycling clothing and Phoenix Fibers' industry, "credential" means clothing or shoes, sold in bulk, and sold by the pound.  (Johnson Decl. (App. Ex. B) ¶ 3; Kean Decl. (App. Ex. A) ¶ 6.)

**Plaintiffs' Response:** Disputed.  "Credential" can include things such as

1    "sheets, towels, pillow cases, lamps, … bric-a-brac" (Salzmann Decl. ¶4, Ex. B

2    (Johnson 29:20-25)), "miscellaneous household items" and "toaster ovens"

3    (Salzmann Decl. ¶5, Ex. C (Kean 15:17-20)).

4        3.    Another way of recycling clothes and textiles is repurposing them by

5    simply reselling them in consignment or thrift shops. (Declaration of Christopher

6    Maciel ("Maciel Decl. (App. Ex. C)") ¶¶ 6-12; App. Ex. I-O; Johnson Decl. (App. Ex.

7    B) ¶ 4.)

8        **<u>Plaintiffs' Response</u>:**  Disputed to the extent not material to Plaintiffs' claims,

9    as the parties' agreement related to recycling of Plaintiffs' products into shoddy

10   fiber.  As Ms. Song testified at her deposition: "we would send the inventory

11   that we needed to -- that we wanted to use as part of our -- one of our green

12   initiative programs. ***Phoenix Fibers would break down the inventory sent to***

13   ***them, shred it and create insulation that they would pass along to Bonded***

14   ***Logic***, who insulated houses in need.  (Salzmann Decl. ¶8, Ex. F (Song 67:11-24

15   (emphasis added)); *see also* 28:10-29:3).

16       4.    A third way is to turn the clothes into something else entirely. (Johnson

17   Decl. (App. Ex. B) ¶ 5; Kean Decl. (App. Ex. A) ¶ 7; Maciel Decl. (App. Ex. C) ¶ 10;

18   App. Ex. M.)

19       **<u>Plaintiffs' Response</u>:**  Disputed only to the extent this suggests there was any

20   other way to recycle Plaintiffs' goods under the parties' agreement, otherwise

21   undisputed.  Phoenix Fibers was founded to " [t]o make shoddy [fiber]."

22   (Salzmann Decl. ¶3, Ex. A (Quinn 39:8-17); ¶38, Ex. JJ ("*Shredding Clothing*

23   *Nets Big Rewards for Phoenix Fibers*")).  Specifically, "Phoenix Fibers was

24   founded to provide a stable source of raw material for Bonded Logic's business

25   of manufacturing denim cloth-based insulation under the name UltraTouch

26   Denim."  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards*

27   *for Phoenix Fibers*")).  Phoenix Fibers and Bonded Logic are affiliated

28   companies owned by the Kean family.  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding*

*Clothing Nets Big Rewards for Phoenix Fibers*"); ¶39, Ex. KK ("*Chandler firm grows; recycles denim material into insulation*")).  Bonded Logic is in the business of manufacturing insulation products, including its flagship product, UltraTouch Denim Insulation.  Shoddy fiber created from recycled denim is the raw material that Bonded Logic uses to manufacturer UltraTouch Denim Insulation.  (Salzmann Decl. ¶24, Ex. V (SP/RCRV005629); ¶39, Ex. KK ("*Chandler firm grows; recycles denim material into insulation*"); ¶40, Ex. LL ("*Green Chandler company looks to bask in solar savings*"); ¶41, Ex. MM ("*Chandler company turns worn-out blue jeans into insulation, more*")).  Prior to launching Phoenix Fibers, Bonded Logic sourced shoddy fiber from a shredding company in Brownsville, Texas.  (Salzmann Decl. ¶5, Ex. C (Kean 65:10-66:21)).  As Tod Kean explained:  "We used to procure our raw material for the production of insulation from other shredders.  But because of instability in both prices and supply, we decided to open Phoenix to become vertically integrated by controlling our own source of raw materials."  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).  Today, Phoenix Fibers receives clothing "by the truckload" from various sources for shredding, and processes 900 to a million pounds of denim and cotton products into shoddy fiber every month.  (Salzmann Decl. ¶4, Ex. B (Johnson 77:2-4); ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

5.     Phoenix Fibers is solely a clothing and textile recycling company that engages in three types of recycling. First, Phoenix Fibers accepts donations of clothing that it then sells, by the pound and in bulk, as credential. Second, Phoenix Fibers accepts donations of clothing, converts that clothing through a proprietary shredding process into shoddy or filler fiber, and then sells it to companies that use this fiber for various purposes (e.g., for housing, automotive, and appliance insulation). Third, *for a fee,* Phoenix Fibers agrees to destroy certain clothing items

1    and produces a certificate of destruction to the customer. (Johnson Decl. (App. Ex.

2    B) ¶ 6; Kean Decl. (App. Ex. A) ¶ 8.)

3         **Plaintiffs' Response:** Disputed.  Phoenix Fibers was founded "[t]o make

4    shoddy [fiber]."  (Salzmann Decl. ¶3, Ex. A (Quinn 39:8-17); ¶38, Ex. JJ

5    ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")). Specifically,

6    "Phoenix Fibers was founded to provide a stable source of raw material for

7    Bonded Logic's business of manufacturing denim cloth-based insulation under

8    the name UltraTouch Denim."  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding

9    Clothing Nets Big Rewards for Phoenix Fibers*")).  Phoenix Fibers and Bonded

10   Logic are affiliated companies owned by the Kean family.  (Salzmann Decl. ¶38,

11   Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*"); ¶39, Ex.

12   KK ("*Chandler firm grows; recycles denim material into insulation*")).  Bonded

13   Logic is in the business of manufacturing insulation products, including its

14   flagship product, UltraTouch Denim Insulation.  Shoddy fiber created from

15   recycled denim is the raw material that Bonded Logic uses to manufacturer

16   UltraTouch Denim Insulation.  (Salzmann Decl. ¶24, Ex. V (SP/RCRV005629);

17   ¶39, Ex. KK ("*Chandler firm grows; recycles denim material into insulation*");

18   ¶40, Ex. LL ("*Green Chandler company looks to bask in solar savings*"); ¶41,

19   Ex. MM ("*Chandler company turns worn-out blue jeans into insulation,

20   more*")).  Prior to launching Phoenix Fibers, Bonded Logic sourced shoddy fiber

21   from a shredding company in Brownsville, Texas.  (Salzmann Decl. ¶5, Ex. C

22   (Kean 65:10-66:21)).  As Tod Kean explained:  "We used to procure our raw

23   material for the production of insulation from other shredders.  But because of

24   instability in both prices and supply, we decided to open Phoenix to become

25   vertically integrated by controlling our own source of raw materials."

26   (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for

27   Phoenix Fibers*")).  Today, Phoenix Fibers receives clothing "by the truckload"

28   from various sources for shredding, and processes 900 to a million pounds of

denim and cotton products into shoddy fiber every month.  (Salzmann Decl. ¶4, Ex. B (Johnson 77:2-4); ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).  Phoenix Fibers was not in the business of selling "credential" when the company was launched in July 2011.  That aspect of Phoenix Fibers' business only came into existence at a later date.  There is no evidence that Phoenix Fibers was engaged in the sale of credential in November 2011, at the time Plaintiffs and Phoenix Fibers came to an agreement to convert all of Plaintiffs' second-quality denim products into shoddy fiber.  (Salzmann Decl. ¶5, Ex. C (Kean 17:20-18:9); ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

6.    Tod Kean is the president and an owner of Phoenix Fibers. (Kean Decl. (App. Ex. A) ¶ 1.)

**Plaintiffs' Response:**  Undisputed. Tod Kean is also the CEO of Phoenix Fibers, and the Secretary and co-founder of Bonded Logic.  (Salzmann Decl. ¶5, Ex. C (Kean 58:11-16)).

7.    Steven Johnson is the current plant manager of Phoenix Fibers, and has been since around September 2013.  (Johnson Decl. (App. Ex. B) ¶ 1; Kean Decl. (App. Ex. A) ¶ 10.)

**Plaintiffs' Response:**  Undisputed.

8.    Prior to Mr. Johnson being plant manager, a person named Matt Graham was the plant manager, as well as the acting general manager, during the startup phase of Phoenix Fibers. (Kean Decl. (App. Ex. A) ¶ 10.)

**Plaintiffs' Response:**  Undisputed.

9.    Mr. Graham started working for Phoenix Fibers in 2011, when the business started, and left in 2013.  (Kean Decl. (App. Ex. A) ¶ 10.)

**Plaintiffs' Response:**  Undisputed.

**B.**  **Plaintiff Sweet People Apparel, Inc. ("Sweet People")**

10. Plaintiff Sweet People sells certain products, including jeans and cutoff denim shorts, under the Miss Me brand name. (First Amended Complaint ("Complaint (App. Ex. H)" ¶ 17.)

**Plaintiffs' Response:** Undisputed (although Phoenix Fibers' citation does not support this statement).

11. Miss Me brand jeans cost a consumer approximately $100 at retail. (Maciel Decl. (App. Ex. C) ¶ 36; App Ex. MM.)

**Plaintiffs' Response:** Undisputed.

12. Lisa Song was an employee of Sweet People from 2009 to February 2014 and worked as a human resources manager during her entire tenure at Sweet People. (Deposition of Lisa Song ("Song Depo. (App. Ex. D)") 18:19-19:16; App. Ex. P.)

**Plaintiffs' Response:** Disputed.  Lisa Song held the title of Human Resources Manager at Sweet People between 2009 and February 2014.  (Salzmann Decl. ¶8, Ex. F (Song 21:9-12)).  Although Ms. Song was on Sweet People's payroll, she was considered an employee of both Sweet People and RCRV, and her time was allocated between those two companies, and a third related entity called Deodar Brands, the proprietor of the MEK DENIM jeanswear brand.  (Salzmann Decl. ¶6, Ex. D (Kim 41:18-42:1; 58:24-59:3; *see also* 105:24-106:16); Kim Decl. ¶¶8-9; Choi Decl. ¶8).

13. Lilly Kim is the General Counsel for Sweet People and has been since 2010. (Rule 30(b)(6) Deposition of Lilly Kim "Rule 30(b)(6) Depo. (Kim) (App. Ex. E)" 31:24-32:7.)

**Plaintiffs' Response:** Disputed.  Ms. Kim served as the General Counsel of Sweet People and RCRV from approximately April 2010 to October 2016.  Since that time, Ms. Kim has continued to oversee Plaintiffs' legal matters as an outside consultant.  (Kim Decl. ¶ 1).

14.   Felipe Salgado is an employee of Sweet People and began working for Sweet People in October 2004. (Rule (30)(b)(6) Deposition of Felipe Salgado ("Rule 30(b)(6) Depo. (Salgado) (App. Ex. F)" 21:20-22:9; 24:1-15.)

**Plaintiffs' Response:**   Undisputed. While Mr. Salgado has been on RCRV's payroll since 2008, he, like Ms. Song, is considered an employee of both Sweet People and RCRV, and his time is allocated between those two companies, as evidenced by his continuing responsibilities relating to the coordination and shipment of second-quality MISS ME (and ROCK REVIVAL products) to Phoenix Fibers for destruction.  (Salzmann Decl. ¶7, Ex. E (Salgado 21:20-22; 24:10-15; 31:8-33:21)).

C.   **Plaintiff RCRV, Inc. ("RCRV")**

15.   Mr. Salgado was responsible for merchandise shipping at Sweet People from 2013 to the present time. (Rule 30(b)(6) Depo. (Salgado) (App. Ex. F) 21:20-28:15.)

**Plaintiffs' Response:**   Disputed.  Since October 2013, Mr. Salgado's only responsibilities relating to Sweet People's warehouse logistics were the coordination and shipment of second-quality MISS ME (and ROCK REVIVAL products) to Phoenix Fibers for destruction.  (Salzmann Decl. ¶7, Ex. E (Salgado 24:10-15; 31:8-33:21)).

16.   Plaintiff RCRV is a denim and apparel company that was formed in 2007. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 102:22-103:1; Complaint (App. Ex. H) ¶ 17.)

**Plaintiffs' Response:**   Undisputed.

17.   RCRV sells certain products under its Rock Revival brand name. (Complaint (App. Ex. H) ¶ 17.)

**Plaintiffs' Response:**   Undisputed.

18.   Rock Revival brand jeans cost a consumer approximately between $150 and $200 at retail. (Maciel Decl. (App. Ex. C) ¶ 37; App Ex. NN.)

**Plaintiffs' Response:**   Undisputed.

19.     In addition to being the General Counsel for Sweet People, Lilly Kim is also the General Counsel for RCRV and has been since 2010. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 31:24-32:7.)

**Plaintiffs' Response:**  Disputed. Ms. Kim served as the General Counsel of Sweet People and RCRV from approximately April 2010 to October 2016. Since that time, Ms. Kim has continued to oversee Plaintiffs' legal matters as an outside consultant.  (Kim Decl. ¶ 1).

20.     In addition to being an employee of Sweet People, Mr. Salgado is an employee of RCRV and has been since 2008. (Rule 30(b)(6) Depo. (Salgado) (App. Ex. F) 15:19-22; 18:2-24; 21:20-28:15.) At RCRV, Mr. Salgado oversees customer service, the shipping department, and the warehouse. (Rule 30(b)(6) Depo. (Salgado) (App. Ex. F) 17:25-18:24.)

**Plaintiffs' Response:**  Undisputed.  While Mr. Salgado has been on RCRV's payroll since 2008, he, like Ms. Song, is considered an employee of both Sweet People and RCRV, and his time is allocated between those two companies, as evidenced by his continuing responsibilities relating to the coordination and shipment of second-quality MISS ME (and ROCK REVIVAL products) to Phoenix Fibers for destruction.  (Salzmann Decl. ¶7, Ex. E (Salgado 21:20-22; 24:10-15; 31:8-33:21)).

21.     Ms. Song was never employed by RCRV.  (Song Depo. (App. Ex. D) 18:19-19:16; 21:9-12; App. Ex. P).

**Plaintiffs' Response:**  Disputed.  Lisa Song held the title of Human Resources Manager at Sweet People between 2009 and February 2014.  (Salzmann Decl. ¶8, Ex. F (Song 21:9-12)).  Although Ms. Song was on Sweet People's payroll, she was considered an employee of both Sweet People and RCRV, and her time was allocated between those two companies, and a third related entity called Deodar Brands, the proprietor of the MEK DENIM jeanswear brand.  (Salzmann

1    Decl. ¶6, Ex. D (Kim 41:18-42:1; 58:24-59:3; *see also* 105:24-106:16); Kim

2    Decl. ¶¶8-9; Choi Decl. ¶8).

3        22.    Further, Ms. Song never negotiated any contracts on behalf of RCRV.

4    (Song Depo. (App. Ex. D) 19:19-20:12).

5        **Plaintiffs' Response:**  Disputed.  Ms. Song, acting on behalf of Plaintiffs and

6    under the direction of Ms. Kim, entered into an agreement with Phoenix Fibers

7    relating to the donation of second-quality MISS ME and ROCK REVIVAL

8    denim products, which were to solely be destroyed and converted into shoddy

9    fiber.  (Salzmann Decl. ¶6, Ex. D (Kim 14:1-9); ¶8, Ex. F (Song 24:4-9); Kim

10   Decl. ¶9; Choi Decl. ¶8).

11       23.    There is no evidence Ms. Song ever represented herself as an employee or

12   agent of RCRV during any conversation that she had with anyone from Phoenix

13   Fibers.

14       **Plaintiffs' Response:**  Disputed.  Ms. Song was considered an employee of both

15   Sweet People and RCRV.  (Salzmann Decl. ¶6, Ex. D (Kim 41:18-42:1; 58:24-

16   59:3; *see also* 105:24-106:16); Kim Decl. ¶¶8-9).  Ms. Song, acting on behalf of

17   both Sweet People and RCRV and under the direction of Ms. Kim (the then-

18   General Counsel of both companies), entered into an agreement with Phoenix

19   Fibers relating to the donation of both second-quality MISS ME and ROCK

20   REVIVAL denim products, which were solely to be destroyed and converted

21   into shoddy fiber.  (Salzmann Decl. ¶6, Ex. D (Kim 14:1-9); ¶8, Ex. F (Song

22   24:4-9); Kim Decl. ¶¶8-9, 15; Choi Decl. ¶8).  Moreover, the parties' course of

23   conduct between November 2011 and September 2015—during which time

24   Plaintiffs' delivered hundreds of thousands of pounds of ROCK REVIVAL—

25   confirm that RCRV was a party to the agreement negotiated by Ms. Song,

26   further indicating that she represented RCRV in the negotiation of the parties'

27   agreement.

28

**D.**     <u>The Interaction Between Sweet People, RCRV, and Phoenix Fibers</u>

24.     Plaintiffs viewed Phoenix Fibers' website prior to shipping any clothing to Phoenix Fibers. (Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)

> **<u>Plaintiffs' Response:</u>**  Disputed.  Plaintiffs' prior statement that "one or more RCRV and/or Sweet People Apparel, Inc. employee visited the Phoenix Fibers website" before Plaintiffs delivered any products to Phoenix Fibers for recycling into shoddy fiber was based on Plaintiffs then-understanding that Ms. Song had visited the Phoenix Fibers website at or around the time she was negotiating the terms of the parties' agreement with Mr. Graham.  Ms. Song, however, recently testified that she has no specific recollection of visiting the Phoenix Fibers website.  (Salzmann Decl. ¶8, Ex. F (Song 47:20-48:17)).  Moreover, Tod Kean conceded at his deposition that Phoenix Fibers ***did not*** have an operational website when the company launched in July 2011, and further testified that he did not know when the Phoenix Fibers website went live, stating that he "would want to check the dates on the [Wayback] machine."  (Salzmann Decl. ¶5, Ex. C (Kean 101:5-25); ¶42, Ex. NN (printouts of Wayback Machine screen capture)).  Accordingly, there is no competent evidence that Phoenix Fibers even had an operational website in or around November 2011.

