1  JOHN C. ULIN (State Bar No. 165524)
   John.Ulin@apks.com
2  ERIC D. MASON (State Bar No. 259233)
   Eric.Mason@apks.com
3  LOUIS S. EDERER (admitted *Pro Hac Vice*)
   Louis.Ederer@apks.com
4  MATTHEW T. SALZMANN (admitted *Pro Hac Vice*)
   Matthew.Salzmann@apks.com
5  ARNOLD & PORTER KAYE SCHOLER LLP
6  777 South Figueroa Street, 44th Floor
   Los Angeles, California 90017-5844
7  Telephone: (213) 243-4000; Facsimile: (213) 243-4199

8  *Attorneys for Plaintiffs*

9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                    **WESTERN DIVISION**

13  SWEET PEOPLE APPAREL, INC. d/b/a      )  Case No.:  2:16-cv-00940-TJH-JC
    MISS ME, a California corporation, and )
14  RCRV, INC. d/b/a ROCK REVIVAL, a       )  Hon. Terry J. Hatter Jr.
    California corporation,                )
15                                         )  **PLAINTIFFS' MEMORANDUM**
                                           )  **OF LAW IN OPPOSITION TO**
16              Plaintiffs,                )  **DEFENDANT PHOENIX**
                                           )  **FIBERS, INC.'S MOTION FOR**
17       v.                                )  **SUMMARY JUDGMENT**
                                           )
18  PHOENIX FIBERS, INC., an Arizona       )  Date:      January 30, 2017
    corporation, U.S. GENERAL EXPORT,      )  Time:      Under submission
19  INC., a California corporation, SAC    )  Location:  Courtroom 9B
    INTERNATIONAL TRADERS, INC., a         )             First Street Courthouse
20  California corporation, SHAUKAT ALI    )
    CHOHAN, an individual, COMAK           )  *[Plaintiffs' Statement of Genuine*
21  TRADING, INC., a California corporation,)  *Disputes of Material Fact;*
    LYDIA EVILSA TERRAZAS CHO, an          )  *Declaration of Lilly Kim;*
22  individual, MYUNG KWON CHO, an         )  *Declaration of Eric. Choi; and*
    individual, TIFFANY ALANA WOLFF,       )  *Declaration of Matthew T. Salzmann*
23  an individual d/b/a MISS V LANE, XYZ   )  *Filed Concurrently Herewith]*
    COMPANIES 1-10, and JOHN AND           )
24  JANE DOES 1-10,                        )
                                           )
25              Defendants.                )
                                           )
26                                         )
                                           )
27                                         )
                                           )
28                                         )

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT..................................................................1

STATEMENT OF FACTS .......................................................................2

ARGUMENT ..........................................................................................7

I.  SUMMARY JUDGMENT STANDARD ........................................7

II.  GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY
     JUDGMENT ON PLAINTIFFS' CONTRACT CLAIMS ................8

     A.  The Evidence Demonstrates the Existence of an Agreement to
         Destroy All of Plaintiffs' Products.............................................9

     B.  RCRV Was a Party to the Agreement With Phoenix Fibers...................13

III.  SUMMARY JUDGMENT SHOULD BE DENIED AS TO
      PLAINTIFFS' TRADEMARK-RELATED CLAIMS........................15

IV.  PHOENIX FIBERS MAY BE HELD JOINTLY AND SEVERALLY
     LIABLE FOR ITS CO-DEFENDANTS' PROFITS...........................18

V.  PUNITIVE DAMAGES ARE PROPER, OR, AT LEAST, THERE
    ARE MATERIAL FACTUAL QUESTIONS REGARDING THEIR
    AWARD ..........................................................................................21

VI.  SUMMARY JUDGMENT SHOULD BE DENIED UNDER FRCP
     56(d)(1) ..........................................................................................23

CONCLUSION .......................................................................................25

1

2

## **TABLE OF AUTHORITIES**

3

**Page(s)**

4

**Cases**

5

6

*Adobe Sys. Inc. v. Blue Source Grp., Inc.*,
   125 F. Supp. 3d 945 (N.D. Cal. 2015)...............................................................19, 20

7

8

*Alexander v. Codemasters Grp. Ltd.*,
   127 Cal. Rptr. 2d 145 (Cal. Ct. App. 5th Dist. 2002).........................................8, 13

9

10

*Aliya Medcare Fin., LLC v. Nickell*,
   2015 WL 4163088 (C.D. Cal. July 9, 2015)............................................................22

11

12

*Am. Builder's Ass'n v. Au-Yang*,
   276 Cal. Rptr. 262 (Cal. Ct. App. 2d Dist. 1990) ....................................................14

13

14

*Am. Family Life Assur. Co. of Columbus v. Biles*,
   714 F.3d 887 (5th Cir. 2013) ....................................................................................23

15

*Am. Licorice Co. v. Total Sweeteners, Inc.*,
   2013 WL 4396778 (N.D. Cal. Aug. 13, 2013) ...........................................................8

16

17

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).....................................................................................................7

18

19

*AOP Ventures, Inc. v. Steam Distribution, LLC*,
   2016 WL 7336730 (C.D. Cal. Oct. 11, 2016)...........................................................21

20

21

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
   869 P.2d 454 (Cal. 1994) ..........................................................................................19

22

23

*Au-Tomotive Gold v. Volkswagen of Am.*,
   603 F.3d 1133 (9th Cir. 2010) ..................................................................................17

24

25

*Azco Biotech, Inc. v. Qiagen, N.V.*,
   2015 WL 12516024 (S.D. Cal. July 2, 2015) .............................................................8

26

*Basketball Mktg. Co. v. Upscale Entm't. & Mktg. Grp.*,
   227 Fed. App'x 492 (6th Cir. 2007) .........................................................................19

27

28

*Bruno Rimini (Furniture) Ltd. v. Connor Mktg., Inc.*,
   2015 WL 4530991 (E.D. Cal. July 27, 2015)...........................................................23

*Burlington N. Santa Fe R.R. Co. v. The Assiniboine & Sioux Tribes of the Fort Peck Reservation*,
   323 F.3d 767 (9th Cir. 2003) ...................................................................23

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
   16 F. Supp. 3d 1123 (S.D. Cal. 2014)....................................................21

*Codexis, Inc. v. Enzymeworks, Inc.*,
   2016 WL 4241909 (N.D. Cal. Aug. 11, 2016) .......................................21

*Del E. Webb Corp. v. Structural Materials Co.*,
   176 Cal. Rptr. 824 (Cal. Ct. App. 2d Dist. 1981) ....................................8

*Doyle v. City of Medford*,
   327 F. App'x 702 (9th Cir. 2009) ...........................................................23

*Duncan v. Stuetzle*,
   76 F.3d 1480 (9th Cir. 1996) ..................................................................22

*El Greco Leather Prods. Co. v. Shoe World, Inc.*
   806 F.2d 392 (2d Cir. 1986)....................................................................18

*Enesco Corp. v. Price/Costco Inc.*,
   146 F.3d 1083 (9th Cir. 1998) ................................................................18

*Hokto Kinoko Co. v. Concord Farms, Inc.*,
   810 F. Supp. 2d 1013 (C.D. Cal. 2011) ..................................................22

*Hunting World, Inc. v. Reboans, Inc.*,
   1992 WL 361741 (N.D. Cal. Sept. 10, 1992) .........................................18

*Ikerd v. Warren T. Merrill & Sons*,
   12 Cal. Rptr. 2d 398 (Cal. Ct. App. 2d Distr. 1992).............................14

*Isle of Capri Casinos, Inc. v. Flynt*,
   2016 WL 6495380 (C.D. Cal. Nov. 1, 2016) .........................................21

*JL Beverage Co. v. Jim Beam Brands Co.*,
   828 F.3d 1098 (9th Cir. 2016) ...........................................................7, 16

*Karl Storz Endoscopy Am., Inc. v. Surgical Technologies, Inc.*,
   285 F.3d 848 (9th Cir. 2002) .............................................................15, 16

*KCI Newport, Inc. v. Smoke Tokes, LLC*,
   2016 WL 2885859 (C.D. Cal. May 17, 2016)........................................21

iv

*Keds Corp. v. Goldstreet Holdings, Inc.*,
   1992 WL 511407 (C.D. Cal. Aug. 19, 1992) ................................................... 19, 20