25.     Since its inception, Phoenix Fibers' website homepage has stated, "Phoenix Fibers collects and recycles textiles in a variety of ways.  We maintain a zero waste philosophy whenever feasible.  The items we do not use in our shredding process are resold to other recycling companies." (Kean Decl. (App. Ex. A) ¶ 9; App. Ex. T; Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 166:3-16.)

> **<u>Plaintiffs' Response:</u>**  Disputed.  Phoenix Fibers has produced no evidence to substantiate Tod Kean's claim that the phxfibers.com website has been active "[s]ince [the company's] inception" in July 2011.  (Kean Decl. ¶9).  Tod Kean conceded at his deposition that Phoenix Fibers ***did not*** have an operational website when the company launched in July 2011, and further testified that he

1   did not know when the Phoenix Fibers website went live, stating that he "would

2   want to check the dates on the [Wayback] machine." (Salzmann Decl. ¶5, Ex. C

3   (Kean 101:5-25)). Had Mr. Kean checked the Wayback Machine, he would

4   have learned that the first screen capture of the phxfibers.com website is from

5   September 13, 2012, more than a year after Phoenix Fibers commenced its

6   business. (Salzmann Decl. ¶42, Ex. NN (printouts of Wayback Machine screen

7   capture)). Moreover, Phoenix Fibers did not "purchase" Plaintiffs' products,

8   and when Mr. Kean was specifically asked how this statement—"The items we

9   do not use in our shredding process are resold to other recycling

10  companies"—which refers to the resale or reselling of products, related Phoenix

11  Fibers' sale of Plaintiffs' products, Mr. Kean was unable to identify any first or

12  initial "sale" of products by Plaintiffs that preceded Phoenix Fibers' "resale."

13  (Salzmann Decl. ¶5, Ex. C (Kean 102:1-23)).

14      26.     Plaintiffs allege that in 2011 they entered into a contract with Phoenix

15  Fibers (the "Alleged Contract"). (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 14:1-9;

16  18:4-19:3; 28:12-29:7.)  The Alleged Contract is not a written contract. *(Id.* at 32:17-

17  34:12; Song Depo. (App. Ex. D) 74:19-75:15; App. Ex. FF.)

18      **Plaintiffs' Response:**  Not disputed that there is no single writing consisting of

19  a written contract between the parties, but disputed to the extent intended to

20  suggest there are no writings that make reference to any of the terms of the

21  parties' agreement. In fact, contemporaneous written communications between

22  the parties memorialize key material terms of the parties' agreement, including,

23  without limitation, Phoenix Fibers' agreement to shred (and thereby destroy) all

24  goods donated to it by Plaintiffs:

25      • On November 4, 2011, Mr. Graham sent Ms. Song an email explaining

26          Phoenix Fibers' shredding services, and explaining that "*[i]f necessary,*

27          *[Phoenix Fibers] can remove the tags, buttons and zippers.  There is no*

28          *charge for our recycling service.*"  (Salzmann Decl. ¶16, Ex. N

1    (SP/RCRV005538-5539) (emphasis added)).  It would only be necessary

2    to remove "the tags, buttons and zippers" from Plaintiffs products if the

3    products were being recycled into shoddy fiber, as the parties

4    contemplated.  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets*

5    *Big Rewards for Phoenix Fibers*") (explaining that the first step in the

6    shredding process is "a proprietary process that removes all buttons,

7    zippers and tags")).

8    • On November 15, 2015, two weeks prior to Plaintiffs' delivery of their

9    first shipment of products to Phoenix Fibers for recycling into shoddy

10    fiber, Mr. Graham sent an email to Ms. Song explaining "[t]here's not

11    much else needed.  *We will receive the material, schedule it for*

12    *destruction and away we go!*  I'll call you this morning to confirm this

13    email."  (Salzmann Decl. ¶18, Ex. P (SP/RCRV005545) (emphasis

14    added)).

15    • December 5, 2011, a week after Plaintiffs delivered their first shipment of

16    products Phoenix Fibers for recycling into shoddy fiber, Mr. Graham sent

17    Ms. Song an email explaining what happens to Plaintiffs' products:  "*The*

18    *product we receive may be recycled into any number of products.  This*

19    *could range from house, automobile or appliance insulation to prison*

20    *mattresses…. There is also a certain portion that cannot be used, such a*

21    *metal pieces in the buttons and zippers.  These are removed and*

22    *recycled separately*."  (Salzmann Decl. ¶20, Ex. R (SP/RCRV005583-

23    5584) (emphasis added)).

24    • A few months later in March 2012, Mr. Graham reaffirmed this process in

25    an email to Ms. Song stating:  "*Phoenix Fibers converts the jeans into*

26    *fiber that gets sent to our affiliate company, Bonded Logic* which in turn,

27    manufactures the end products."  (Salzmann Decl. ¶24, Ex. V

28    (SP/RCRV005629) (emphasis added)).

- Shortly thereafter, on April 9, 2012, Mr. Graham sent an email to Ms. Song following up on their recent in-person meeting stating: "***Some of our new machinery I told you about has just arrived.  Once we have it set up and running, I will send you a video of us running your jeans.***" (Salzmann Decl. ¶27, Ex. Y (SP/RCRV005640) (emphasis added)).

27.    Ms. Kim and Plaintiffs allege, but cannot prove, that, pursuant to the terms of the Alleged Contract, Phoenix Fibers was obligated to recycle all products donated to Phoenix Fibers by Plaintiffs. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 26:1-6; 197:18-25; App. Ex. V-W.)  Further, Ms. Kim and Plaintiffs assert, but cannot prove, that Plaintiffs *explicitly* placed a requirement on Phoenix Fibers to destroy all items that Plaintiffs donated, and that the Alleged Contract required Phoenix Fibers to destroy all items that Plaintiffs donated. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 26:1-6; 197:18-25; 26:20.-29:14; App. Ex. V-W.)

**Plaintiffs' Response:**  Disputed.  Ms. Kim saw written communications between Ms. Song and Mr. Graham wherein Mr. Graham specifically represented that Phoenix Fibers would destroy all of Plaintiffs' second-quality denim products and convert them into shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶¶10-11).  As Ms. Kim testified, "[w]e did require that the items be destroyed and recycled" (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)).  Based on her contemporaneous discussions with Ms. Song regarding Ms. Song's conversations with Mr. Graham, Ms. Kim understood that Plaintiffs had conditioned their agreement to provide Phoenix Fibers with their second-quality MISS ME and ROCK REVIVAL denim products on Phoenix Fibers' agreement to convert all such products into shoddy fiber.  (Salzmann Decl. ¶6, Ex. D (Kim 28:14-29:4); L. Kim Decl. ¶¶10-12; *see also* Choi Decl. ¶8).  Moreover, the contemporaneous written communications between the parties memorialize material terms of the parties' agreement, which include destruction:

15

- On November 4, 2011, Mr. Graham sent Ms. Song an email explaining Phoenix Fibers' shredding services, and explaining that "*[i]f necessary, [Phoenix Fibers] can remove the tags, buttons and zippers.  There is no charge for our recycling service.*"  (Salzmann Decl. ¶16, Ex. N (SP/RCRV005538-5539) (emphasis added)).  It would only be necessary to remove "the tags, buttons and zippers" from Plaintiffs products if the products were being recycled into shoddy fiber, as the parties contemplated.  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*") (explaining that the first step in the shredding process is "a proprietary process that removes all buttons, zippers and tags")).

- On November 15, 2015, two weeks prior to Plaintiffs' delivery of their first shipment of products to Phoenix Fibers for recycling into shoddy fiber, Mr. Graham sent an email to Ms. Song explaining "[t]here's not much else needed.  *We will receive the material, schedule it for destruction and away we go!*  I'll call you this morning to confirm this email."  (Salzmann Decl. ¶18, Ex. P (SP/RCRV005545) (emphasis added)).

- December 5, 2011, a week after Plaintiffs delivered their first shipment of products Phoenix Fibers for recycling into shoddy fiber, Mr. Graham sent Ms. Song an email explaining what happens to Plaintiffs' products:  "*The product we receive may be recycled into any number of products.  This could range from house, automobile or appliance insulation to prison mattresses…. There is also a certain portion that cannot be used, such a metal pieces in the buttons and zippers.  These are removed and recycled separately*."  (Salzmann Decl. ¶20, Ex. R (SP/RCRV005583-5584) (emphasis added)).

16

- A few months later in March 2012, Mr. Graham reaffirmed this process in an email to Ms. Song stating: "***Phoenix Fibers converts the jeans into fiber that gets sent to our affiliate company, Bonded Logic*** which in turn, manufactures the end products." (Salzmann Decl. ¶24, Ex. V (SP/RCRV005629) (emphasis added)).

- Shortly thereafter, on April 9, 2012, Mr. Graham sent an email to Ms. Song following up on their recent in-person meeting stating: "***Some of our new machinery I told you about has just arrived.  Once we have it set up and running, I will send you a video of us running your jeans.***" (Salzmann Decl. ¶27, Ex. Y (SP/RCRV005640) (emphasis added)).

28.    Plaintiffs' 30(b)(6) witness regarding negotiation of, and entry into, the Alleged Contract testified that the Alleged Contract was negotiated and entered into by the human resource manager, Ms. Song, on behalf of Plaintiffs, as opposed to Ms. Kim, Plaintiffs' General Counsel or anyone else. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 14:1-9; 18:4-19:15; 31:24-32:7; 175:25-176:3.) Plaintiffs' 30(b)(6) witness further testified that Ms. Song negotiated the Alleged Contract with Mr. Graham and then entered into the Alleged Contract with Mr. Graham, a representative of Phoenix Fibers. (*Id.* at 14:1-9; 18:4-19:3; 28:12-29:4.)

> **Plaintiffs' Response:**  Disputed.  Ms. Song, acting on behalf of Plaintiffs and under the direction of Ms. Kim, entered into an agreement with Phoenix Fibers relating to the donation of second-quality MISS ME and ROCK REVIVAL denim products, which were all to be destroyed and converted into shoddy fiber. (Salzmann Decl. ¶6, Ex. D (Kim 14:1-9); ¶8, Ex. F (Song 24:4-9); Kim Decl. ¶¶8-12).  Eric Choi, Plaintiffs' then-CEO approved the terms of the parties' agreement.  (Choi Decl. ¶ 8).

29.    To the extent there is a contract, the Alleged Contract was entered into prior to November 7, 2011. (Song Depo. (App. Ex. D) 57:14-60:3; 62:8-17; 82:1783:7; Maciel Decl. (App. Ex. C) ¶ 28; App. Ex. EE).

**Plaintiffs' Response:**  Disputed.  The parties' agreement was finalized prior to the first delivery of denim products to Phoenix Fibers for recycling into shoddy fiber on November 29, 2011.  Phoenix Fibers is desperately attempting to ignore Mr. Graham's November 15, 2015 email to Ms. Song—two weeks prior to Plaintiffs' delivery of their first shipment of products to Phoenix Fibers for recycling into shoddy fiber—in which Mr. Graham states "[t]here's not much else needed. ***We will receive the material, schedule it for destruction and away we go!***  I'll call you this morning to confirm this email."  (Salzmann Decl. ¶18, Ex. P (SP/RCRV005545) (emphasis added)).  Further, try as it may, even if the parties' agreement had been reached on November 7, 2011, Mr. Graham's November 15, 2011 email merely serves to confirm that which the parties had already agreed to—that Phoenix Fibers would only recycle Plaintiffs' products into shoddy fiber.

30.     Plaintiffs have no evidence that Ms. Kim, the General Counsel, has any personal knowledge of the formation of, or terms of, the Alleged Contract.

**Plaintiffs' Response:**  Undisputed.  Throughout her discussions with Phoenix Fibers, Ms. Song reported back to Ms. Kim, Mr. Choi and Steve Kim, Plaintiffs' then-COO, her superiors who also worked for both Sweet People and RCRV.  (Salzmann Decl. ¶6, Ex. D (Kim 18:4-24; 20:1-11; 20:25-21:3; 43:8-19); ¶15, Ex. M (SP/RCRV005532-5533), ¶16, Ex. N (SP/RCRV005538-5539), ¶17, Ex. O (SP/RCRV005542-5543); Kim Decl. ¶9; Choi Decl. ¶8).  Moreover, Ms. Kim saw written communications between Ms. Song and Mr. Graham wherein Mr. Graham specifically represented that Phoenix Fibers would only destroy Plaintiffs' second-quality denim products and convert them into shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶11), and testified that "[w]e did require that the items be destroyed and recycled" (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)).  Based on her contemporaneous discussions with Ms. Song regarding Ms. Song's negotiations with Mr. Graham, Ms. Kim understood

that Plaintiffs had conditioned their agreement to provide Phoenix Fibers with
their second-quality MISS ME and ROCK REVIVAL denim products on
Phoenix Fibers' agreement to convert all such products into shoddy fiber.
(Salzmann Decl. ¶6, Ex. D (Kim 28:14-29:4); Kim Decl. ¶10; *see also* Choi
Decl. ¶8).

31.     Ms. Kim did not have any communications of any kind with anyone from
Phoenix Fibers until 2015, years after the alleged formation of the Alleged Contract.
(Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 19:4-15; 31:24-32:7.)

**Plaintiffs' Response:**  Disputed to the following extent.  While Ms. Kim did not
have any such direct communications until 2015, throughout her discussions
with Phoenix Fibers, Ms. Song reported back to Ms. Kim, Mr. Choi and Steve
Kim, Plaintiffs' then-COO, her superiors who also worked for both Sweet
People and RCRV.  (Salzmann Decl. ¶6, Ex. D (Kim 18:4-24; 20:1-11; 20:25-
21:3; 43:8-19); ¶15, Ex. M (SP/RCRV005532-5533), ¶16, Ex. N
(SP/RCRV005538-5539), ¶17, Ex. O (SP/RCRV005542-5543); Kim Decl. ¶9;
Choi Decl. ¶8).  Moreover, Ms. Kim saw written communications between Ms.
Song and Mr. Graham wherein Mr. Graham represented that Phoenix Fibers
would destroy Plaintiffs' second-quality denim products and convert them into
shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶11), and
testified that "[w]e did require that the items be destroyed and recycled"
(Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)).  Based on her contemporaneous
discussions with Ms. Song regarding Ms. Song's negotiations with Mr. Graham,
Ms. Kim understood that Plaintiffs had conditioned their agreement to provide
Phoenix Fibers with their second-quality MISS ME and ROCK REVIVAL
denim products only based on Phoenix Fibers' agreement to convert all such
products into shoddy fiber.  (Salzmann Decl. ¶6, Ex. D (Kim 28:14-29:4); Kim
Decl. ¶10; *see also* Choi Decl. ¶8).  In addition, based on her contemporaneous
understanding of Ms. Song's oral and written communications with Phoenix

19

Fibers, namely, Mr. Graham's representation that Phoenix Fibers would "destroy" Plaintiffs' products and convert them into shoddy fiber, and his statement that Phoenix Fibers did not require a writing to memorialize the parties' understanding, Ms. Kim was satisfied that a written agreement with Phoenix Fibers was not necessary.  (Salzmann Decl. ¶6, Ex. D (Kim 34:4-12; 37:22-38:10); Kim Decl. ¶12).

32.     Ms. Kim never spoke to or communicated with Mr. Graham about anything. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 19:4-15; 175:25-176:3.)

**Plaintiffs' Response:**  Disputed to the following extent.  While Ms. Kim did not have any direct communications with Mr. Graham, throughout her discussions with Phoenix Fibers, Ms. Song reported back to Ms. Kim, Mr. Choi and Steve Kim, Plaintiffs' then-COO, her superiors who also worked for both Sweet People and RCRV.  (Salzmann Decl. ¶6, Ex. D (Kim 18:4-24; 20:1-11; 20:25-21:3; 43:8-19); ¶15, Ex. M (SP/RCRV005532-5533), ¶16, Ex. N (SP/RCRV005538-5539), ¶17, Ex. O (SP/RCRV005542-5543); Kim Decl. ¶9; Choi Decl. ¶8).  Moreover, Ms. Kim saw written communications between Ms. Song and Mr. Graham wherein Mr. Graham represented that Phoenix Fibers would destroy Plaintiffs' second-quality denim products and convert them into shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶11), and testified that "[w]e did require that the items be destroyed and recycled" (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)).  Based on her contemporaneous discussions with Ms. Song regarding Ms. Song's negotiations with Mr. Graham, Ms. Kim understood that Plaintiffs had conditioned their agreement to provide Phoenix Fibers with their second-quality MISS ME and ROCK REVIVAL denim products only based on Phoenix Fibers' agreement to convert all such products into shoddy fiber.  (Salzmann Decl. ¶6, Ex. D (Kim 28:14-29:4); Kim Decl. ¶10; *see also* Choi Decl. ¶8).  In addition, based on her contemporaneous understanding of Ms. Song's oral and written communications with Phoenix

Fibers, namely, Mr. Graham's representation that Phoenix Fibers would "destroy" Plaintiffs' products and convert them into shoddy fiber, and his statement that Phoenix Fibers did not require a writing to memorialize the parties' understanding, Ms. Kim was satisfied that a written agreement with Phoenix Fibers was not necessary.  (Salzmann Decl. ¶6, Ex. D (Kim 34:4-12; 37:22-38:10); Kim Decl. ¶12).