*KTS Karaoke, Inc. v. Sony/ATV Music Publ'g LLC*,
   2014 WL 12567169 (C.D. Cal. Jan. 14, 2014) ...................................................... 20

*Levi Strauss & Co. v. Blue Bell, Inc.*,
   632 F.2d 817 (9th Cir. 1980) ...................................................................................... 16

*Maier Brewing Co. v. Fleischmann Distilling Corp.*,
   390 F.2d 117 (9th Cir. 1968) ...................................................................................... 20

*MCA, Inc. v. Wilson*,
   677 F.2d 180 (2d Cir. 1981) ....................................................................................... 20

*Metabolife Int'l, Inc. v. Wornick*,
   264 F.3d 832 (9th Cir. 2001) ............................................................................... 23, 25

*Microban Prods. v. API Indus., Inc.*,
   2014 WL 1856471 (S.D.N.Y. May 8, 2014) .......................................................... 18

*Microsoft Corp. v. U-Top Printing Corp.*,
   1996 WL 479060 (N.D. Cal. Aug. 13, 1996) ....................................................... 19

*Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*,
   629 F. Supp. 2d 1135 (E.D. Cal. 2009) ....................................................... 8, 13, 14

*New W. Corp. v. NYM Co. of California*,
   595 F.2d 1194 (9th Cir. 1979) ............................................................................ 21, 22

*PepsiCo, Inc. v. IRIE Motivations, Inc.*,
   2008 WL 5732153 (C.D. Cal. Dec. 29, 2008) ...................................................... 19

*Porges v. RQ Const., Inc.*,
   79 Fed. App'x 957 (9th Cir. 2003) .............................................................................. 8

*Rearden LLC v. Rearden Commerce, Inc.*,
   683 F.3d 1190 (9th Cir. 2012) ................................................................................... 16

*Rolex Watch U.S.A., Inc. v. Michel Co.*,
   179 F.3d 704 (9th Cir. 1999) ...................................................................................... 17

*Sammons v. Colonial Press, Inc.*,
   126 F.2d 341 (1st Cir. 1942) ....................................................................................... 20

v

*SEC v. JT Wallenbrock & Assocs.*,
   440 F.3d 1109 (9th Cir. 2006) ........................................................ 20

*SEC v. Wilde*,
   2012 WL 6621747 (C.D. Cal. Dec. 17, 2012) ................................. 20

*Shell Oil Co. v. Commercial Petroleum, Inc.*,
   928 F.2d 104 (4th Cir. 1991) ......................................................... 18

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) ....................................................... 21

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
   809 F.2d 626 (9th Cir. 1987) ................................................. 7, 8, 1

*Thane Int'l, Inc. v. Trek Bicycle Corp.*,
   305 F.3d 894 (9th Cir. 2002) ......................................................... 16

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
   1981 WL 40542 (C.D. Cal. Feb. 12, 1981), *aff'd* 768 F.2d 1001
   (9th Cir. 1985) ............................................................................... 19

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
   768 F.2d 1001 (9th Cir. 1985) ....................................................... 22

*U.S. v. Real Prop. Located at 149 G. Street, Lincoln, California, Placer
   Cnty, APC 008-266-015-000*,
   2013 WL 2664770 (E.D. Cal. June 12, 2013) ............................... 23

**Statutes & Rules**

Cal. Civ. Code §§ 3294(c)(1)–(2) ........................................................ 22

Cal. Civ. Code § 3294(c)(3) ................................................................ 22

Fed. R. Civ. P. 56(a) ............................................................................. 7

Fed. R. Civ. P. 56(d) ................................................................... 23, 25

**Other Authorities**

2 McCarthy on Trademarks & Unfair Competition § 32:37 .............. 16, 17

4 McCarthy on Trademarks & Unfair Competition § 25:23 .................. 19

Restatement (Second) of Torts § 875 (1979) ....................................... 19

Plaintiffs Sweet People Apparel, Inc. d/b/a Miss Me ("Sweet People") and RCRV, Inc. d/b/a Rock Revival ("RCRV", and together with Sweet People, "Plaintiffs") respectfully submit this Memorandum of Law in opposition to Defendant Phoenix Fibers, Inc. ("Phoenix Fibers")'s Motion for Summary Judgment.

## **PRELIMINARY STATEMENT**

Phoenix Fibers' motion is as disingenuous in its presentation of Plaintiffs' claims as its principals were in 2015 when Phoenix Fibers was caught selling Plaintiffs' second-quality MISS ME and ROCK REVIVAL denim products into the marketplace.  As the undisputed evidence shows, knowing full well that any sales were in violation of the clear terms of the agreement Plaintiffs had negotiated with Phoenix Fibers years earlier, in which Phoenix Fibers agreed to recycle Plaintiffs' products *only* by shredding them into shoddy fiber, and *not* by reselling them, Phoenix Fibers' principals lied to Plaintiffs and told them that Plaintiffs' products had found their way out of Phoenix Fibers' warehouse through "leakage"—that is, they had been stolen.

Now, however, confronted not only with Plaintiffs' claim for breach of contract, but also for the consumer confusion and resulting harm being caused to Plaintiffs' immensely popular jeanswear brands in the marketplace, Phoenix Fibers takes a new tack.  Now Phoenix Fibers claims, in the face of clear evidence to the contrary, that it never had an agreement with Plaintiffs only to shred Plaintiffs' second-quality goods—which Plaintiffs delivered to Phoenix Fibers specifically so that they would be destroyed and not be sold into the marketplace—and instead mischaracterizes the evidence to argue that its agreement with Plaintiffs allowed it to "recycle" Plaintiffs' goods for profit, knowing full well they would end up being purchased by consumers.  As alleged in Plaintiffs' complaint and discussed below, Phoenix Fibers' conduct gives rise not only to a clear-cut claim of breach of contract, but also a series of trademark-related claims, as this conduct is likely to cause confusion in the post-sale market, where observers of these products are getting the

wrong idea about the quality of Plaintiffs' brands, whose image and reputation they have worked so hard and long to establish and maintain.

In that regard, Phoenix Fibers' disingenuousness continues.  In diametric contrast to the claims themselves, it mischaracterizes Plaintiffs' trademark-related claims as alleging confusion on the part of the immediate purchaser of Plaintiffs' second-quality goods—Defendant U.S. General Export, Inc. ("U.S. General").  That, however, is **not** what Plaintiffs claim.  Rather, Plaintiffs claim that observers of these goods in the post-sale marketplace, who previously had only positive views about Plaintiffs' MISS ME and ROCK REVIVAL brands and their extremely high quality, are now seeing others wearing damaged, inferior, and otherwise low-quality goods that Plaintiffs never intended to be sold to consumers.  Indeed, preventing this very harm was the whole idea behind the program Plaintiffs agreed to enter into with Phoenix Fibers in 2011, where only one thing was supposed to happen to these goods—they were to be destroyed.  Thus, at the very least, there are material fact issues requiring the denial of Phoenix Fibers' motion.

## STATEMENT OF FACTS

Plaintiffs manufacture, promote, sell and distribute high-quality denim and apparel products throughout the United States under the well-known MISS ME and ROCK REVIVAL brand names, each of which is the subject of numerous federal trademark registrations.  Over the past several years, Plaintiffs' MISS ME and ROCK REVIVAL products have achieved substantial sales success and received extensive media coverage in popular fashion magazines.  Moreover, Plaintiffs' products are widely recognized for their superior quality, a reputation they have earned by maintaining strict quality control policies that ensure that only goods that meet the reputation of their MISS ME and ROCK REVIVAL products for superior quality enter the stream of commerce.  (Plaintiffs' Statement Disputed Facts ("DF") 1-4).

As a result of Plaintiffs' strict quality control procedures, certain MISS ME and ROCK REVIVAL denim products are deemed unfit for sale to consumers.  Prior

to entering into their agreement with Phoenix Fibers in November 2011, Plaintiffs took great care to dispose of such products either by incinerating them at their overseas factories, or cutting them up and sending them to a landfill.  However, in light of the potential negative environmental impact of these disposal methods, finding an environmentally-friendly way to dispose of their second-quality denim became a high priority for the companies.  (DF 5, 26, 27).