33.     Plaintiffs have no evidence that Mr. Salgado has personal knowledge of the terms of the Alleged Contract between Phoenix Fibers.

**Plaintiffs' Response**:  Undisputed.

34.     Mr. Salgado does not remember ever speaking to former Phoenix Fibers employee, Mr. Graham. (Rule 30(b)(6) Depo. (Salgado) (App. Ex. F) 71:172:4). Mr. Salgado never spoke to current Phoenix Fibers employee Mr. Johnson about any obligations between Phoenix Fibers and Plaintiffs. (*Id.* at 73:19-74:2.)

**Plaintiffs' Response**:  Disputed to the following extent.  While he did not have any such direct communications, Mr. Salgado understood that Plaintiffs' products were delivered to Phoenix Fibers for destruction.  (Salzmann Decl. ¶7, Ex. E (Salgado 31:8-25; 35:16-25; 99:14-19)).  Moreover, Mr. Johnson's communications with Mr. Salgado confirmed that Phoenix Fibers was destroying Plaintiffs' products.  Indeed, on September 11, 2015, Mr. Johnson wrote the following to Mr. Salgado:  "The last 3 loads have been mostly Miss Me, due to the high metal content we 'salt' Miss me into our blend.  This insures that we do not over burden our metal counter measures.  ***The Rocks [Revivals] have significantly less metal & we can destroy / convert those quickly***."  (Salzmann Decl. ¶28, Ex. Z (SP/RCRV001006-1009) (emphasis added)).

35.     No one ever told Mr. Salgado that there was a contract between Plaintiffs and Phoenix Fibers. (Rule 30(b)(6) Depo. (Salgado)(App. Ex. F) 90:5-12.)

**Plaintiffs' Response**:  Disputed to the following extent.  While he did not have any such direct communication, Mr. Salgado understood that Plaintiffs' products

1    were delivered to Phoenix Fibers for destruction.  (Salzmann Decl. ¶7, Ex. E

2    (Salgado 31:8-25; 35:16-25; 99:14-19)).  Moreover, Mr. Johnson's

3    communications with Mr. Salgado confirmed that Phoenix Fibers was

4    destroying Plaintiffs' products.  Indeed, on September 11, 2015, Mr. Johnson

5    wrote the following to Mr. Salgado:  "The last 3 loads have been mostly Miss

6    Me, due to the high metal content we 'salt' Miss me into our blend.  This insures

7    that we do not over burden our metal counter measures.  ***The Rocks [Revivals]***

8    ***have significantly less metal & we can destroy / convert those quickly***."

9    (Salzmann Decl. ¶28, Ex. Z (SP/RCRV001006-1009) (emphasis added)).

10   36.    Ms. Song, the only person who spoke to Phoenix Fibers regarding the

11   Alleged Contract, cannot recall whether any part of the Alleged Contract was based

12   on conversations she had with Phoenix Fibers. (Song Depo. (App. Ex. D) 61:21-

13   62:1.)

14        **Plaintiffs' Response:**  Disputed.  Ms. Song's testimony was: "I can't recall the

15        origins of what I recall, whether it was a phone [call] or a[n] e-mail."  (Salzmann

16        Decl. ¶8, Ex. F (Song 61:12-19; *see also* 35:13-18; 72:20-73:2)).  In fact, Ms.

17        Song testified at length that the parties' agreement was based in significant part

18        on conversations and negotiations she had with Mr. Graham.  (Salzmann Decl.

19        ¶8, Ex. F (Song 31:8-24; 32:14-33:1; 33:9-17)).

20   37.    Plaintiffs do not know if, and cannot prove that, during verbal discussions,

21   Ms. Song ever required Plaintiffs to destroy all items that they donated to Phoenix

22   Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-16; 28:12-29:14;

23   Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:552:3; 52:11-17; Maciel

24   Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)

25        **Plaintiffs' Response:**  Disputed.  Phoenix Fibers mischaracterizes Ms. Song's

26        testimony.  In the portion referred to, Ms. Song's testimony was: "I can't recall

27        the origins of what I recall, whether it was a phone [call] or a[n] e-mail."

28        (Salzmann Decl. ¶8, Ex. F (Song 61:12-19; *see also* 35:13-18; 72:20-73:2)).  In

fact, Ms. Song testified at length that the parties' agreement was based in significant part on conversations and negotiations she had with Mr. Graham. Salzmann Decl. ¶8, Ex. F (Song 31:8-24; 32:14-33:1; 33:9-17)).  Further, Ms. Song has a clear recollection and understanding that Phoenix Fibers agreed to shred (*i.e.*, destroy) all of Plaintiffs' products into shoddy fiber.  (Salzmann Decl. ¶8, Ex. F (Song 67:11-24; 28:10-29:3)).  Moreover, contemporaneous written communications between the parties memorialize key material terms of the parties' agreement, including, without limitation, Phoenix Fibers' agreement to shred (and thereby destroy) all goods donated to it by Plaintiffs.  (Salzmann Decl. ¶16, Ex. N (SP/RCRV005538-5539); ¶18, Ex. P (SP/RCRV005545); ¶20, Ex. R (SP/RCRV005583-5584); ¶24, Ex. V (SP/RCRV005629); ¶27, Ex. Y (SP/RCRV005640)).

38.    Ms. Song does not recall any oral communications in which she required Plaintiffs to destroy all the items that they donated to Phoenix Fibers. (Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:5-52:3; 52:11-17.)

**Plaintiffs' Response:**  Disputed.  Phoenix Fibers mischaracterizes Ms. Song's testimony.  In the portion referred to, Ms. Song's testimony was: "I can't recall the origins of what I recall, whether it was a phone [call] or a[n] e-mail." (Salzmann Decl. ¶8, Ex. F (Song 61:12-19; *see also* 35:13-18; 72:20-73:2)).  In fact, Ms. Song testified at length that the parties' agreement was based in significant part on conversations and negotiations she had with Mr. Graham. Salzmann Decl. ¶8, Ex. F (Song 31:8-24; 32:14-33:1; 33:9-17)).  Further, Ms. Song has a clear recollection and understanding that Phoenix Fibers agreed to shred (*i.e.*, destroy) all of Plaintiffs' products into shoddy fiber.  (Salzmann Decl. ¶8, Ex. F (Song 67:11-24; 28:10-29:3)).  Moreover, contemporaneous written communications between the parties memorialize key material terms of the parties' agreement, including, without limitation, Phoenix Fibers' agreement to shred (and thereby destroy) all goods donated to it by Plaintiffs.  (Salzmann

23

Decl. ¶16, Ex. N (SP/RCRV005538-5539); ¶18, Ex. P (SP/RCRV005545); ¶20, Ex. R (SP/RCRV005583-5584); ¶24, Ex. V (SP/RCRV005629); ¶27, Ex. Y (SP/RCRV005640)).

39.     Further, despite Ms. Kim's belief, Plaintiffs do not know if, and cannot prove that, during verbal discussions, Phoenix Fibers ever agreed to destroy all items that Plaintiffs donated to Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-16; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:5-52:3; 52:11-17; Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ).  Nor have Plaintiffs provided evidence that Phoenix Fibers ever agreed to destroy every shipment of materials Plaintiffs provided them. (*See id.*)

**Plaintiffs' Response:**  Disputed.  Ms. Kim testified that she saw written communications between Ms. Song and Mr. Graham wherein Mr. Graham represented that Phoenix Fibers would destroy Plaintiffs' second-quality denim products and convert them into shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶11), and testified that "[w]e did require that the items be destroyed and recycled" (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)).  Further, contemporaneous written communications between the parties memorialize key material terms of the parties' agreement, including, without limitation, Phoenix Fibers' agreement to shred (and thereby destroy) all goods donated to it by Plaintiffs:

- On November 4, 2011, Mr. Graham sent Ms. Song an email explaining Phoenix Fibers' shredding services, and explaining that "***[i]f necessary, [Phoenix Fibers] can remove the tags, buttons and zippers.  There is no charge for our recycling service.***"  (Salzmann Decl. ¶16, Ex. N (SP/RCRV005538-5539) (emphasis added)).  It would only be necessary to remove "the tags, buttons and zippers" from Plaintiffs products if the products were being recycled into shoddy fiber, as the parties contemplated.  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets*

*Big Rewards for Phoenix Fibers*") (explaining that the first step in the shredding process is "a proprietary process that removes all buttons, zippers and tags")).

- On November 15, 2015, two weeks prior to Plaintiffs' delivery of their first shipment of products to Phoenix Fibers for recycling into shoddy fiber, Mr. Graham sent an email to Ms. Song explaining "[t]here's not much else needed. *We will receive the material, schedule it for destruction and away we go!* I'll call you this morning to confirm this email." (Salzmann Decl. ¶18, Ex. P (SP/RCRV005545) (emphasis added)).

- December 5, 2011, a week after Plaintiffs delivered their first shipment of products Phoenix Fibers for recycling into shoddy fiber, Mr. Graham sent Ms. Song an email explaining what happens to Plaintiffs' products: "*The product we receive may be recycled into any number of products. This could range from house, automobile or appliance insulation to prison mattresses…. There is also a certain portion that cannot be used, such a metal pieces in the buttons and zippers. These are removed and recycled separately*." (Salzmann Decl. ¶20, Ex. R (SP/RCRV005583-5584) (emphasis added)).

- A few months later in March 2012, Mr. Graham reaffirmed this process in an email to Ms. Song stating: "*Phoenix Fibers converts the jeans into fiber that gets sent to our affiliate company, Bonded Logic* which in turn, manufactures the end products." (Salzmann Decl. ¶24, Ex. V (SP/RCRV005629) (emphasis added)).

- Shortly thereafter, on April 9, 2012, Mr. Graham sent an email to Ms. Song following up on their recent in-person meeting stating: "*Some of our new machinery I told you about has just arrived. Once we have it*

1    *set up and running, I will send you a video of us running your jeans.*"

2    (Salzmann Decl. ¶27, Ex. Y (SP/RCRV005640) (emphasis added)).

3    40.    Plaintiffs' 30(b)(6) witness admitted: "I don't know if the word

4    'destroyed' was used in the verbal discussions" between Ms. Song and Mr. Graham.

5    (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:13-19.)

6    **Plaintiffs' Response:**  Disputed to the following extent.  While Ms. Kim so

7    testified, she saw written communications between Ms. Song and Mr. Graham

8    wherein Mr. Graham represented that Phoenix Fibers would destroy Plaintiffs'

9    second-quality denim products and convert them into shoddy fiber (Salzmann

10   Decl. ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶11), and testified that "[w]e did

11   require that the items be destroyed and recycled" (Salzmann Decl. ¶6, Ex. D

12   (Kim 27:20-28:1)).

13   41.    Plaintiffs allege that Ms. Song reported to Ms. Kim with respect to the

14   negotiations and entry into the Alleged Contract between Plaintiffs and Phoenix

15   Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 14:4-9; 18:4-19:15; 24:17-25:4;

16   28:12-29:14; Song Depo. (App. Ex. D) 27:9-15.)

17   **Plaintiffs' Response:**  Disputed as to the reference to an "Alleged Contract."

18   Otherwise undisputed, as throughout her discussions with Phoenix Fibers, Ms.

19   Song reported back to Ms. Kim, Mr. Choi and Steve Kim, Plaintiffs' then-COO,

20   her superiors who also worked for both Sweet People and RCRV.  (Salzmann

21   Decl. ¶6, Ex. D (Kim 18:4-24; 20:1-11; 20:25-21:3; 43:8-19); ¶15, Ex. M

22   (SP/RCRV005532-5533), ¶16, Ex. N (SP/RCRV005538-5539), ¶17, Ex. O

23   (SP/RCRV005542-5543); Kim Decl. ¶9; Choi Decl. ¶8)

24   42.    Despite reporting to Ms. Kim with respect to the negotiations between

25   Sweet People and Phoenix Fibers and the alleged formation of the Alleged Contract,

26   Ms. Song never reported to Ms. Kim that the Alleged Contract contained an explicit

27   requirement on Phoenix Fibers to destroy all items that Plaintiffs donated to

28

1    Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-19;

2    28:12-29:14.)

3         **Plaintiffs' Response**: Disputed.  Throughout her discussions with Phoenix

4         Fibers, Ms. Song reported back to Ms. Kim, Mr. Choi and Steve Kim, Plaintiffs'

5         then-COO, her superiors who also worked for both Sweet People and RCRV

6         that the agreement between the parties required Phoenix Fibers to destroy all

7         items that Plaintiffs donated to Phoenix Fibers.  (Salzmann Decl. ¶6, Ex. D (Kim

8         18:4-24; 20:1-11; 20:25-21:3; 43:8-19); ¶15, Ex. M (SP/RCRV005532-5533),

9         ¶16, Ex. N (SP/RCRV005538-5539), ¶17, Ex. O (SP/RCRV005542-5543); Kim

10        Decl. ¶9; Choi Decl. ¶8).  Moreover, Ms. Kim saw written communications

11        between Ms. Song and Mr. Graham wherein Mr. Graham represented that

12        Phoenix Fibers would destroy Plaintiffs' second-quality denim products and

13        convert them into shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25); Kim

14        Decl. ¶11), and testified that "[w]e did require that the items be destroyed and

15        recycled" (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)).  Based on her

16        contemporaneous discussions with Ms. Song regarding Ms. Song's negotiations

17        with Mr. Graham, Ms. Kim understood that Plaintiffs had conditioned their

18        agreement to provide Phoenix Fibers with their second-quality MISS ME and

19        ROCK REVIVAL denim products only based on Phoenix Fibers' agreement to

20        convert all such products into shoddy fiber.  (Salzmann Decl. ¶6, Ex. D (Kim

21        28:14-29:4); Kim Decl. ¶10; *see also* Choi Decl. ¶8).

22        43.    Prior to October 27, 2015, Plaintiffs never verbally or electronically told

23   Phoenix Fibers that reselling the products donated to Phoenix Fibers by Plaintiffs was

24   prohibited. (Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)

25        **Plaintiffs' Response**:  Disputed to the following extent.  While no such

26        communication took place prior to October 27, 2015, Plaintiffs had no reason to

27        believe that Phoenix Fibers had violated the terms of the parties' agreement that

28

1   Phoenix Fibers would only shred all products donated to it by Plaintiffs, and had
2   resold any such products, prior to that date.

3       44.    Plaintiffs were aware of Phoenix Fibers' certified destruction program.
4   (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 167:21-168:24; 169:12-170:3; Maciel
5   Decl. (App. Ex. C) ¶ 18; App. Ex. U.)  Plaintiffs did not require any certification
6   from Phoenix Fibers confirming that the items Plaintiffs donated to Phoenix Fibers
7   had been destroyed. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 34:13-21; Maciel
8   Decl. (App. Ex. C) IN 32-33; App. Ex. II-JJ.) Plaintiffs never paid Phoenix Fibers
9   to destroy the items that Plaintiffs donated to Phoenix Fibers. (Johnson Decl. (App.
10   Ex. B) ¶ 7.)

11       **Plaintiffs' Response:**  Disputed as to the existence and Plaintiffs' purported
12   awareness of Phoenix Fibers' "certified destruction program" at the time the
13   parties' agreement was entered into in November 2011.  As a result, Plaintiffs
14   did not believe it was necessary to request certificates of destruction from
15   Phoenix Fibers for the second-quality goods they had donated to Phoenix Fibers
16   for that purpose, because they "assumed that the goods were being recycled [into
17   shoddy fiber] as [they] were told they were."  (Salzmann Decl. ¶6, Ex. D (Kim
18   168:12-19; 26:23-28:5; 39:5-22); Kim Decl. ¶13).  As Mr. Graham advised Ms.
19   Song, "***We will receive the material, schedule it for destruction and away we***
20   ***go!***" (Salzmann Decl. ¶18, Ex. P (SP/RCRV005545) (emphasis added)).

21       45.    Prior to October 2015, Plaintiffs never sought confirmation that any
22   products it had donated to Phoenix Fibers had been destroyed. (Maciel Decl. (App. Ex.
23   C) ¶¶ 32-33; App. Ex. II-JJ.)

24       **Plaintiffs' Response:**  Disputed to the following extent.  Prior to October 2015,
25   Plaintiffs had no reason to believe it was necessary to request continual
26   confirmation of destruction from Phoenix Fibers, because they assumed Phoenix
27   Fibers was adhering to its agreement to destroy all such products.  In particular,
28   Plaintiffs "assumed that the goods were being recycled [into shoddy fiber] as

1   [they] were told they were."  (Salzmann Decl. ¶6, Ex. D (Kim 168:12-19; 26:23-

2   28:5; 39:5-22); Kim Decl. ¶13; Choi Decl. ¶¶10-11).

3       46.    Plaintiffs assert that they believed that recycling was synonymous with

4   "destroying" in the context of clothing. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E)

5   27:20-28:5; 39:5-12; 197:18-25; 198:23-199:12.)