On November 1, 2011, Plaintiffs' then-CEO Eric Choi came across the website of Phoenix Fibers' affiliate, Bonded Logic, which promoted its use of recycled denim to manufacture environmentally-friendly insulation products.  That same day, Mr. Choi sent a link to Bonded Logic's website to Plaintiffs' then-General Counsel, Lilly Kim, with the message "Let's discuss!"  (DF 23-24).  Days later, Lisa Song, acting under Ms. Kim's direction, contacted Bonded Logic about its program, and was referred to its affiliate Phoenix Fibers.  (DF 25, 28-29).  Thereafter, Ms. Song engaged in a series of communications with Phoenix Fibers' General Manager, Matt Graham, in which she explained Plaintiffs' desire to dispose of their second-quality MISS ME and ROCK REVIVAL denim products in an environmentally-friendly manner, and Mr. Graham pitched Phoenix Fibers' business of converting denim into shoddy fiber for its affiliate's use in producing insulation.  (DF 29-36).  Among other things, Mr. Graham stated in emails to Ms. Song:

> *We will receive the material, schedule it for destruction and away we go!*  (DF 33).
>
> *If necessary, [Phoenix Fibers] can remove the tags, buttons and zippers.  There is no charge for our recycling service.*  (DF 30).
>
> *The product we receive may be recycled into any number of products.  This could range from house, automobile or appliance insulation to prison mattresses…. There is also a certain portion that cannot be used, such a metal pieces in the buttons and zippers.  These are removed and recycled separately.*  (DF 40).

Shortly thereafter, the parties arrived at a mutually beneficial agreement— Plaintiffs would deliver their second-quality products to Phoenix Fibers' Chandler,

Arizona-based facility at no cost, and Phoenix Fibers would shred (*i.e.*, destroy) Plaintiffs' products and recycle them into shoddy fiber, which its affiliate Bonded Logic would then use to manufacture environmentally friendly insulation products. (DF 28-51).  Later that month, on November 29, 2011, Plaintiffs delivered their first load of second-quality denim products to Phoenix Fibers for shredding.  (DF 39).  In all, through September 2015, Plaintiffs shipped hundreds of thousands of pounds of second-quality MISS ME and ROCK REVIVAL denim products to Phoenix Fibers for destruction and recycling into shoddy fiber.  (DF 54).

At no time during this entire period did Phoenix Fibers ever indicate, or so much as even imply, that it was doing (or had the right to do) anything with Plaintiffs' second-quality goods other than destroy them in accordance with the parties' agreement.  (DF 43).  Indeed, four months into the parties' relationship, in March 2012, Ms. Song advised Mr. Graham that "it would be nice to show the executives pictures of what you guys do with the denim and also show employees the insulation we make for the houses."  (DF 46).  In response, Mr. Graham sent Plaintiffs a sample of Bonded Logic's denim-based insulation manufactured from Phoenix Fibers-supplied shoddy fiber, and provided the following description of what it was doing with Plaintiffs' products:  "***Phoenix Fibers converts the jeans into fiber that gets sent to our affiliate company, Bonded Logic which in turn, manufactures the end products.***"  (DF 47-48 (emphasis added)).  Plaintiffs were so proud of their partnership with Phoenix Fibers that they displayed Bonded Logic's denim-based insulation in their conference rooms.  (DF 49).  A few weeks later, Mr. Graham visited Plaintiffs' Los Angeles facility to meet with Plaintiffs.  (DF 50).  After that meeting, Mr. Graham sent Ms. Song an email stating:  "***Some of our new machinery I told you about has just arrived.  Once we have it set up and running, I will send you video of us running your jeans.***"  (DF 51 (emphasis added)).

Over the next four years, the parties operated under their November 2011 agreement without incident.  Phoenix Fibers received a steady flow of denim

4

products from Plaintiffs, which it needed to create shoddy fiber, and in exchange, Plaintiffs received the benefit of permanently removing their unfit products from consumer trade channels while destroying them in an environmentally-friendly manner.  (DF 52, 54).  As both Ms. Kim and Ms. Song testified at deposition, Plaintiffs never thought for a second that Phoenix Fibers was doing anything with their second-quality products other than shredding and converting them into shoddy fiber.  (DF 42-43, 53).

Then, in the summer of 2015, Plaintiffs learned that significant quantities of low quality MISS ME and ROCK REVIVAL denim products, which Plaintiffs never authorized to be sold to consumers, were being offered for sale in secondary consumer trade channels, including eBay and Facebook.  (DF 62).  Plaintiffs' investigation revealed that the products were ones that had been delivered to Phoenix Fibers for recycling into shoddy fiber under the parties' 2011 agreement.  (DF 63).

Accordingly, in October 2015, Ms. Kim contacted Tod Kean, CEO of Phoenix Fibers and co-founder of Bonded Logic, to express Plaintiffs' concern that second-quality products were finding their way out of Phoenix Fibers' warehouse and into consumer trade channels.  (DF 64-66).  Mr. Kean responded that there may have been "leakage" (*i.e.*, theft) from Phoenix Fibers' warehouse, and referred Ms. Kim to Phoenix Fibers' Plant Manager, Steve Johnson.  (DF 66-67).  Ms. Kim then spoke to Mr. Johnson, and he also mentioned the possibility of "leakage," and promised to investigate (DF 68), but that was a ruse.  In fact, Mr. Johnson knew exactly how Plaintiffs' products had ended up on eBay and in other secondary channels—***on Phoenix Fibers' behalf, he had sold the products to Defendant U.S. General***.  (DF 57-61, 69-70).  Mr. Johnson admitted at his deposition that he had first-hand knowledge of these sales, but had feigned ignorance when questioned by Ms. Kim:

> Q.  Okay.  And during that initial conversation, did you advise Ms. Kim that Phoenix Fibers had been selling its product to Mr. Mroueh [U.S. General]?

A.  No.

Q.  But you knew that that was the case at the time; is that right?

A.  Yes.

(DF 69).  During depositions, it became clear that Mr. Kean was also aware of Phoenix Fibers' sales of Plaintiffs' products to U.S. General, as Mr. Johnson had told him of the sales "right after we were notified" of Plaintiffs' concerns.  (DF 71-74).

After Ms. Kim spoke with Messrs. Kean and Johnson, weeks went by without any further explanation of the purported "leakage," or the results of Mr. Johnson's "investigation." (DF 75-76).  Accordingly, on November 17, 2015, Plaintiffs' counsel demanded that Mr. Kean explain the purported instances of leakage, and provide assurances as to how Plaintiffs' low-quality products would be handled in the future. (DF 77-78).  Rather than respond to Plaintiffs' inquiries, however, Phoenix Fibers, through its then-outside counsel, terminated the parties' agreement, stating that Phoenix Fibers would no longer accept Plaintiffs' products for "processing."  Even more remarkably, Phoenix Fibers' then-counsel made the extraordinary statement that if any of Plaintiffs' products had been removed from Phoenix Fibers' warehouse, "***it was done without the knowledge and consent of Phoenix Fibers***." (DF 79-80 (emphasis added)).

Moreover, and tellingly, neither Phoenix Fibers nor its counsel ever took the position that Phoenix Fibers had the right to sell Plaintiffs' products as "credential". (DF 81).  Rather, counsel advised that Phoenix Fibers was prepared to continue to "***process them as usual, taking them from the 'cage' and processing them through the machinery.…***"  (DF 80 (emphasis added); *see also* DF 82-88).[1]

Having received only dishonest responses from Phoenix Fibers, in early December 2015 Plaintiffs hired a private investigator, at significant expense, to

---

[1] Mr. Johnson testified that the term "processed", as used by Phoenix Fibers, refers to denim "put on the line to be turned into shoddy." (DF 84).