6       **Plaintiffs' Response**:  Disputed.  Plaintiffs believed—and correctly so—that

7       recycling denim products into shoddy fiber, which is what Phoenix Fibers

8       agreed to do with respect to all such products donated to it by Plaintiffs, required

9       destruction.  (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:5; 39:5-22); Kim Decl.

10      ¶13).  As Ms. Kim testified: "we believed that during the recycling process, the

11      items would naturally be destroyed as they were made into shoddy fiber."

12      (Salzmann Decl. ¶6, Ex. D (Kim 28:2-4)).

13      47.    Ms. Song never formed a specific agreement with Phoenix Fibers, she

14  merely had an understanding of what Phoenix Fibers did. (Song Depo. (App. Ex. D)

15  62:19-63:16.)

16      **Plaintiffs' Response**:  Disputed.  In fact, Ms. Song believed that Plaintiffs had

17      formed such an agreement with Phoenix Fibers.  When asked at her deposition

18      for her "understanding of the agreement at the time that that first shipment went

19      to Phoenix Fibers," Ms. Song stated:

20          My understanding was that we would send the inventory that

21          we needed to -- that we wanted to use as part of our -- one of

22          our green initiative programs. ***Phoenix Fibers would break***

23          ***down the inventory sent to them, shred it and create insulation***

24          ***that they would pass along to Bonded Logic***, who insulated

25          houses in need.  (Salzmann Decl. ¶8, Ex. F (Song 67:11-24

26          (emphasis added); *see also* 28:10-29:3)).

27      Moreover, Ms. Song testified as follows:

28

1        Q.   Do you have an understanding that prior to that first

2              shipment of goods from Sweet People to Phoenix Fibers,

3              that there was an agreement between Sweet People and

4              Phoenix Fibers?

5       [Objections]

6        A.   Yes, I believe that there was an understanding.

7        Q.   And you understand -- Strike that.

8              So it's your understanding that that agreement -- Strike

9              that.

10             You said you believe there was an understanding.

11             Did you un- -- Did you believe that that understanding was

12             an agreement?

13      [Objections]

14       A.   Yes.  (Salzmann Decl. ¶8, Ex. F (Song 59:7-60:3)).

15      48.   Ms. Song's understanding of what Phoenix Fibers did was based, in part,

16   on conversations with a third party and the information she viewed on a third-party

17   website. (Song Depo. (App. Ex. D) 43:23-48:17.)

18      **Plaintiffs' Response:**  Disputed, with respect to the contention that "Ms. Song's

19      understanding of what Phoenix Fibers did was based, in part, on conversations

20      with a third party…," as no such conversations are identified in the citation list

21      above.  Moreover, Plaintiffs dispute the characterization of Phoenix Fibers'

22      commonly-owned affiliate, Bonded Logic, as a "third party."  Phoenix Fibers

23      and Bonded Logic are affiliated companies owned by the Kean family.

24      (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for*

25      *Phoenix Fibers*"); ¶39, Ex. KK ("*Chandler firm grows; recycles denim material*

26      *into insulation*")).  Tod Kean is the President and CEO of Phoenix Fibers, and

27      the Secretary and Co-founder of Bonded Logic.  (Salzmann Decl. ¶5, Ex. C

28      (Kean 58:11-16)).  In fact, "Phoenix Fibers was founded to provide a stable

source of raw material for Bonded Logic's business of manufacturing denim cloth-based insulation under the name UltraTouch Denim." (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

49.   Plaintiffs assert that subsequent to the formation of the Alleged Contract, Plaintiffs and Phoenix Fibers entered a series of other contracts, the terms of which pertained only to the shipment of the products that Plaintiffs would donate to Phoenix Fibers pursuant to the Alleged Contract (the "Shipment Contracts"). (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 15:1-16:6; 16:21-17:7; 17:14-18:3; Song Depo. (App. Ex. D) 55:13-56:13.)

**Plaintiffs' Response:**  Disputed to the extent it is suggested that the terms of the "Shipment Contracts" in any way entitled Phoenix Fibers to depart from the terms of the so-called "Alleged Contract," otherwise undisputed.

50.   Despite the Shipment Contracts, the terms of the Alleged Contract initially entered into by Ms. Song never changed. (Song Depo. (App. Ex. D) 86:8-15.)

**Plaintiffs' Response:**  Disputed to the extent it is suggested that the terms of the "Shipment Contracts" in any way entitled Phoenix Fibers to depart from the terms of the so-called "Alleged Contract," otherwise undisputed.  Plaintiffs further state that they donated MISS ME and ROCK REVIVAL products to Phoenix Fibers pursuant to the terms of parties' November 2011 agreement— namely, (a) Plaintiffs would deliver unfinished, damaged and otherwise second-quality MISS ME and ROCK REVIVAL denim products to Phoenix Fibers' Chandler, Arizona facility, at no cost to Phoenix Fibers, and (b) Phoenix Fibers would shred all such products into shoddy fiber, which would then be used by Phoenix Fibers' affiliate, Bonded Logic, to manufacture environmentally friendly products such as insulation.  (Salzmann Decl. ¶8, Ex. F (Song 28:10-29:3; 58:4-60:3; 64:3-8; 65:21-66:3; 67:11-24; 77:3-24; 85:11-86:1); ¶6, Ex. D (Kim 34:4-12; 37:22-38:10); ¶16, Ex. N (SP/RCRV005538-5539); ¶18, Ex. P

1   (SP/RCRV005545); ¶20, Ex. R (SP/RCRV005583-5584); ¶24, Ex. V

2   (SP/RCRV005629); ¶27, Ex. Y (SP/RCRV005640); Kim Decl. ¶12; Choi Decl.

3   ¶8).

4       51.    Plaintiffs allege that the *Shipment Contracts* were negotiated by numerous

5   individuals, including Lilly Kim and Felipe Salgado, on behalf of Plaintiffs, and Matt

6   Graham and Steven Johnson, on behalf of Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim)

7   (App. Ex. E) 17:1-7; 201:14-202:25; Maciel Decl. (App. Ex. C)1111. 19-20; App. Ex.

8   V-W; Song Depo. (App. Ex. D) 55:13-56:13.)

9       **Plaintiffs' Response**:  Disputed to the extent it is suggested that the terms of the

10   "Shipment Contracts" were different than the terms of the so-called "Alleged

11   Contract," otherwise undisputed.

12       52.    The Shipping Contracts only governed the terms of actual shipment and

13   timing of shipment of materials to Phoenix Fibers, not other terms. (Rule 30(b)(6)

14   Depo. (Kim) (App. Ex. E) 15:1-16:6; 16:21-17:7; 17:14-18:3; Song Depo. (App. Ex.

15   D) 55:13-56:13.)

16       **Plaintiffs' Response**:  Disputed to the extent it is suggested that the terms of the

17   "Shipment Contracts" in any way entitled Phoenix Fibers to depart from the

18   terms of the so-called "Alleged Contract," otherwise undisputed.

19       53.    Sweet People donated Miss Me brand clothing items to Phoenix Fibers.

20   (Complaint (App. Ex. H) ¶¶ 28-30.)

21       **Plaintiffs' Response**:  Disputed.  Plaintiffs donated MISS ME and ROCK

22   REVIVAL products to Phoenix Fibers pursuant to the terms of parties'

23   agreement—namely, (a) Plaintiffs would deliver unfinished, damaged and

24   otherwise second-quality MISS ME and ROCK REVIVAL denim products to

25   Phoenix Fibers' Chandler, Arizona facility, at no cost to Phoenix Fibers, and (b)

26   Phoenix Fibers would shred all such products into shoddy fiber, which would

27   then be used by Phoenix Fibers' affiliate, Bonded Logic, to manufacture

28   environmentally friendly products such as insulation.  (Salzmann Decl. ¶8, Ex. F

1    (Song 28:10-29:3; 58:4-60:3; 64:3-8; 65:21-66:3; 67:11-24; 77:3-24; 85:11-
2    86:1); ¶6, Ex. D (Kim 34:4-12; 37:22-38:10); ¶16, Ex. N (SP/RCRV005538-
3    5539); ¶18, Ex. P (SP/RCRV005545); ¶20, Ex. R (SP/RCRV005583-5584); ¶24,
4    Ex. V (SP/RCRV005629); ¶27, Ex. Y (SP/RCRV005640); Kim Decl. ¶12; Choi
5    Decl. ¶8).

6        54.    RCRV donated Rock Revival brand clothing items to Phoenix Fibers.
7    (Complaint (App. Ex. H) ¶¶ 28-30.)

8        **Plaintiffs' Response:**  Disputed.  Plaintiffs donated MISS ME and ROCK
9        REVIVAL products to Phoenix Fibers pursuant to the terms of parties'
10       agreement—namely, (a) Plaintiffs would deliver unfinished, damaged and
11       otherwise second-quality MISS ME and ROCK REVIVAL denim products to
12       Phoenix Fibers' Chandler, Arizona facility, at no cost to Phoenix Fibers, and (b)
13       Phoenix Fibers would shred all such products into shoddy fiber, which would
14       then be used by Phoenix Fibers' affiliate, Bonded Logic, to manufacture
15       environmentally friendly products such as insulation. (Salzmann Decl. ¶8, Ex. F
16       (Song 28:10-29:3; 58:4-60:3; 64:3-8; 65:21-66:3; 67:11-24; 77:3-24; 85:11-
17       86:1); ¶6, Ex. D (Kim 34:4-12; 37:22-38:10); ¶16, Ex. N (SP/RCRV005538-
18       5539); ¶18, Ex. P (SP/RCRV005545); ¶20, Ex. R (SP/RCRV005583-5584); ¶24,
19       Ex. V (SP/RCRV005629); ¶27, Ex. Y (SP/RCRV005640); Kim Decl. ¶12; Choi
20       Decl. ¶8).

21       55.    Damaged or defective items that Plaintiffs donated to Phoenix Fibers were
22   marked as either damaged or defective. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E)
23   77:13-78:1; 108:10-109:3; 112:9-113:4; 117:20-23; 123:18-124:14; 132:914; App Ex.
24   R-S; Rule 30(b)(6) Depo. (Salgado) (App. Ex. F) 32:23-33:16.)

25       **Plaintiffs' Response:**  Disputed to the extent this statement is intended to imply
26       that all items that Plaintiffs delivered to Phoenix Fibers for recycling into
27       shoddy fiber "were marked as either damaged or defective," even though all

28

1    such items were, in fact, damaged, defective or otherwise second-quality.

2    (Salzmann Decl. ¶6, Ex. D (Kim 112:9-21)).

3         56.    No one at Phoenix Fibers ever affixed any Miss Me or Rock Revival

4    brand name to any product or collection of products. (Kean Decl. (App. Ex. A) ¶¶ 1-

5    16.)

6         **Plaintiffs' Response:**  Undisputed.

7    **E.    Post-Donation Recycling**

8         57.    Defendant U.S. General Exports ("U.S. General") is a clothing recycling

9    company. (Kean Decl. (App. Ex. A) ¶ 13; Johnson Decl. (App. Ex. B) 8; Maciel Decl.

10   (App. Ex. C) ¶ 31; App. Ex. HH.)

11        **Plaintiffs' Response:**  Disputed, to the extent it implies that U.S. General's

12        business is limited to clothing recycling.  When Mr. Johnson was asked at his

13        deposition whether it was his understanding that "U.S. General Export is a

14        recycling company," his response was "I have no idea."  (Salzmann Decl. ¶4,

15        Ex. B (Johnson 98:6-8)).  Discovery of U.S. General has yet to be concluded.

16        (Salzmann Decl. ¶¶49-55, 62).

17        58.    Phoenix Fibers sold certain products donated by Plaintiffs, as credential,

18   in bulk and by the pound, to U.S. General. (Johnson Decl. (App. Ex. B) ¶ 8.)

19        **Plaintiffs' Response:**  Disputed as to the use of the phrase "as credential."

20        Although Phoenix Fibers typically refers to "credential" that it sells by a

21        standard item number (20-040) on its "Packing List," the "Packing List"

22        corresponding to Phoenix Fibers' May 21, 2015 sale of Plaintiffs' products to

23        U.S. General—which was filled out by a Phoenix Fibers' employee—identified

24        the goods being sold as "Miss Me 3,473 lbs" and "RR [Rock Revival] 3,294."

25        (Salzmann Decl. ¶5, Ex. C (Johnson 82:8-19; 84:11-85:8; 85:24-86:2); ¶29, Ex.

26        AA (US GEN EXPORT 000001-27)).  Moreover, U.S. General, in turn, sold

27        Plaintiffs' goods to Defendant SAC International Trader, Inc. by the unit,

28

34

1   making direct reference to the MISS ME and ROCK REVIVAL brand names.

2   (Salzmann Decl. ¶30, Ex. BB (US GEN EXPORT 000028-33)).

3       59.    Phoenix Fibers first sold credential to U.S. General in 2013 and not

4   before; however, it was not until 2015 that Phoenix Fibers sold credential to U.S.

5   General that contained items donated by Sweet People or RCRV.  Many of the items

6   donated by Sweet People and RCRV were converted into shoddy fiber.  (Johnson Decl.

7   (App. Ex. B) ¶ 9.)

8       **Plaintiffs' Response:**  Disputed.  When Mr. Johnson was asked at his

9       deposition whether Phoenix Fibers was doing business with Kamel Mroueh, the

10      owner of U.S. General, at the time he came on board as Plant Manager in

11      September 2013, his response was "I honestly don't know, but I'm -- yeah, I

12      don't know.  I don't know when the relationship started."  (Salzmann Decl. ¶5,

13      Ex. C (Johnson 33:5-10)).  However, Mr. Johnson now states in his declaration

14      that "[t]o my knowledge, based on my job and a review of records, Phoenix

15      Fibers did not sell any credential to U.S. General prior to 2013."  (Johnson Decl.

16      ¶8).  Whatever Phoenix Fibers "records" Mr. Johnson is referring to in his

17      declaration have not been produced in this litigation.  Moreover, when Mr.

18      Johnson was asked at his deposition if he had "a sense of the percentage of

19      donated Miss Me and Rock Revival product that was converted into shoddy as

20      opposed to sold," his response was "I have no idea."  When further asked

21      whether anyone at Phoenix Fibers would know the answer to that question, Mr.

22      Johnson's response was "No."  (Salzmann Decl. ¶5, Ex. C (Johnson 70:19-24)).

23      Similarly, Mr. Kean verified Phoenix Fibers' responses to Plaintiffs'

24      Interrogatories, which state that Phoenix Fibers (a) "does not know the total

25      volume of [Plaintiffs' products] it processed into shoddy fiber," and (b) "does

26      not know the total volume of [Plaintiffs' products] it sold, distributed, supplied

27      or otherwise conveyed to any Person."  (Salzmann Decl. ¶44, Ex. PP (Phoenix

28

1   Fibers' Responses to First Set of Interrogatories From Plaintiff Sweet People
2   Apparel, Inc.)).

3   60.    Kamel Mroueh was a representative of U.S. General with whom
4   representatives of Phoenix Fibers communicated to facilitate the sale of credential.
5   (Johnson Decl. (App. Ex. B) ¶ 10.)

6   **Plaintiffs' Response**:  Disputed to the extent this statement of fact purports to
7   refer to sales of products other than those that Plaintiff donated to Phoenix
8   Fibers for recycling into shoddy fiber, otherwise undisputed.

9   61.    U.S. General, through Mr. Mroueh, only purchased credential from
10  Phoenix Fibers at Phoenix Fibers' warehouse. (Johnson Decl. (App. Ex. B) ¶ 11.)  The
11  credential was stored in large bins or boxes. (Johnson Decl. (App. Ex. B) ¶ 11.)  Mr.
12  Mroueh never inquired into which brands of credential Phoenix Fibers had in its
13  warehouse nor did Mr. Mroueh ever state that he was interested in certain brands of
14  credential. (Johnson Decl. (App. Ex. B) ¶ 12.)

15  **Plaintiffs' Response**:  Disputed.  Plaintiffs contest the veracity of the
16  declarant's statement upon which this statement of fact is based, and have not
17  yet taken the deposition of U.S. General, the party that purchased Plaintiffs'
18  products from Phoenix Fibers, to test the accuracy of such statement.  (Salzmann
19  Decl. ¶¶48-55, 62).  Further, there is evidence that Mr. Mroueh selected
20  Plaintiffs' product for purchase by identifying Plaintiffs' brand names on the
21  boxes while being escorted by Mr. Johnson around Phoenix Fibers' warehouse
22  in which such products were maintained.  (Salzmann Decl. ¶4, Ex. B (Johnson
23  39:13-16; 71:5-14).  Moreover, although Phoenix Fibers typically refers to the
24  "credential" that it sells by a standard item number (20-040) on its "Packing
25  List," the "Packing List" corresponding to Phoenix Fibers' May 21, 2015 sale of
26  Plaintiffs' products to U.S. General—which was filled out by a Phoenix Fibers'
27  employee—identified such products as "Miss Me 3,473 lbs" and "RR [Rock
28  Revival] 3,294."  (Salzmann Decl. ¶5, Ex. C (Johnson 82:8-19; 84:11-85:8;

36

85:24-86:2); ¶29, Ex. AA (US GEN EXPORT 000001-27)).  Further, U.S. General, in turn, sold Plaintiffs' to Defendant SAC International Trader, Inc. by the unit, and with direct reference to the MISS ME and ROCK REVIVAL brand names.  (Salzmann Decl. ¶30, Ex. BB (US GEN EXPORT 000028-33)).