6

1   determine the source of the low-quality MISS ME and ROCK REVIVAL denim
2   products that were flooding consumer trade channels.  (DF 89).  Between December
3   2015 and February 2016, Plaintiffs' investigators purchased over 29,000 units of such
4   products from Defendants SAC International Traders, Inc., Shaukat Ali Chohan,
5   Comak Trading, Inc. and Lydia Evilsa Terrazas Cho, at a cost of nearly $200,000.
6   (DF 90-91).  Unfortunately, those units turned out to be only the tip of the iceberg.
7   Discovery has established that all of these goods were sourced from Defendant U.S.
8   General, which in turn had purchased them from Phoenix Fibers, in sales brokered by
9   Mr. Johnson.  (DF 92, 58).  Thus, the consumer market has been, and continues to be
10  flooded with poor quality MISS ME and ROCK REVIVAL products that were never
11  intended to be sold to the public.  (DF 96).

**ARGUMENT**

12
13  **I.   SUMMARY JUDGMENT STANDARD**

14          Summary judgment is appropriate only where there is no genuine dispute as to
15  any material fact.  Fed. R. Civ. P. 56(a); *JL Beverage Co. v. Jim Beam Brands Co.*,
16  828 F.3d 1098, 1105 (9th Cir. 2016).  A fact is "material" if it might affect the
17  outcome of the suit.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
18  Accordingly, Phoenix Fibers "must demonstrate that, even viewing the evidence in
19  the light most favorable to the [Plaintiffs], [Plaintiffs] cannot satisfy [their] burden to
20  prove [their] claims."  *JL Beverage Co.*, 828 F.3d at 1105 (citing *Celotex Corp. v.
21  Catrett*, 477 U.S. 317, 322–23 (1986)).

22          Conversely, summary judgment must be denied if there is sufficient evidence
23  of a material factual dispute "to require a jury or judge to resolve the parties'
24  differing versions of the truth at trial."  *Anderson*, 477 U.S. at 249 (citation omitted);
25  *accord T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th
26  Cir. 1987).  "[A]t the summary judgment stage the judge's function is not himself to
27  weigh the evidence and determine the truth of the matter but to determine whether
28  there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  "[I]f a rational trier of

7

1  fact might resolve the issue in favor of the nonmoving party, summary judgment
2  must be denied." *T.W. Elec. Serv., Inc.*, 809 F.2d at 631 (citing *Matsushita Elec.*
3  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

4  **II.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY**
5  **JUDGMENT ON PLAINTIFFS' CONTRACT CLAIMS**

6       "The formation of a binding contract requires … mutual assent …." *Porges v.*
7  *RQ Const., Inc.*, 79 Fed. App'x 957, 958 (9th Cir. 2003) (citing Cal. Civ. Code §§
8  1550, 1565).  This presents a factual question.  *See, e.g.*, *Porges*, 79 Fed. App'x at
9  958; *Am. Licorice Co. v. Total Sweeteners, Inc.*, 2013 WL 4396778, at *10 (N.D. Cal.
10  Aug. 13, 2013); *Alexander v. Codemasters Grp. Ltd.*, 127 Cal. Rptr. 2d 145, 152
11  (Cal. Ct. App. 5th Dist. 2002).  Courts may consider multiple sources in determining
12  whether a contract exists, and what are its terms, such as evidence of the contract's
13  negotiation, and the parties' subsequent conduct.  *See, e.g.*, *Azco Biotech, Inc. v.*
14  *Qiagen, N.V.*, 2015 WL 12516024, at *5 (S.D. Cal. July 2, 2015) (citing *Varni Bros.*
15  *Corp. v. Wine World, Inc.*, 41 Cal. Rptr. 2d 740, 745 & n.2 (Cal. Ct. App. 5th Dist.
16  1995)); *Del E. Webb Corp. v. Structural Materials Co.*, 176 Cal. Rptr. 824, 833–34
17  (Cal. Ct. App. 2d Dist. 1981).  And, "where the existence … of a contract … is the
18  point in issue, and the evidence is conflicting or admits of more than one inference,"
19  summary judgment must be denied.  *Alexander*, 127 Cal. Rptr. 2d at 152; *see also*
20  *Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*, 629 F. Supp. 2d
21  1135, 1142–43 (E.D. Cal. 2009).  At the very least, that is the case here.

22       Phoenix Fibers makes three arguments in support of its claim that it did not
23  enter into any contract obligating it to destroy all of Plaintiffs' denim products.  *First*,
24  Phoenix Fibers argues that the undisputed evidence shows that no oral contract
25  existed between it and Plaintiffs, or at least that no such contract obligated it only to
26  destroy Plaintiffs' products.  *See* Dkt. No. 84 at 8–10.  *Second*, it argues that there
27  was no contract with Plaintiffs because there was no mutual assent.  *See id.* at 13–15.
28  *Third*, it argues that there was no contract between it and Plaintiff RCRV, because

1   Ms. Song was employed only by Sweet People.  *See id.* at 15–16.  The evidence,

2   however, shows that Phoenix Fibers is wrong on all counts and, at the very least there

3   are material issues of fact as to all of them.

4        **A.    The Evidence Demonstrates the Existence of an Agreement to**

5             **Destroy All of Plaintiffs' Products**

6        Contrary to Phoenix Fibers' arguments, the evidence plainly demonstrates that

7   the parties reached an agreement, with mutual assent, obligating Phoenix Fibers to

8   shred (*i.e.*, destroy) all of Plaintiffs' denim products into shoddy fiber.  At least, there

9   is strong evidence contradicting Phoenix Fibers' contentions, requiring a finding that

10  material fact issues preclude summary adjudication of the issues of the existence and

11  terms of such an agreement.

12       During her deposition, Ms. Song repeatedly testified as to her understanding

13  that Plaintiffs and Phoenix Fibers had a clear, definite agreement that the denim

14  products Plaintiffs would deliver to Phoenix Fibers—at no cost to Phoenix Fibers—

15  would only be shredded (*i.e.*, destroyed) for recycling into shoddy fiber.  (DF 28, 41-

16  43).  As Ms. Song explained, Plaintiffs agreed to "send the inventory [to Phoenix

17  Fibers] that [Plaintiffs] … wanted to use as part of [their] … green initiative

18  programs," while Phoenix Fibers agreed to "***shred [such products] and create***

19  ***insulation that they would pass along to Bonded Logic ….***"  (DF 42 (emphasis

20  added)).   Further, as Ms. Song testified, and as Phoenix Fibers' employees

21  acknowledged, all parties would benefit from this relationship:  Plaintiffs would have

22  their low-quality denim products recycled (*i.e.*, shredded into shoddy fiber) in an

23  environmentally-friendly manner, as they had long desired, and Phoenix Fibers and

24  its affiliate would profit from the sale of end products, such as insulation, created

25  from Plaintiffs' shredded denim products.  (DF 30-31, 35, 41-43, 45; *see also* DF 9-

26  14).

27       Ms. Song's recollection is consistent with those of her superiors, Mr. Choi and

28  Ms. Kim, who were kept closely informed of her negotiations with Phoenix Fibers.

(DF 34-38, 44). According to them, Ms. Song was tasked with locating an environmentally responsible manner for permanently disposing of Plaintiffs' second-quality products, so as to prevent such products from ending up in secondary channels of trade. (DF 25, 28, 34). Based on their contemporaneous discussions with Ms. Song and review of her correspondence with Phoenix Fibers, Mr. Choi and Ms. Kim understood that there was a clear agreement that Phoenix Fibers would only shred (*i.e.*, destroy) Plaintiffs' denim products into shoddy fiber, and not use Plaintiffs' products for any other purpose. (DF 34-38, 44).

Not only that, but Plaintiffs' understanding of the agreement is supported by the words of Phoenix Fibers' own Matt Graham, its General Manager, who represented Phoenix Fibers in negotiations with Plaintiffs. In November 2011, prior to Plaintiffs' delivery of any products to Phoenix Fibers, Mr. Graham advised Ms. Song: "***We will receive the material, schedule it for destruction and away we go!***" (DF 33 (emphasis added)).[2] Further, according to Mr. Graham, Phoenix Fibers would recycle Plaintiffs' denim products "into any number of products … rang[ing] from house, automobile or appliance insulation to prison mattresses." (DF 40; *see also* DF 48). In doing so, Mr. Graham explained that Phoenix Fibers would even, "[i]f necessary, … remove the tags, buttons and zippers"—the first step in the shredding process. (DF 30-31; *see also* DF 15, 40). Mr. Graham even discussed sending Plaintiffs photographs, videos, and samples of the insulation Phoenix Fibers' affiliate, Bonded Logic, manufactured from the shoddy fiber created from Plaintiffs' products. (DF 46-47, 49, 51). At minimum, this raises an issue of fact as to whether Plaintiffs' understanding of the terms of the agreement is correct.