62.     U.S. General paid the market rate for credential for all items it purchased from Phoenix Fibers, which was generally $0.30 to $0.60 per pound.  U.S. General never paid a premium for credential that included Sweet People or Rock Revival products. (Johnson Decl. (App. Ex. B) ¶ 13; Maciel Decl. (App. Ex. C) 30; App. Ex. GG.)

**Plaintiffs' Response:**  Disputed. Plaintiffs contest the veracity of the declarant's statement upon which this statement of fact is based, and have not yet taken the deposition of U.S. General, the party that purchased Plaintiffs' products from Phoenix Fibers, to test the accuracy of such statement.  Further, whatever Phoenix Fibers records the declarant may have been referring to have not been produced in discovery in this action.  Plaintiffs further dispute the use of the term "credential" when referring to Phoenix Fibers' sales of Plaintiffs' second-quality products to U.S. General.  Although Phoenix Fibers typically refers to "credential" that it sells by a standard item number (20-040) on its "Packing List," the "Packing List" corresponding to Phoenix Fibers' May 21, 2015 sale of Plaintiffs' products to U.S. General—which was filled out by a Phoenix Fibers' employee—identified the goods being sold as "Miss Me 3,473 lbs" and "RR [Rock Revival] 3,294."  (Salzmann Decl. ¶5, Ex. C (Johnson 82:8-19; 84:11-85:8; 85:24-86:2); ¶29, Ex. AA (US GEN EXPORT 000001-27)).  Moreover, U.S. General, in turn, sold Plaintiffs' goods to Defendant SAC International Trader, Inc. by the unit, making direct reference to the MISS ME and ROCK REVIVAL brand names.  (Salzmann Decl. ¶30, Ex. BB (US GEN EXPORT 000028-33)).

63.     U.S. General was not confused as to the origin or quality of the clothing it purchased from Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 198:23-199:12; Deposition of Tiffany Wolff ("Wolff Depo. (App. Ex. G)") 125:11:25; 146:14-147:14.)

**Plaintiffs' Response:**  Disputed to the extent it is suggested that this statement of fact has any relevance whatsoever to Plaintiffs' claims, which are not premised on the alleged confusion of U.S. General or any other Defendant.

64.     Any purchaser of the items that were originally donated to Phoenix Fibers by Plaintiffs was not confused as to the quality or origin of the credential that it was purchasing. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 198:23-199:12; Wolff Depo. (App. Ex. G) 125:11:25; 146:14-147:14.)  The purchaser understood that the items were defective or second-quality goods that originated with Sweet People or RCRV. (*Id.*)

**Plaintiffs' Response:**  Disputed to the extent this statement of fact has any relevance to Plaintiffs' claims as they pertain to any of the Defendant wholesalers (U.S. General, SAC International Traders and Comak Trading), but there is no evidence that "any purchaser" of the products Plaintiffs' originally donated to Phoenix Fibers was not confused as to the quality or origin of such products.  Further disputed as to the use of the term "credential" to describe Plaintiffs' products.  Although Phoenix Fibers typically refers to the "credential" that it sells by a standard item number (20-040) on its "Packing List," the "Packing List" corresponding to Phoenix Fibers' May 21, 2015 sale of Plaintiffs' products to U.S. General—which was filled out by a Phoenix Fibers' employee—identified such products as "Miss Me 3,473 lbs" and "RR [Rock Revival] 3,294."  (Salzmann Decl. ¶5, Ex. C (Johnson 82:8-19; 84:11-85:8; 85:24-86:2); ¶29, Ex. AA (US GEN EXPORT 000001-27)).  Moreover, U.S. General, in turn, sold Plaintiffs' to Defendant SAC International Trader, Inc. by

38

the unit, and with direct reference to the MISS ME and ROCK REVIVAL brand names.  (Salzmann Decl. ¶30, Ex. BB (US GEN EXPORT 000028-33)).

65.    Phoenix Fibers never advertised that it sold, distributed, manufactured or otherwise had any connection of any kind with the Miss Me brand or any other brand of Sweet People. (Kean Decl. (App. Ex. A) ¶¶ 11-16.)

**Plaintiffs' Response**:  Disputed.  Plaintiffs contest the veracity of the declarant's statement upon which this statement of fact is based, and have not yet taken the deposition of U.S. General, the party that purchased Plaintiffs' products from Phoenix Fibers, to test the accuracy of such statement.  Moreover, although Phoenix Fibers typically refers to the "credential" that it sells by a standard item number (20-040) on its "Packing List," the "Packing List" corresponding to Phoenix Fibers' May 21, 2015 sale of Plaintiffs' products to U.S. General—which was filled out by a Phoenix Fibers' employee—identified the such products as "Miss Me 3,473 lbs" and "RR [Rock Revival] 3,294." Salzmann Decl. ¶5, Ex. C (Johnson 82:8-19; 84:11-85:8; 85:24-86:2); ¶29, Ex. AA (US GEN EXPORT 000001-27)).

66.    Phoenix Fibers never advertised that it sold, distributed, manufactured or otherwise had any connection of any kind with the Rock Revival brand or any other brand of RCRV. (Kean Decl. (App. Ex. A) ¶¶ 11-16.)

**Plaintiffs' Response**:  Disputed.  Plaintiffs contest the veracity of the declarant's statement upon which this statement of fact is based, and have not yet taken the deposition of U.S. General, the party that purchased Plaintiffs' products from Phoenix Fibers, to test the accuracy of such statement.  Moreover, although Phoenix Fibers typically refers to the "credential" that it sells by a standard item number (20-040) on its "Packing List," the "Packing List" corresponding to Phoenix Fibers' May 21, 2015 sale of Plaintiffs' products to U.S. General—which was filled out by a Phoenix Fibers' employee—identified the such products as "Miss Me 3,473 lbs" and "RR [Rock Revival] 3,294."

Salzmann Decl. ¶5, Ex. C (Johnson 82:8-19; 84:11-85:8; 85:24-86:2); ¶29, Ex. AA (US GEN EXPORT 000001-27)).

67.    On October 27, 2017, Ms. Song called Mr. Kean to complain about certain Miss Me and Rock Revival denim being sold on eBay.  After October 27, 2015, Phoenix Fibers never sold any products that Plaintiffs donated to Phoenix Fibers as credential to anyone. (Kean Decl. (App. Ex. A) ¶ 17.)

> **Plaintiffs' Response:**  Disputed.  Ms. Kim, not Ms. Song, spoke to Mr. Kean on or around October 27, 2015 (not October 27, 2017).  Further, U.S. General has produced documents reflecting its purchase of 20,958 pounds of Plaintiffs' products from Phoenix Fibers on November 10, 2015.  Mr. Johnson signed the bill of lading corresponding to the shipment of these goods on November 10, 2015. (Salzmann Decl. ¶33, Ex. EE (PHX001040); ¶29, Ex. AA (US GEN EXPORT 000010-11); Kim Decl. ¶¶19-21).

68.    Plaintiffs allege that between December 2015 and February 2016, they covertly purchased back 29,000 back [*sic*] units of denim containing their trademarks from the retailers named as defendants in the Complaint. (Complaint (App. Ex. H) ¶ 40).

> **Plaintiffs' Response:**  Disputed.  In an effort to mitigate the incalculable harm to the MISS ME and ROCK REVIVAL brands being caused by the widespread availability of second-quality MISS ME and ROCK REVIVAL denim products, Plaintiffs authorized their investigators to purchase as many of such products as possible so they could be removed from consumer markets.  Between December 11, 2015 and February 9, 2016 (the day before Plaintiffs commenced this action), Plaintiffs' investigators purchased over 29,000 units of second-quality MISS ME and ROCK REVIVAL denim products from Defendants SAC International Traders, Inc., Shaukat Ali Chohan, Comak Trading, Inc. and Lydia Evilsa Terrazas Cho, at a cost of over $190,000.  (Kim Decl. ¶¶30-32).

1    69.    In December 2015, with the cooperation of Phoenix Fibers, Plaintiffs

2    removed from Phoenix Fibers' warehouse all the remaining products, totaling five

3    truckloads and no less than 130,000 pounds, that they had previously donated to

4    Phoenix Fibers.  (Johnson Decl. (App. Ex. B) ¶ 17.)

5         **Plaintiffs' Response:**  Disputed, to the extent of Phoenix Fibers' representation

6         that Plaintiffs were provided with "all the remaining products," as Plaintiffs

7         have no way to test the veracity of that statement.  Further, Plaintiffs dispute that

8         any such removal was done with the "cooperation" of Phoenix Fibers, as what

9         precipitated such removal of products from Phoenix Fibers' warehouse were its

10        false statements that it had not resold such products, but rather that they had

11        "leaked" out of the warehouse.  (Kim Decl. ¶¶26-29).

12   70.    Plaintiffs cannot prove, nor have they even alleged, that Phoenix Fibers

13   conspired with other defendants and certainly not to such an extent as to be co-partners

14   with them.

15        **Plaintiffs' Response:**  Disputed.  By law, no specific conspiracy or co-partner

16        relationship must be pleaded or proven.  Rather, the rule is simply that joint

17        tortfeasors in a trademark case are liable for the entire harm, and for any

18        monetary award that may issue as a result.  *See* Restatement (Second) of Torts §

19        875 (1979).  Plaintiffs have so alleged, and have come forward with evidence

20        that is more than sufficient to comply with such rule.  (Salzmann Decl. ¶12, Ex.

21        J (Plaintiffs' First Amended Complaint) at ¶¶ 18, 43, 50).

22

23

24

25

26

27

28

## II. PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THEY CONTEND THERE IS NO DISPUTE, BUT TO THE EXTENT DISPUTED BY PHOENIX FIBERS, ARE ACCORDINGLY GENERAL DISPUTES OF MATERIAL FACT

### A.   Plaintiffs and their MISS ME and ROCK REVIVAL Brands

1.      Sweet People and RCRV are affiliated jeanswear companies which respectively manufacture, promote, distribute and sell high-quality denim and apparel products throughout the United States under the well-known MISS ME and ROCK REVIVAL brand names, each of which is the subject of numerous trademark registrations.  (Choi Decl. ¶3; Salzmann Decl. ¶12, Ex. J (Plaintiffs' First Amended Complaint) at Exs. A, B).

2.      MISS ME and ROCK REVIVAL products are sold at such prominent retail outlets as Macy's, Nordstrom, Dillard's and The Buckle, both in-store and online, and through Plaintiffs' respective ecommerce websites (<www.missme.com> and <www.rockrevival.com>).  MISS ME jeans typically retail for approximately $120, while ROCK REVIVAL jeans retail for around $170.  (Choi Decl. ¶3).

3.      MISS ME and ROCK REVIVAL brand jeans are known to consumers as high fashion apparel products.  Over the past several years, MISS ME and ROCK REVIVAL denim products have achieved substantial sales success, and received extensive media coverage in widely circulated fashion magazines.  (Choi Decl. ¶4).

4.      In addition to the unique and distinctive designs created by Plaintiffs' designers, which are embroidered or stitched onto the pockets and waistband areas of MISS ME and ROCK REVIVAL denim products, such products are widely recognized for their superior quality, including both the fit and wash.  Plaintiffs have worked extremely hard to earn this reputation by maintaining strict quality control policies and procedures that ensure that only products commensurate with the high quality reputation of MISS ME and ROCK REVIVAL denim products ever enter the stream of commerce.  (Choi Decl. ¶4).

42

5.     An unfortunate consequence of these strict quality control procedures is that the manufacture of a certain volume of MISS ME and ROCK REVIVAL denim and apparel products that, following careful inspection, Plaintiffs deem unfit for sale due to damage, improper finish or other failure to meet their rigorous standards.  (Choi Decl. ¶5).

6.     Eric Choi is the CEO of RCRV, and the former CEO of Sweet People, a position he held until December 1, 2016.  He is currently a Director and shareholder of Sweet People.  (Choi Decl. ¶1).

7.     Lilly Kim, Esq., served as the General Counsel of Sweet People and RCRV from approximately April 2010 to October 2016.  Since that time, she has continued to oversee Plaintiffs' legal matters as an outside consultant.  (Kim Decl. ¶1). Prior to joining Sweet People and RCRV, Ms. Kim was Of Counsel to Reed Smith LLP.  Ms. Kim is a graduate of Loyola Law School.  (Salzmann Decl. ¶6, Ex. D (Kim 31:24-32:7; 55:14-16; 56:25-57:1)).

8.     Lisa Song held the title of Human Resources Manager at Sweet People between 2009 and February 2014.  (Salzmann Decl. ¶8, Ex. F (Song 21:9-12)). Although Ms. Song was on Sweet People's payroll, she was considered an employee of both Sweet People and RCRV, and her time was allocated between those two companies, and a third related entity called Deodar Brands, the proprietor of the MEK DENIM jeanswear brand.  (Salzmann Decl. ¶6, Ex. D (Kim 41:18-42:1; 58:24-59:3; *see also* 105:24-106:16); Kim Decl. ¶8; Choi Decl. ¶8).

**B.     The Business of Defendant Phoenix Fibers**

9.     Phoenix Fibers was founded in July 2011 "[t]o make shoddy [fiber]." (Salzmann Decl. ¶3, Ex. A (Quinn 39:8-17); ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

10.    Bonded Logic, Inc., Phoenix Fibers' affiliate, is in the business of manufacturing insulation products, including its flagship product, UltraTouch Denim Insulation.  Shoddy fiber created from recycled denim is the raw material that Bonded

Logic uses to manufacturer UltraTouch Denim Insulation.  (Salzmann Decl. ¶24, Ex. V (SP/RCRV005629); ¶39, Ex. KK ("*Chandler firm grows; recycles denim material into insulation*"); ¶40, Ex. LL ("*Green Chandler company looks to bask in solar savings*"); ¶41, Ex. MM ("*Chandler company turns worn-out blue jeans into insulation, more*")).

11.    Phoenix Fibers, Bonded Logic and United Fibers are affiliated companies owned by the Kean family, and operated by Jim Kean and his two sons, Tod Kean and Mike Kean.  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*"); ¶39, Ex. KK ("*Chandler firm grows; recycles denim material into insulation*")).

12.    "Phoenix Fibers was founded to provide a stable source of raw material for Bonded Logic's business of manufacturing denim cloth-based insulation under the name UltraTouch Denim."  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

13.    Prior to launching Phoenix Fibers, Bonded Logic sourced shoddy fiber from a shredding company in Brownsville, Texas.  (Salzmann Decl. ¶5, Ex. C (Kean 65:10-66:21)).  As Tod Kean, the Managing Partner for Phoenix Fibers and Bonded Logic, explained:  "We used to procure our raw material for the production of insulation from other shredders.  But because of instability in both prices and supply, we decided to open Phoenix to become vertically integrated by controlling our own source of raw materials."  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

14.    Today, Phoenix Fibers receives clothing "by the truckload" from various sources for shredding, and processes 900 to a million pounds of denim and cotton products into shoddy fiber every month.  (Salzmann Decl. ¶4, Ex. B (Johnson 77:2-4); ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

15.    The first step in the process Phoenix Fibers uses to convert denim into shoddy fiber is "a proprietary process that removes all buttons, zippers and tags."

(Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

16.    Phoenix Fibers was formed for the sole purpose of recycling denim into shoddy fiber, and was not in the business of selling "credential" when the company was launched in July 2011.  That aspect of Phoenix Fibers' business only came into existence at a later date.  There is no evidence that Phoenix Fibers was engaged in the sale of credential in November 2011, at the time Plaintiffs and Phoenix Fibers came to an agreement to convert Plaintiffs' second-quality denim products into shoddy fiber. (Salzmann Decl. ¶5, Ex. C (Kean 17:20-18:9); ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

17.    "Credential" can include things such as "sheets, towels, pillow cases, lamps, … bric-a-brac" (Salzmann Decl. ¶4, Ex. B (Johnson 29:20-25)), "miscellaneous household items" and "toaster ovens" (Salzmann Decl. ¶5, Ex. C (Kean 15:17-20)).

18.    Tod Kean is the President and CEO of Phoenix Fibers, and the Secretary and Co-founder of Bonded Logic.  (Salzmann Decl. ¶5, Ex. C (Kean 58:11-16)).

19.    Matt Graham was the Plant Manager and General Manager of Phoenix Fibers between 2011 and mid-2013, during which time he served as Mr. Kean's second-in-command.  (Salzmann Decl. ¶5, Ex. C (Kean 28:13-24); Kean Decl. ¶10).

20.    Steve Johnson joined Phoenix Fibers as Plant Manager in September 2013.  (Salzmann Decl. ¶4, Ex. B (Johnson 13:9-18)).  Neither at that time, nor prior to this dispute, did Mr. Johnson ever speak to Mr. Kean or anyone else at Phoenix Fibers about the relationship between Plaintiffs and Phoenix Fibers that predated his employment.  (Salzmann Decl. ¶4, Ex. B (Johnson 57:17-20; 58:23-59:1)).  Nor did Mr. Johnson ever ask anyone whether Phoenix Fibers was permitted to sell Plaintiffs' products as credential.  (Salzmann Decl. ¶4, Ex. B (Johnson 59:2-7)).  Mr. Johnson also is unaware of any written communication between Phoenix Fibers and Plaintiffs wherein Phoenix Fibers stated, in words or substance, that it reserved the right to sell

Plaintiffs' products as credential or otherwise.  (Salzmann Decl. ¶4, Ex. B (Johnson 66:5-9)).