Notably, Phoenix Fibers has come forward with no evidence from its former

---

[2] Phoenix Fibers insists that the parties' agreement was in existence, at the latest, by November 7, 2011. *See* Dkt. No. 84 at 5. If that is correct, then Mr. Graham's email (sent several days later) confirms that the parties had already agreed that Phoenix Fibers would only destroy Plaintiffs' products.

10

General Manager, Mr. Graham, that in any way contradicts Plaintiffs' version of what he said and agreed to on its behalf.  That alone speaks volumes about what happened here, and, at the very least, raises issues of fact as to Phoenix Fibers' unsubstantiated version of the story.  For example, there is no evidence that Mr. Graham, in communicating with Plaintiffs, ever mentioned the possibility that Plaintiffs' denim products might be sold as "credential" as a method of "recycling" such goods, or, for that matter, any other form of recycling besides shredding (*i.e.*, destruction)—indeed, there is no evidence that Phoenix Fibers was even in the business of selling credential when the parties' agreement was formed in November 2011.  (DF 16, 43; *see also* DF 20-22).  And, revealingly, Phoenix Fibers has made no effort to locate Mr. Graham—the only person beside Ms. Song who was directly involved in negotiating the parties' agreement—and has not produced a single one of his emails with Plaintiffs.  (DF 55-56; *see also* DF 19-22).

   As further evidence supporting Plaintiffs' understanding of the existence and terms of the parties' agreement, for over three years—between November 2011 and early 2015—the parties' course of conduct conformed exactly to the terms agreed to by Ms. Song and Mr. Graham.  (DF 54).  Throughout this time, Plaintiffs delivered their denim products to Phoenix Fibers at no cost, and Phoenix Fibers shredded (*i.e.*, destroyed) those products into shoddy fiber for use in insulation and other materials. Phoenix Fibers only claims to have begun selling Plaintiffs' products as "credential" sometime in 2015, when—without informing Plaintiffs, and without checking to see if such sales were permitted—Mr. Graham's replacement, Steve Johnson, began escorting U.S. General's President around Phoenix Fibers' warehouse, allowing him to purchase pallets of Plaintiffs' products based on his identification of Plaintiffs' federally-registered trademarks and logos.  (DF 44, 52, 54, 57-61, 101-102).  Then, even more revealingly, when confronted by Plaintiffs in late October 2015 with the fact that Plaintiffs' products were being sold in secondary consumer channels, both Johnson and his boss, Tod Kean, President and CEO of Phoenix Fibers, deliberately

lied to Plaintiffs, blaming the availability of Plaintiffs' products on "leakage" from Phoenix Fibers' warehouse. (DF 18, 64-85). Both Johnson and Kean knew full well that this was a ruse, and yet they perpetuated this fiction for over six months, going so far as to deny Phoenix Fibers' sales of Plaintiffs' products in its Answer to Plaintiff's Complaint five months later. (DF 93-94). This alone should be enough to raise issues of fact as to all of Phoenix Fibers' contract arguments.

In short, there is considerable evidence of the existence of an agreement (with mutual assent, and confirmed by the parties' subsequent course of conduct) between Plaintiffs and Phoenix Fibers that required destruction of all of Plaintiffs' products. Phoenix Fibers' desperate attempt to show that Ms. Song somehow conceded there was no such agreement is simply false. *See* Dkt. No. 84 at 9–10. This argument ignores 99% of Ms. Song's deposition testimony, and focuses on one response to a single question in which she stated she was "a little confused" by the question. *See id.* at 9. On the other hand, a plethora of evidence, including Ms. Song's testimony, Mr. Graham's words, the parties' conduct for nearly four years, and Phoenix Fibers' lies about what happened when caught red-handed, demonstrates the existence of an agreement requiring the destruction of Plaintiffs' products, or, at least, disputed issues of material fact.

Phoenix Fibers' further argument that the parties only ever discussed "recycling" of Plaintiffs' products, and not "destruction," is equally disingenuous. *See id.* at 10–13. Ms. Song repeatedly testified at her deposition that the parties' agreement related only to the shredding of Plaintiffs' products. (DF 29, 41-43). There is no dispute that a "shredded" denim product equals a "destroyed" denim product. That, of course, is why Mr. Graham's own emails unequivocally stated that Phoenix Fibers intended to "*schedule [Plaintiffs' products] for destruction*" (DF 33), that "*Phoenix Fibers converts the jeans into fiber*" (DF 48), and that he would send a "*video of [Phoenix Fibers] running [Plaintiffs'] jeans*" through Phoenix Fibers' "*new machinery*" (DF 51 (all emphasis added)). Rather than explaining

these critical admissions by its then-General Manager, Phoenix Fibers all but ignores Mr. Graham, as if his departure from the company released it from the undertakings he agreed to on its behalf. (DF 20-22, 55-56). Left only with Mr. Graham's correspondence, however, and not his oral testimony, which Phoenix Fibers has not come forward with, the Court should take Mr. Graham at his word, and find that his writings, at the very least, create fact issues as to the terms of the parties' agreement.

As for Phoenix Fibers' further argument that there was no mutual assent, this too is premised on its *post hoc* claim that the parties reached an agreement only as to the "recycling," and not "destruction" of Plaintiffs' goods. *See* Dkt. No. 84 at 13–15. Thus, Phoenix Fibers now argues that there was no mutual assent, because the parties had different understandings of the term "recycling." *See id.* As demonstrated above, however, there is overwhelming evidence that the agreement covered only the shredding of Plaintiffs' products into shoddy fiber—not the least of which is Phoenix Fibers' own course of conduct for over three years. Moreover, the alleged understanding of Johnson and Kean as to the meaning of the term "recycling" in 2016 is irrelevant to the terms of agreement reached by Ms. Song and Mr. Graham in 2011, since neither was part of that discussion. (DF 20-22, 55).

In view of the above, there are, at least, material questions of fact regarding the existence and terms of Phoenix Fibers' agreement to destroy Plaintiffs' products. *See, e.g.*, *Multifamily Captive Grp., LLC*, 629 F. Supp. 2d at 1142–43; *Alexander*, 127 Cal. Rptr. 2d at 152. Accordingly, Phoenix Fibers' motion for summary judgment dismissing Plaintiffs' contract claims should be denied.

## B.   RCRV Was a Party to the Agreement With Phoenix Fibers

Phoenix Fibers raises the further argument that, as a matter of law, there could not have been an agreement between Phoenix Fibers and Plaintiff RCRV, because there is no material factual dispute that Ms. Song was not an employee of RCRV at the time she engaged Phoenix Fibers in contract negotiations, and did not tell Phoenix fibers she was representing RCRV. *See* Dkt. No. 84 at 15–16. These

1   arguments are belied by the evidence.

2         First, although Ms. Song was paid by Sweet People, she was an employee of

3   both Plaintiffs, as she devoted a significant amount of her work day to RCRV's

4   business.   (DF 8).   Putting aside Ms. Song's employment status, however, the

5   evidence is equally plain that Ms. Song negotiated with Mr. Graham on behalf of

6   both Sweet People and RCRV, with the authority of her superiors in both companies.

7   (DF 6-7, 25, 28, 34, 54).   Further, there is no issue that the agreement she negotiated

8   related to the destruction of both Plaintiffs' products.   (*Id.*).   Thus, regardless of

9   whether Ms. Song disclosed her relationship to or representation of RCRV—which

10  she did—California law has long considered undisclosed principals to be parties to

11  contracts negotiated on their behalf by their agents.   *See, e.g.*, *Ikerd v. Warren T.*

12  *Merrill & Sons*, 12 Cal. Rptr. 2d 398, 401 n.6 (Cal. Ct. App. 2d Distr. 1992); *Am.*

13  *Builder's Ass'n v. Au-Yang*, 276 Cal. Rptr. 262, 264 (Cal. Ct. App. 2d Dist. 1990).