21.    Mr. Johnson was not even aware that Plaintiffs had been delivering MISS ME and ROCK REVIVAL denim products to Phoenix Fibers for recycling into shoddy fiber prior to the time he joined the company in September 2013.  (Salzmann Decl. ¶4, Ex. B (Johnson 59:18-21)).

22.    Mr. Graham was no longer employed by Phoenix Fibers at the time Mr. Johnson joined the company in September 2013.  Mr. Johnson was unable to even identify Mr. Graham as the person who held the position of Plant Manager before him (Salzmann Decl. ¶4, Ex. B (Johnson 14:8-22)), having testified at his deposition that "I have no idea who Matt Graham is" (Salzmann Decl. ¶4, Ex. B (Johnson 122:19)).

**C.    Phoenix Fibers' Agreement to Recycle Plaintiffs' MISS ME and ROCK REVIVAL Denim Products Into Shoddy Fiber**

23.    On November 1, 2011, Eric Choi, the owner and CEO of Sweet People and RCRV, sent an email to Lilly Kim containing a link to Bonded Logic's website with the message "let's discuss!"  Minutes after receiving this email from Mr. Choi, Ms. Kim forwarded the email to Ms. Song.  (Salzmann Decl. ¶6, Ex. D (Kim 67:24-68:8); ¶13, Ex. K (SP/RCRV000065-66); Choi Decl. ¶7; L. Kim Decl. ¶3).

24.    Mr. Choi and Ms. Kim subsequently discussed the potential opportunity that they believed Bonded Logic offered to dispose of unfinished, damaged or otherwise second-quality MISS ME and ROCK REVIVAL denim products in an environmentally sound manner—*i.e.*, shredding into shoddy fiber—and decided to take advantage of it.  (Choi Decl. ¶7; Kim Decl. ¶7).

25.    Ms. Kim thereafter tasked Ms. Song with finding "a company that recycled denim so that we could recycle our products, rather than sending them to a landfill."  Salzmann Decl. ¶6, Ex. D (Kim 18:17-19); ¶8, Ex. F (Song 24:4-9; 26:2-4); Kim Decl. ¶8; Choi Decl. ¶¶7-8).  The impetus for this initiative was Plaintiffs' desire to find an environmentally responsible way to dispose of damaged, unfinished,

1   obsolete, returned or otherwise second-quality MISS ME and ROCK REVIVAL denim

2   products.  Salzmann Decl. ¶6, Ex. D (Kim 29:20-30:17); Kim Decl. ¶4; Choi Decl.

3   ¶¶4-7).

4       26.   At the time, Plaintiffs would either oversee the destruction of damaged or

5   otherwise second-quality denim products at their factories in Asia, or manually cut up

6   the products domestically and send them to a landfill for disposal.  Salzmann Decl. ¶6,

7   Ex. D (Kim 30:18-25); Kim Decl. ¶5; Choi Decl. ¶5).

8       27.   While Plaintiffs wanted to dispose of their second-quality denim products

9   in an environmentally friendly manner, they were equally, if not more concerned about

10   permanently removing damaged, unfinished, obsolete, returned or otherwise second-

11   quality MISS ME and ROCK REVIVAL denim products from the stream of

12   commerce.  Salzmann Decl. ¶6, Ex. D (Kim 166:18-167:20); Kim Decl. ¶6; Choi Decl.

13   ¶¶4-10).

14      28.   Ms. Song, acting on behalf of Plaintiffs and under the direction of Ms.

15   Kim, subsequently entered into an agreement with Phoenix Fibers relating to the

16   donation of second-quality MISS ME and ROCK REVIVAL denim products, which

17   were to be destroyed and converted into shoddy fiber.  Salzmann Decl. ¶6, Ex. D (Kim

18   14:1-9); ¶8, Ex. F (Song 24:4-9); Kim Decl. ¶¶9-12; Choi Decl. ¶¶8, 10).

19      29.   On November 3, 2011, Ms. Song contacted Bonded Logic regarding its

20   business of converting denim products into shoddy fiber, and was referred to Matt

21   Graham at Phoenix Fibers, Bonded Logic's affiliate.  That same day, Ms. Song spoke

22   with Mr. Graham, who, she understood, had the authority to act on behalf of Phoenix

23   Fibers, about starting a program whereby Plaintiffs would ship their damaged,

24   unfinished, obsolete, returned or otherwise second-quality MISS ME and ROCK

25   REVIVAL denim products to Phoenix Fibers for destruction and recycling into shoddy

26   fiber.  (Salzmann Decl. ¶14, Ex. L (SP/RCRV005530-5531)).

27      30.   On November 4, 2011, Mr. Graham sent Ms. Song an email labeled

28   "High" importance explaining Phoenix Fibers' shredding services and capabilities.

Mr. Graham made a point of explaining that "*[i]f necessary, [Phoenix Fibers] can remove the tags, buttons and zippers.  There is no charge for our recycling service.*" (Salzmann Decl. ¶16, Ex. N (SP/RCRV005538-5539) (emphasis added)).

31.     If the resale of such products as "credential" had been part of the discussion between Mr. Graham and Ms. Song, there would have been no reason to remove "the tags, buttons and zippers" from such products.  Rather, those items—tags, buttons and zippers—would only need to be removed if the products were being recycled into shoddy fiber, as the parties contemplated.  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*") (explaining that the first step in the shredding process is "a proprietary process that removes all buttons, zippers and tags")).

32.     Later that day, in response to Mr. Graham's November 4, 2011 email, Ms. Song inquired:  "What will be the next step?  Is there paperwork to fill out, or do we just start by sending the shipment to you?"  (Salzmann Decl. ¶16, Ex. N (SP/RCRV005538-5539)).  That same day, Mr. Graham advised that "[t]here is nothing to fill out from our end."  (Salzmann Decl. ¶17, Ex. O (SP/RCRV005542-5543)).

33.     On November 15, 2015, Mr. Graham responded to an email from Ms. Song inquiring as to shipping logistics, and agreed to pass along information regarding some of the carriers that Phoenix Fibers worked with.  In conclusion, Mr. Graham stated "[t]here's not much else needed.  *We will receive the material, schedule it for destruction and away we go!*  I'll call you this morning to confirm this email." (Salzmann Decl. ¶18, Ex. P (SP/RCRV005545) (emphasis added)).

34.     Throughout her discussions with Phoenix Fibers, Ms. Song reported back to Ms. Kim, Mr. Choi and Steve Kim, Plaintiffs' then-COO, her superiors who also worked for both Sweet People and RCRV.  (Salzmann Decl. ¶6, Ex. D (Kim 18:4-24; 20:1-11; 20:25-21:3; 43:8-19); ¶15, Ex. M (SP/RCRV005532-5533), ¶16, Ex. N

(SP/RCRV005538-5539), ¶17, Ex. O (SP/RCRV005542-5543); Kim Decl. ¶9; Choi Decl. ¶8).

35.     Ms. Kim saw written communications between Ms. Song and Mr. Graham wherein Mr. Graham represented that Phoenix Fibers would destroy Plaintiffs' second-quality denim products and convert them into shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶11), and testified that "[w]e did require that the items be destroyed and recycled" (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)).

36.     Moreover, Ms. Kim understood that "during the recycling process, the items would naturally be destroyed as they were made into shoddy fiber." (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:4; 39:5-22); Kim Decl. ¶13).

37.     Based on her contemporaneous discussions with Ms. Song regarding Ms. Song's conversations with Mr. Graham, Ms. Kim understood that Plaintiffs had conditioned their agreement to provide Phoenix Fibers with their second-quality MISS ME and ROCK REVIVAL denim products on Phoenix Fibers' agreement to convert all such products into shoddy fiber.  (Salzmann Decl. ¶6, Ex. D (Kim 28:14-29:4); Kim Decl. ¶10).  Mr. Choi had the same understanding.  (Choi Decl. ¶¶8, 10).

38.     Based on her contemporaneous understanding of Ms. Song's oral and written communications with Phoenix Fibers, namely, Mr. Graham's representation that Phoenix Fibers would "destroy" Plaintiffs' products and convert them into shoddy fiber, and his statement that Phoenix Fibers did not require a writing to memorialize the parties' understanding, Ms. Kim was satisfied that a written agreement with Phoenix Fibers was not necessary.  (Salzmann Decl. ¶6, Ex. D (Kim 34:4-12; 37:22-38:10); Kim Decl. ¶12).

39.     Thereafter, Plaintiffs made shipping arrangements with their own carrier, and on November 22, 2011, Ms. Song contacted Mr. Graham to advise him that Plaintiffs were ready to make their first delivery of denim products to Phoenix Fibers for recycling into shoddy fiber on November 29, 2011.  In that same email, Ms. Song asked Mr. Graham to send over "any tax id's or documents for tax exemption or leed

[Leadership in Energy and Environmental Design] credit." (Salzmann Decl. ¶19, Ex. Q (SP/RCRV005570)).

40. Mr. Graham responded to Ms. Song's inquiry by email dated December 5, 2011, explaining that "Phoenix Fibers, Inc. is a for-profit recycler and cannot legally offer a tax credit for our service." Mr. Graham went on to explain what happens to the denim products Phoenix Fibers received from Sweet People and RCRV: "***The product we receive may be recycled into any number of products. This could range from house, automobile or appliance insulation to prison mattresses…. There is also a certain portion that cannot be used, such a metal pieces in the buttons and zippers. These are removed and recycled separately***." (Salzmann Decl. ¶20, Ex. R (SP/RCRV005583-5584) (emphasis added)).

41. Ms. Song understood that Plaintiffs and Phoenix Fibers had reached an agreement with respect to the shredding of Plaintiffs' denim products into shoddy fiber before any products were shipped to Phoenix Fibers, and that Plaintiffs' executive management, and Phoenix Fibers' General Manager, had approved the agreement. (Salzmann Decl. ¶8, Ex. F (Song 28:10-29:3; 58:4-60:3; 64:3-8; 65:21-66:3; 67:11-24; 77:3-24; 85:11-86:1); *see also* Choi Decl. ¶8).

42. When asked at her deposition for her understanding of the agreement between Plaintiffs and Phoenix Fibers at the time the first shipment of Plaintiffs' products was made to Phoenix Fibers, Ms. Song stated:

> My understanding was that we would send the inventory that
> we needed to -- that we wanted to use as part of our -- one of
> our green initiative programs. ***Phoenix Fibers would break
> down the inventory sent to them, shred it and create insulation
> that they would pass along to Bonded Logic***, who insulated
> houses in need. (Salzmann Decl. ¶8, Ex. F (Song 67:11-24;
> 28:10-29:3) (emphasis added)).

43.     There was never any discussion between Ms. Song and Mr. Graham regarding Phoenix Fibers' recycling of Plaintiffs' denim products in any other manner, including the sale of such products as credential or otherwise.  The term "credential" does not appear in any of the communications between Ms. Song and Mr. Graham.

44.     Ms. Kim and Mr. Choi understood, in November 2011, that there was a contract between Phoenix Fibers, on the one hand, and Plaintiffs, on the other hand, whereby (a) Plaintiffs would deliver unfinished, damaged and otherwise second-quality MISS ME and ROCK REVIVAL denim products to Phoenix Fibers' Chandler, Arizona facility, at no cost to Phoenix Fibers, and (b) Phoenix Fibers would shred such products into shoddy fiber, which would then be used by Phoenix Fibers' affiliate, Bonded Logic, to manufacture environmentally friendly products such as insulation. (Salzmann Decl. ¶6, Ex. D (Kim 33:24-34:3); Kim Decl. ¶¶12, 14; Choi Decl. ¶¶8, 10).

45.     By email dated January 27, 2012, Mr. Graham confirmed to Ms. Song that Phoenix Fibers had received two additional loads of Plaintiffs' products, and stated that "Phoenix Fibers is very happy to be working with your company."  (Salzmann Decl. ¶21, Ex. S (SP/RCRV005617)).

46.     Thereafter, on March 8, 2012, after Plaintiffs had already shipped multiple tractor-trailer loads of MISS ME and ROCK REVIVAL denim products to Phoenix Fibers for destruction and recycling into shoddy fiber, Ms. Song told Mr. Graham that "it would be nice to show the executives pictures of what you guys do with the denim and also show employees the insulation we make for the houses," and asked if Mr. Graham if he could provide a sample.  (Salzmann Decl. ¶22, Ex. T (SP/RCRV005624)).

47.     That same day Mr. Graham responded, stating that he would send Ms. Song "samples of the final product" that day.  Hours later, Ms. Song responded to Mr. Graham and further requested that he send "some pictures of the houses that we are insulating", and inquired as to the name of the company to which Phoenix Fibers was distributing the insulation.  (Salzmann Decl. ¶23, Ex. U (SP/RCRV005628)).

48.     Mr. Graham promptly provided the following response:  "***Phoenix Fibers converts the jeans into fiber that gets sent to our affiliate company, Bonded Logic*** which in turn, manufactures the end products.  We don't get involved with the actual distribution of the material.  I would direct you to their web site for additional information. www.bondedlogic.com."  (Salzmann Decl. ¶24, Ex. V (SP/RCRV005629) (emphasis added)).

49.     Thereafter, Ms. Song received a sample of Bonded Logic's UltraTouch Denim insulation from Phoenix Fibers.  (Salzmann Decl. ¶25, Ex. W (SP/RCRV000072)).  Eric Choi was so proud of Plaintiffs' partnership with Phoenix Fibers, and of having found an environmentally sound solution for the disposal of Plaintiffs' second-quality products, that Plaintiffs prominently displayed the samples in the conference rooms at Plaintiffs' headquarters, as an examples of the companies' commitment to the environment.  (Choi Decl. ¶ 9).  A photograph of one such display case appears below:



 (Choi Decl. ¶9; Salzmann Decl. ¶25, Ex. W (SP/RCRV000072)).

50.     Later that month, on March 29, 2012, Mr. Graham visited Plaintiffs' Los Angeles, California facility, and met with Lisa Song and Steve Kim, Sweet People's then-COO.  (Salzmann Decl. ¶26, Ex. X (SP/RCRV005630-5639)).

51.     Shortly thereafter, on April 9, 2012, Mr. Graham sent an email to Ms. Song following up on their March 29, 2012 in-person meeting.  In his email, Mr. Graham wrote:  "***Some of our new machinery I told you about has just arrived.  Once***

1   ***we have it set up and running, I will send you a video of us running your jeans.***"

2   (Salzmann Decl. ¶27, Ex. Y (SP/RCRV005640) (emphasis added)).

3       52.    Once Plaintiffs reached an agreement with Phoenix Fibers, in November

4   2011, for the shredding and recycling of their second-quality denim products into

5   shoddy fiber, Plaintiffs began importing their unfinished or second-quality apparel

6   products from their Asian factories for ultimate shipment to Phoenix Fibers, rather than

7   having them incinerated by the factories.  This involved a significant expense, but it

8   was an expense Plaintiffs were willing to incur in order to dispose of their second-

9   quality denim products in an environmentally safe manner.  (Salzmann Decl. ¶6, Ex. D

10   (Kim 98:24-100:10); Kim Decl. ¶14).

11       53.    Plaintiffs did not believe it was necessary to request certificates of

12   destruction from Phoenix Fibers for the second-quality goods they had donated to

13   Phoenix Fibers for that purpose, because they "assumed that the goods were being

14   recycled [into shoddy fiber] as [they] were told they were."  (Salzmann Decl. ¶6, Ex. D

15   (Kim 168:12-19; 26:23-28:5; 39:5-22); Kim Decl. ¶13; Choi Decl. ¶11).

16       54.    Over the next four years, during the period November 2011 through

17   September 2015, Plaintiffs donated hundreds of thousands of pounds of second-quality

18   MISS ME and ROCK REVIVAL denim products to Phoenix Fibers for shredding into

19   shoddy fiber.  It cost Plaintiffs approximately $1,000 per shipping container to

20   transport MISS ME and ROCK REVIVAL denim products from their facility in Los

21   Angeles, California to Phoenix Fibers' facility in Chandler, Arizona.  (Kim Decl. ¶15).

22       55.    Prior to this litigation, Mr. Kean was not aware of any of Mr. Graham's

23   communications with Ms. Song (Salzmann Decl. ¶5, Ex. C (Kean 80:3-6)), and did not

24   know when Plaintiffs first started to deliver MISS ME and ROCK REVIVAL products

25   to Phoenix Fibers (Salzmann Decl. ¶5, Ex. C (Kean 64:10-12)).

26       56.    Phoenix Fibers has made no attempt to locate Mr. Graham in connection

27   with this litigation (Salzmann Decl. ¶5, Ex. C (Kean 34:1-3)), and further claims that

28   Mr. Graham "maliciously destroyed" all of his emails when he was terminated in 2013

1    because Phoenix Fibers "couldn't afford his position" (Salzmann Decl. ¶5, Ex. C

2    (Kean 30:6-11; 31:7-22)).