14        Further, and more importantly for purposes of this motion, to the extent the

15  evidence is conflicting as to whether Ms. Song represented RCRV in her contract

16  negotiations with Phoenix Fibers, as discussed earlier, the existence of a contract,

17  including the issue of who were the parties thereto, is a question of fact not

18  appropriate for summary judgment.   *See, e.g.*, *Multifamily Captive Grp., LLC*, 629 F.

19  Supp. 2d at 1142–44.   In *Multifamily*, under similar circumstances, the parties

20  disputed whether a person negotiated a contract solely on behalf of her company, or

21  on behalf of both her company and herself as an individual.   *See id.* at 1143–44.

22  After considering the evidence, the court found that the dispute at least presented a

23  genuine issue of fact that precluded summary judgment.   *See id.*   For the same

24  reasons, the Court should find that summary judgment is precluded here on the issue

25  of whether Ms. Song represented both Sweet People and RCRV.

26

27

28

1

2

## III.   SUMMARY JUDGMENT SHOULD BE DENIED AS TO PLAINTIFFS' TRADEMARK-RELATED CLAIMS

3   Phoenix Fibers' principal argument in support of its motion relating to Plaintiffs'

4   trademark and unfair competition claims is that there is no issue of fact as to likelihood

5   of confusion.  Phoenix Fibers argues that there is no evidence that the immediate

6   purchaser of Plaintiffs' goods, Defendant U.S. General, was confused as to what it was

7   buying from Phoenix Fibers, that is, second-quality MISS ME and ROCK REVIVAL

8   denim products.  *See* Dkt. No. 84 at 16–20.  Phoenix Fibers' argument is a complete

9   red herring.

10   Plaintiffs never claimed that U.S. General did not understand it was buying low-

11   quality MISS ME and ROCK REVIVAL denim products.  Indeed, this case has

12   nothing to do with whether any of Phoenix Fibers' co-Defendants, who were wholesale

13   purchasers of Plaintiffs' products, were confused in any way.  Plaintiffs' claim has

14   been clear since day one—Defendants' unauthorized sale of low-quality denim

15   products bearing their recognizable marks creates a likelihood of ***post-sale confusion***

16   among consumers who see them being worn, and wrongly assume these products

17   typify the quality of Plaintiffs' products.  *See* Dkt. 32 at ¶¶45, 53.  Indeed, this was the

18   primary reason Plaintiffs entered into a relationship with Phoenix Fibers in the first

19   place—they had damaged, low-quality goods that they never wanted to see enter

20   consumer markets.  (DF 23-27).  In short, the entire premise of Plaintiffs' trademark

21   and unfair competition claims is that there is a likelihood of confusion in the post-sale

22   market, not whether any of the Defendants were confused in any way whatsoever.

23   Post-sale confusion is a well-recognized basis for trademark and unfair

24   competition liability.  *See Karl Storz Endoscopy Am., Inc. v. Surgical Technologies,*

25   *Inc.*, 285 F.3d 848, 854 (9th Cir. 2002) ("an action for trademark infringement can in

26   fact be based upon the confusion of non-purchasers, such as those who simply observe

27   the purchaser wearing [an] accused article of clothing") (citing *Payless Shoesource,*

28   *Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 989–90 (Fed. Cir. 1993)).  "The law in the

Ninth Circuit is clear that 'post-purchase' confusion, *i.e.*, confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion under the Lanham Act." *Id.*; *see, e.g., Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding actionable post-sale confusion in a case involving the sale of infringing jeanswear).

The *Storz* decision in particular, has important implications in this case, as it also involves second quality branded goods that were originally manufactured by the plaintiff in that case, namely, refurbished endoscopes for use by doctors that sometimes malfunctioned.  While the hospitals that purchased the refurbished Storz scopes were not confused about what they had purchased, the Ninth Circuit found that the likelihood that surgeons who worked in the hospitals would be confused about whether they were new Storz devices was sufficient to support triable trademark claims.  It therefore reversed the district court's grant of summary judgment.  *Storz*, 285 F.3d at 855.  The Ninth Circuit also confirmed that the fact that the infringing goods were originally manufactured by the trademark owner (or with its authorization), as opposed to being third-party products, is no defense to trademark infringement.  Under *Storz*, if the sale of inferior goods under Plaintiffs' marks creates a likelihood of post-sale confusion, that is enough to support trademark liability.  *Id.*

Moreover, even if Phoenix Fibers had not mischaracterized Plaintiffs' confusion claim, the Court should nevertheless deny summary judgment because likelihood of confusion is the central issue in this motion.  As the Ninth Circuit has recognized repeatedly, likelihood of confusion is the ultimate question of fact in trademark-related cases, a fact-intensive inquiry that usually requires a full record.  District courts should therefore be reluctant to resolve the issue at the summary judgment stage.  *E.g.*, *JL Beverage Co.*, 828 F.3d at 1105-06 (9th Cir. 2016); *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1210 (9th Cir. 2012); *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901-02 (9th Cir. 2002); 2 McCarthy on Trademarks & Unfair

16

Competition § 32:37 at 745 (likelihood of confusion issue routinely treated as one of fact, and trial courts disfavor deciding trademark cases in summary judgment because the ultimate issue is so inherently factual).  (DF 96).

As for Phoenix Fibers' defense based on the "first sale doctrine," this too must fail given its mischaracterization of Plaintiffs' confusion claim as something other than a claim of *post-sale confusion*.  Indeed, it is ironic that one of the cases Phoenix Fibers principally relies on in support of its first sale doctrine argument, *Au-Tomotive Gold v. Volkswagen of Am.*, 603 F.3d 1133 (9th Cir. 2010), is a post-sale confusion case that actually supports Plaintiffs' position.  As the *Au-Tomotive Gold* court noted, "[i]n each case in which a court has applied the 'first sale' doctrine, the court either had good reason not to be concerned with post-purchase confusion or took steps to avoid addressing the issue." *Id.* at 1138.  Unfortunately for Phoenix Fibers, the court then went on to explain why the first sale doctrine does not apply in post-sale confusion cases:

> Post-purchase confusion creates a free-rider problem….When a producer purchases a trademarked product, that producer is not purchasing the trademark. Rather, the producer is purchasing a product that has been trademarked. If a producer profits from a trademark because of post-purchase confusion about the product's origin, the producer is, to that degree, a free-rider.
>
> For example, a producer may purchase non-functioning Rolex watches and refurbish them with non-Rolex parts, leaving only the original casing. Even if the producer adequately explains the nature of the refurbished watches to purchasers, the producer nonetheless infringes on Rolex's trademarks by profiting from the Rolex name. In such a case, the purchasers buy the watches in order to make others think that they have bought a true Rolex watch. *See Rolex Watch [U.S.A., Inc. v. Michel Co.,]* 179 F.3d [704,] 707-10 [(9th Cir. 1999)]….If the producer purchases such a trademarked product and uses that product to create post-purchase confusion as to the source of a new product, the producer is free-riding even though it has paid for the trademarked product.

*Id.* at 1138-39.  Phoenix Fibers' "first sale doctrine" defense thus fails for the same

17

1   reason as its confusion argument—this is a case of ***post-sale confusion***.[3]

2   **IV.    PHOENIX FIBERS MAY BE HELD JOINTLY AND SEVERALLY**

3   **LIABLE FOR ITS CO-DEFENDANTS' PROFITS**

4   Phoenix Fibers' next argument is that it cannot be held jointly and severally

5   liable for the profits of its co-defendants in this action, because Plaintiffs have come

6   forward with no evidence that Phoenix Fibers "conspired" or was "co-partners" with

7   these defendants.  Dkt. No. 84 at 23.  This argument fails for several reasons.