3    **D.**     **Phoenix Fibers' Sale of MISS ME and ROCK REVIVAL Denim**

4            **Products to U.S. General**

5            57.     Although it was uncommon for customers purchasing credential from

6    Phoenix Fibers to visit Phoenix Fibers' warehouse to select such credential (Salzmann

7    Decl. ¶5, Ex. C (Kean 17:6-14)), starting in 2015, Kamel Mroueh, the President of

8    Defendant U.S. General Export, Inc. ("U.S. General"), visited Phoenix Fibers'

9    warehouse on multiple occasions to select credential for purchase.  During these visits,

10   Mr. Johnson would accompany Mr. Mroueh as he walked the warehouse floor and

11   selected pallets of denim products that he wanted to purchase (Salzmann Decl. ¶4, Ex.

12   B (Johnson 34:2-10)).

13          58.     Mr. Johnson concedes that on a number of occasions in 2015, Mr. Mroueh

14   selected pallets of second-quality MISS ME and ROCK REVIVAL denim products.

15   Mr. Johnson specifically recalls Mr. Mroueh selecting these pallets because the boxes

16   contained on those pallets clearly displayed the Sweet People and/or RCRV business

17   names, and/or the MISS ME and/or ROCK REVIVAL trademarks and logos.

18   (Salzmann Decl. ¶4, Ex. B (Johnson 39:13-16; 71:5-14)).

19          59.     Mr. Johnson signed the Bill of Lading that corresponded with a Packing

20   List for certain second-quality MISS ME and ROCK REVIVAL denim products

21   Phoenix Fibers sold to U.S. General in May 2015.  The Packing List was filled out by

22   a Phoenix Fibers employee, and recorded the sale of "Miss Me 3,473 lbs" and "RR

23   [Rock Revival] 3,294."  (Salzmann Decl. ¶4, Ex. B (Johnson 82:8-19; 84:11-85:8;

24   85:24-86:2); ¶29, Ex. AA (US GEN EXPORT 000001-27)).  While this document was

25   created by Phoenix Fibers, neither it, nor any other transactional document relating to

26   the multiple sales of pallets of MISS ME and ROCK REVIVAL denim products that

27   Mr. Johnson brokered on Phoenix Fibers' behalf, have been produced in discovery by

28   Phoenix Fibers.

60.     Prior to Phoenix Fibers' sales of pallets of MISS ME and ROCK REVIVAL denim products to U.S. General in 2015, Phoenix Fibers concedes that all of the MISS ME and ROCK REVIVAL denim products that Plaintiffs donated to Phoenix Fibers were either recycled into shoddy fiber, or retrieved by Plaintiffs in December 2015.  (Johnson Decl. ¶¶9, 17).

61.     Mr. Johnson cannot recall any other instance where Phoenix Fibers sold denim products that a brand owner had delivered to it free of charge as credential. (Salzmann Decl. ¶4, Ex. B (Johnson 64:16-22; 41:23-42:1)).

**E.      Plaintiffs Discover Large Quantities of Second-Quality MISS ME and ROCK REVIVAL Denim Products In Secondary Channels of Trade**

62.     In or around the summer of 2015, Plaintiffs began to receive complaints from their sales representatives, authorized retail accounts, and others, regarding the availability of second-quality MISS ME and ROCK REVIVAL denim products for online and wholesale purchase.  (Salzmann Decl. ¶6, Ex. D (Kim 106:25-107:11; 108:10-25; 67:2-13); Kim Decl. ¶16).

63.     Thereafter, Ms. Kim oversaw the purchase of approximately 9,000 units of second-quality MISS ME and ROCK REVIVAL denim products from certain resellers who were selling such goods on eBay and Facebook.  Upon examination of the products, Ms. Kim and others within the companies were able to determine that such products had previously been delivered to Phoenix Fibers for shredding and recycling into shoddy fiber.  (Salzmann Decl. ¶6, Ex. D (Kim 108:22-109:20; 115:18-116:12); Kim Decl. ¶17).

**F.      Plaintiffs Contact Phoenix Fibers Regarding the Availability of Plaintiffs' Products in Secondary Channels of Trade, and Phoenix Fibers Fabricates a Story to Cover Up Its Sales of Such Products**

64.     In or around the last week of October 2015, Ms. Kim called Mr. Johnson, Phoenix Fibers' Plant Manager, to inquire as to how Phoenix Fibers was storing Plaintiffs' second-quality MISS ME and ROCK REVIVAL denim products before

55

shredding them into shoddy fiber.  During that call, Mr. Johnson explained to me that Plaintiffs' goods were received and placed in a secure cage until they were ready to be shredded, at which time they would be removed from the secure cage and shredded into shoddy fiber.  (Salzmann Decl. ¶6, Ex. D (Kim 148:19-149:8); Kim Decl. ¶18).

65.    Thereafter, on October 27, 2015, Ms. Kim sent an email to Mr. Kean stating that an issue had come up that she would like to discuss with him at his earliest convenience.  (Salzmann Decl. ¶33, Ex. EE (PHX000005)).

66.    Ms. Kim subsequently spoke with Mr. Kean and advised him that Plaintiffs "had found goods [they] believed were possibly coming from his location, that had been sent there for destruction and recycling."  In response, Mr. Kean stated that he would look into it, and mentioned the possibility that there may have been "leakage" (*i.e.*, theft) from the Phoenix Fibers warehouse.  Specifically, Mr. Kean explained that on occasion, the cage where Plaintiffs' products were stored would be full, and certain products would be left outside of the cage, thus being susceptible to theft.  At the end of the call, Mr. Kean referred Ms. Kim to Mr. Johnson, who, he stated, would be able to answer Ms. Kim's questions regarding security issues and the possible "leakage" of Plaintiffs' products from Phoenix Fibers' warehouse.  (Salzmann Decl. ¶6, Ex. D (Kim 145:20-148:3); Kim Decl. ¶¶19-20).

67.    At no time during Ms. Kim's call with Mr. Kean, or at any time thereafter, did Mr. Kean state that Phoenix Fibers had sold Plaintiffs' second-quality MISS ME and ROCK REVIVAL denim products to anyone as credential, nor did he state that it was Phoenix Fibers' position under the parties' agreement that Phoenix Fibers was entitled to sell Plaintiffs' products as credential or otherwise.  (Kim Decl. ¶21).

68.    Later that same day, Ms. Kim called Mr. Johnson and told him what she had previously explained to Mr. Kean, namely, that Plaintiffs were seeing significant quantities of second-quality MISS ME and ROCK REVIVAL denim products being offered for sale in secondary channels of trade, and that Plaintiffs had examined these products and believed that they had previously been delivered to Phoenix Fibers for

destruction and recycling into shoddy fiber.  In response, Mr. Johnson acknowledged the possibility that Plaintiffs' products had "leaked" from Phoenix Fibers' warehouse, stated Phoenix Fibers was adding security cameras in its warehouse, and further stated that he would personally investigate the issue and report back to Ms. Kim.  (Salzmann Decl. ¶6, Ex. D (Kim 151:15-152:24); Kim Decl. ¶22).

69.    Mr. Johnson engaged in these conversations with Ms. Kim knowing full well that he was lying to her, and that, in particular, Phoenix Fibers had sold a substantial number of pallets of MISS ME and ROCK REVIVAL products to Mr. Mroueh of U.S. General only months earlier:

> Q.  Okay.  And during that initial conversation, did you advise Ms. Kim that Phoenix Fibers had been selling its products to Mr. Mroueh?
>
> A.  No.
>
> Q.  But you knew that that was the case at that time; is that right?
>
> A.  Yes.  (Salzmann Decl. ¶4, Ex. B (Johnson 100:23-101:4; *see also* 35:2-8; 70:25-71:10; 99:19-101:8)).

70.    At no time during Ms. Kim's conversation with Mr. Johnson, or at any time thereafter, did Mr. Johnson disclose the fact he had personally overseen the sale of many pallets of second-quality MISS ME and ROCK REVIVAL denim products to Defendant U.S. General, or state that it was Phoenix Fibers' position that Phoenix Fibers was entitled to sell Plaintiffs' products to anyone as credential or otherwise.  (Kim Decl. ¶23).

71.    Mr. Johnson testified that, notwithstanding his failure to so advise Ms. Kim, he "probably" first advised Mr. Kean that he had overseen the sale of pallets of MISS ME and ROCK REVIVAL products to Mr. Mroueh at U.S. General "right after we were notified" by Plaintiffs—*i.e.*, in or around October 27, 2015.  (Salzmann Decl. ¶4, Ex. B (Johnson 103:23-104:5; 106:12-18)).

72.    Mr. Kean, however, was unable to recall when, or in what context, Mr. Johnson first told him that Mr. Johnson had overseen the sale of pallets of MISS ME

and ROCK REVIVAL products to Mr. Mroueh at U.S. General (Salzmann Decl. ¶5, Ex. C (Kean 10:17-22; 12:7-16)), but believes that the conversation must have taken place prior to May 18, 2016, the date on which Plaintiffs' First Amended Complaint was filed:

> Q.  Well, do you recall whether or not you had that conversation with
>       Mr. Johnson before the complaint was filed in this case?
>
> A.  I don't recall.
>
> Q.  Okay.  Do you recall whether or not you had that conversation with
>       Mr. Johnson before the answer was filed?
>
> A.  I don't recall.  I don't know when the answer was filed, so I'd need
>       to look at a document.
>
> Q.  March 29th, 2016.
>
> A.  I don't recall.
>
> Q.  Okay.  How about as of May 18th, 2016?
>
> A.  I would make an assumption, yes, I had spoken to him by May.
>       (Salzmann Decl. ¶5, Ex. C (Kean 42:10-22)).

73.     After Mr. Johnson advised Mr. Kean that he had overseen Phoenix Fibers' sale of an unknown number of pallets of MISS ME and ROCK REVIVAL denim products to Mr. Mroueh at U.S. General, there was never any discussion between them as to whether or not Phoenix Fibers should advise Plaintiffs that it had resold their products.  (Salzmann Decl. ¶4, Ex. B (Johnson 107:22-25)).  In fact, there was no further discussion between Mr. Johnson and Mr. Kean about this issue until Phoenix Fibers was preparing its discovery responses in this action in late May 2016. (Salzmann Decl. ¶4, Ex. B (Johnson 109:24-110:4)).

74.     Instead, Mr. Kean and Phoenix Fibers continued to ignore the fact that Mr. Johnson, Phoenix Fibers' Plant Manager, had personally overseen the sale of an unknown number of pallets of MISS ME and ROCK REVIVAL products to Mr.

1   Mroueh at U.S. General, and had withheld such information from Plaintiffs when Ms.

2   Kim directly raised the issue.

3          75.    Although Mr. Johnson had advised Ms. Kim in late October or early

4   November 2015 that he would look into the possibility that certain MISS ME and

5   ROCK REVIVAL denim products had been stolen from Phoenix Fibers warehouse,

6   and then report back to her, Ms. Kim received no further information or response of

7   any kind from Mr. Johnson or Mr. Kean.  (Salzmann Decl. ¶6, Ex. D (Kim 155:1-6);

8   Kim Decl. ¶24).

9          76.    When Mr. Johnson spoke to Mr. Kean about his conversation with Ms.

10  Kim, he advised Mr. Kean that he mentioned to Ms. Kim that "he would immediately

11  look into any theft issues."  Mr. Kean recalls Mr. Johnson looking into the issue of

12  theft, but Mr. Johnson did not report back to him to advise what he had determined.

13  (Salzmann Decl. ¶5, Ex. C (Kean 8:14-9:9)).

14         77.    In the weeks that followed, Plaintiffs continued to see increasing numbers

15  of second-quality MISS ME and ROCK REVIVAL denim products being made

16  available online for purchase in secondary channels of trade.  Finally, in mid-

17  November 2015, Ms. Kim instructed Plaintiffs' outside counsel to contact Mr. Kean, in

18  order to ensure that Plaintiffs' donated products were being properly handled and

19  secured prior to being shredded and recycled into shoddy fiber.  At the time, Plaintiffs

20  had no idea that these products had found their way out of Phoenix Fibers' warehouse

21  in any way other than through "leakage" (*i.e.*, theft).  (Kim Decl. ¶25).

22         78.    The November 17, 2015 letter from Plaintiffs' counsel further stated that

23  Plaintiffs desired to "resolve th[e] matter in an amicable and business-like manner" so

24  that the parties could "continue their valued relationship," and asked that Phoenix

25  Fibers provide Plaintiffs with a written protocol for securely handling their MISS ME

26  and ROCK REVIVAL products going forward.  (Salzmann Decl. ¶34, Ex. FF

27  (PHX001040-1041)).

28

1      79.    On December 3, 2015, Plaintiffs' outside counsel received a response to

2  its November 17, 2015 letter from Phoenix Fibers' then-outside counsel, Charles

3  Wirken, Esq., of the firm of Gust & Rosenfeld.  Mr. Wirken's December 3, 2015 letter,

4  on which Mr. Kean was copied, denied that Phoenix Fibers had any knowledge of

5  Plaintiffs' products being "removed from the main warehouse floor," by way of sale of

6  otherwise, and stated that if any such products had been removed, "***it was done***

7  ***without the knowledge and consent of Phoenix Fibers.***"  (Salzmann Decl. ¶35, Ex.

8  GG (PHX001042–001043) (emphasis added); Kim Decl. ¶26).

9      80.    Mr. Wirken's letter further advised that Phoenix Fibers would no longer

10  accept the donation of Plaintiffs' MISS ME and ROCK REVIVAL denim products.

11  As for the inventory of Plaintiffs' products that Phoenix Fibers had on hand, Mr.

12  Wirken advised that Phoenix Fibers "***will either process them as usual, taking them***

13  ***from the 'cage' and processing them through the machinery on the warehouse floor***,

14  or allow [Plaintiffs] to reclaim the unprocessed products at their expense."  (Salzmann

15  Decl. ¶35, Ex. GG (PHX001042–001043) (emphasis added); Kim Decl. ¶26).  Once

16  again, no mention was made that any of the goods in question had been sold as

17  credential, in direct violation of the parties' agreement.

18      81.    In particular, at no point did Phoenix Fibers or its then-counsel, Mr.

19  Wirken, (a) disclose to Plaintiffs the fact that Mr. Johnson, Phoenix Fibers' Plant

20  Manager, had personally overseen Phoenix Fibers' sale of an unknown quantity of

21  MISS ME and ROCK REVIVAL denim products to Mr. Mroueh at U.S. General, or

22  (b) take the position that Phoenix Fibers had the right to resell Plaintiffs' denim

23  products as credential.  Salzmann Decl. ¶35, Ex. GG (PHX001042–001043); ¶37, Ex.

24  II (SP/RCRV000056-60)).

25      82.    By letter dated December 7, 2015, Plaintiffs' outside counsel requested

26  that Mr. Wirken advise as to "the volume of unprocessed Sweet People and/or RCRV

27  products currently maintained" at Phoenix Fibers' facility, so that Plaintiffs could

28

1   assess the possibility of reclaiming their unprocessed products.  (Salzmann Decl. ¶36,

2   Ex. HH (SP/RCRV000055)).

3          83.    The following day, Mr. Wirken advised Plaintiffs' outside counsel that

4   Phoenix Fibers possessed 125 pallets of Plaintiffs' products, with an estimated weight

5   of 125,000 to 130,000 pounds.  Mr. Wirken further advised that "[t]hese numbers are

6   decreasing *as the product is processed*."  Once again, no mention was made that any

7   products had been or were being resold as credential, or that anything else was being

8   done with them other than shredding them for processing into shoddy fiber.  That same

9   day, Plaintiffs' outside counsel advised Mr. Wirken that Plaintiffs would reclaim all

10  remaining inventory, and requested that Phoenix Fibers cease processing Plaintiffs'

11  products.  In response, Mr. Wirken represented that the remaining inventory

12  represented "*whatever your clients sent [to Phoenix Fibers] and was not previously*

13  *processed.*"  (Salzmann Decl. ¶37, Ex. II (SP/RCRV000056-60) (emphasis added)).

14         84.    Mr. Johnson testified that the term "processed," as used by Phoenix

15  Fibers, refers to denim "put on the line to be turned into shoddy."  (Salzmann Decl. ¶4,

16  Ex. B (Johnson 21:20-25; 76:15-25)).

17         85.    Mr. Wirken's representations, however, were not true or accurate, given

18  that Mr. Johnson, Phoenix Fibers' Plant Manager, had personally overseen Phoenix

19  Fibers' sale of an unknown quantity of MISS ME and ROCK REVIVAL denim

20  products to Mr. Mroueh at U.S. General.  (Salzmann Decl. ¶4, Ex. B (Johnson 39:13-

21  16; 71:5-14)).

22         86.    Shortly thereafter, in mid-December 2015, Plaintiffs reclaimed

23  approximately 125 pallets of their unprocessed/unsold second-quality MISS ME and

24  ROCK REVIVAL denim products from Phoenix Fibers' warehouse in Chandler,

25  Arizona.  (Salzmann Decl. ¶6, Ex. D (Kim 25:17-26:11); Kim Decl. ¶27).

26         87.    Once the products were returned to Plaintiffs' warehouse in Los Angeles,

27  California, at Ms. Kim's direction Plaintiffs' warehouse staff conducted a review of

28  the reclaimed products.  That review revealed that among the reclaimed goods were

1  denim products that Plaintiffs had delivered to Phoenix Fibers for recycling into

2  shoddy fiber as early as 2012.  (Salzmann Decl. ¶6, Ex. D (Kim 25:17-26:11); Kim

3  Decl. ¶28).

4       88.    In addition, many of the reclaimed boxes of MISS ME and ROCK

5  REVIVAL denim products had been cut open in one corner, and had apparently been

6  rummaged through.  After viewing certain of these cut-open boxes, it was Ms. Kim's

7  belief that the boxes were opened in this manner to determine the quality and/or

8  saleability of the MISS ME and ROCK REVIVAL denim products contained inside.