8   *First*, Phoenix Fibers misrepresents the circumstances under which a defendant

9   may be held jointly and severally liable for the profits of a co-defendant in the same

10  chain of distribution.  By law, no specific conspiracy or co-partner relationship must

11  be pleaded or proven.  Rather, the rule is simply that joint tortfeasors in a trademark

12  case are liable for the entire harm, and for any monetary award that may issue as a

13

14  _____

    [3] Phoenix Fibers' first sale doctrine defense fails at a fundamental level—there was no
15  first sale.  Plaintiffs never authorized any sale of their second-quality denim products
    under their marks.  Quite the opposite—the products were shipped to Phoenix Fibers
16  for destruction, pursuant to its agreement with Plaintiffs, to prevent their sale.  Without
    a first sale, Phoenix Fibers cannot claim the protection of the first sale doctrine.  *See*
17  *Microban Prods. v. API Indus., Inc.*, 2014 WL 1856471, at *9-*10 (S.D.N.Y. May 8,
18  2014) (rejecting first sale defense where the trademark owner never authorized the
    alleged initial sale under its marks).  (DF 44, 97).
19
    Phoenix Fibers' first sale doctrine defense also fails under the "quality control
20  exception" (*see Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1087 (9th Cir.
    1998)), because the second quality goods it obtained from Plaintiffs failed Plaintiffs'
21  quality control standards, and are not considered genuine goods.  *See also Shell Oil Co.*
    *v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991) ("a product is not
22  truly 'genuine' unless it is manufactured and distributed under quality control
23  established under the manufacturer"); *El Greco Leather Prods. Co. v. Shoe World, Inc.*
    806 F.2d 392, 395 (2d Cir. 1986) (shoes ordered, but not inspected to assure quality by
24  trademark owner are not genuine and sales of shoes bearing the original mark were
    therefore infringing); *accord Hunting World, Inc. v. Reboans, Inc.*, 1992 WL 361741,
25  at *3 (N.D. Cal. Sept. 10, 1992).  Phoenix Fibers' "exception to the exception"
26  argument fails, for the same reason as all of its other trademark-related arguments—it
    matters not whether U.S. General was confused when it purchased these goods from
27  Phoenix Fibers, since this is a case of ***post-sale confusion***.
28

result.  *See* Restatement (Second) of Torts § 875 (1979).  Further, although courts may sometimes use the word "conspiracy" when addressing the issue of joint tort liability, that term refers only to "a concert of action and intent which will extend tort liability beyond the active wrongdoer to those who merely planned, assisted or encouraged his acts."  4 McCarthy on Trademarks & Unfair Competition § 25:23; *see also Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994) ("Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration.").

As for Phoenix Fibers' argument that joint liability does not extend to the profits earned by each individual tortfeasor, the law is clear that joint tortfeasors in a trademark infringement case may be held jointly and severally liable for all compensatory relief, ***including disgorgement of the profits of each***.  *See Transgo, Inc. v. Ajac Transmission Parts Corp.*, 1981 WL 40542, at *6 (C.D. Cal. Feb. 12, 1981), *aff'd* 768 F.2d 1001, 1023 (9th Cir. 1985); *Basketball Mktg. Co. v. Upscale Entm't. & Mktg. Grp.*, 227 Fed. App'x 492 (6th Cir. 2007) (holding defendants jointly liable for defendants' profits as joint tortfeasors) (citing *Costello Publ'g Co. v. Rotelle*, 670 F.2d 1035, 1043 (D.C. Cir. 1981)).  This is because "any member of the distribution chain of allegedly infringing products can be jointly and severally liable for the alleged misconduct." *Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945, 973 (N.D. Cal. 2015) (quotations and citations omitted).  Indeed, courts in this Circuit routinely hold co-defendants in trademark infringement cases jointly and severally liable for all of their respective profits.  *See, e.g.*, *PepsiCo, Inc. v. IRIE Motivations, Inc.*, 2008 WL 5732153, at *2 (C.D. Cal. Dec. 29, 2008); *Microsoft Corp. v. U-Top Printing Corp.*, 1996 WL 479060, at *2 (N.D. Cal. Aug. 13, 1996); *Keds Corp. v. Goldstreet Holdings, Inc.*, 1992 WL 511407, at *2 (C.D. Cal. Aug. 19,

1992).[4]

*Second*, the evidence at least raises an issue of fact as to whether Phoenix Fibers and its co-defendants were joint tortfeasors subject to joint liability, since they were all "member[s] of the distribution chain of allegedly infringing products." *Adobe Sys. Inc.*, 125 F. Supp. 3d at 973.  Certainly, the evidence demonstrates that Phoenix Fibers and U.S. General—the party to which Phoenix Fibers sold Plaintiffs' goods—had a close and unique relationship.  For example, the President of U.S. General would personally visit Phoenix Fibers' warehouse, and—while being escorted by Phoenix Fibers' Plant Manager—would select the branded goods of Plaintiffs that he wished to purchase, with Plaintiffs' well-known trademarks prominently displayed on the boxes.  (DF 57-61).  Indeed, even Phoenix Fibers has conceded that such in-person visits from "credential" customers were uncommon.  (DF 58).  Further, although Phoenix Fibers now claims it had many "credential" customers, it only ever sold Plaintiffs' products to one such customer—U.S. General. (DF 57-61).  At the least, then, there are critical factual questions as to the nature of the relationship between Phoenix Fibers, U.S. General, and the other co-defendants.

---

[4] The cases relied on by Phoenix Fibers either support Plaintiffs' position, or are easily distinguishable.  Two of its citations, though not intellectual property cases, demonstrate that defendants may be jointly liable for wrongfully-obtained profits whenever they "collaborate" in committing a wrong.  *See SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1117 (9th Cir. 2006) (defendants can be jointly liable for such profits where they "collaborate … in engaging in the violations"); *SEC v. Wilde*, 2012 WL 6621747, at **15–16 (C.D. Cal. Dec. 17, 2012).  Two other cases are decades-old, non-trademark cases which say nothing about the rule in this Circuit.  *See MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2d Cir. 1981) (copyright); *Sammons v. Colonial Press, Inc.*, 126 F.2d 341 (1st Cir. 1942) (same).  Phoenix Fibers' final citation, also not a trademark case, merely demonstrates that where an award of profits "exceed[s] the award of actual damages," defendants cannot be held jointly liable for such an award.  *See KTS Karaoke, Inc. v. Sony/ATV Music Publ'g LLC*, 2014 WL 12567169, at *5 (C.D. Cal. Jan. 14, 2014).  In the trademark context, however—and here in particular—an award of profits is a proxy for actual damages.  *See Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir. 1968).

Moreover, Plaintiffs have not yet been able to take full discovery of U.S. General or certain of the other co-defendants. *See infra* Part VI. So, once such discovery is complete, the evidence of a top-to-bottom conspiracy to make money off of Plaintiffs' second-quality denim products may well be plentiful. Given this, and because "a rational trier of fact might resolve the issue in favor of" Plaintiffs, "summary judgment must be denied." *T.W. Elec. Serv., Inc.*, 809 F.2d at 631.

## V. <u>PUNITIVE DAMAGES ARE PROPER, OR, AT LEAST, THERE ARE MATERIAL FACTUAL QUESTIONS REGARDING THEIR AWARD</u>

Phoenix Fibers next argues that punitive damages are improper in this case because: (a) while they can be awarded for common law unfair competition claims, such claims are limited to "passing off," which does not exist here; and (b) punitive damages can only be awarded where conduct is willful, as to which, Phoenix Fibers claims, there is no evidence. *See* Dkt. No. 84 at 23–24. Both arguments are wrong.

*First*, the common law tort of unfair competition encompasses not just "passing off," but also "acts analogous to passing off *such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market*." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1147 (9th Cir. 1997) (emphasis added); *Codexis, Inc. v. Enzymeworks, Inc.*, 2016 WL 4241909, at *7 (N.D. Cal. Aug. 11, 2016); *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1123, 1138–39 (S.D. Cal. 2014). Accordingly, this Court has repeatedly held that "claims for trademark infringement and … claim[s] pursuant to California's unfair competition law are evaluated under the same standard." *Isle of Capri Casinos, Inc. v. Flynt*, 2016 WL 6495380, at *3 (C.D. Cal. Nov. 1, 2016) (citation omitted); *AOP Ventures, Inc. v. Steam Distribution, LLC*, 2016 WL 7336730, at *4 (C.D. Cal. Oct. 11, 2016) ("Claims of 'federal … trademark infringement … [and] California unfair competition' share the same essential elements."); *KCI Newport, Inc. v. Smoke Tokes, LLC*, 2016 WL 2885859, at *7 (C.D. Cal. May 17, 2016) (same).