9  (Salzmann Decl. ¶6, Ex. D (Kim 181:18-25); Kim Decl. ¶29).

10       89.    Realizing that they had received no forthright responses from Phoenix

11  Fibers about how their second-quality products were finding their way out of Phoenix

12  Fibers' warehouse, in or around early December 2015 Plaintiffs hired, at significant

13  expense, a private investigator to help identify the source of the second-quality MISS

14  ME and ROCK REVIVAL denim products that were continuing to flood secondary

15  channels of trade.  (Kim Decl. ¶30).

16       90.    In an effort to mitigate the incalculable harm to the MISS ME and ROCK

17  REVIVAL brands that was being caused by the widespread availability of second-

18  quality MISS ME and ROCK REVIVAL denim products, which Plaintiffs had always

19  taken strict measures to prevent, Ms. Kim authorized Plaintiffs' investigators to

20  purchase as many of such products as possible. (Kim Decl. ¶31).

21       91.    Between December 30, 2015 and February 9, 2016 (the day before

22  Plaintiffs commenced this action), Plaintiffs' investigators purchased over 29,000 units

23  of second-quality MISS ME and ROCK REVIVAL denim products from Defendants

24  SAC International Traders, Inc., Shaukat Ali Chohan, Comak Trading, Inc. and Lydia

25  Evilsa Terrazas Cho, at a cost of over $190,000.  Documents produced in discovery in

26  this action establish that these goods were sourced by these parties from Defendant

27  U.S. General Export, Inc. who, in turn, purchased them from Phoenix Fibers in sales

28  brokered by Mr. Johnson.  (Kim Decl. ¶31).

62

92.     To this day, as a direct result of Phoenix Fibers' conduct, second-quality MISS ME and ROCK REVIVAL denim products improperly sold by Phoenix Fibers are being offered for sale in secondary channels, and are continuing to be sold by downstream customers through eBay and social media platforms such as Facebook. Phoenix Fibers' inexplicable sale of these products, which Plaintiffs would never have authorized for distribution to consumers at any level, has caused irreparable harm to Plaintiffs and their MISS ME and ROCK REVIVAL brands.  (Kim Decl. ¶32; Choi Decl. ¶¶12-13; Salzmann Decl. ¶31, Ex. CC (SP/RCRV001366-1367); ¶32, Ex. DD (SP/RCRV005756-5757)).

93.     In its Answer to Plaintiffs' Complaint, filed on March 29, 2016—nearly five months after Ms. Kim first contacted Mr. Kean, and long after Mr. Johnson conceded that he "probably advised" Mr. Kean of the sale of Plaintiffs' products to U.S. General—Phoenix Fibers repeatedly and expressly denied Plaintiffs' allegations, stating that "***Defendant lacks any record of Defendant's donated goods being distributed or sold by Defendant in the same form as donated by Plaintiffs*** [*i.e.*, as credential] ***and on that basis specifically denies such allegation.***"  (Salzmann Decl. ¶11, Ex. I (Phoenix Fibers' Answer) at ¶¶ 4-6, 32, 37, 41-42, 46-50, 58-65, 67-73, 75-79, 83-94 (emphasis added)).

94.     On May 13, 2016—over six months after Ms. Kim first contacted Mr. Kean, and long after Mr. Johnson conceded that he "probably advised" Mr. Kean of his sale of Plaintiffs' products to U.S. General—Phoenix Fibers served its Initial Disclosures.  Those disclosures continued to perpetuate the charade that Phoenix Fibers had not resold Plaintiffs' products, and identified no documents relating to, or witnesses with knowledge of such sales of Plaintiffs' products, despite the fact that Mr. Johnson, the individual who had personally overseen the sale of pallets of Plaintiffs' MISS ME and ROCK REVIVAL products to U.S. General, was identified by Phoenix Fibers as a witness with knowledge of relevant facts.  (Salzmann Decl. ¶43, Ex. OO

1   (Defendant Phoenix Fibers Initial Disclosures)).  To date, Phoenix Fibers has not

2   amended its Initial Disclosures.

3       95.    Five days later, on May 18, 2016, Plaintiffs filed their First Amended

4   Complaint.  (Salzmann Decl. ¶12, Ex. J (Plaintiffs' First Amended Complaint)).

5   Phoenix Fibers has not filed an answer to Plaintiffs' First Amended Complaint.

6       **G.    Likelihood of Post-Sale Confusion**

7       96.    Observers of Plaintiffs' second-quality products, initially sold into

8   secondary trade channels by Phoenix Fibers, being worn by purchasers of such

9   products in the post-sale marketplace, are likely to be confused and believe that such

10  inferior quality products were authorized for sale by Plaintiffs as first-quality products.

11  (Choi Decl. ¶¶12-13; Kim Decl. ¶32).

12      **H.    "Factual" Statements in the Declarations of Tod Kean and Steve**

13      **Johnson That Are Inconsistent with Their Deposition Testimony**

14      97.    Phoenix Fibers did not have an operational website when the company

15  launched in July 2011, and Tod Kean does not know when the website went live,

16  stating at his deposition that he "would want to check the dates on the [Wayback]

17  machine."  (Salzmann Decl. ¶5, Ex. C (Kean 101:5-25)).  Had Mr. Kean checked the

18  Wayback Machine, he would have learned that the first screen capture of the

19  phxfibers.com website is from September 13, 2012, more than a year after Phoenix

20  Fibers commenced its business.  (Salzmann Decl. ¶42, Ex. NN (printout of Wayback

21  Machine screen capture)).  Moreover, Phoenix Fibers did not "purchase" Plaintiffs'

22  products, and when Mr. Kean was specifically asked how this statement—"The items

23  we do not use in our shredding process are resold to other recycling companies"—

24  which refers to the resale or reselling of products, related Phoenix Fibers' sale of

25  Plaintiffs' products, Mr. Kean was unable to identify any first or initial "sale" of

26  products by Plaintiffs that preceded Phoenix Fibers' "resale."  (Salzmann Decl. ¶5, Ex.

27  C (Kean 102:1-23)).

28

98.     Phoenix Fibers has produced no evidence to substantiate Mr. Kean's claim that the phxfibers.com website has been active "[s]ince [the company's] inception" in July 2011.  (Kean Decl. ¶9).

99.     When Mr. Johnson was asked at his deposition whether it was his understanding that "U.S. General Export is a recycling company," his response was "I have no idea."  (Salzmann Decl. ¶4, Ex. B (Johnson 98:6-8)).  Yet now, Mr. Johnson unequivocally states in his declaration that "U.S. General Exports [sic] … is a clothing recycler," and downplays Phoenix Fibers' involvement in the shredding of denim products and their conversion into shoddy fiber.  (Johnson Decl. ¶8).

100.    When Mr. Johnson was asked at his deposition whether Phoenix Fibers was doing business with Kamel Mroueh, the owner of U.S. General, at the time he came on board as Plant Manager in September 2013, his response was "I honestly don't know, but I'm -- yeah, I don't know.  I don't know when the relationship started."  (Salzmann Decl. ¶4, Ex. B (Johnson 33:5-10)).  However, Mr. Johnson now unequivocally states in his declaration that "[t]o my knowledge, based on my job and a review of records, Phoenix Fibers did not sell any credential to U.S. General prior to 2013."  (Johnson Decl. ¶8).  Furthermore, whatever Phoenix Fibers "records" Mr. Johnson is referring to in his declaration have not been produced in this litigation.

101.    When Mr. Johnson was asked at his deposition whether he knew how Phoenix Fibers was able to determine the dates of its sales of Plaintiffs' products to U.S. General, as disclosed in Phoenix Fibers' Responses to Sweet People's First Set of Interrogatories (*i.e.*, "between early Spring 2015 — early Fall 2015"), he testified that he did not know, and could not recall if he had discussed the range of those dates with Mr. Kean prior to the time Mr. Kean verified the accuracy of the response.  (Salzmann Decl. ¶4, Ex. B (Johnson 92:25-93:7); ¶44, Ex. PP (Defendant Phoenix Fibers, Inc.'s Responses to First Set of Interrogatories From Plaintiff Sweet People Apparel, Inc.)).  In his declaration, however, Mr. Johnson now states that "[b]ased on my review of Phoenix Fibers' records and my recollection, Phoenix Fibers sold certain products

65

donated by Sweet People and RCRV to U.S. General, as credential, in bulk, and by the pound beginning in 2015." (Johnson Decl. ¶9). As for the "records" Mr. Johnson is referring to, at his deposition Mr. Johnson testified that Mr. Mroueh "always" paid in cash, and therefore the only transactional documents that would exist were handwritten sales slips that he would have prepared. (Salzmann Decl. ¶4, Ex. B (Johnson 37:18-19; 47:20-48:5)). It is therefore unclear what "Phoenix Fibers records" Mr. Johnson is referring to, as Phoenix Fibers has produced no such records relating to its sales of Plaintiffs' denim products to U.S. General.

102. When Mr. Johnson was asked at his deposition if he had "a sense of the percentage of donated Miss Me and Rock Revival product that was converted into shoddy as opposed to sold," his response was "I have no idea." When further asked whether anyone at Phoenix Fibers would know the answer to that question, Mr. Johnson's response was "No." (Salzmann Decl. ¶4, Ex. B (Johnson 70:19-24)). However, Mr. Johnson now states definitively in his declaration that "[p]rior to 2015, items donated by Sweet People and RCRV were converted into shoddy fiber." (Johnson Decl. ¶9).

I.   **Plaintiffs Have Not Completed Certain Fact Discovery Required to Oppose Phoenix Fibers' Motion, and Fact Discovery Remains Open For Two More Months**

103. Fact discovery in this action closes on March 13, 2017. (Salzmann Decl. ¶47).

104. Plaintiffs have diligently attempted to schedule the deposition of U.S. General since September 2016. Plaintiffs' counsel first contacted U.S. General's counsel, Eugene Alkana, on September 16, 2016, to inquire about scheduling the deposition of U.S. General's President, Kamel Mroueh. That same day, Mr. Alkana advised that he believed that Mr. Mroueh "currently resides in the Congo," that he would "talk to him about his travel plans" and would provide Plaintiffs' counsel with an update during the week of September 26, 2016. (Salzmann Decl. ¶48).

105.   Plaintiffs' counsel thereafter followed up with Mr. Alkana on September 26, to again inquire as to Mr. Mroueh's availability, further stating:  "To the extent Mr. Mroueh will not be returning to the U.S., we would like to depose Ms. [Nellie] Sanchez.  Also we would like to depose an appropriate corporate representative(s) to address the topics set forth in the attached draft Rule 30(b)(6) notice.  We will serve formal notices once we are able to work out dates."  (Salzmann Decl. ¶49).

106.   In response, on September 29, 2016, Mr. Alkana advised that Mr. Mroueh "will not return to the U.S. [until] June 2017," and offered to explore the possibility of conducting a video deposition of Mr. Mroueh from the Congo.  After exploring this possibility, it was determined to be unfeasible, and on October 5, 2016, Plaintiffs' counsel sent an email to Mr. Alkana advising him of the same, and reiterating Plaintiffs' counsel's position that Plaintiffs "are entitled to depose a knowledgeable corporate representative of U.S. General (whether it is Mr. Mroueh or someone else) in California where U.S. General is registered to do business and maintains its principal place of business."  (Salzmann Decl. ¶50, Ex. SS).

107.   That same day (October 5, 2016), Plaintiffs' counsel served Plaintiffs' Rule 30(b)(6) notice of deposition on U.S. General, calling for the deposition to take place on October 28, 2016.  (Salzmann Decl. ¶51, Ex. TT).

108.   Thereafter, on October 14, 2016, U.S. General served Objections and Designations in response to Plaintiffs' Rule 30(b)(6) deposition notice, identifying Ms. Sanchez as U.S. General's corporate representative, and indicating that "[t]he date currently set for deposition is not acceptable as counsel for U.S. General is not available on that date," yet offering no alternative dates.  (Salzmann Decl. ¶52).

109.   On November 14, 2016, Plaintiffs' counsel sent an email to Mr. Alkana requesting that he provide "Ms. Sanchez's availability for deposition during the week of December 5."  Having received no response from Mr. Alkana, Plaintiffs' counsel sent him another email on November 23, 2016, again requesting that he advise of Ms. Sanchez's availability for deposition during the week of December 5, 2016.  That same

1  day, Mr. Alkana responded, stating only: "I will inquire."  Again, having not received

2  a further response from Mr. Alkana, Plaintiffs' counsel sent him another email on

3  December 7, 2016 inquiring as to Ms. Sanchez's availability.  Mr. Alkana responded

4  the same day, stating "I will get dates for Ms. Sanchez and report to [you] on

5  Monday."  However, Mr. Alkana has yet to propose any dates for Ms. Sanchez's

6  deposition. (Salzmann Decl. ¶53, Ex. UU).

7        110.   Accordingly, despite Plaintiffs' diligent efforts to schedule the Rule

8  30(b)(6) deposition of U.S. General, the party that most immediately purchased

9  Plaintiffs' Donated Products from Phoenix Fibers—and therefore the party in the best

10  position to testify as to the representations made by Phoenix Fibers about such

11  products and sales—Plaintiffs have not yet been able to complete that important

12  discovery.  (Salzmann Decl. ¶54).

13        111.   Mr. Johnson has submitted a declaration in support of Phoenix Fibers'

14  motion wherein he characterizes the nature of U.S. General's business (Johnson Decl.

15  ¶8), his communications with Mr. Mroueh (Johnson Decl. ¶¶10-12), and Phoenix

16  Fibers' sale of MISS ME and ROCK REVIVAL products to U.S. General (Johnson

17  Decl. ¶¶9, 13-16).

18        112.   To this date, Plaintiffs have not had the opportunity to inquire of a U.S.

19  General representative as to the veracity of those alleged communications.  (Salzmann

20  Decl. ¶55).

21        113.   Defendant Shaukat Ali Chohan, the owner of Defendant SAC

22  International Traders, Inc.—a party that purchased approximately 60,000 units of

23  MISS ME and ROCK REVIVAL products from Phoenix Fibers' direct customer U.S.

24  General (Salzmann Decl. ¶30, Ex. BB (US GEN EXPORT 000028-33))—left the

25  United States in or around January or February 2016.  (Salzmann Decl. ¶9, Ex. G

26  (Wolff 43:25-44:6; 101:13-102:15)).

27        114.   The Clerk entered a default against Mr. Chohan in this case on March 28,

28  2016.  (Salzmann Decl. ¶57).

115.   Mr. Chohan operated his business in close partnership with Defendants Lydia Evilsa Terrazas Cho and Comak Trading, Inc., and collectively they engaged in the resale of MISS ME and ROCK REVIVAL products that SAC International Traders purchased from U.S. General.  (Salzmann Decl. ¶9, Ex. G (Wolff 73:22-76:17); ¶45, Ex. QQ (Plaintiff Sweet People Apparel, Inc.'s First Set of Interrogatories Directed to Defendant Tiffany Alana Wolff); ¶46, Ex. RR (Wolff's Responses to RCRV's Interrogatories); ¶58).

116.   Although the two individuals most directly involved in the distribution of MISS ME and ROCK REVIVAL products sold by Phoenix Fibers—Mr. Mroueh (U.S. General) and Mr. Chohan (SAC International Traders)—left the United States shortly following the commencement of this action, Ms. Cho, Mr. Chohan's associate from Comak Trading, remains in California.  (Salzmann Decl. ¶59; ¶9, Ex. G (Wolff 43:25-44:6; 73:22-76:17; 101:13-102:15)).

117.   Plaintiffs' counsel served a notice of deposition on Ms. Cho on November 14, 2016, calling for her deposition to take place in December 9, 2016.  Thereafter, on November 30, 2016, Plaintiffs' counsel sent an email to Ms. Cho requesting that she confirm her availability for deposition on December 9, 2016 as noticed.  Having received no response from Ms. Cho, Plaintiffs' counsel sent an email to Ms. Cho and all counsel of record adjourning her deposition.  (Salzmann Decl. ¶60, Ex. VV).

118.   Thereafter, on December 6, 2016, Plaintiffs' counsel received a call from a representative of Ms. Cho, stating that she was in the process of attempting to retain new counsel for purposes of her deposition, and requesting that her deposition be further adjourned until January 2017.  (Salzmann Decl. ¶61).

119.   The depositions of U.S. General and Ms. Cho will be critical to providing the complete picture as to the nature and scope of Phoenix Fibers' relationship with U.S. General and Comak Trading, and other defendants up the chain, which is essential to the question whether Defendants are joint tortfeasors.  In addition, this long-awaited discovery will provide important information about the manner in which Plaintiffs'

second-quality goods were and are being improperly distributed, including how Phoenix Fibers presented them to U.S. General.  (Salzmann Decl. ¶62).

Dated:  January 9, 2017                    ARNOLD & PORTER KAYE SCHOLER LLP

                                           By:   /s/ *Matthew T. Salzmann*
                                                 John C. Ulin
                                                 Eric D. Mason
                                                 Louis S. Ederer
                                                 Matthew T. Salzmann

                                                 *Attorneys for Plaintiffs*