Thus, as the Ninth Circuit has repeatedly explained, "[w]hether we call the

violation infringement, unfair competition or false designation of origin, the test is identical[:] is there a 'likelihood of confusion?'" *New W. Corp. v. NYM Co. of California*, 595 F.2d 1194, 1201 (9th Cir. 1979); *see also Aliya Medcare Fin., LLC v. Nickell*, 2015 WL 4163088, at *15 (C.D. Cal. July 9, 2015) (likelihood of confusion is the "ultimate test" under the Lanham Act and California law) (citing *Academy of Motion Picture Arts & Sciences v. Benson*, 104 P.2d 650, 653 (Cal. 1940)); *Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1031–32 (C.D. Cal. 2011) (likelihood of confusion is the "decisive test"). Here, the evidence plainly shows that Phoenix Fibers' unauthorized sale of Plaintiffs' low-quality products has created an actionable likelihood of confusion claim, or, at the very least, material factual questions going to these issues. *See supra* Part III.

 *Second*, under California law, a plaintiff may recover punitive damages for common law unfair competition when the defendant's actions were malicious, oppressive, or fraudulent. *Duncan v. Stuetzle*, 76 F.3d 1480, 1490 (9th Cir. 1996) (citing Cal. Civ. Code § 3294(a)); *see also Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1024–25 (9th Cir. 1985). "Malicious, wanton or oppressive conduct may be found by wrongful conduct done willfully, intentionally and in reckless disregard of its possible injurious consequences." *Transgo, Inc.*, 768 F.2d at 1024; *see also* Cal. Civ. Code §§ 3294(c)(1)–(2) (defining "malice" and "oppression"). Additionally, "fraud" is defined as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention … of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3). As described above, there is substantial evidence that Phoenix Fibers acted with malice or fraud in committing its infringing, unfairly competitive acts, including the fact that it lied to Plaintiffs about whether it had sold the infringing denim products to wholesalers instead of destroying them, at the very least raising an issue of fact as to the viability of Plaintiffs' punitive damages claim. *See supra* Part II.

## VI. <u>SUMMARY JUDGMENT SHOULD BE DENIED UNDER FRCP 56(d)(1)</u>

Federal Rule 56(d)(1) provides an essential safeguard to ensure that the Court has a full record before deciding summary judgment, and that the responding party has had a full and fair opportunity to present its opposition.  As the Circuit Court has explained, "the Supreme Court has restated the rule as requiring … discovery 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.'"  *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (quoting *Anderson*, 477 U.S. at 250 n.5); *accord Burlington N. Santa Fe R.R. Co. v. The Assiniboine & Sioux Tribes of the Fort Peck Reservation*, 323 F.3d 767, 773–74 (9th Cir. 2003).  Accordingly, "[c]ourts are reluctant to deny Rule 56(d) requests…. [U]nless [the non-moving party] failed to exercise due diligence in conducting discovery, filed an untimely Rule 56(d) request, or failed to explain how additional facts would oppose summary judgment, the request is generally granted with liberality."  *Bruno Rimini (Furniture) Ltd. v. Connor Mktg., Inc.*, 2015 WL 4530991, at *1 (E.D. Cal. July 27, 2015) (quoting *Freeman v. ABC Legal Servs. Inc.*, 827 F. Supp. 2d 1065, 1071 (N.D. Cal. 2011)); *see also U.S. v. Real Prop. Located at 149 G. Street, Lincoln, California, Placer Cnty, APC 008-266-015-000*, 2013 WL 2664770, at *4 (E.D. Cal. June 12, 2013) ("courts should liberally grant a 56(d) motion when the nonmoving party has not had adequate time to conduct discovery"). Further, Rule 56(d) requests are "broadly favored and should be liberally granted." *Am. Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013).

Rule 56(d) relief is particularly appropriate when the requesting party: (1) identifies the facts it hopes to elicit from further discovery, (2) shows that the facts that are sought exist, and (3) explains how the sought-after facts are essential to oppose summary judgment. *See Doyle v. City of Medford*, 327 F. App'x 702, 703 (9th Cir. 2009).  The concurrently filed Declaration of Matthew T. Salzmann meets these requirements many times over.

1    Thus, as Mr. Salzmann indicates, Plaintiffs have diligently sought discovery of

2    Defendants U.S. General and Lydia Cho (owner of Defendant Comak Trading).  For

3    months, Plaintiffs have tried to schedule the depositions of these parties, to no avail.

4    (DF 104-119).  Plaintiffs first attempted to depose U.S. General's President, Kamel

5    Mroueh (the individual Mr. Johnson escorted around the Phoenix Fibers warehouse

6    and to whom he sold Plaintiffs' products) in September 2016, only to be advised that

7    Mroueh "currently resides in the Congo."  (DF 104).  Thereafter, Plaintiffs learned

8    that Mroueh "will not return to the U.S. [until] June 2017," and after investigating

9    and ruling out the possibility of conducting Mroueh's deposition by videoconference,

10   on October 5, 2016, Plaintiffs served a Rule 30(b)(6) notice on U.S. General, calling

11   for a deposition on October 28, 2016.  (DF 105-107).  Thereafter, U.S. General

12   identified Nellie Sanchez as U.S. General's corporate representative, and indicated

13   that "[t]he date currently set for deposition is not acceptable as counsel for U.S.

14   General is not available on that date," but offered no alternative dates.  (DF 108).

15   Since then, Plaintiffs' counsel has repeatedly pressed U.S. General's counsel for a

16   date for Ms. Sanchez's deposition, to no avail. (DF 109-110).

17   As for Ms. Cho (who is no longer represented by counsel), Plaintiffs served a

18   notice of deposition on November 14, 2016, calling for her deposition on December

19   9, 2016.  Thereafter, on November 30, 2016, Plaintiffs' counsel sent an email to Ms.

20   Cho requesting that she confirm her availability.  Receiving no response, Plaintiffs

21   adjourned her deposition.  Thereafter, on December 6, 2016, Plaintiffs' counsel

22   received a call from a representative of Ms. Cho, stating that she was attempting to

23   retain new counsel for purposes of her deposition, and requesting that her deposition

24   be further adjourned until January 2017.  (DF 117-118).

25   With fact discovery now not closing until March 13, 2017, Plaintiffs fully

26   expect to obtain vital, yet-to-be-revealed discovery from Phoenix Fibers' most direct

27   customer for Plaintiffs' products—U.S. General—as well as the next link in the chain

28   of distribution, Defendant Cho.  (DF 103, 119).  These depositions will help provide

the complete picture as to the nature and scope of Phoenix Fibers' relationship with U.S. General and Comak Trading, and other defendants up the chain, which is essential to the question whether Defendants are joint tortfeasors.  In addition, this long-awaited discovery will provide important information about the manner in which Plaintiffs' second-quality goods were and are being improperly distributed, including how Phoenix Fibers presented them to U.S. General.  (DF 119).

Moreover, the deposition of U.S. General will allow Plaintiffs to test the veracity of Mr. Johnson's declaration concerning the nature of U.S. General's business (Johnson Decl. ¶8), his communications with Mr. Mroueh (*id.* at ¶¶10-12), and the circumstances surrounding Phoenix Fibers' sale of Plaintiffs' products to U.S. General (*id.* at ¶¶9, 13-16).  This is particularly important since Mr. Johnson previously had no issue knowingly telling Plaintiffs falsehoods about his direct involvement in the sale of Plaintiffs' products to U.S. General.  (DF 68-71, 111).

In sum, Phoenix Fibers' summary judgment motion should be denied under Rule 56(d)(1), in view of the essential discovery Plaintiffs have not been able to conduct, despite their diligent efforts, and which they fully intend to conduct over the next two months before the discovery period ends.  *See, e.g.*, *Metabolife Int'l*, 264 F.3d at 846.

## CONCLUSION

For all the foregoing reasons, Phoenix Fibers' motion for summary judgment should be denied in all respects.

Dated:  January 9, 2017                    ARNOLD & PORTER KAYE SCHOLER LLP

                                           By:   /s/ Matthew T. Salzmann
                                                 John C. Ulin
                                                 Eric D. Mason
                                                 Louis S. Ederer
                                                 Matthew T. Salzmann
                                                 *Attorneys for Plaintiffs*