1   ROSS WERSCHING & WOLCOTT LLP
    William C. O'Neill / Bar No. 251071
2      WCO@RossLLP.com
    3151 Airway Avenue, Building S-1
3   Costa Mesa, California 92626
    Telephone:   (714) 444-3900
4   Facsimile:    (714) 444-3901

5   HAYNES AND BOONE, LLP
    Mark D. Erickson / Bar No.104403
6      mark.erickson@haynesboone.com
    Kenneth G. Parker / Bar No. 182911
7      kenneth.parker@haynesboone.com
    Martin M. Ellison / Bar No. 292060
8      martin.ellison@haynesboone.com
    Christopher B. Maciel / Bar No. 300733
9      chris.maciel@haynesboone.com
    600 Anton Boulevard, Suite 700
10  Costa Mesa, California 92626
    Telephone:   (949) 202-3000
11  Facsimile     (949) 202-3001

12  Attorneys for Defendant
    PHOENIX FIBERS, INC.

13

14              **UNITED STATES DISTRICT COURT**

15    **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

16  SWEET PEOPLE APPAREL, INC.          Case No. 2:16-cv-00940-TJH-JC
    d/b/a MISS ME, a California
17  corporation, et al.,                Hon. Terry J. Hatter, Jr.

18            Plaintiffs,               **CONSOLIDATED SEPARATE
                                        STATEMENT**
19        v.
                                        [*Reply Brief; Declaration of William C.
20  PHOENIX FIBERS, INC., an            O'Neill; and Objections filed
    Arizona corporation, et al.,        concurrently herewith*]
21
              Defendants.               Hearing Date:      January 30, 2017
22

23                                      Hearing Time:      Under submission

24
                                        Place of Hearing:  Courtroom 9B
25                                                         First Street
                                                           Courthouse
26

27

28

_____
                    CONSOLIDATED SEPARATE STATEMENT

1    Defendant Phoenix Fibers, Inc. ("Phoenix Fibers") respectfully submits this
2    Consolidated Separate Statement, which contains both Phoenix Fibers' reply to
3    Sweet People Apparel, Inc. and RCRV, Inc.'s (collectively, "Plaintiffs") responses
4    and Phoenix Fibers' responses to Plaintiffs' statements of fact.

5    **I.   PHOENIX FIBERS' STATEMENT OF UNCONTROVERTED FACTS**
6    **(AND PLAINTIFFS' RESPONSES)**

7    **A.   Defendant Phoenix Fibers' Business**

8         1.    Defendant Phoenix Fibers is an Arizona-based clothing and textile
9    recycling company that was founded in July 2011. (Appendix of Exhibits ("App.
10   Ex.") LL; Declaration of Tod Kean ("Kean Decl. (App. Ex. A)") ¶ 2.) In the textile
11   recycling industry, clothes are recycled in various ways. One way in which clothes
12   are recycled within the clothing recycling industry is to sell them as "credential."
13   (Declaration of Steven Johnson ("Johnson Decl. (App. Ex. B)") ¶ 3; Kean Decl.
14   (App. Ex. A) ¶ 6).

15        **Plaintiffs' Response:**  Disputed. Phoenix Fibers was founded "[t]o make
16        shoddy [fiber]." (Salzmann Decl. ¶3, Ex. A (Quinn 39:8-17); ¶38, Ex. JJ
17        ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")). Specifically,
18        "Phoenix Fibers was founded to provide a stable source of raw material for
19        Bonded Logic's business of manufacturing denim cloth-based insulation
20        under the name UltraTouch Denim." (Salzmann Decl. ¶38, Ex. JJ
21        ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")). Phoenix
22        Fibers and Bonded Logic are affiliated companies owned by the Kean
23        family. (Salzmann Decl. ¶38, Ex. JJ ("Shredding Clothing Nets Big Rewards
24        for Phoenix Fibers"); ¶39, Ex. KK ("Chandler firm grows; recycles denim
25        material into insulation")). Bonded Logic is in the business of manufacturing
26        insulation products, including its flagship product, UltraTouch Denim
27        Insulation. Shoddy fiber created from recycled denim is the raw material that
28        Bonded Logic uses to manufacturer UltraTouch Denim Insulation.

(Salzmann Decl. ¶24, Ex. V (SP/RCRV005629); ¶39, Ex. KK ("Chandler firm grows; recycles denim material into insulation"); ¶40, Ex. LL ("Green Chandler company looks to bask in solar savings"); ¶41, Ex. MM ("Chandler company turns worn-out blue jeans into insulation, more")). Prior to launching Phoenix Fibers, Bonded Logic sourced shoddy fiber from a shredding company in Brownsville, Texas. (Salzmann Decl. ¶5, Ex. C (Kean 65:10-66:21)). As Tod Kean explained: "We used to procure our raw material for the production of insulation from other shredders. But because of instability in both prices and supply, we decided to open Phoenix to become vertically integrated by controlling our own source of raw materials." (Salzmann Decl. ¶38, Ex. JJ ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")). Today, Phoenix Fibers receives clothing "by the truckload" from various sources for shredding, and processes 900 to a million pounds of denim and cotton products into shoddy fiber every month. (Salzmann Decl. ¶4, Ex. B (Johnson 77:2-4); ¶38, Ex. JJ ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")).

Phoenix Fibers was not in the business of selling "credential" when the company was launched in July 2011. That aspect of Phoenix Fibers' business only came into existence at a later date. There is no evidence that Phoenix Fibers was engaged in the sale of credential in November 2011, at the time Plaintiffs and Phoenix Fibers came to an agreement to convert Plaintiffs' second-quality denim products into shoddy fiber. (Salzmann Decl. ¶5, Ex. C (Kean 17:20- 18:9); ¶38, Ex. JJ ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")).

**Phoenix Fibers' Reply:**  Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20-27, 29-38.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted

currently herewith.

2.     In the context of recycling clothing and Phoenix Fibers' industry, "credential" means clothing or shoes, sold in bulk, and sold by the pound. (Johnson Decl. (App. Ex. B) ¶ 3; Kean Decl. (App. Ex. A) ¶ 6.)

**Plaintiffs' Response:** Disputed. "Credential" can include things such as "sheets, towels, pillow cases, lamps,…bric-a-brac" (Salzmann Decl. ¶4, Ex. B (Johnson 29:20-25)), "miscellaneous household items" and "toaster ovens" (Salzmann Decl. ¶5, Ex. C (Kean 15:17-20)).

**Phoenix Fibers' Reply:** Plaintiffs rely wholly on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26-27, 39.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.  Moreover, Plaintiffs cited evidence does not create a genuine dispute that "in *the context of recycling clothing*," "credential" means clothing or shoes sold in bulk and sold by the pound.  Toaster ovens and miscellaneous household items are not clothing.

3.     Another way of recycling clothes and textiles is repurposing them by simply reselling them in consignment or thrift shops.  (Declaration of Christopher Maciel ("Maciel Decl. (App. Ex. C)") ¶¶ 6-12; App. Ex. I-O; Johnson Decl. (App. Ex. B) ¶ 4.)

**Plaintiffs' Response:** Disputed to the extent not material to Plaintiffs' claims, as the parties' agreement related to recycling of Plaintiffs' products into shoddy fiber. As Ms. Song testified at her deposition: "we would send the inventory that we needed to -- that we wanted to use as part of our -- one of our green initiative programs. Phoenix Fibers would break down the inventory sent to them, shred it and create insulation that they would pass along to Bonded Logic, who insulated houses in need. (Salzmann Decl. ¶8, Ex. F (Song 67:11-24 (emphasis added)); *see also* 28:10-29:3.)

1    **Phoenix Fibers' Reply:** Plaintiffs rely wholly on inadmissible evidence in

2    attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

3    at 20, 28, 56-57.)  Plaintiffs' evidence does not contradict Phoenix Fibers'

4    statement or evidence, for the reasons set forth in the Reply Brief submitted

5    currently herewith.

6        4.      A third way is to turn the clothes into something else entirely.

7    (Johnson Decl. (App. Ex. B) ¶ 5; Kean Decl. (App. Ex. A) ¶ 7; Maciel Decl. (App.

8    Ex. C) ¶ 10; App. Ex. M.)

9    **Plaintiffs' Response:** Disputed only to the extent this suggests there was

10   any other way to recycle Plaintiffs' goods under the parties' agreement,

11   otherwise undisputed. Phoenix Fibers was founded to " [t]o make shoddy

12   [fiber]." (Salzmann Decl. ¶3, Ex. A (Quinn 39:8-17); ¶38, Ex. JJ

13   ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")). Specifically,

14   "Phoenix Fibers was founded to provide a stable source of raw material for

15   Bonded Logic's business of manufacturing denim cloth-based insulation

16   under the name UltraTouch Denim." (Salzmann Decl. ¶38, Ex. JJ

17   ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")). Phoenix

18   Fibers and Bonded Logic are affiliated companies owned by the Kean

19   family. (Salzmann Decl. ¶38, Ex. JJ ("Shredding Clothing Nets Big Rewards

20   or Phoenix Fibers"); ¶39, Ex. KK ("Chandler firm grows; recycles denim

21   material into insulation")). Bonded Logic is in the business of manufacturing

22   insulation products, including its flagship product, UltraTouch Denim

23   Insulation. Shoddy fiber created from recycled denim is the raw material that

24   Bonded Logic uses to manufacturer UltraTouch Denim Insulation.

25   (Salzmann Decl. ¶24, Ex. V (SP/RCRV005629); ¶39, Ex. KK ("Chandler

26   firm grows; recycles denim material into insulation"); ¶40, Ex. LL ("Green

27   Chandler company looks to bask in solar savings"); ¶41, Ex. MM

28   ("Chandler company turns worn-out blue jeans into insulation, more")).

---

4

CONSOLIDATED SEPARATE STATEMENT

Prior to launching Phoenix Fibers, Bonded Logic sourced shoddy fiber from a shredding company in Brownsville, Texas. (Salzmann Decl. ¶5, Ex. C (Kean 65:10-66:21)). As Tod Kean explained: "We used to procure our raw material for the production of insulation from other shredders. But because of instability in both prices and supply, we decided to open Phoenix to become vertically integrated by controlling our own source of raw materials." (Salzmann Decl. ¶38, Ex. JJ ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")). Today, Phoenix Fibers receives clothing "by the truckload" from various sources for shredding, and processes 900 to a million pounds of denim and cotton products into shoddy fiber every month. (Salzmann Decl. ¶4, Ex. B (Johnson 77:2-4); ¶38, Ex. JJ ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")).

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute. (*See* Dkt. No. 98 [Def.'s Objections] at 20-25, 29-39.) Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

5.     Phoenix Fibers is solely a clothing and textile recycling company that engages in three types of recycling. First, Phoenix Fibers accepts donations of clothing that it then sells, by the pound and in bulk, as credential. Second, Phoenix Fibers accepts donations of clothing, converts that clothing through a proprietary shredding process into shoddy or filler fiber, and then sells it to companies that use this fiber for various purposes (e.g., for housing, automotive, and appliance insulation). Third, *for a fee*, Phoenix Fibers agrees to destroy certain clothing items and produces a certificate of destruction to the customer. (Johnson Decl. (App. Ex. B) ¶ 6; Kean Decl. (App. Ex. A) ¶ 8.)

**Plaintiffs' Response:** Disputed. Phoenix Fibers was founded "[t]o make shoddy [fiber]." (Salzmann Decl. ¶3, Ex. A (Quinn 39:8-17); ¶38, Ex. JJ

1  ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")).

2  specifically, "Phoenix Fibers was founded to provide a stable source of raw

3  material for Bonded Logic's business of manufacturing denim cloth-based

4  insulation under the name UltraTouch Denim." (Salzmann Decl. ¶38, Ex. JJ

5  ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")). Phoenix

6  Fibers and Bonded Logic are affiliated companies owned by the Kean

7  family. (Salzmann Decl. ¶38, Ex. JJ ("Shredding Clothing Nets Big Rewards

8  for Phoenix Fibers"); ¶39, Ex. KK ("Chandler firm grows; recycles denim

9  material into insulation")). Bonded Logic is in the business of manufacturing

10  insulation products, including its flagship product, UltraTouch Denim

11  Insulation. Shoddy fiber created from recycled denim is the raw material that

12  Bonded Logic uses to manufacturer UltraTouch Denim Insulation.

13  (Salzmann Decl. ¶24, Ex. V (SP/RCRV005629); ¶39, Ex. KK ("Chandler

14  firm grows; recycles denim material into insulation"); ¶40, Ex. LL ("Green

15  Chandler company looks to bask in solar savings"); ¶41, Ex. MM

16  ("Chandler company turns worn-out blue jeans into insulation, more")).

17  Prior to launching Phoenix Fibers, Bonded Logic sourced shoddy fiber from

18  a shredding company in Brownsville, Texas. (Salzmann Decl. ¶5, Ex. C

19  (Kean 65:10-66:21)). As Tod Kean explained: "We used to procure our raw

20  material for the production of insulation from other shredders. But because

21  of instability in both prices and supply, we decided to open Phoenix to

22  become vertically integrated by controlling our own source of raw

23  materials." (Salzmann Decl. ¶38, Ex. JJ ("Shredding Clothing Nets Big

24  Rewards for Phoenix Fibers")). Today, Phoenix Fibers receives clothing "by

25  the truckload" from various sources for shredding, and processes 900 to a

26  million pounds of denim and cotton products into shoddy fiber every month.

27  (Salzmann Decl. ¶4, Ex. B (Johnson 77:2-4); ¶38, Ex. JJ ("Shredding

28  Clothing Nets Big Rewards for Phoenix Fibers")). Phoenix Fibers was not in

the business of selling "credential" when the company was launched in July 2011. That aspect of Phoenix Fibers' business only came into existence at a later date. There is no evidence that Phoenix Fibers was engaged in the sale of credential in November 2011, at the time Plaintiffs and Phoenix Fibers came to an agreement to convert all of Plaintiffs' second-quality denim products into shoddy fiber. (Salzmann Decl. ¶5, Ex. C (Kean 17:20-18:9); ¶38, Ex. JJ ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")).

**Phoenix Fibers' Reply:**  Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20-25, 29-39.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

6.      Tod Kean is the president and an owner of Phoenix Fibers.  (Kean Decl. (App. Ex. A) ¶ 1.)

**Plaintiffs' Response:** Undisputed. Tod Kean is also the CEO of Phoenix Fibers, and the Secretary and co-founder of Bonded Logic. (Salzmann Decl. ¶5, Ex. C (Kean 58:11-16)).

**Phoenix Fibers' Reply:** No reply as this fact is undisputed.

7.      Steven Johnson is the current plant manager of Phoenix Fibers, and has been since around September 2013. (Johnson Decl. (App. Ex. B) ¶ 1; Kean Decl.  (App. Ex. A) ¶ 10.)

**Plaintiffs' Response:** Undisputed.

**Phoenix Fibers' Reply:** No reply as this fact is undisputed.

8.      Prior to Mr. Johnson being plant manager, a person named Matt Graham was the plant manager, as well as the acting general manager, during the startup phase of Phoenix Fibers.  (Kean Decl. (App. Ex. A)  ¶ 10.)

**Plaintiffs' Response:** Undisputed.

**Phoenix Fibers' Reply:** No reply as this fact is undisputed.

9.      Mr. Graham started working for Phoenix Fibers in 2011, when the business started, and left in 2013.  (Kean Decl. (App. Ex. A) ¶ 10.)

**Plaintiffs' Response:** Undisputed.

**Phoenix Fibers' Reply:** No reply as this fact is undisputed.

**B.    Plaintiff Sweet People Apparel, Inc. ("Sweet People")**

10.     Plaintiff Sweet People sells certain products, including jeans and cutoff denim shorts, under the Miss Me brand name.  (First Amended Complaint ("Complaint (App. Ex. H)" ¶ 17.)

**Plaintiffs' Response:** Undisputed (although Phoenix Fibers' citation does not support this statement).

**Phoenix Fibers' Reply:** No reply as this fact is undisputed.

11.     Miss Me brand jeans cost a consumer approximately $100 at retail. (Maciel Decl. (App. Ex. C) ¶ 36; App Ex. MM.)

**Plaintiffs' Response:** Undisputed.

**Phoenix Fibers' Reply:** No reply as this fact is undisputed.

12.     Lisa Song was an employee of Sweet People from 2009 to February 2014 and worked as a human resources manager during her entire tenure at Sweet People.  (Deposition of Lisa Song ("Song Depo. (App. Ex. D)") 18:19-19:16; App. Ex. P.)

**Plaintiffs' Response:** Disputed. Lisa Song held the title of Human Resources Manager at Sweet People between 2009 and February 2014. (Salzmann Decl. ¶8, Ex. F (Song 21:9-12)). Although Ms. Song was on Sweet People's payroll, she was considered an employee of both Sweet People and RCRV, and her time was allocated between those two companies, and a third related entity called Deodar Brands, the proprietor of the MEK DENIM jeanswear brand. (Salzmann Decl. ¶6, Ex. D (Kim 41:18-42:1; 58:24-59:3; see also 105:24-106:16); Kim Decl. ¶¶8-9; Choi Decl. ¶8).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute. (*See* Dkt. No. 98 [Def.'s Objections] at 7-8, 11, 20, 27-28, 47.) Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

13.  Lilly Kim is the General Counsel for Sweet People and has been since 2010. (Rule 30(b)(6) Deposition of Lilly Kim "Rule 30(b)(6) Depo. (Kim) (App. Ex. E)" 31:24-32:7.)

**Plaintiffs' Response:** Disputed. Ms. Kim served as the General Counsel of Sweet People and RCRV from approximately April 2010 to October 2016. Since that time, Ms. Kim has continued to oversee Plaintiffs' legal matters as an outside consultant. (Kim Decl. ¶ 1.)

**Phoenix Fibers' Reply:** Plaintiffs' dispute does not create a genuine dispute of a material fact that is relevant for summary judgment.

14.  Felipe Salgado is an employee of Sweet People and began working for Sweet People in October 2004. (Rule (30)(b)(6) Deposition of Felipe Salgado ("Rule 30(b)(6) Depo. (Salgado) (App. Ex. F)" 21:20-22:9; 24:1-15.)

**Plaintiffs' Response:** Undisputed. While Mr. Salgado has been on RCRV's payroll since 2008, he, like Ms. Song, is considered an employee of both Sweet People and RCRV, and his time is allocated between those two companies, as evidenced by his continuing responsibilities relating to the coordination and shipment of second-quality MISS ME (and ROCK REVIVAL products) to Phoenix Fibers for destruction. (Salzmann Decl. ¶7, Ex. E (Salgado 21:20-22; 24:10-15; 31:8-33:21)).

**Phoenix Fibers' Reply:** No reply as this fact is undisputed. However, Plaintiffs rely wholly on inadmissible evidence. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 27-28, 54-56.)

## C.   Plaintiff RCRV, Inc. ("RCRV")

15.     Mr. Salgado was responsible for merchandise shipping at Sweet People from 2013 to the present time.  (Rule 30(b)(6) Depo. (Salgado) (App. Ex. F) 21:20-28:15.)

> **Plaintiffs' Response:** Disputed. Since October 2013, Mr. Salgado's only responsibilities relating to Sweet People's warehouse logistics were the coordination and shipment of second-quality MISS ME (and ROCK REVIVAL products) to Phoenix Fibers for destruction. (Salzmann Decl. ¶7, Ex. E (Salgado 24:10-15; 31:8-33:21)).
>
> **Phoenix Fibers' Reply:** Plaintiffs rely wholly on inadmissible evidence to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 27-28, 54-56.)  Moreover, Plaintiffs' clarification does not create a genuine dispute of a material fact that is relevant for summary judgment.

16.     Plaintiff RCRV is a denim and apparel company that was formed in 2007.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 102:22-103:1; Complaint (App. Ex. H) ¶ 17.)

> **Plaintiffs' Response:** Undisputed.
>
> **Phoenix Fibers' Reply:** No reply as this fact is undisputed.

17.     RCRV sells certain products under its Rock Revival brand name. (Complaint (App. Ex. H) ¶ 17.)

> **Plaintiffs' Response:** Undisputed.
>
> **Phoenix Fibers' Reply:** No reply as this fact is undisputed.

18.     Rock Revival brand jeans cost a consumer approximately between $150 and $200 at retail.  (Maciel Decl. (App. Ex. C) ¶ 37; App Ex. NN.)

> **Plaintiffs' Response:** Undisputed.
>
> **Phoenix Fibers' Reply:** No reply as this fact is undisputed.

1    19.    In addition to being the General Counsel for Sweet People, Lilly Kim

2  is also the General Counsel for RCRV and has been since 2010.  (Rule 30(b)(6)

3  Depo. (Kim) (App. Ex. E) 31:24-32:7.)

4    **Plaintiffs' Response:** Disputed. Ms. Kim served as the General Counsel of

5    Sweet People and RCRV from approximately April 2010 to October 2016.

6    Since that time, Ms. Kim has continued to oversee Plaintiffs' legal matters

7    as an outside consultant. (Kim Decl. ¶ 1).

8    **Phoenix Fibers' Reply:** Plaintiffs' dispute does not create a genuine dispute

9    of a material fact that is relevant for summary judgment.

10    20.    In addition to being an employee of Sweet People, Mr. Salgado is an

11  employee of RCRV and has been since 2008.  (Rule 30(b)(6) Depo. (Salgado)

12  (App. Ex. F) 15:19-22; 18:2-24; 21:20-28:15.)  At RCRV, Mr. Salgado oversees

13  customer service, the shipping department, and the warehouse.  (Rule 30(b)(6)

14  Depo. (Salgado) (App. Ex. F) 17:25-18:24.)

15    **Plaintiffs' Response:** Undisputed. While Mr. Salgado has been on RCRV's

16    payroll since 2008, he, like Ms. Song, is considered an employee of both

17    Sweet People and RCRV, and his time is allocated between those two

18    companies, as evidenced by his continuing responsibilities relating to the

19    coordination and shipment of second-quality MISS ME (and ROCK

20    REVIVAL products) to Phoenix Fibers for destruction. (Salzmann Decl. ¶7,

21    Ex. E (Salgado 21:20-22; 24:10-15; 31:8-33:21)).

22    **Phoenix Fibers' Reply:** No reply as this fact is undisputed. However,

23    Plaintiffs rely wholly on inadmissible evidence.  (*See* Dkt. No. 98 [Def.'s

24    Objections] at 20, 26-27, 54-56.)

25    21.    Ms. Song was never employed by RCRV.  (Song Depo. (App. Ex. D)

26  18:19-19:16; 21:9-12; App. Ex. P).

27    **Plaintiffs' Response:** Disputed. Lisa Song held the title of Human

28    Resources Manager at Sweet People between 2009 and February 2014.

1   (Salzmann Decl. ¶8, Ex. F (Song 21:9-12)). Although Ms. Song was on

2   Sweet People's payroll, she was considered an employee of both Sweet

3   People and RCRV, and her time was allocated between those two

4   companies, and a third related entity called Deodar Brands, the proprietor of

5   the MEK DENIM jeanswear brand. (Salzmann Decl. ¶6, Ex. D (Kim 41:18-

6   42:1; 58:24-59:3; see also 105:24-106:16); Kim Decl. ¶¶8-9; Choi Decl. ¶8).

7   **<u>Phoenix Fibers' Reply:</u>** Plaintiffs rely wholly on inadmissible evidence in

8   attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

9   at 6-8, 11-12, 20, 27-28, 47.)  Plaintiffs' evidence does not contradict

10   Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply

11   Brief submitted currently herewith.

12   22.   Further, Ms. Song never negotiated any contracts on behalf of RCRV.

13   (Song Depo. (App. Ex. D) 19:19-20:12.)

14   **<u>Plaintiffs' Response:</u>** Disputed. Ms. Song, acting on behalf of Plaintiffs and

15   under the direction of Ms. Kim, entered into an agreement with Phoenix

16   Fibers relating to the donation of second-quality MISS ME and ROCK

17   REVIVAL denim products, which were to solely be destroyed and converted

18   into shoddy fiber. (Salzmann Decl. ¶6, Ex. D (Kim 14:1-9); ¶8, Ex. F (Song

19   24:4-9); Kim Decl. ¶9; Choi Decl. ¶8).

20   **<u>Phoenix Fibers' Reply:</u>** Plaintiffs rely wholly on inadmissible evidence in

21   attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

22   at 7-8, 11-12, 20, 26-28, 41.)  Plaintiffs' evidence does not contradict

23   Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply

24   Brief submitted currently herewith.

25   23.   There is no evidence Ms. Song ever represented herself as an

26   employee or agent of RCRV during any conversation that she had with anyone

27   from Phoenix Fibers.

28

1    **Plaintiffs' Response:** Disputed. Ms. Song was considered an employee of

2    both Sweet People and RCRV. (Salzmann Decl. ¶6, Ex. D (Kim 41:18-42:1;

3    58:24- 59:3; see also 105:24-106:16); Kim Decl. ¶¶8-9). Ms. Song, acting on

4    behalf of both Sweet People and RCRV and under the direction of Ms. Kim

5    (the then- General Counsel of both companies), entered into an agreement

6    with Phoenix Fibers relating to the donation of both second-quality MISS

7    ME and ROCK REVIVAL denim products, which were solely to be

8    destroyed and converted into shoddy fiber. (Salzmann Decl. ¶6, Ex. D (Kim

9    14:1-9); ¶8, Ex. F (Song 24:4-9); Kim Decl. ¶¶8-9, 15; Choi Decl. ¶8).

10   Moreover, the parties' course of conduct between November 2011 and

11   September 2015—during which time Plaintiffs' delivered hundreds of

12   thousands of pounds of ROCK REVIVAL— confirm that RCRV was a

13   party to the agreement negotiated by Ms. Song, further indicating that she

14   represented RCRV in the negotiation of the parties' agreement.

15   **Phoenix Fibers' Reply:** Plaintiffs wholly on inadmissible evidence in

16   attempting to create an alleged dispute. (*See* Dkt. No. 98 [Def.'s Objections]

17   at 7-8, 11-12, 14, 20, 27-28, 41, 47.) Plaintiffs' evidence does not contradict

18   Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply

19   Brief submitted currently herewith.

20   **D.    The Interaction Between Sweet People, RCRV, and Phoenix Fibers**

21        24.    Plaintiffs viewed Phoenix Fibers' website prior to shipping any

22   clothing to Phoenix Fibers. (Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)

23   **Plaintiffs' Response:** Disputed. Plaintiffs' prior statement that "one or more

24   RCRV and/or Sweet People Apparel, Inc. employee visited the Phoenix

25   Fibers website" before Plaintiffs delivered any products to Phoenix Fibers

26   for recycling into shoddy fiber was based on Plaintiffs then-understanding

27   that Ms. Song had visited the Phoenix Fibers website at or around the time

28   she was negotiating the terms of the parties' agreement with Mr. Graham.

1   Ms. Song, however, recently testified that she has no specific recollection of

2   visiting the Phoenix Fibers website. (Salzmann Decl. ¶8, Ex. F (Song 47:20-

3   48:17)). Moreover, Tod Kean conceded at his deposition that Phoenix Fibers

4   did not have an operational website when the company launched in July

5   2011, and further testified that he did not know when the Phoenix Fibers

6   website went live, stating that he "would want to check the dates on the

7   [Wayback] machine." (Salzmann Decl. ¶5, Ex. C (Kean 101:5-25); ¶42, Ex.

8   NN (printouts of Wayback Machine screen capture)). Accordingly, there is

9   no competent evidence that Phoenix Fibers even had an operational website

10  in or around November 2011.

11  **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence to create an

12  alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26-28.)

13  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or

14  evidence.  Plaintiffs submit no evidence to support their statement that

15  "Plaintiffs' prior statement that 'one or more RCRV and/or Sweet People

16  Apparel, Inc. employee visited the Phoenix Fibers website' before Plaintiffs

17  delivered any products to Phoenix Fibers for recycling into shoddy fiber was

18  based on Plaintiffs then-understanding that Ms. Song had visited the

19  Phoenix Fibers website at or around the time she was negotiating the terms

20  of the parties' agreement with Mr. Graham."  Plaintiffs point to Phoenix

21  Fibers' lack of evidence to create a material dispute of fact; however, it is

22  *Plaintiffs'* burden to create a material dispute of fact, not Phoenix Fibers'.

23  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

24  25.    Since its inception, Phoenix Fibers' website homepage has stated,

25  "Phoenix Fibers collects and recycles textiles in a variety of ways. We maintain a

26  zero waste philosophy whenever feasible. The items we do not use in our

27  shredding process are resold to other recycling companies."  (Kean Decl. (App.

28  Ex. A) ¶ 9; App. Ex. T; Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 166:3-16.)

1    **Plaintiffs' Response:**  Disputed. Phoenix Fibers has produced no evidence

2    to substantiate Tod Kean's claim that the phxfibers.com website has been

3    active "[s]ince [the  company's] inception" in July 2011. (Kean Decl. ¶9).

4    Tod Kean conceded at his deposition that  Phoenix Fibers did not have an

5    operational website when the company launched in July 2011, and further

6    testified that he did not know when the Phoenix Fibers website went live,

7    stating that he "would want to check the dates on the [Wayback] machine."

8    (Salzmann Decl. ¶5, Ex. C (Kean 101:5-25)). Had Mr. Kean checked the

9    Wayback Machine, he would have learned that the first screen capture of the

10   phxfibers.com website is from September 13, 2012, more than a year after

11   Phoenix Fibers commenced its business. (Salzmann Decl. ¶42, Ex. NN

12   (printouts of Wayback Machine screen capture)). Moreover, Phoenix Fibers

13   did not "purchase" Plaintiffs' products, and when Mr. Kean was specifically

14   asked how this statement—"The items we do not use in our shredding

15   process are resold to other recycling companies"—which refers to the resale

16   or reselling of products, related Phoenix Fibers' sale of Plaintiffs' products,

17   Mr. Kean was unable to identify any first or initial "sale" of products by

18   Plaintiffs that preceded Phoenix Fibers' "resale." (Salzmann Decl. ¶5, Ex. C

19   (Kean 102:1-23)).

20   **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence to create an

21   alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26-27.)

22   Plaintiffs' evidence does not contradict Phoenix Fibers' statement or

23   evidence. Plaintiffs point to Phoenix Fibers' lack of evidence to create a

24   material dispute of fact; however, it is *Plaintiffs'* burden to create a material

25   dispute of fact, not Phoenix Fibers'.  *Celotex Corp. v. Catrett*, 477 U.S. 317

26   (1986).

27   26.    Plaintiffs allege that in 2011 they entered into a contract with Phoenix

28   Fibers (the "Alleged Contract").  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 14:1-9;

---

15

1   18:4-19:3; 28:12-29:7.)  The Alleged Contract is not a written contract.  (*Id.* at

2   32:17-34:12; Song Depo. (App. Ex. D) 74:19-75:15; App. Ex. FF.)

3       **<u>Plaintiffs' Response:</u>** Not disputed that there is no single writing consisting

4       of a written contract between the parties, but disputed to the extent intended

5       to suggest there are no writings that make reference to any of the terms of

6       the parties' agreement. In fact, contemporaneous written communications

7       between the parties memorialize key material terms of the parties'

8       agreement, including, without limitation, Phoenix Fibers' agreement to shred

9       (and thereby destroy) all goods donated to it by Plaintiffs:

10          • On November 4, 2011, Mr. Graham sent Ms. Song an email

11              explaining Phoenix Fibers' shredding services, and explaining that

12              "[i]f necessary, [Phoenix Fibers] can remove the tags, buttons and

13              zippers. There is no charge for our recycling service." (Salzmann

14              Decl. ¶16, Ex. N (SP/RCRV005538-5539) (emphasis added)). It

15              would only be necessary to remove "the tags, buttons and zippers"

16              from Plaintiffs products if the products were being recycled into

17              shoddy fiber, as the parties contemplated. (Salzmann Decl. ¶38, Ex. JJ

18              ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")

19              (explaining that the first step in the shredding process is "a proprietary

20              process that removes all buttons, zippers and tags")).

21          • On November 15, 2015, two weeks prior to Plaintiffs' delivery of

22              their first shipment of products to Phoenix Fibers for recycling into

23              shoddy fiber, Mr. Graham sent an email to Ms. Song explaining

24              "[t]here's not much else needed. We will receive the material,

25              schedule it for destruction and away we go! I'll call you this morning

26              to confirm this email." (Salzmann Decl. ¶18, Ex. P

27              (SP/RCRV005545) (emphasis added)).

28

Case 2:16-cv-00940-TJH-JC   Document 100   Filed 01/13/17   Page 18 of 113   Page ID
#:1689

- December 5, 2011, a week after Plaintiffs delivered their first
  shipment of products Phoenix Fibers for recycling into shoddy fiber,
  Mr. Graham sent Ms. Song an email explaining what happens to
  Plaintiffs' products: "The product we receive may be recycled into
  any number of products. This could range from house, automobile or
  appliance insulation to prison mattresses…. There is also a certain
  portion that cannot be used, such a metal pieces in the buttons and
  zippers. These are removed and recycled separately." (Salzmann Decl.
  ¶20, Ex. R (SP/RCRV005583- 5584) (emphasis added)).

- A few months later in March 2012, Mr. Graham reaffirmed this
  process in an email to Ms. Song stating: "Phoenix Fibers converts the
  jeans into fiber that gets sent to our affiliate company, Bonded Logic
  which in turn, manufactures the end products." (Salzmann Decl. ¶24,
  Ex. V (SP/RCRV005629) (emphasis added)).

- Shortly thereafter, on April 9, 2012, Mr. Graham sent an email to Ms.
  Song following up on their recent in-person meeting stating: "Some of
  our new machinery I told you about has just arrived. Once we have it
  set up and running, I will send you a video of us running your jeans."
  (Salzmann Decl. ¶27, Ex. Y (SP/RCRV005640) (emphasis added)).

**Phoenix Fibers' Reply:** Plaintiffs wholly on inadmissible evidence in
attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]
at 21-24, 31-34, 37.)  Plaintiffs' evidence does not contradict Phoenix
Fibers' statement or evidence, for the reasons set forth in the Reply Brief
submitted currently herewith.

27.    Ms. Kim and Plaintiffs allege, but cannot prove, that, pursuant to the
terms of the Alleged Contract, Phoenix Fibers was obligated to recycle all products
donated to Phoenix Fibers by Plaintiffs.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E)
26:1-6; 197:18-25; App. Ex. V-W.)  Further, Ms. Kim and Plaintiffs assert, but

cannot prove, that Plaintiffs *explicitly* placed a requirement on Phoenix Fibers to destroy all items that Plaintiffs donated, and that the Alleged Contract required Phoenix Fibers to destroy all items that Plaintiffs donated.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 26:1-6; 197:18-25; 26:20-29:14; App. Ex. V-W.)

**Plaintiffs' Response:** Disputed. Ms. Kim saw written communications between Ms. Song and Mr. Graham wherein Mr. Graham specifically represented that Phoenix Fibers would destroy all of Plaintiffs' second-quality denim products and convert them into shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶¶10-11). As Ms. Kim testified, "[w]e did require that the items be destroyed and recycled" (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)). Based on her contemporaneous discussions with Ms. Song regarding Ms. Song's conversations with Mr. Graham, Ms. Kim understood that Plaintiffs had conditioned their agreement to provide Phoenix Fibers with their second-quality MISS ME and ROCK REVIVAL denim products on Phoenix Fibers' agreement to convert all such products into shoddy fiber. (Salzmann Decl. ¶6, Ex. D (Kim 28:14-29:4); L. Kim Decl. ¶¶10-12; *see also* Choi Decl. ¶8). Moreover, the contemporaneous written communications between the parties memorialize material terms of the parties' agreement, which include destruction:

- On November 4, 2011, Mr. Graham sent Ms. Song an email explaining Phoenix Fibers' shredding services, and explaining that "[i]f necessary, [Phoenix Fibers] can remove the tags, buttons and zippers. There is no charge for our recycling service." (Salzmann Decl. ¶16, Ex. N (SP/RCRV005538-5539) (emphasis added)). It would only be necessary to remove "the tags, buttons and zippers" from Plaintiffs products if the products were being recycled into shoddy fiber, as the parties contemplated. (Salzmann Decl. ¶38, Ex. JJ ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")

1    (explaining that the first step in the shredding process is "a proprietary

2    process that removes all buttons, zippers and tags")).

3    •   On November 15, 2015, two weeks prior to Plaintiffs' delivery of

4        their first shipment of products to Phoenix Fibers for recycling into

5        shoddy fiber, Mr. Graham sent an email to Ms. Song explaining

6        "[t]here's not much else needed. We will receive the material,

7        schedule it for destruction and away we go! I'll call you this morning

8        to confirm this email." (Salzmann Decl. ¶18, Ex. P

9        (SP/RCRV005545) (emphasis added)).

10   •   December 5, 2011, a week after Plaintiffs delivered their first

11       shipment of products Phoenix Fibers for recycling into shoddy fiber,

12       Mr. Graham sent Ms. Song an email explaining what happens to

13       Plaintiffs' products: "The product we receive may be recycled into

14       any number of products. This could range from house, automobile or

15       appliance insulation to prison mattresses…. There is also a certain

16       portion that cannot be used, such a metal pieces in the buttons and

17       zippers. These are removed and recycled separately." (Salzmann Decl.

18       ¶20, Ex. R (SP/RCRV005583- 5584) (emphasis added)).

19   •   A few months later in March 2012, Mr. Graham reaffirmed this

20       process in an email to Ms. Song stating: "Phoenix Fibers converts the

21       jeans into fiber that gets sent to our affiliate company, Bonded Logic

22       which in turn, manufactures the end products." (Salzmann Decl. ¶24,

23       Ex. V (SP/RCRV005629) (emphasis added)).

24   •   Shortly thereafter, on April 9, 2012, Mr. Graham sent an email to Ms.

25       Song following up on their recent in-person meeting stating: "Some of

26       our new machinery I told you about has just arrived. Once we have it

27       set up and running, I will send you a video of us running your jeans."

28       (Salzmann Decl. ¶27, Ex. Y (SP/RCRV005640) (emphasis added)).

---

19

CONSOLIDATED SEPARATE STATEMENT

1    **Phoenix Fibers' Reply:** Plaintiffs wholly on inadmissible evidence in
2    attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]
3    at 7-8, 12-13, 20-24, 27, 30-34, 37, 43-44.)  Plaintiffs' evidence does not
4    contradict Phoenix Fibers' statement or evidence, for the reasons set forth in
5    the Reply Brief submitted currently herewith.

6    28.    Plaintiffs' 30(b)(6) witness regarding negotiation of, and entry into,
7    the Alleged Contract testified that the Alleged Contract was negotiated and entered
8    into by the human resource manager, Ms. Song, on behalf of Plaintiffs, as opposed
9    to Ms. Kim, Plaintiffs' General Counsel or anyone else.  (Rule 30(b)(6) Depo.
10   (Kim) (App. Ex. E) 14:1-9; 18:4-19:15; 31:24-32:7; 175:25-176:3.)  Plaintiffs'
11   30(b)(6) witness further testified that Ms. Song negotiated the Alleged Contract
12   with Mr. Graham and then entered into the Alleged Contract with Mr. Graham, a
13   representative of Phoenix Fibers.  (*Id.* at 14:1-9; 18:4-19:3; 28:12-29:4.)

14   **Plaintiffs' Response:** Disputed. Ms. Song, acting on behalf of Plaintiffs and
15   under the direction of Ms. Kim, entered into an agreement with Phoenix
16   Fibers relating to the donation of second-quality MISS ME and ROCK
17   REVIVAL denim products, which were all to be destroyed and converted
18   into shoddy fiber. (Salzmann Decl. ¶6, Ex. D (Kim 14:1-9); ¶8, Ex. F (Song
19   24:4-9); Kim Decl. ¶¶8-12). Eric Choi, Plaintiffs' then-CEO approved the
20   terms of the parties' agreement. (Choi Decl. ¶ 8).

21   **Phoenix Fibers' Reply:** Plaintiffs on inadmissible evidence in attempting to
22   create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 7-8, 11-
23   13, 20, 27-28, 41.)  Plaintiffs' evidence does not contradict Phoenix Fibers'
24   statement or evidence, for the reasons set forth in the Reply Brief submitted
25   currently herewith.

26   29.    To the extent there is a contract, the Alleged Contract was entered into
27   prior to November 7, 2011. (Song Depo. (App. Ex. D) 57:14-60:3; 62:8-17; 82:17-
28   83:7; Maciel Decl. (App. Ex. C) ¶ 28; App. Ex. EE).

1    **Plaintiffs' Response:** Disputed. The parties' agreement was finalized prior

2    to the first delivery of denim products to Phoenix Fibers for recycling into

3    shoddy fiber on November 29, 2011. Phoenix Fibers is desperately

4    attempting to ignore Mr. Graham's November 15, 2015 email to Ms. Song—

5    two weeks prior to Plaintiffs' delivery of their first shipment of products to

6    Phoenix Fibers for recycling into shoddy fiber—in which Mr. Graham states

7    "[t]here's not much else needed. We will receive the material, schedule it for

8    destruction and away we go! I'll call you this morning to confirm this

9    email." (Salzmann Decl. ¶18, Ex. P (SP/RCRV005545) (emphasis added)).

10   Further, try as it may, even if the parties' agreement had been reached on

11   November 7, 2011, Mr. Graham's November 15, 2011 email merely serves

12   to confirm that which the parties had already agreed to—that Phoenix Fibers

13   would only recycle Plaintiffs' products into shoddy fiber.

14   **Phoenix Fibers' Reply:** Plaintiffs wholly on inadmissible evidence in

15   attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

16   at 21-22, 31.)  Plaintiffs' evidence does not contradict Phoenix Fibers'

17   statement or evidence, for the reasons set forth in the Reply Brief submitted

18   currently herewith.

19        30.     Plaintiffs have no evidence that Ms. Kim, the General Counsel, has

20   any personal knowledge of the formation of, or terms of, the Alleged Contract.

21   **Plaintiffs' Response:** Undisputed. Throughout her discussions with Phoenix

22   Fibers, Ms. Song reported back to Ms. Kim, Mr. Choi and Steve Kim,

23   Plaintiffs' then-COO, her superiors who also worked for both Sweet People

24   and RCRV. (Salzmann Decl. ¶6, Ex. D (Kim 18:4-24; 20:1-11; 20:25-21:3;

25   43:8-19); ¶15, Ex. M (SP/RCRV005532-5533), ¶16, Ex. N

26   (SP/RCRV005538-5539), ¶17, Ex. O (SP/RCRV005542-5543); Kim Decl.

27   ¶9; Choi Decl. ¶8). Moreover, Ms. Kim saw written communications

28   between Ms. Song and Mr. Graham wherein Mr. Graham specifically

1    represented that Phoenix Fibers would only destroy Plaintiffs' second-

2    quality denim products and convert them into shoddy fiber (Salzmann Decl.

3    ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶11), and testified that "[w]e did

4    require that the items be destroyed and recycled" (Salzmann Decl. ¶6, Ex. D

5    (Kim 27:20-28:1)). Based on her contemporaneous discussions with Ms.

6    Song regarding Ms. Song's negotiations with Mr. Graham, Ms. Kim

7    understood that Plaintiffs had conditioned their agreement to provide

8    Phoenix Fibers with their second-quality MISS ME and ROCK REVIVAL

9    denim products on Phoenix Fibers' agreement to convert all such products

10   into shoddy fiber. (Salzmann Decl. ¶6, Ex. D (Kim 28:14-29:4); Kim Decl.

11   ¶10; *see also* Choi Decl. ¶8).

12   **Phoenix Fibers' Reply:** No reply as this fact is undisputed. However,

13   Plaintiffs rely on inadmissible evidence.  (*See* Dkt. No. 98 [Def.'s

14   Objections] at 7-8, 11-13, 20-21, 27, 30-31, 41-44.)

15       31.    Ms. Kim did not have any communications of any kind with anyone

16   from Phoenix Fibers until 2015, years after the alleged formation of the Alleged

17   Contract.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 19:4-15; 31:24-32:7.)

18   **Plaintiffs' Response:** Disputed to the following extent. While Ms. Kim did

19   not have any such direct communications until 2015, throughout her

20   discussions with Phoenix Fibers, Ms. Song reported back to Ms. Kim, Mr.

21   Choi and Steve Kim, Plaintiffs' then-COO, her superiors who also worked

22   for both Sweet People and RCRV. (Salzmann Decl. ¶6, Ex. D (Kim 18:4-24;

23   20:1-11; 20:25- 21:3; 43:8-19); ¶15, Ex. M (SP/RCRV005532-5533), ¶16,

24   Ex. N (SP/RCRV005538-5539), ¶17, Ex. O (SP/RCRV005542-5543); Kim

25   Decl. ¶9; Choi Decl. ¶8). Moreover, Ms. Kim saw written communications

26   between Ms. Song and Mr. Graham wherein Mr. Graham represented that

27   Phoenix Fibers would destroy Plaintiffs' second-quality denim products and

28   convert them into shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25);

Kim Decl. ¶11), and testified that "[w]e did require that the items be destroyed and recycled" (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)). Based on her contemporaneous discussions with Ms. Song regarding Ms. Song's negotiations with Mr. Graham, Ms. Kim understood that Plaintiffs had conditioned their agreement to provide Phoenix Fibers with their second-quality MISS ME and ROCK REVIVAL denim products only based on Phoenix Fibers' agreement to convert all such products into shoddy fiber. (Salzmann Decl. ¶6, Ex. D (Kim 28:14-29:4); Kim Decl. ¶10; *see also* Choi Decl. ¶8). In addition, based on her contemporaneous understanding of Ms. Song's oral and written communications with Phoenix Fibers, namely, Mr. Graham's representation that Phoenix Fibers would "destroy" Plaintiffs' products and convert them into shoddy fiber, and his statement that Phoenix Fibers did not require a writing to memorialize the parties' understanding, Ms. Kim was satisfied that a written agreement with Phoenix Fibers was not necessary. (Salzmann Decl. ¶6, Ex. D (Kim 34:4-12; 37:22-38:10); Kim Decl. ¶12).

**Phoenix Fibers' Reply:** Plaintiffs on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 7-8, 11-13, 20-21, 27, 30-31, 41-46.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

32.    Ms. Kim never spoke to or communicated with Mr. Graham about anything.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 19:4-15; 175:25-176:3.)

**Plaintiffs' Response:** Disputed to the following extent. While Ms. Kim did not have any direct communications with Mr. Graham, throughout her discussions with Phoenix Fibers, Ms. Song reported back to Ms. Kim, Mr. Choi and Steve Kim, Plaintiffs' then-COO, her superiors who also worked for both Sweet People and RCRV. (Salzmann Decl. ¶6, Ex. D (Kim 18:4-24;

20:1-11; 20:25- 21:3; 43:8-19); ¶15, Ex. M (SP/RCRV005532-5533), ¶16,
Ex. N (SP/RCRV005538-5539), ¶17, Ex. O (SP/RCRV005542-5543); Kim
Decl. ¶9; Choi Decl. ¶8). Moreover, Ms. Kim saw written communications
between Ms. Song and Mr. Graham wherein Mr. Graham represented that
Phoenix Fibers would destroy Plaintiffs' second-quality denim products and
convert them into shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25);
Kim Decl. ¶11), and testified that "[w]e did require that the items be
destroyed and recycled" (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)).
Based on her contemporaneous discussions with Ms. Song regarding Ms.
Song's negotiations with Mr. Graham, Ms. Kim understood that Plaintiffs
had conditioned their agreement to provide Phoenix Fibers with their
second-quality MISS ME and ROCK REVIVAL denim products only based
on Phoenix Fibers' agreement to convert all such products into shoddy fiber.
(Salzmann Decl. ¶6, Ex. D (Kim 28:14-29:4); Kim Decl. ¶10; *see also* Choi
Decl. ¶8). In addition, based on her contemporaneous understanding of Ms.
Song's oral and written communications with Phoenix Fibers, namely, Mr.
Graham's representation that Phoenix Fibers would "destroy" Plaintiffs'
products and convert them into shoddy fiber, and his statement that Phoenix
Fibers did not require a writing to memorialize the parties' understanding,
Ms. Kim was satisfied that a written agreement with Phoenix Fibers was not
necessary. (Salzmann Decl. ¶6, Ex. D (Kim 34:4-12; 37:22-38:10); Kim
Decl. ¶12).

**Phoenix Fibers' Reply:** Plaintiffs wholly on inadmissible evidence in
attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]
at 7-8, 11-13, 20-21, 27, 30-31, 41-46.)  Plaintiffs' evidence does not
contradict Phoenix Fibers' statement or evidence, for the reasons set forth in
the Reply Brief submitted currently herewith.

33.    Plaintiffs have no evidence that Mr. Salgado has personal knowledge of the terms of the Alleged Contract between Phoenix Fibers.

**Plaintiffs' Response:** Undisputed.

**Phoenix Fibers' Reply:** No reply as this fact is undisputed.

34.    Mr. Salgado does not remember ever speaking to former Phoenix Fibers employee, Mr. Graham.  (Rule 30(b)(6) Depo. (Salgado) (App. Ex. F) 71:1-72:4).  Mr. Salgado never spoke to current Phoenix Fibers employee Mr. Johnson about any obligations between Phoenix Fibers and Plaintiffs.  (*Id.* at 73:19-74:2.)

**Plaintiffs' Response:** Disputed to the following extent. While he did not have any such direct communications, Mr. Salgado understood that Plaintiffs' products were delivered to Phoenix Fibers for destruction. (Salzmann Decl. ¶7, Ex. E (Salgado 31:8-25; 35:16-25; 99:14-19)). Moreover, Mr. Johnson's communications with Mr. Salgado confirmed that Phoenix Fibers was destroying Plaintiffs' products. Indeed, on September 11, 2015, Mr. Johnson wrote the following to Mr. Salgado: "The last 3 loads have been mostly Miss Me, due to the high metal content we 'salt' Miss me into our blend. This insures that we do not over burden our metal counter measures. The Rocks [Revivals] have significantly less metal & we can destroy / convert those quickly." (Salzmann Decl. ¶28, Ex. Z (SP/RCRV001006-1009) (emphasis added)).

**Phoenix Fibers' Reply:** Plaintiffs wholly on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 23, 27-28, 34, 54-56.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

35.    No one ever told Mr. Salgado that there was a contract between Plaintiffs and Phoenix Fibers.  (Rule 30(b)(6) Depo. (Salgado)(App. Ex. F) 90:5-12.)

CONSOLIDATED SEPARATE STATEMENT

1   **Plaintiffs' Response:** Disputed to the following extent. While he did not

2   have any such direct communication, Mr. Salgado understood that Plaintiffs'

3   products were delivered to Phoenix Fibers for destruction. (Salzmann Decl.

4   ¶7, Ex. E (Salgado 31:8-25; 35:16-25; 99:14-19)). Moreover, Mr. Johnson's

5   communications with Mr. Salgado confirmed that Phoenix Fibers was

6   destroying Plaintiffs' products. Indeed, on September 11, 2015, Mr. Johnson

7   wrote the following to Mr. Salgado: "The last 3 loads have been mostly Miss

8   Me, due to the high metal content we 'salt' Miss me into our blend. This

9   insures that we do not over burden our metal counter measures. The Rocks

10  [Revivals] have significantly less metal & we can destroy / convert those

11  quickly." (Salzmann Decl. ¶28, Ex. Z (SP/RCRV001006-1009) (emphasis

12  added)).

13  **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence to create an

14  alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 23, 27-28, 34,

15  54-56.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or

16  evidence.

17      36.     Ms. Song, the only person who spoke to Phoenix Fibers regarding the

18  Alleged Contract, cannot recall whether any part of the Alleged Contract was

19  based on conversations she had with Phoenix Fibers.  (Song Depo. (App. Ex. D)

20  61:21-62:1.)

21  **Plaintiffs' Response:** Disputed. Ms. Song's testimony was: "I can't recall

22  the origins of what I recall, whether it was a phone [call] or a[n] e-mail."

23  (Salzmann Decl. ¶8, Ex. F (Song 61:12-19; *see also* 35:13-18; 72:20-73:2)).

24  In fact, Ms. Song testified at length that the parties' agreement was based in

25  significant part on conversations and negotiations she had with Mr. Graham.

26  (Salzmann Decl. ¶8, Ex. F (Song 31:8-24; 32:14-33:1; 33:9-17)).

27  **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

28  attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

at 20, 28.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

37.     Plaintiffs do not know if, and cannot prove that, during verbal discussions, Ms. Song ever required Plaintiffs to destroy all items that they donated to Phoenix Fibers.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-16; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:5-52:3; 52:11-17; Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)

**Plaintiffs' Response:** Disputed. Phoenix Fibers mischaracterizes Ms. Song's testimony. In the portion referred to, Ms. Song's testimony was: "I can't recall the origins of what I recall, whether it was a phone [call] or a[n] e-mail." (Salzmann Decl. ¶8, Ex. F (Song 61:12-19; see also 35:13-18; 72:20-73:2)). In fact, Ms. Song testified at length that the parties' agreement was based in significant part on conversations and negotiations she had with Mr. Graham. Salzmann Decl. ¶8, Ex. F (Song 31:8-24; 32:14-33:1; 33:9-17)). Further, Ms. Song has a clear recollection and understanding that Phoenix Fibers agreed to shred (i.e., destroy) all of Plaintiffs' products into shoddy fiber. (Salzmann Decl. ¶8, Ex. F (Song 67:11-24; 28:10-29:3)). Moreover, contemporaneous written communications between the parties memorialize key material terms of the parties' agreement, including, without limitation, Phoenix Fibers' agreement to shred (and thereby destroy) all goods donated to it by Plaintiffs. (Salzmann Decl. ¶16, Ex. N (SP/RCRV005538-5539); ¶18, Ex. P (SP/RCRV005545); ¶20, Ex. R (SP/RCRV005583-5584); ¶24, Ex. V (SP/RCRV005629); ¶27, Ex. Y (SP/RCRV005640)).

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20-23, 28, 31-34, 56-57.)  Plaintiffs' evidence does not contradict Phoenix

Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

38.     Ms. Song does not recall any oral communications in which she required Plaintiffs to destroy all the items that they donated to Phoenix Fibers. (Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:5-52:3; 52:11-17.)

**Plaintiffs' Response:** Disputed. Phoenix Fibers mischaracterizes Ms. Song's testimony. In the portion referred to, Ms. Song's testimony was: "I can't recall the origins of what I recall, whether it was a phone [call] or a[n] e-mail." (Salzmann Decl. ¶8, Ex. F (Song 61:12-19; *see also* 35:13-18; 72:20-73:2)). In fact, Ms. Song testified at length that the parties' agreement was based in significant part on conversations and negotiations she had with Mr. Graham. Salzmann Decl. ¶8, Ex. F (Song 31:8-24; 32:14-33:1; 33:9-17)). Further, Ms. Song has a clear recollection and understanding that Phoenix Fibers agreed to shred (i.e., destroy) all of Plaintiffs' products into shoddy fiber. (Salzmann Decl. ¶8, Ex. F (Song 67:11-24; 28:10-29:3)). Moreover, contemporaneous written communications between the parties memorialize key material terms of the parties' agreement, including, without limitation, Phoenix Fibers' agreement to shred (and thereby destroy) all goods donated to it by Plaintiffs. (Salzmann Decl. ¶16, Ex. N (SP/RCRV005538-5539); ¶18, Ex. P (SP/RCRV005545); ¶20, Ex. R (SP/RCRV005583-5584); ¶24, Ex. V (SP/RCRV005629); ¶27, Ex. Y (SP/RCRV005640)).

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20-23, 28, 31-34, 56-57.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

39.     Further, despite Ms. Kim's belief, Plaintiffs do not know if, and cannot prove that, during verbal discussions, Phoenix Fibers ever agreed to destroy all items that Plaintiffs donated to Phoenix Fibers.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-16; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:5-52:3; 52:11-17; Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)  Nor have Plaintiffs provided evidence that Phoenix Fibers ever agreed to destroy every shipment of materials Plaintiffs provided them.  (*See id.*)

**Plaintiffs' Response:** Disputed. Ms. Kim testified that she saw written communications between Ms. Song and Mr. Graham wherein Mr. Graham represented that Phoenix Fibers would destroy Plaintiffs' second-quality denim products and convert them into shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶11), and testified that "[w]e did require that the items be destroyed and recycled" (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)). Further, contemporaneous written communications between the parties memorialize key material terms of the parties' agreement, including, without limitation, Phoenix Fibers' agreement to shred (and thereby destroy) all goods donated to it by Plaintiffs:

- On November 4, 2011, Mr. Graham sent Ms. Song an email explaining Phoenix Fibers' shredding services, and explaining that "[i]f necessary, [Phoenix Fibers] can remove the tags, buttons and zippers. There is no charge for our recycling service." (Salzmann Decl. ¶16, Ex. N (SP/RCRV005538-5539) (emphasis added)). It would only be necessary to remove "the tags, buttons and zippers" from Plaintiffs products if the products were being recycled into shoddy fiber, as the parties contemplated. (Salzmann Decl. ¶38, Ex. JJ ("Shredding Clothing Nets Big Rewards for Phoenix Fibers")

1    (explaining that the first step in the shredding process is "a proprietary

2    process that removes all buttons, zippers and tags")).

3    • On November 15, 2015, two weeks prior to Plaintiffs' delivery of

4    their first shipment of products to Phoenix Fibers for recycling into

5    shoddy fiber, Mr. Graham sent an email to Ms. Song explaining

6    "[t]here's not much else needed. We will receive the material,

7    schedule it for destruction and away we go! I'll call you this morning

8    to confirm this email." (Salzmann Decl. ¶18, Ex. P

9    (SP/RCRV005545) (emphasis added)).

10    • December 5, 2011, a week after Plaintiffs delivered their first

11    shipment of products Phoenix Fibers for recycling into shoddy fiber,

12    Mr. Graham sent Ms. Song an email explaining what happens to

13    Plaintiffs' products: "The product we receive may be recycled into

14    any number of products. This could range from house, automobile or

15    appliance insulation to prison mattresses…. There is also a certain

16    portion that cannot be used, such a metal pieces in the buttons and

17    zippers. These are removed and recycled separately." (Salzmann Decl.

18    ¶20, Ex. R (SP/RCRV005583- 5584) (emphasis added)).

19    • A few months later in March 2012, Mr. Graham reaffirmed this

20    process in an email to Ms. Song stating: "Phoenix Fibers converts the

21    jeans into fiber that gets sent to our affiliate company, Bonded Logic

22    which in turn, manufactures the end products." (Salzmann Decl. ¶24,

23    Ex. V (SP/RCRV005629) (emphasis added)).

24    • Shortly thereafter, on April 9, 2012, Mr. Graham sent an email to Ms.

25    Song following up on their recent in-person meeting stating: "Some of

26    our new machinery I told you about has just arrived. Once we have it

27    set up and running, I will send you a video of us running your jeans."

28    (Salzmann Decl. ¶27, Ex. Y (SP/RCRV005640) (emphasis added)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute. (*See* Dkt. No. 98 [Def.'s Objections] at 7-8, 12-13, 20-24, 27, 30-34, 37, 43-44.) Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

40.    Plaintiffs' 30(b)(6) witness admitted: "I don't know if the word 'destroyed' was used in the verbal discussions" between Ms. Song and Mr. Graham. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:13-19.)

**Plaintiffs' Response:** Disputed to the following extent. While Ms. Kim so testified, she saw written communications between Ms. Song and Mr. Graham wherein Mr. Graham represented that Phoenix Fibers would destroy Plaintiffs' second-quality denim products and convert them into shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶11), and testified that "[w]e did require that the items be destroyed and recycled" (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)).

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute. (*See* Dkt. No. 98 [Def.'s Objections] at 13, 20, 27, 43-44.) Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

41.    Plaintiffs allege that Ms. Song reported to Ms. Kim with respect to the negotiations and entry into the Alleged Contract between Plaintiffs and Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 14:4-9; 18:4-19:15; 24:17-25:4; 28:12-29:14; Song Depo. (App. Ex. D) 27:9-15.)

**Plaintiffs' Response:** Disputed as to the reference to an "Alleged Contract." Otherwise undisputed, as throughout her discussions with Phoenix Fibers, Ms. Song reported back to Ms. Kim, Mr. Choi and Steve Kim, Plaintiffs' then-COO, her superiors who also worked for both Sweet People and

1    RCRV. (Salzmann Decl. ¶6, Ex. D (Kim 18:4-24; 20:1-11; 20:25-21:3; 43:8-

2    19); ¶15, Ex. M (SP/RCRV005532-5533), ¶16, Ex. N (SP/RCRV005538-

3    5539), ¶17, Ex. O (SP/RCRV005542-5543); Kim Decl. ¶9; Choi Decl. ¶8)

4    **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

5    attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

6    at 7-8, 11-13, 20-21, 27, 30-31, 41-44.)  Plaintiffs' evidence does not

7    contradict Phoenix Fibers' statement or evidence, for the reasons set forth in

8    the Reply Brief submitted currently herewith.

9    42.    Despite reporting to Ms. Kim with respect to the negotiations between

10   Sweet People and Phoenix Fibers and the alleged formation of the Alleged

11   Contract, Ms. Song never reported to Ms. Kim that the Alleged Contract contained

12   an explicit requirement on Phoenix Fibers to destroy all items that Plaintiffs

13   donated to Phoenix Fibers.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15;

14   27:13-19; 28:12-29:14.)

15   **Plaintiffs' Response:** Disputed. Throughout her discussions with Phoenix

16   Fibers, Ms. Song reported back to Ms. Kim, Mr. Choi and Steve Kim,

17   Plaintiffs' then-COO, her superiors who also worked for both Sweet People

18   and RCRV that the agreement between the parties required Phoenix Fibers

19   to destroy all items that Plaintiffs donated to Phoenix Fibers. (Salzmann

20   Decl. ¶6, Ex. D (Kim 18:4-24; 20:1-11; 20:25-21:3; 43:8-19); ¶15, Ex. M

21   (SP/RCRV005532-5533), ¶16, Ex. N (SP/RCRV005538-5539), ¶17, Ex. O

22   (SP/RCRV005542-5543); Kim Decl. ¶9; Choi Decl. ¶8). Moreover, Ms.

23   Kim saw written communications between Ms. Song and Mr. Graham

24   wherein Mr. Graham represented that Phoenix Fibers would destroy

25   Plaintiffs' second-quality denim products and convert them into shoddy fiber

26   (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶11), and testified

27   that "[w]e did require that the items be destroyed and recycled" (Salzmann

28   Decl. ¶6, Ex. D (Kim 27:20-28:1)). Based on her contemporaneous

1    discussions with Ms. Song regarding Ms. Song's negotiations with Mr.

2    Graham, Ms. Kim understood that Plaintiffs had conditioned their agreement

3    to provide Phoenix Fibers with their second-quality MISS ME and ROCK

4    REVIVAL denim products only based on Phoenix Fibers' agreement to

5    convert all such products into shoddy fiber. (Salzmann Decl. ¶6, Ex. D (Kim

6    28:14-29:4); Kim Decl. ¶10; *see also* Choi Decl. ¶8).

7    **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

8    attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

9    at 7-8, 11-13, 20-21, 27, 30-31, 41-44.)  Plaintiffs' evidence does not

10   contradict Phoenix Fibers' statement or evidence, for the reasons set forth in

11   the Reply Brief submitted currently herewith.

12        43.    Prior to October 27, 2015, Plaintiffs never verbally or electronically

13   told Phoenix Fibers that reselling the products donated to Phoenix Fibers by

14   Plaintiffs was prohibited.  (Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)

15   **Plaintiffs' Response:** Disputed to the following extent. While no such

16   communication took place prior to October 27, 2015, Plaintiffs had no

17   reason to believe that Phoenix Fibers had violated the terms of the parties'

18   agreement that Phoenix Fibers would only shred all products donated to it by

19   Plaintiffs, and had resold any such products, prior to that date.

20   **Phoenix Fibers' Reply:** Plaintiffs present no evidence to create a dispute.

21   Plaintiffs were aware of Phoenix Fibers' certified destruction program.

22   (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 167:21-168:24; 169:12-170:3;

23   Maciel Decl. (App. Ex. C) ¶ 18; App. Ex. U.)  Plaintiffs did not require any

24   certification from Phoenix Fibers confirming that the items Plaintiffs

25   donated to Phoenix Fibers had been destroyed.  (Rule 30(b)(6) Depo. (Kim)

26   (App. Ex. E) 34:13-21; Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)

27   Plaintiffs never paid Phoenix Fibers to destroy the items that Plaintiffs

28   donated to Phoenix Fibers. (Johnson Decl. (App. Ex. B) ¶ 7.)

44.     Plaintiffs were aware of Phoenix Fibers' certified destruction program.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 167:21-168:24; 169:12-170:3; Maciel Decl. (App. Ex. C) ¶ 18; App. Ex. U.)  Plaintiffs did not require any certification from Phoenix Fibers confirming that the items Plaintiffs donated to Phoenix Fibers had been destroyed.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 34:13-21; Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)  Plaintiffs never paid Phoenix Fibers to destroy the items that Plaintiffs donated to Phoenix Fibers. (Johnson Decl. (App. Ex. B) ¶ 7.)

> **<u>Plaintiffs' Response:</u>** Disputed as to the existence and Plaintiffs' purported awareness of Phoenix Fibers' "certified destruction program" at the time the parties' agreement was entered into in November 2011. As a result, Plaintiffs did not believe it was necessary to request certificates of destruction from Phoenix Fibers for the second-quality goods they had donated to Phoenix Fibers for that purpose, because they "assumed that the goods were being recycled [into shoddy fiber] as [they] were told they were." (Salzmann Decl. ¶6, Ex. D (Kim 168:12-19; 26:23-28:5; 39:5-22); Kim Decl. ¶13). As Mr. Graham advised Ms. Song, "We will receive the material, schedule it for destruction and away we go!" (Salzmann Decl. ¶18, Ex. P (SP/RCRV005545) (emphasis added)).

> **<u>Phoenix Fibers' Reply:</u>** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 13, 20, 27, 43-44, 46-47, 54.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

45.     Prior to October 2015, Plaintiffs never sought confirmation that any products it had donated to Phoenix Fibers had been destroyed.  (Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)

1    **Plaintiffs' Response:** Disputed to the following extent. Prior to October

2    2015, Plaintiffs had no reason to believe it was necessary to request

3    continual confirmation of destruction from Phoenix Fibers, because they

4    assumed Phoenix Fibers was adhering to its agreement to destroy all such

5    products. In particular, Plaintiffs "assumed that the goods were being

6    recycled [into shoddy fiber] as [they] were told they were." (Salzmann Decl.

7    ¶6, Ex. D (Kim 168:12-19; 26:23-28:5; 39:5-22); Kim Decl. ¶13; Choi Decl.

8    ¶¶10-11).

9    **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

10   attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

11   at 8-9, 13, 20, 27, 43-44, 46-47, 54.)  Plaintiffs' evidence does not contradict

12   Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply

13   Brief submitted currently herewith.

14       46.     Plaintiffs assert that they believed that recycling was synonymous

15   with "destroying" in the context of clothing.  (Rule 30(b)(6) Depo. (Kim) (App.

16   Ex. E) 27:20-28:5; 39:5-12; 197:18-25; 198:23-199:12.)

17   **Plaintiffs' Response:** Disputed. Plaintiffs believed—and correctly so—that

18   recycling denim products into shoddy fiber, which is what Phoenix Fibers

19   agreed to do with respect to all such products donated to it by Plaintiffs,

20   required destruction. (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:5; 39:5-22);

21   Kim Decl. ¶13). As Ms. Kim testified: "we believed that during the

22   recycling process, the items would naturally be destroyed as they were made

23   into shoddy fiber." (Salzmann Decl. ¶6, Ex. D (Kim 28:2-4)).

24   **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

25   attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

26   at 13, 20, 27, 43-44, 46-47.)  Plaintiffs' evidence does not contradict

27   Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply

28   Brief submitted currently herewith.

1      47.    Ms. Song never formed a specific agreement with Phoenix Fibers, she

2  merely had an understanding of what Phoenix Fibers did.  (Song Depo. (App. Ex.

3  D) 62:19-63:16.)

4      **<u>Plaintiffs' Response:</u>** Disputed. In fact, Ms. Song believed that Plaintiffs

5      had formed such an agreement with Phoenix Fibers. When asked at her

6      deposition for her "understanding of the agreement at the time that that first

7      shipment went to Phoenix Fibers," Ms. Song stated:

8          My understanding was that we would send the inventory that

9          we needed to -- that we wanted to use as part of our -- one of

10         our green initiative programs. Phoenix Fibers would break

11         down the inventory sent to them, shred it and create

12         insulation that they would pass along to Bonded Logic, who

13         insulated houses in need. (Salzmann Decl. ¶8, Ex. F (Song

14         67:11-24 (emphasis added); *see also* 28:10-29:3)).

15     Moreover, Ms. Song testified as follows:

16         Q. Do you have an understanding that prior to that first

17         shipment of goods from Sweet People to Phoenix Fibers, that

18         there was an agreement between Sweet People and Phoenix

19         Fibers?

20         [Objections]

21         A. Yes, I believe that there was an understanding.

22         Q. And you understand -- Strike that. So it's your

23         understanding that that agreement – Strike that.

24         You said you believe there was an understanding.

25         Did you un- -- Did you believe that that understanding was

26         an agreement?

27         [Objections]

28         A. Yes. (Salzmann Decl. ¶8, Ex. F (Song 59:7-60:3)).

1

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

2

attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

3

at 20, 28, 56-57.)  Plaintiffs' evidence does not contradict Phoenix Fibers'

4

statement or evidence, for the reasons set forth in the Reply Brief submitted

5

currently herewith.

6

48.    Ms. Song's understanding of what Phoenix Fibers did was based, in

7

part, on conversations with a third party and the information she viewed on a third-

8

party website.  (Song Depo. (App. Ex. D) 43:23-48:17.)

9

**Plaintiffs' Response:** Disputed, with respect to the contention that "Ms.

10

Song's understanding of what Phoenix Fibers did was based, in part, on

11

conversations with a third party…," as no such conversations are identified

12

in the citation list above. Moreover, Plaintiffs dispute the characterization of

13

Phoenix Fibers' commonly-owned affiliate, Bonded Logic, as a "third

14

party." Phoenix Fibers and Bonded Logic are affiliated companies owned by

15

the Kean family. (Salzmann Decl. ¶38, Ex. JJ ("Shredding Clothing Nets

16

Big Rewards for Phoenix Fibers"); ¶39, Ex. KK ("Chandler firm grows;

17

recycles denim material into insulation")). Tod Kean is the President and

18

CEO of Phoenix Fibers, and the Secretary and Co-founder of Bonded Logic.

19

(Salzmann Decl. ¶5, Ex. C (Kean 58:11-16)). In fact, "Phoenix Fibers was

20

founded to provide a stable source of raw material for Bonded Logic's

21

business of manufacturing denim cloth-based insulation under the name

22

UltraTouch Denim." (Salzmann Decl. ¶38, Ex. JJ ("Shredding Clothing Nets

23

Big Rewards for Phoenix Fibers")).

24

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

25

attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

26

at 20, 24-27, 37.)  Plaintiffs' evidence does not contradict Phoenix Fibers'

27

statement or evidence, for the reasons set forth in the Reply Brief submitted

28

currently herewith.

CONSOLIDATED SEPARATE STATEMENT

49.     Plaintiffs assert that subsequent to the formation of the Alleged Contract, Plaintiffs and Phoenix Fibers entered a series of other contracts, the terms of which pertained only to the shipment of the products that Plaintiffs would donate to Phoenix Fibers pursuant to the Alleged Contract (the "Shipment Contracts").  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 15:1-16:6; 16:21-17:7; 17:14-18:3; Song Depo. (App. Ex. D) 55:13-56:13.)

**Plaintiffs' Response:** Disputed to the extent it is suggested that the terms of the "Shipment Contracts" in any way entitled Phoenix Fibers to depart from the terms of the so-called "Alleged Contract," otherwise undisputed.

**Phoenix Fibers' Reply:** Plaintiffs present no evidence to create an alleged dispute.

50.     Despite the Shipment Contracts, the terms of the Alleged Contract initially entered into by Ms. Song never changed.  (Song Depo. (App. Ex. D) 86:8-15.)

**Plaintiffs' Response:** Disputed to the extent it is suggested that the terms of the "Shipment Contracts" in any way entitled Phoenix Fibers to depart from the terms of the so-called "Alleged Contract," otherwise undisputed. Plaintiffs further state that they donated MISS ME and ROCK REVIVAL products to Phoenix Fibers pursuant to the terms of parties' November 2011 agreement— namely, (a) Plaintiffs would deliver unfinished, damaged and otherwise secondquality MISS ME and ROCK REVIVAL denim products to Phoenix Fibers' Chandler, Arizona facility, at no cost to Phoenix Fibers, and (b) Phoenix Fibers would shred all such products into shoddy fiber, which would then be used by Phoenix Fibers' affiliate, Bonded Logic, to manufacture environmentally friendly products such as insulation. (Salzmann Decl. ¶8, Ex. F (Song 28:10- 29:3; 58:4-60:3; 64:3-8; 65:21-66:3; 67:11-24; 77:3-24; 85:11-86:1); ¶6, Ex. D (Kim 34:4-12; 37:22-38:10); ¶16, Ex. N (SP/RCRV005538-5539); ¶18, Ex. P (SP/RCRV005545); ¶20, Ex. R

1    SP/RCRV005583-5584); ¶24, Ex. V (SP/RCRV005629); ¶27, Ex. Y

2    (SP/RCRV005640); Kim Decl. ¶12; Choi Decl. ¶8).

3    **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

4    attempting to create an alleged dispute. (*See* Dkt. No. 98 [Def.'s Objections]

5    at 7-8, 12, 20-23, 27-28, 31-34, 45-46, 56-57.) Plaintiffs' evidence does not

6    contradict Phoenix Fibers' statement or evidence, for the reasons set forth in

7    the Reply Brief submitted currently herewith.

8    51.    Plaintiffs allege that the *Shipment Contracts* were negotiated by

9    numerous individuals, including Lilly Kim and Felipe Salgado, on behalf of

10   Plaintiffs, and Matt Graham and Steven Johnson, on behalf of Phoenix Fibers.

11   (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 17:1-7; 201:14-202:25; Maciel Decl.

12   (App. Ex. C) ¶¶ 19-20; App. Ex. V-W; Song Depo. (App. Ex. D) 55:13-56:13.)

13   **Plaintiffs' Response:** Disputed to the extent it is suggested that the terms of

14   the "Shipment Contracts" were different than the terms of the so-called

15   "Alleged Contract," otherwise undisputed.

16   **Phoenix Fibers' Reply:** Plaintiffs fail to cite evidence and thus do not

17   create a factual dispute.

18   52.    The Shipping Contracts only governed the terms of actual shipment

19   and timing of shipment of materials to Phoenix Fibers, not other terms. (Rule

20   30(b)(6) Depo. (Kim) (App. Ex. E) 15:1-16:6; 16:21-17:7; 17:14-18:3; Song Depo.

21   (App. Ex. D) 55:13-56:13.)

22   **Plaintiffs' Response:** Disputed to the extent it is suggested that the terms of

23   the "Shipment Contracts" in any way entitled Phoenix Fibers to depart from

24   the terms of the so-called "Alleged Contract," otherwise undisputed.

25   **Phoenix Fibers' Reply:** Plaintiffs fail to cite evidence and thus do not

26   create a factual dispute.

27

28

53.     Sweet People donated Miss Me brand clothing items to Phoenix Fibers.  (Complaint (App. Ex. H) ¶¶ 28-30.)

**Plaintiffs' Response:** Disputed. Plaintiffs donated MISS ME and ROCK REVIVAL products to Phoenix Fibers pursuant to the terms of parties' agreement—namely, (a) Plaintiffs would deliver unfinished, damaged and otherwise second-quality MISS ME and ROCK REVIVAL denim products to Phoenix Fibers' Chandler, Arizona facility, at no cost to Phoenix Fibers, and (b) Phoenix Fibers would shred all such products into shoddy fiber, which would then be used by Phoenix Fibers' affiliate, Bonded Logic, to manufacture environmentally friendly products such as insulation. (Salzmann Decl. ¶8, Ex. F.)

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 28.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

54.     RCRV donated Rock Revival brand clothing items to Phoenix Fibers. (Complaint (App. Ex. H) ¶¶ 28-30.)

**Plaintiffs' Response:** Disputed. Plaintiffs donated MISS ME and ROCK REVIVAL products to Phoenix Fibers pursuant to the terms of parties' agreement—namely, (a) Plaintiffs would deliver unfinished, damaged and otherwise second-quality MISS ME and ROCK REVIVAL denim products to Phoenix Fibers' Chandler, Arizona facility, at no cost to Phoenix Fibers, and (b) Phoenix Fibers would shred all such products into shoddy fiber, which would then be used by Phoenix Fibers' affiliate, Bonded Logic, to manufacture environmentally friendly products such as insulation. (Salzmann Decl. ¶8, Ex. F (Song 28:10-29:3; 58:4-60:3; 64:3-8; 65:21-66:3; 67:11-24; 77:3-24; 85:11- 86:1); ¶6, Ex. D (Kim 34:4-12; 37:22-38:10); ¶16,

1   Ex. N (SP/RCRV005538- 5539); ¶18, Ex. P (SP/RCRV005545); ¶20, Ex. R

2   (SP/RCRV005583-5584); ¶24, Ex. V (SP/RCRV005629); ¶27, Ex. Y

3   (SP/RCRV005640); Kim Decl. ¶12; Choi Decl. ¶8).

4   **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

5   attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

6   at 7-8, 12, 20-23, 27-28, 31-34, 45-46, 56-57.)  Plaintiffs' evidence does not

7   contradict Phoenix Fibers' statement or evidence, for the reasons set forth in

8   the Reply Brief submitted currently herewith.

9   55.   Damaged or defective items that Plaintiffs donated to Phoenix Fibers

10   were marked as either damaged or defective.  (Rule 30(b)(6) Depo. (Kim) (App.

11   Ex. E) 77:13-78:1; 108:10-109:3; 112:9-113:4; 117:20-23; 123:18-124:14; 132:9-

12   14; App Ex. R-S; Rule 30(b)(6) Depo. (Salgado) (App. Ex. F) 32:23-33:16.)

13   **Plaintiffs' Response:** Disputed to the extent this statement is intended to

14   imply that all items that Plaintiffs delivered to Phoenix Fibers for recycling

15   into shoddy fiber "were marked as either damaged or defective," even

16   though all such items were, in fact, damaged, defective or otherwise second-

17   quality. (Salzmann Decl. ¶6, Ex. D (Kim 112:9-21)).

18   **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

19   attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

20   at 20, 27, 48.)  Plaintiffs' evidence does not contradict Phoenix Fibers'

21   statement or evidence, for the reasons set forth in the Reply Brief submitted

22   currently herewith.

23   56.   No one at Phoenix Fibers ever affixed any Miss Me or Rock Revival

24   brand name to any product or collection of products.  (Kean Decl. (App. Ex. A) ¶¶

25   11-16.)

26   **Plaintiffs' Response:** Undisputed.

27   **Phoenix Fibers' Reply:** No reply, as this fact is undisputed.

28

E.     **Post-Donation Recycling**

57.     Defendant U.S. General Exports ("U.S. General") is a clothing recycling company.  (Kean Decl. (App. Ex. A) ¶ 13; Johnson Decl. (App. Ex. B) ¶ 8; Maciel Decl. (App. Ex. C) ¶ 31; App. Ex. HH.)

**Plaintiffs' Response:** Disputed, to the extent it implies that U.S. General's business is limited to clothing recycling. When Mr. Johnson was asked at his deposition whether it was his understanding that "U.S. General Export is a recycling company," his response was "I have no idea." (Salzmann Decl. ¶4, Ex. B (Johnson 98:6-8)). Discovery of U.S. General has yet to be concluded. (Salzmann Decl. ¶¶49-55, 62).

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

58.     Phoenix Fibers sold certain products donated by Plaintiffs, as credential, in bulk and by the pound, to U.S. General.  (Johnson Decl. (App. Ex. B) ¶ 8.)

**Plaintiffs' Response:** Disputed as to the use of the phrase "as credential." Although Phoenix Fibers typically refers to "credential" that it sells by a standard item number (20-040) on its "Packing List," the "Packing List" corresponding to Phoenix Fibers' May 21, 2015 sale of Plaintiffs' products to U.S. General—which was filled out by a Phoenix Fibers' employee— identified the goods being sold as "Miss Me 3,473 lbs" and "RR [Rock Revival] 3,294." (Salzmann Decl. ¶5, Ex. C (Johnson 82:8-19; 84:11-85:8; 85:24-86:2); ¶29, Ex. AA (US GEN EXPORT 000001-27)). Moreover, U.S. General, in turn, sold Plaintiffs' goods to Defendant SAC International Trader, Inc. by the unit, making direct reference to the MISS ME and ROCK

1   REVIVAL brand names. (Salzmann Decl. ¶30, Ex. BB (US GEN EXPORT

2   000028-33)).

3   **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

4   attempting to create an alleged dispute. (*See* Dkt. No. 98 [Def.'s Objections]

5   at 20, 23-24, 26-27, 34-35, 39-40.) Plaintiffs' evidence does not contradict

6   Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply

7   Brief submitted currently herewith.

8   59.   Phoenix Fibers first sold credential to U.S. General in 2013 and not

9   before; however, it was not until 2015 that Phoenix Fibers sold credential to U.S.

10  General that contained items donated by Sweet People or RCRV. Many of the

11  items donated by Sweet People and RCRV were converted into shoddy fiber.

12  (Johnson Decl. (App. Ex. B) ¶ 9.)

13  **Plaintiffs' Response:** Disputed. When Mr. Johnson was asked at his

14  deposition whether Phoenix Fibers was doing business with Kamel Mroueh,

15  the owner of U.S. General, at the time he came on board as Plant Manager in

16  September 2013, his response was "I honestly don't know, but I'm -- yeah, I

17  don't know. I don't know when the relationship started." (Salzmann Decl.

18  ¶5, Ex. C (Johnson 33:5-10)). However, Mr. Johnson now states in his

19  declaration that "[t]o my knowledge, based on my job and a review of

20  records, Phoenix Fibers did not sell any credential to U.S. General prior to

21  2013." (Johnson Decl. ¶8). Whatever Phoenix Fibers "records" Mr. Johnson

22  is referring to in his declaration have not been produced in this litigation.

23  Moreover, when Mr. Johnson was asked at his deposition if he had "a sense

24  of the percentage of donated Miss Me and Rock Revival product that was

25  converted into shoddy as opposed to sold," his response was "I have no

26  idea." When further asked whether anyone at Phoenix Fibers would know

27  the answer to that question, Mr. Johnson's response was "No." (Salzmann

28  Decl. ¶5, Ex. C (Johnson 70:19-24)). Similarly, Mr. Kean verified Phoenix

Fibers' responses to Plaintiffs' Interrogatories, which state that Phoenix Fibers (a) "does not know the total volume of [Plaintiffs' products] it processed into shoddy fiber," and (b) "does not know the total volume of [Plaintiffs' products] it sold, distributed, supplied or otherwise conveyed to any Person." (Salzmann Decl. ¶44, Ex. PP (Phoenix Fibers' Responses to First Set of Interrogatories From Plaintiff Sweet People Apparel, Inc.)).

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26-27, 39.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

60.    Kamel Mroueh was a representative of U.S. General with whom representatives of Phoenix Fibers communicated to facilitate the sale of credential. (Johnson Decl. (App. Ex. B) ¶ 10.)

**Plaintiffs' Response:** Disputed to the extent this statement of fact purports to refer to sales of products other than those that Plaintiff donated to Phoenix Fibers for recycling into shoddy fiber, otherwise undisputed.

**Phoenix Fibers' Reply:** Plaintiffs present no evidence to create an alleged dispute.

61.    U.S. General, through Mr. Mroueh, only purchased credential from Phoenix Fibers at Phoenix Fibers' warehouse.  (Johnson Decl. (App. Ex. B) ¶ 11.) The credential was stored in large bins or boxes.  (Johnson Decl. (App. Ex. B) ¶ 11.)  Mr. Mroueh never inquired into which brands of credential Phoenix Fibers had in its warehouse nor did Mr. Mroueh ever state that he was interested in certain brands of credential.  (Johnson Decl. (App. Ex. B) ¶ 12.)

**Plaintiffs' Response:** Disputed. Plaintiffs contest the veracity of the declarant's statement upon which this statement of fact is based, and have not yet taken the deposition of U.S. General, the party that purchased

1  Plaintiffs' products from Phoenix Fibers, to test the accuracy of such

2  statement. (Salzmann Decl. ¶¶48-55, 62). Further, there is evidence that Mr.

3  Mroueh selected Plaintiffs' product for purchase by identifying Plaintiffs'

4  brand names on the boxes while being escorted by Mr. Johnson around

5  Phoenix Fibers' warehouse in which such products were maintained.

6  (Salzmann Decl. ¶4, Ex. B (Johnson 39:13-16; 71:5-14). Moreover, although

7  Phoenix Fibers typically refers to the "credential" that it sells by a standard

8  item number (20-040) on its "Packing List," the "Packing List"

9  corresponding to Phoenix Fibers' May 21, 2015 sale of Plaintiffs' products

10  to U.S. General—which was filled out by a Phoenix Fibers' employee—

11  identified such products as "Miss Me 3,473 lbs" and "RR [Rock Revival]

12  3,294." (Salzmann Decl. ¶5, Ex. C (Johnson 82:8-19; 84:11-85:8; 85:24-

13  86:2); ¶29, Ex. AA (US GEN EXPORT 000001-27)). Further, U.S. General,

14  in turn, sold Plaintiffs' to Defendant SAC International Trader, Inc. by the

15  unit, and with direct reference to the MISS ME and ROCK REVIVAL brand

16  names. (Salzmann Decl. ¶30, Ex. BB (US GEN EXPORT 000028-33)).

17  **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

18  attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

19  at 20, 23-24, 26-27, 34-35, 39-40.)  Plaintiffs' evidence does not contradict

20  Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply

21  Brief submitted currently herewith.

22  62.    U.S. General paid the market rate for credential for all items it

23  purchased from Phoenix Fibers, which was generally 30¢ to 60¢ per pound.  U.S.

24  General never paid a premium for credential that included Sweet People or Rock

25  Revival products.  (Johnson Decl. (App. Ex. B) ¶ 13; Maciel Decl. (App. Ex. C) ¶

26  30; App. Ex. GG.)

27  **Plaintiffs' Response:** Disputed. Plaintiffs contest the veracity of the

28  declarant's statement upon which this statement of fact is based, and have

not yet taken the deposition of U.S. General, the party that purchased Plaintiffs' products from Phoenix Fibers, to test the accuracy of such statement. Further, whatever Phoenix Fibers records the declarant may have been referring to have not been produced in discovery in this action. Plaintiffs further dispute the use of the term "credential" when referring to Phoenix Fibers' sales of Plaintiffs' secondquality products to U.S. General. Although Phoenix Fibers typically refers to "credential" that it sells by a standard item number (20-040) on its "Packing List," the "Packing List" corresponding to Phoenix Fibers' May 21, 2015 sale of Plaintiffs' products to U.S. General—which was filled out by a Phoenix Fibers' employee— identified the goods being sold as "Miss Me 3,473 lbs" and "RR [Rock Revival] 3,294." (Salzmann Decl. ¶5, Ex. C (Johnson 82:8-19; 84:11- 85:8; 85:24-86:2); ¶29, Ex. AA (US GEN EXPORT 000001-27)). Moreover, U.S. General, in turn, sold Plaintiffs' goods to Defendant SAC International Trader, Inc. by the unit, making direct reference to the MISS ME and ROCK REVIVAL brand names. (Salzmann Decl. ¶30, Ex. BB (US GEN EXPORT 000028-33)).

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 23-24, 26-27, 29-30, 34-35, 39-40.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

63.     U.S. General was not confused as to the origin or quality of the clothing it purchased from Phoenix Fibers.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 198:23-199:12; Deposition of Tiffany Wolff ("Wolff Depo. (App. Ex. G)") 125:11:25; 146:14-147:14.)

**Plaintiffs' Response:** Disputed to the extent it is suggested that this statement of fact has any relevance whatsoever to Plaintiffs' claims, which

1  are not premised on the alleged confusion of U.S. General or any other

2  Defendant.

3  **Phoenix Fibers' Reply:** Plaintiffs do not present any evidence to create an

4  alleged dispute.

5  64.    Any purchaser of the items that were originally donated to Phoenix

6  Fibers by Plaintiffs was not confused as to the quality or origin of the credential

7  that it was purchasing.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 198:23-199:12;

8  Wolff Depo. (App. Ex. G) 125:11:25; 146:14-147:14.)   The purchaser understood

9  that the items were defective or second-quality goods that originated with Sweet

10  People or RCRV.  (*Id*.)

11  **Plaintiffs' Response:** Disputed to the extent this statement of fact has any

12  relevance to Plaintiffs' claims as they pertain to any of the Defendant

13  wholesalers (U.S. General, SAC International Traders and Comak Trading),

14  but there is no evidence that "any purchaser" of the products Plaintiffs'

15  originally donated to Phoenix Fibers was not confused as to the quality or

16  origin of such products. Further disputed as to the use of the term

17  "credential" to describe Plaintiffs' products. Although Phoenix Fibers

18  typically refers to the "credential" that it sells by a standard item number

19  (20-040) on its "Packing List," the "Packing List" corresponding to Phoenix

20  Fibers' May 21, 2015 sale of Plaintiffs' products to U.S. General—which

21  was filled out by a Phoenix Fibers' employee—identified such products as

22  "Miss Me 3,473 lbs" and "RR [Rock Revival] 3,294." (Salzmann Decl. ¶5,

23  Ex. C (Johnson 82:8-19; 84:11-85:8; 85:24-86:2); ¶29, Ex. AA (US GEN

24  EXPORT 000001-27)). Moreover, U.S. General, in turn, sold Plaintiffs' to

25  Defendant SAC International Trader, Inc. by the unit, and with direct

26  reference to the MISS ME and ROCK REVIVAL brand names. (Salzmann

27  Decl. ¶30, Ex. BB (US GEN EXPORT 000028-33)).

28

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 23-24, 26-27, 34-35, 39-40.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

65.     Phoenix Fibers never advertised that it sold, distributed, manufactured or otherwise had any connection of any kind with the Miss Me brand or any other brand of Sweet People.  (Kean Decl. (App. Ex. A) ¶¶ 11-16.)

**Plaintiffs' Response:** Disputed. Plaintiffs contest the veracity of the declarant's statement upon which this statement of fact is based, and have not yet taken the deposition of U.S. General, the party that purchased Plaintiffs' products from Phoenix Fibers, to test the accuracy of such statement. Moreover, although Phoenix Fibers typically refers to the "credential" that it sells by a standard item number (20-040) on its "Packing List," the "Packing List" corresponding to Phoenix Fibers' May 21, 2015 sale of Plaintiffs' products to U.S. General—which was filled out by a Phoenix Fibers' employee—identified the such products as "Miss Me 3,473 lbs" and "RR [Rock Revival] 3,294." Salzmann Decl. ¶5, Ex. C (Johnson 82:8-19; 84:11-85:8; 85:24-86:2); ¶29, Ex. AA (US GEN EXPORT 000001-27)).

**Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 23-24, 26-27, 34-35, 39-40.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply Brief submitted currently herewith.

66.     Phoenix Fibers never advertised that it sold, distributed, manufactured or otherwise had any connection of any kind with the Rock Revival brand or any other brand of RCRV.  (Kean Decl. (App. Ex. A) ¶¶ 11-16.)

1    **Plaintiffs' Response:** Disputed. Plaintiffs contest the veracity of the
2    declarant's statement upon which this statement of fact is based, and have
3    not yet taken the deposition of U.S. General, the party that purchased
4    Plaintiffs' products from Phoenix Fibers, to test the accuracy of such
5    statement. Moreover, although Phoenix Fibers typically refers to the
6    "credential" that it sells by a standard item number (20-040) on its "Packing
7    List," the "Packing List" corresponding to Phoenix Fibers' May 21, 2015
8    sale of Plaintiffs' products to U.S. General—which was filled out by a
9    Phoenix Fibers' employee—identified the such products as "Miss Me 3,473
10   lbs" and "RR [Rock Revival] 3,294." Salzmann Decl. ¶5, Ex. C (Johnson
11   82:8-19; 84:11-85:8; 85:24-86:2); ¶29, Ex. AA (US GEN EXPORT 000001-
12   27)).

13   **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in
14   attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]
15   at 20, 23-24, 26-27, 34-35, 39-40.)  Plaintiffs' evidence does not contradict
16   Phoenix Fibers' statement or evidence, for the reasons set forth in the Reply
17   Brief submitted currently herewith.

18   67.    On October 27, 2017, Ms. Song called Mr. Kean to complain about
19   certain Miss Me and Rock Revival denim being sold on eBay.  After October 27,
20   2015, Phoenix Fibers never sold any products that Plaintiffs donated to Phoenix
21   Fibers as credential to anyone.  (Kean Decl. (App. Ex. A) ¶ 17.)

22   **Plaintiffs' Response:** Disputed. Ms. Kim, not Ms. Song, spoke to Mr. Kean
23   on or around October 27, 2015 (not October 27, 2017). Further, U.S.
24   General has produced documents reflecting its purchase of 20,958 pounds of
25   Plaintiffs' products from Phoenix Fibers on November 10, 2015. Mr.
26   Johnson signed the bill of lading corresponding to the shipment of these
27   goods on November 10, 2015. (Salzmann Decl. ¶33, Ex. EE (PHX001040);
28   ¶29, Ex. AA (US GEN EXPORT 000010-11); Kim Decl. ¶¶19-21).

1   **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

2   attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

3   at 15-16, 23-24, 36.)  Plaintiffs' evidence does not contradict Phoenix

4   Fibers' statement or evidence, for the reasons set forth in the Reply Brief

5   submitted currently herewith.

6   68.    Plaintiffs allege that between December 2015 and February 2016, they

7   covertly purchased back 29,000 back units of denim containing their trademarks

8   from the retailers named as defendants in the Complaint.  (Complaint (App. Ex. H)

9   ¶ 40).

10  **Plaintiffs' Response:** Disputed. In an effort to mitigate the incalculable

11  harm to the MISS ME and ROCK REVIVAL brands being caused by the

12  widespread availability of second-quality MISS ME and ROCK REVIVAL

13  denim products, Plaintiffs authorized their investigators to purchase as many

14  of such products as possible so they could be removed from consumer

15  markets. Between December 11, 2015 and February 9, 2016 (the day before

16  Plaintiffs commenced this action), Plaintiffs' investigators purchased over

17  29,000 units of second-quality MISS ME and ROCK REVIVAL denim

18  products from Defendants SAC International Traders, Inc., Shaukat Ali

19  Chohan, Comak Trading, Inc. and Lydia Evilsa Terrazas Cho, at a cost of

20  over $190,000. (Kim Decl. ¶¶30-32).

21  **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

22  attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

23  at 19.)  Paragraph 32 of Ms. Kim's testimony does not exist.  Plaintiffs'

24  evidence does not contradict Phoenix Fibers' statement or evidence, for the

25  reasons set forth in the Reply Brief submitted currently herewith.

26  69.    In December 2015, with the cooperation of Phoenix Fibers, Plaintiffs

27  removed from Phoenix Fibers' warehouse all the remaining products, totaling five

28

CONSOLIDATED SEPARATE STATEMENT

1    truckloads and no less than 130,000 pounds, that they had previously donated to

2    Phoenix Fibers.  (Johnson Decl. (App. Ex. B) ¶ 17.)

3         **Plaintiffs' Response:** Disputed, to the extent of Phoenix Fibers'

4         representation that Plaintiffs were provided with "all the remaining

5         products," as Plaintiffs have no way to test the veracity of that statement.

6         Further, Plaintiffs dispute that any such removal was done with the

7         "cooperation" of Phoenix Fibers, as what precipitated such removal of

8         products from Phoenix Fibers' warehouse were its false statements that it

9         had not resold such products, but rather that they had "leaked" out of the

10        warehouse. (Kim Decl. ¶¶26-29.)

11        **Phoenix Fibers' Reply:** Plaintiffs rely on inadmissible evidence in

12        attempting to create an alleged dispute.  (*See* Dkt. No. 98 [Def.'s Objections]

13        at 18-19.)  Plaintiffs' evidence does not contradict Phoenix Fibers' statement

14        or evidence, for the reasons set forth in the Reply Brief submitted currently

15        herewith.

16        70.    Plaintiffs cannot prove, nor have they even alleged, that Phoenix

17   Fibers conspired with other defendants and certainly not to such an extent as to be

18   co-partners with them.

19        **Plaintiffs' Response:** Disputed. By law, no specific conspiracy or co-

20        partner relationship must be pleaded or proven. Rather, the rule is simply

21        that joint tortfeasors in a trademark case are liable for the entire harm, and

22        for any monetary award that may issue as a result. See Restatement (Second)

23        of Torts § 875 (1979). Plaintiffs have so alleged, and have come forward

24        with evidence that is more than sufficient to comply with such rule.

25        (Salzmann Decl. ¶12, Ex. J (Plaintiffs' First Amended Complaint) at ¶¶ 18,

26        43, 50).

27

28

1    **Phoenix Fibers' Reply:** Plaintiffs' evidence does not contradict Phoenix

2    Fibers' statement or evidence, for the reasons set forth in the Reply Brief

3    submitted currently herewith.

4  **II. PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

5      **(AND PHOENIX FIBERS' RESPONSES)**

6        Phoenix Fibers has concurrently filed objections to many of Plaintiffs'

7  exhibits and to portions of the declarations that Plaintiffs submitted in support of

8  their Opposition. Phoenix Fibers has annotated below where those objections,

9  should the Court sustain them, would impact Plaintiffs' ability to substantiate their

10  proposed undisputed material facts.

11        **Plaintiffs and Their Miss Me and Rock Revival Brands**

12        **1.**    Sweet People and RCRV are affiliated jeanswear companies which

13  respectively manufacture, promote, distribute and sell high-quality denim and

14  apparel products throughout the United States under the well-known MISS ME and

15  ROCK REVIVAL brand names, each of which is the subject of numerous

16  trademark registrations.  (Choi Decl. ¶3; Salzmann Decl. ¶12, Ex. J (Plaintiffs'

17  First Amended Complaint) at Exs. A, B).

18    **Phoenix Fibers' Response:** Plaintiffs do not create a material factual

19    dispute. Plaintiffs' First Amended Complaint is not evidence of these

20    purported facts, either.  Plaintiffs have presented no admissible evidence that

21    their denim and apparel products are "high-quality," or that their brand

22    names are "well-known."

23        **2.**    MISS ME and ROCK REVIVAL products are sold at such prominent

24  retail outlets as Macy's, Nordstrom, Dillard's and The Buckle, both in-store and

25  online, and through Plaintiffs' respective ecommerce websites

26  (<www.missme.com> and <www.rockrevival.com>).  MISS ME jeans typically

27  retail for approximately $120, while ROCK REVIVAL jeans retail for around

28  $170.  (Choi Decl. ¶3).

1      **Phoenix Fibers' Response:** Plaintiffs do not create a material factual

2      dispute. Plaintiffs' estimated retail prices differ from the estimated prices

3      that Phoenix Fibers identified in its Statement of Uncontroverted Facts. (*See*

4      Dkt. No. 85 [Def.'s SUF] at 2-3 (¶¶ 11, 18).) Plaintiffs did not dispute

5      Phoenix Fibers' approximate prices of $100 per pair of Miss Me brand jeans,

6      and $150–$200 price range for Rock Revival brand jeans. (*See* Dkt. No. 96

7      [Pls.' Resp. to Def.'s SUF] at 8-9 (¶¶ 11, 18).)

8      **3.**     MISS ME and ROCK REVIVAL brand jeans are known to consumers

9 as high fashion apparel products.  Over the past several years, MISS ME and

10 ROCK REVIVAL denim products have achieved substantial sales success, and

11 received extensive media coverage in widely circulated fashion magazines.  (Choi

12 Decl. ¶4).

13      **Phoenix Fibers' Response:** Plaintiffs do not create a material factual

14      dispute. The cited portions of Mr. Choi's declaration lack a basis in personal

15      knowledge and are therefore inadmissible under FRE 602 to support the

16      contentions that (1) Plaintiffs' brand names are known to consumers as high

17      fashion apparel products, (2) Plaintiffs' denim products have achieved

18      substantial sales success, and (3) Plaintiffs' denim products have received

19      extensive media coverage. (*See* Dkt. No. 98 [Def.'s Objections] at 4-5.)

20      Thus, Plaintiffs have presented no admissible evidence to support these

21      contentions.

22      **4.**     In addition to the unique and distinctive designs created by Plaintiffs'

23 designers, which are embroidered or stitched onto the pockets and waistband areas

24 of MISS ME and ROCK REVIVAL denim products, such products are widely

25 recognized for their superior quality, including both the fit and wash.  Plaintiffs

26 have worked extremely hard to earn this reputation by maintaining strict quality

27 control policies and procedures that ensure that only products commensurate with

28 the high quality reputation of MISS ME and ROCK REVIVAL denim products

1   ever enter the stream of commerce.  (Choi Decl. ¶4).

2          **Phoenix Fibers' Response:** Plaintiffs do not create a material factual

3   dispute. The cited portions of Mr. Choi's declaration lack a basis in personal

4   knowledge and are therefore inadmissible under FRE 602 to support the

5   contentions that (1) Plaintiffs' designs are unique and distinctive, (2)

6   Plaintiffs' products are widely recognized for their superior quality, and (3)

7   Plaintiffs have a high quality reputation. (*See* Dkt. No. 98 [Def.'s

8   Objections] at 5.) Thus, Plaintiffs have presented no admissible evidence to

9   support these contentions.

10         **5.**     An unfortunate consequence of these strict quality control procedures

11  is that the manufacture of a certain volume of MISS ME and ROCK REVIVAL

12  denim and apparel products that, following careful inspection, Plaintiffs deem unfit

13  for sale due to damage, improper finish or other failure to meet their rigorous

14  standards.  (Choi Decl. ¶5).

15         **Phoenix Fibers' Response:** Undisputed only that Plaintiffs deem certain of

16  their denim and apparel products unfit for sale, otherwise not material.

17         **6.**     Eric Choi is the CEO of RCRV, and the former CEO of Sweet People,

18  a position he held until December 1, 2016.   He is currently a Director and

19  shareholder of Sweet People.  (Choi Decl. ¶1).

20         **Phoenix Fibers' Response:** Undisputed.

21         **7.**     Lilly Kim, Esq., served as the General Counsel of Sweet People and

22  RCRV from approximately April 2010 to October 2016.  Since that time, she has

23  continued to oversee Plaintiffs' legal matters as an outside consultant.  (Kim Decl.

24  ¶1).  Prior to joining Sweet People and RCRV, Ms. Kim was Of Counsel to Reed

25  Smith LLP.  Ms. Kim is a graduate of Loyola Law School.  (Salzmann Decl. ¶6,

26  Ex. D (Kim 31:24-32:7; 55:14-16; 56:25-57:1)).

27         **Phoenix Fibers' Response:** The fact is undisputed, but Paragraph 6 of the

28  Salzmann Declaration is inadmissible for lack of foundation, and Exhibit D

of the Salzmann Declaration is inadmissible for lack of authentication. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 27.)

**8.**     Lisa Song held the title of Human Resources Manager at Sweet People between 2009 and February 2014. (Salzmann Decl. ¶8, Ex. F (Song 21:9-12)). Although Ms. Song was on Sweet People's payroll, she was considered an employee of both Sweet People and RCRV, and her time was allocated between those two companies, and a third related entity called Deodar Brands, the proprietor of the MEK DENIM jeanswear brand. (Salzmann Decl. ¶6, Ex. D (Kim 41:18-42:1; 58:24-59:3; *see also* 105:24-106:16); Kim Decl. ¶8; Choi Decl. ¶8).

**Phoenix Fibers' Response:** Plaintiffs do not create a material factual dispute. Plaintiffs rely on a substantial amount of inadmissible evidence. (*See* Dkt. No. 98 [Def.'s Objections] at 7,-8, 20, 27-28, 47.)  Although Plaintiffs contend that Ms. Song "was considered an employee of both Sweet People and RCRV," Ms. Song testified at deposition that she worked only for Sweet People. (Song Depo. (App. Ex. D)18:19-19:16; 21:9-12; App. Ex. P). Ms. Song's testimony that she was a Sweet People employee and not an employee of RCRV is supported by her LinkedIn profile, which only refers to Sweet People as her employer from 2009 through February 2014. (*Id.*)

### The Business of Defendant Phoenix Fibers

**9.**     Phoenix Fibers was founded in July 2011 "[t]o make shoddy [fiber]." (Salzmann Decl. ¶3, Ex. A (Quinn 39:8-17); ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

**Phoenix Fibers' Response:** Plaintiffs do not create a material factual dispute.  Plaintiffs rely wholly on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 24-25, 37, 39.)  It is undisputed that Phoenix Fibers does make shoddy fiber; however it has always done more than just

make shoddy fiber.  Phoenix Fibers' business consists of three parts: First, Phoenix Fibers accepts donations of clothing that it then sells, by the pound and in bulk, as credential.  Second, Phoenix Fibers accepts donations of clothing, converts that clothing through a proprietary shredding process into shoddy or filler fiber, and then sells it to companies that use this fiber for various purposes (e.g., for housing, automotive, and appliance insulation). Third, for a fee, Phoenix Fibers agrees to destroy certain clothing items and produces a certificate of destruction to the customer.  (Johnson Decl. (App. Ex. B) ¶ 6; Kean Decl. (App. Ex. A) ¶ 8.)

**10.**    Bonded Logic, Inc., Phoenix Fibers' affiliate, is in the business of manufacturing insulation products, including its flagship product, UltraTouch Denim Insulation.  Shoddy fiber created from recycled denim is the raw material that Bonded Logic uses to manufacturer UltraTouch Denim Insulation.  (Salzmann Decl. ¶24, Ex. V (SP/RCRV005629); ¶39, Ex. KK ("*Chandler firm grows; recycles denim material into insulation*"); ¶40, Ex. LL ("*Green Chandler company looks to bask in solar savings*"); ¶41, Ex. MM ("*Chandler company turns worn-out blue jeans into insulation, more*")).

> **Phoenix Fibers' Response:** No material factual dispute that the legal obligations of one do not apply to the other.  Bonded Logic, Inc. and Phoenix Fibers, Inc. are separate entities.  Plaintiffs rely wholly on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 22, 24-25, 33, 37-38.)

**11.**    Phoenix Fibers, Bonded Logic and United Fibers are affiliated companies owned by the Kean family, and operated by Jim Kean and his two sons, Tod Kean and Mike Kean.  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*"); ¶39, Ex. KK ("*Chandler firm grows; recycles denim material into insulation*")).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Phoenix Fibers' Response:** No material factual dispute that the legal obligations of one do not apply to the other. Bonded Logic, Inc. and Phoenix Fibers, Inc. are separate entities. Plaintiffs rely wholly on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay. (*See* Dkt. No. 98 [Def.'s Objections] at 24-25, 37.)

12. "Phoenix Fibers was founded to provide a stable source of raw material for Bonded Logic's business of manufacturing denim cloth-based insulation under the name UltraTouch Denim." (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

**Phoenix Fibers' Response:** Plaintiffs do not create a material factual dispute. Plaintiffs rely wholly on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay. (*See* Dkt. No. 98 [Def.'s Objections] at 24, 37.) Phoenix Fibers' business consists of three parts: First, Phoenix Fibers accepts donations of clothing that it then sells, by the pound and in bulk, as credential. Second, Phoenix Fibers accepts donations of clothing, converts that clothing through a proprietary shredding process into shoddy or filler fiber, and then sells it to companies that use this fiber for various purposes (e.g., for housing, automotive, and appliance insulation). Third, for a fee, Phoenix Fibers agrees to destroy certain clothing items and produces a certificate of destruction to the customer. (Johnson Decl. (App. Ex. B) ¶ 6; Kean Decl. (App. Ex. A) ¶ 8.)

13. Prior to launching Phoenix Fibers, Bonded Logic sourced shoddy fiber from a shredding company in Brownsville, Texas. (Salzmann Decl. ¶5, Ex. C (Kean 65:10-66:21)). As Tod Kean, the Managing Partner for Phoenix Fibers and Bonded Logic, explained: "We used to procure our raw material for the production of insulation from other shredders. But because of instability in both prices and supply, we decided to open Phoenix to become vertically integrated by controlling our own source of raw materials." (Salzmann Decl. ¶38, Ex. JJ

1    (*"Shredding Clothing Nets Big Rewards for Phoenix Fibers"*)).

2         **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

3    rely wholly on evidence that is inadmissible based on a lack of authenticity,

4    lack of personal knowledge, and hearsay. (*See* Dkt. No. 98 [Def.'s

5    Objections] at 20, 24, 26-27, 37.) Further, what Bonded Logic did prior to

6    the existence of Phoenix Fibers is irrelevant.

7         **14.** Today, Phoenix Fibers receives clothing "by the truckload" from

8    various sources for shredding, and processes 900 to a million pounds of denim and

9    cotton products into shoddy fiber every month. (Salzmann Decl. ¶4, Ex. B

10   (Johnson 77:2-4); ¶38, Ex. JJ (*"Shredding Clothing Nets Big Rewards for Phoenix*

11   *Fibers"*)).

12        **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

13   rely on evidence that is inadmissible based on a lack of authenticity, lack of

14   personal knowledge, and hearsay. (*See* Dkt. No. 98 [Def.'s Objections] at

15   20, 24, 26, 37.)

16        **15.** The first step in the process Phoenix Fibers uses to convert denim into

17   shoddy fiber is "a proprietary process that removes all buttons, zippers and tags."

18   (Salzmann Decl. ¶38, Ex. JJ (*"Shredding Clothing Nets Big Rewards for Phoenix*

19   *Fibers"*)).

20        **Phoenix Fibers' Response:** Plaintiffs do not create a material factual

21   dispute. Plaintiffs rely wholly on evidence that is inadmissible based on a

22   lack of authenticity, lack of personal knowledge, and hearsay. (*See* Dkt. No.

23   98 [Def.'s Objections] at 24, 27.) Phoenix Fibers' business consists of three

24   parts: First, Phoenix Fibers accepts donations of clothing that it then sells, by

25   the pound and in bulk, as credential. Second, Phoenix Fibers accepts

26   donations of clothing, converts that clothing through a proprietary shredding

27   process into shoddy or filler fiber, and then sells it to companies that use this

28   fiber for various purposes (e.g., for housing, automotive, and appliance

insulation).  Third, for a fee, Phoenix Fibers agrees to destroy certain clothing items and produces a certificate of destruction to the customer. (Johnson Decl. (App. Ex. B) ¶ 6; Kean Decl. (App. Ex. A) ¶ 8.)

**16.**   Phoenix Fibers was formed for the sole purpose of recycling denim into shoddy fiber, and was not in the business of selling "credential" when the company was launched in July 2011.  That aspect of Phoenix Fibers' business only came into existence at a later date.  There is no evidence that Phoenix Fibers was engaged in the sale of credential in November 2011, at the time Plaintiffs and Phoenix Fibers came to an agreement to convert Plaintiffs' second-quality denim products into shoddy fiber.  (Salzmann Decl. ¶5, Ex. C (Kean 17:20-18:9); ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*")).

> **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely wholly on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 24, 26-27, 38.)  Phoenix Fibers' business consists of three parts: First, Phoenix Fibers accepts donations of clothing that it then sells, by the pound and in bulk, as credential. Second, Phoenix Fibers accepts donations of clothing, converts that clothing through a proprietary shredding process into shoddy or filler fiber, and then sells it to companies that use this fiber for various purposes (e.g., for housing, automotive, and appliance insulation). Third, for a fee, Phoenix Fibers agrees to destroy certain clothing items and produces a certificate of destruction to the customer. (Johnson Decl. (App. Ex. B) ¶ 6; Kean Decl. (App. Ex. A) ¶ 8.)

**17.**   "Credential" can include things such as "sheets, towels, pillow cases, lamps, … bric-a-brac" (Salzmann Decl. ¶4, Ex. B (Johnson 29:20-25)), "miscellaneous household items" and "toaster ovens" (Salzmann Decl. ¶5, Ex. C (Kean 15:17-20)).

> **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26-27.)  In the clothing recycling industry, "credential" means clothing or shoes, sold in bulk, and sold by the pound. (Johnson Decl. (App. Ex. B) ¶ 3; Kean Decl. (App. Ex. A) ¶ 6.)

**18.**    Tod Kean is the President and CEO of Phoenix Fibers, and the Secretary and Co-founder of Bonded Logic. (Salzmann Decl. ¶5, Ex. C (Kean 58:11-16)).

**Phoenix Fibers' Response:** Undisputed except to the extent that Paragraph 5 of the Salzmann Declaration is inadmissible, and Exhibit C of the Salzmann Declaration is inadmissible. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26-27.)

**19.**    Matt Graham was the Plant Manager and General Manager of Phoenix Fibers between 2011 and mid-2013, during which time he served as Mr. Kean's second-in-command. (Salzmann Decl. ¶5, Ex. C (Kean 28:13-24); Kean Decl. ¶10).

**Phoenix Fibers' Response:** Undisputed except to the extent that Paragraph 5 of the Salzmann Declaration is inadmissible, and Exhibit C of the Salzmann Declaration is inadmissible. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26-27.)

**20.**    Steve Johnson joined Phoenix Fibers as Plant Manager in September 2013. (Salzmann Decl. ¶4, Ex. B (Johnson 13:9-18)).  Neither at that time, nor prior to this dispute, did Mr. Johnson ever speak to Mr. Kean or anyone else at Phoenix Fibers about the relationship between Plaintiffs and Phoenix Fibers that predated his employment. (Salzmann Decl. ¶4, Ex. B (Johnson 57:17-20; 58:23-59:1)).  Nor did Mr. Johnson ever ask anyone whether Phoenix Fibers was permitted to sell Plaintiffs' products as credential. (Salzmann Decl. ¶4, Ex. B (Johnson 59:2-7)).  Mr. Johnson also is unaware of any written communication

between Phoenix Fibers and Plaintiffs wherein Phoenix Fibers stated, in words or substance, that it reserved the right to sell Plaintiffs' products as credential or otherwise.  (Salzmann Decl. ¶4, Ex. B (Johnson 66:5-9)).

**Phoenix Fibers' Response:** Undisputed, except to the extent that Paragraph 4 of the Salzmann Declaration is inadmissible, and Exhibit B of the Salzmann Declaration is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26.)

**21.** Mr. Johnson was not even aware that Plaintiffs had been delivering MISS ME and ROCK REVIVAL denim products to Phoenix Fibers for recycling into shoddy fiber prior to the time he joined the company in September 2013. (Salzmann Decl. ¶4, Ex. B (Johnson 59:18-21)).

**Phoenix Fibers' Response:** Undisputed, except to the extent it implies that Phoenix Fibers had an obligation to recycle any items donated by Plaintiffs into shoddy fiber and to the extent that Paragraph 4 of the Salzmann Declaration is inadmissible, and Exhibit B of the Salzmann Declaration is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26.).

**22.** Mr. Graham was no longer employed by Phoenix Fibers at the time Mr. Johnson joined the company in September 2013.  Mr. Johnson was unable to even identify Mr. Graham as the person who held the position of Plant Manager before him (Salzmann Decl. ¶4, Ex. B (Johnson 14:8-22)), having testified at his deposition that "I have no idea who Matt Graham is" (Salzmann Decl. ¶4, Ex. B (Johnson 122:19)).

**Phoenix Fibers' Response:** Undisputed for the purposes of this Motion, except to the extent that Paragraph 4 of the Salzmann Declaration is inadmissible, and Exhibit B of the Salzmann Declaration is inadmissible. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26.)

**Phoenix Fibers' [Alleged] Agreement to Recycle**

**Plaintiffs' Miss Me and Rock Revival Denim Products into Shoddy Fiber**

23.   On November 1, 2011, Eric Choi, the owner and CEO of Sweet People and RCRV, sent an email to Lilly Kim containing a link to Bonded Logic's website with the message "let's discuss!"  Minutes after receiving this email from Mr. Choi, Ms. Kim forwarded the email to Ms. Song.  (Salzmann Decl. ¶6, Ex. D (Kim 67:24-68:8); ¶13, Ex. K (SP/RCRV000065-66); Choi Decl. ¶7; L. Kim Decl. ¶3).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely wholly on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 6-7, 10, 20-21, 27, 30.)

24.   Mr. Choi and Ms. Kim subsequently discussed the potential opportunity that they believed Bonded Logic offered to dispose of unfinished, damaged or otherwise second-quality MISS ME and ROCK REVIVAL denim products in an environmentally sound manner—*i.e.*, shredding into shoddy fiber—and decided to take advantage of it.  (Choi Decl. ¶7; Kim Decl. ¶7).

**Phoenix Fibers' Response:** No material factual dispute that either Mr. Choi or Ms. Kim failed to communicate their alleged desire to dispose of unfinished, damaged or otherwise second-quality MISS ME and ROCK REVIVAL denim products by having them shred into shoddy fiber to a representative of Phoenix Fibers.  Indeed, Ms. Kim never communicated with anyone from Phoenix Fibers prior to October 2015.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 19:4-15; 175:25-176:3.)  Plaintiffs never allege that Mr. Choi spoke with anyone from Phoenix Fibers.  As such, this fact is irrelevant.  Moreover, Plaintiffs rely on inadmissible evidence.  (*See* Dkt. No. 98 [Def.'s Objections] at 6-7, 11.)

25.   Ms. Kim thereafter tasked Ms. Song with finding "a company that

recycled denim so that we could recycle our products, rather than sending them to a landfill." Salzmann Decl. ¶6, Ex. D (Kim 18:17-19); ¶8, Ex. F (Song 24:4-9; 26:2-4); Kim Decl. ¶8; Choi Decl. ¶¶7-8).  The impetus for this initiative was Plaintiffs' desire to find an environmentally responsible way to dispose of damaged, unfinished, obsolete, returned or otherwise second-quality MISS ME and ROCK REVIVAL denim products.  Salzmann Decl. ¶6, Ex. D (Kim 29:20-30:17); Kim Decl. ¶4; Choi Decl. ¶¶4-7).

**Phoenix Fibers' Response:** Undisputed for the purposes of this Motion, except to the extent that Plaintiffs' evidence in support of this statement is inadmissible. (*See* Dkt. No. 98 [Def.'s Objections] at 4-8, 10, 20, 27-28, 41-42, 44-45.)  This statement does not create a genuine dispute of material fact as to the existence of a contract between Phoenix Fibers and either, or both, Plaintiffs.

**26.**    At the time, Plaintiffs would either oversee the destruction of damaged or otherwise second-quality denim products at their factories in Asia, or manually cut up the products domestically and send them to a landfill for disposal. Salzmann Decl. ¶6, Ex. D (Kim 30:18-25); Kim Decl. ¶5; Choi Decl. ¶5).

**Phoenix Fibers' Response:** Undisputed for the purposes of this Motion, except to the extent that Plaintiffs' evidence in support of this statement is inadmissible. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 27.)

**27.**    While Plaintiffs wanted to dispose of their second-quality denim products in an environmentally friendly manner, they were equally, if not more concerned about permanently removing damaged, unfinished, obsolete, returned or otherwise second-quality MISS ME and ROCK REVIVAL denim products from the stream of commerce.  Salzmann Decl. ¶6, Ex. D (Kim 166:18-167:20); Kim Decl. ¶6; Choi Decl. ¶¶4-10).

**Phoenix Fibers' Response:** No material factual dispute that Phoenix Fibers

never agreed to take any action to aid in "permanently removing damaged, unfinished, obsolete, returned or otherwise second-quality MISS ME and ROCK REVIVAL denim products from the stream of commerce." (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-19; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:5- 52:3; 52:11-17; 61 :21-62:1; Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.) Moreover, a substantial portion of Plaintiffs' evidence in support of this statement is inadmissible. (*See* Dkt. No. 98 [Def.'s Objections] at 4-8, 11, 20, 27, 53-54.)

No material factual dispute that Plaintiffs and Phoenix Fibers did not form an agreement. (Song Depo. (App. Ex. D) 62:19-63:16.)

**28.**     Ms. Song, acting on behalf of Plaintiffs and under the direction of Ms. Kim, subsequently entered into an agreement with Phoenix Fibers relating to the donation of second-quality MISS ME and ROCK REVIVAL denim products, which were to be destroyed and converted into shoddy fiber. Salzmann Decl. ¶6, Ex. D (Kim 14:1-9); ¶8, Ex. F (Song 24:4-9); Kim Decl. ¶¶9-12; Choi Decl. ¶¶8, 10).

**Phoenix Fibers' Response:** No material dispute of fact. Plaintiffs have failed to present admissible evidence that Plaintiffs, or either of them, entered into an agreement with Phoenix Fibers relating to the donation of second-quality MISS ME and ROCK REVIVAL denim products, which were to be destroyed and converted into shoddy fiber. (*See* Dkt. No. 98 [Def.'s Objections] at 7-8, 11-13, 20, 27, 41.) Plaintiffs' 30(b)(6) witness admitted: "I don't know if the word 'destroyed' was used in the verbal discussions" between Ms. Song and Mr. Graham. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:13-19.) Moreover, Plaintiffs do not know if, and cannot prove that, during verbal discussions, Phoenix Fibers ever agreed to destroy all items that Plaintiffs donated to Phoenix Fibers. (Rule 30(b)(6)

Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-19; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:5-52:3; 52:11-17; 61:21-62:1.) Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)

Further, Plaintiffs concede that Ms. Kim does not have personal knowledge of any of the communications that Plaintiffs had with Phoenix Fibers regarding the alleged contract. (*See* Dkt. No. 96 [Plaintiffs' Statement] at 18 ["Undisputed" that "Plaintiffs have no evidence that Ms. Kim, the General Counsel, has any personal knowledge of the formation of, or terms of, the Alleged Contract].) And, Mr. Choi is not an individual that has personal knowledge of any communications between Plaintiffs and Phoenix Fibers, as is evident by Plaintiffs' failure to identify him as having such information in their initial disclosure. (O'Neill Decl. ¶ 2-3, Ex. A-C.) As such, their statements are irrelevant in determining the existence of, or the terms of, any contract between Plaintiffs and Phoenix Fibers.

No material factual dispute that Plaintiffs and Phoenix Fibers did not form an agreement. (Song Depo. (App. Ex. D) 62:19-63:16.)

**29.** On November 3, 2011, Ms. Song contacted Bonded Logic regarding its business of converting denim products into shoddy fiber, and was referred to Matt Graham at Phoenix Fibers, Bonded Logic's affiliate. That same day, Ms. Song spoke with Mr. Graham, who, she understood, had the authority to act on behalf of Phoenix Fibers, about starting a program whereby Plaintiffs would ship their damaged, unfinished, obsolete, returned or otherwise second-quality MISS ME and ROCK REVIVAL denim products to Phoenix Fibers for destruction and recycling into shoddy fiber. (Salzmann Decl. ¶14, Ex. L (SP/RCRV005530-5531)).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely wholly on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay. (*See* Dkt. No. 98 [Def.'s

Objections] at 21, 30.)  Further, there is no material factual dispute because Plaintiffs purported evidence does not indicate that (1) Bonded Logic's business consisted of converting denim products into shoddy fiber, (2) Ms. Song understand that Mr. Graham had the authority to act on behalf of Phoenix Fibers, or (3) Ms. Song spoke with Mr. Graham about starting a program whereby Plaintiffs would ship their damaged, unfinished, obsolete, returned or otherwise second-quality MISS ME and ROCK REVIVAL denim products to Phoenix Fibers for destruction and recycling into shoddy fiber.  No material factual dispute that Plaintiffs and Phoenix Fibers did not form an agreement.  (Song Depo. (App. Ex. D) 62:19-63:16.)

**30.**   On November 4, 2011, Mr. Graham sent Ms. Song an email labeled "High" importance explaining Phoenix Fibers' shredding services and capabilities. Mr. Graham made a point of explaining that "[i]f necessary, [Phoenix Fibers] can remove the tags, buttons and zippers.  There is no charge for our recycling service."  (Salzmann Decl. ¶16, Ex. N (SP/RCRV005538-5539) (emphasis added)).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 21, 31.)  Further, there is no material factual dispute that this purported email does not contain a portion of any contract or a contract itself.

**31.**   If the resale of such products as "credential" had been part of the discussion between Mr. Graham and Ms. Song, there would have been no reason to remove "the tags, buttons and zippers" from such products.  Rather, those items— tags, buttons and zippers—would only need to be removed if the products were being recycled into shoddy fiber, as the parties contemplated.  (Salzmann Decl. ¶38, Ex. JJ ("*Shredding Clothing Nets Big Rewards for Phoenix Fibers*") (explaining that the first step in the shredding process is "a proprietary process that

1  removes all buttons, zippers and tags")).

2        **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

3  rely on evidence that is inadmissible based on a lack of authenticity, lack of

4  personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at

5  24, 37.)  Further, there is no material factual dispute because Plaintiffs' cited

6  evidence does not support the statement that "If the resale of such products

7  as 'credential' had been part of the discussion between Mr. Graham and Ms.

8  Song, there would have been no reason to remove 'the tags, buttons and

9  zippers' from such products."  Moreover, there is no material factual dispute

10  because Plaintiffs' cited evidence does not support the statement that "tags,

11  buttons and zippers . . . would only need to be removed if the products were

12  being recycled into shoddy fiber."  And, there is no material factual dispute

13  because Plaintiffs' cited evidence does not support the statement "the parties

14  contemplated" that "the products" would be "recycled into shoddy fiber."

15        **32.**      Later that day, in response to Mr. Graham's November 4, 2011 email,

16  Ms. Song inquired:  "What will be the next step?  Is there paperwork to fill out, or

17  do we just start by sending the shipment to you?"  (Salzmann Decl. ¶16, Ex. N

18  (SP/RCRV005538-5539)).  That same day, Mr. Graham advised that "[t]here is

19  nothing to fill out from our end."  (Salzmann Decl. ¶17, Ex. O (SP/RCRV005542-

20  5543)).

21        **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

22  rely on evidence that is inadmissible based on a lack of authenticity, lack of

23  personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at

24  21, 31.)  Further, there is no material factual dispute that this purported

25  email does not contain a portion of any contract or a contract itself.  No

26  material factual dispute that Plaintiffs and Phoenix Fibers did not form an

27  agreement.  (Song Depo. (App. Ex. D) 62:19-63:16.)

28        **33.**      On November 15, 2015, Mr. Graham responded to an email from Ms.

Song inquiring as to shipping logistics, and agreed to pass along information regarding some of the carriers that Phoenix Fibers worked with.  In conclusion, Mr. Graham stated "[t]here's not much else needed.  We will receive the material, schedule it for destruction and away we go!  I'll call you this morning to confirm this email."  (Salzmann Decl. ¶18, Ex. P (SP/RCRV005545) (emphasis added)).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 21-22, 31.)  Further, there is no material factual dispute that this purported email does not contain a portion of any contract or a contract itself because Plaintiffs believe that any contract between Plaintiffs and Phoenix Fibers was entered into prior to November 7, 2011.  (Song Depo. (App. Ex. D) 57:14-60:3; 62:8-17; 82:17- 83:7; Maciel Decl. (App. Ex. C) ¶ 28; App. Ex. EE).

34.    Throughout her discussions with Phoenix Fibers, Ms. Song reported back to Ms. Kim, Mr. Choi and Steve Kim, Plaintiffs' then-COO, her superiors who also worked for both Sweet People and RCRV.  (Salzmann Decl. ¶6, Ex. D (Kim  18:4-24;  20:1-11;  20:25-21:3;  43:8-19);  ¶15,  Ex.  M  (SP/RCRV005532-5533), ¶16, Ex. N (SP/RCRV005538-5539), ¶17, Ex. O (SP/RCRV005542-5543); Kim Decl. ¶9; Choi Decl. ¶8).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 7-8, 11-12, 20-21, 27, 30-31, 41-42.)  Ms. Song never reported to Ms. Kim or Mr. Cho that there was a contract between Phoenix Fibers and Plaintiffs, nor did she report that Phoenix Fibers agreed to destroy any items sent over to Phoenix Fibers by Plaintiffs.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-19; 28:12-29:14.)

**35.**     Ms. Kim saw written communications between Ms. Song and Mr. Graham wherein Mr. Graham represented that Phoenix Fibers would destroy Plaintiffs' second-quality denim products and convert them into shoddy fiber (Salzmann Decl. ¶6, Ex. D (Kim 28:14-25); Kim Decl. ¶11), and testified that "[w]e did require that the items be destroyed and recycled" (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:1)).

> **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 13, 20, 27, 43-44.)   Further, Plaintiffs have not produced such "written communications" to Phoenix Fibers and testimony regarding the content of such written communications is barred as hearsay and under the best evidence rule.  Fed. R. Evid. 802; 1002.  Further, Plaintiffs concede that Ms. Kim does not have personal knowledge of any of the communications that Plaintiffs had with Phoenix Fibers regarding the alleged contract.  (*See* Dkt. No. 96 [Plaintiffs' Statement] at 18 ["Undisputed" that "Plaintiffs have no evidence that Ms. Kim, the General Counsel, has any personal knowledge of the formation of, or terms of, the Alleged Contract].)  As such, Ms. Kim's statements are irrelevant in determining the existence of, or the terms of, any contract between Plaintiffs and Phoenix Fibers.

**36.**     Moreover, Ms. Kim understood that "during the recycling process, the items would naturally be destroyed as they were made into shoddy fiber." (Salzmann Decl. ¶6, Ex. D (Kim 27:20-28:4; 39:5-22); Kim Decl. ¶13).

> **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 13, 20, 27, 43-44.)  Further, Plaintiffs concede that Ms. Kim does not have personal knowledge of any of the communications that Plaintiffs had with

1    Phoenix Fibers regarding the alleged contract.  (*See* Dkt. No. 96 [Plaintiffs'

2    Statement] at 18 ["Undisputed" that "Plaintiffs have no evidence that Ms.

3    Kim, the General Counsel, has any personal knowledge of the formation of,

4    or terms of, the Alleged Contract].)  As such, this statement is irrelevant in

5    determining the existence of, or the terms of, any contract between Plaintiffs

6    and Phoenix Fibers.

7    **37.**    Based on her contemporaneous discussions with Ms. Song regarding

8    Ms. Song's conversations with Mr. Graham, Ms. Kim understood that Plaintiffs

9    had conditioned their agreement to provide Phoenix Fibers with their second-

10   quality MISS ME and ROCK REVIVAL denim products on Phoenix Fibers'

11   agreement to convert all such products into shoddy fiber.  (Salzmann Decl. ¶6, Ex.

12   D (Kim 28:14-29:4); Kim Decl. ¶10).   Mr. Choi had the same understanding.

13   (Choi Decl. ¶¶8, 10).

14   **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

15   rely on evidence that is inadmissible based on a lack of authenticity, lack of

16   personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 7-

17   8, 12, 20, 27, 44.)  Further, Plaintiffs concede that Ms. Kim does not have

18   personal knowledge of any of the communications that Plaintiffs had with

19   Phoenix Fibers regarding the alleged contract.  (*See* Dkt. No. 96 [Plaintiffs'

20   Statement] at 18 ["Undisputed" that "Plaintiffs have no evidence that Ms.

21   Kim, the General Counsel, has any personal knowledge of the formation of,

22   or terms of, the Alleged Contract].)  And, Mr. Choi is not an individual that

23   has personal knowledge of any communications between Plaintiffs and

24   Phoenix Fibers, as is evident by Plaintiffs' failure to identify him as having

25   such information in their initial disclosure.  (O'Neill Decl. ¶¶ 2-3, Exs. A-

26   C.)  As such, this statement is irrelevant in determining the existence of, or

27   the terms of, any contract between Plaintiffs and Phoenix Fibers.

28   Plaintiffs' 30(b)(6) witness admitted: "I don't know if the word

'destroyed' was used in the verbal discussions" between Ms. Song and Mr. Graham. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:13-19.)   Moreover, Plaintiffs do not know if, and cannot prove that, during verbal discussions, Phoenix Fibers ever agreed to destroy all items that Plaintiffs donated to Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-19; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:5-52:3; 52:11-17; 61:21-62:1.) Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)   No material factual dispute that Plaintiffs and Phoenix Fibers did not form an agreement.   (Song Depo. (App. Ex. D) 62:19-63:16.)

**38.**     Based on her contemporaneous understanding of Ms. Song's oral and written communications with Phoenix Fibers, namely, Mr. Graham's representation that Phoenix Fibers would "destroy" Plaintiffs' products and convert them into shoddy fiber, and his statement that Phoenix Fibers did not require a writing to memorialize the parties' understanding, Ms. Kim was satisfied that a written agreement with Phoenix Fibers was not necessary.   (Salzmann Decl. ¶6, Ex. D (Kim 34:4-12; 37:22-38:10); Kim Decl. ¶12).

**Phoenix Fibers' Response:** No material factual dispute. Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay. (*See* Dkt. No. 98 [Def.'s Objections] at 13, 20, 27, 45-46.)   Further, Plaintiffs concede that Ms. Kim does not have personal knowledge of any of the communications that Plaintiffs had with Phoenix Fibers regarding the alleged contract.   (*See* Dkt. No. 96 [Plaintiffs' Statement] at 18 ["Undisputed" that "Plaintiffs have no evidence that Ms. Kim, the General Counsel, has any personal knowledge of the formation of, or terms of, the Alleged Contract].)   As such, this statement is irrelevant in determining the existence of, or the terms of, any contract between Plaintiffs and Phoenix Fibers.

Plaintiffs' 30(b)(6) witness admitted: "I don't know if the word

---

71

'destroyed' was used in the verbal discussions" between Ms. Song and Mr. Graham. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:13-19.)   Moreover, Plaintiffs do not know if, and cannot prove that, during verbal or written discussions, Phoenix Fibers ever agreed to destroy all items that Plaintiffs donated to Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-19; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:5-52:3; 52:11-17; 61:21-62:1; Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)   No material factual dispute that Plaintiffs and Phoenix Fibers did not form an agreement.   (Song Depo. (App. Ex. D) 62:19-63:16.)

**39.**   Thereafter, Plaintiffs made shipping arrangements with their own carrier, and on November 22, 2011, Ms. Song contacted Mr. Graham to advise him that Plaintiffs were ready to make their first delivery of denim products to Phoenix Fibers for recycling into shoddy fiber on November 29, 2011.  In that same email, Ms. Song asked Mr. Graham to send over "any tax id's or documents for tax exemption or leed [Leadership in Energy and Environmental Design] credit." (Salzmann Decl. ¶19, Ex. Q (SP/RCRV005570)).

> **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 22, 31.)

**40.**   Mr. Graham responded to Ms. Song's inquiry by email dated December 5, 2011, explaining that "Phoenix Fibers, Inc. is a for-profit recycler and cannot legally offer a tax credit for our service."  Mr. Graham went on to explain what happens to the denim products Phoenix Fibers received from Sweet People and RCRV:  "The product we receive may be recycled into any number of products.  This could range from house, automobile or appliance insulation to prison mattresses…. There is also a certain portion that cannot be used, such a

metal pieces in the buttons and zippers.   These are removed and recycled separately."   (Salzmann Decl. ¶20, Ex. R (SP/RCRV005583-5584) (emphasis added)).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely wholly on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.   (*See* Dkt. No. 98 [Def.'s Objections] at 22, 32.)   Further, there is no material factual dispute that this purported email does not contain a portion of any contract or a contract itself because Plaintiffs believe that any contract between Plaintiffs and Phoenix Fibers was entered into prior to November 7, 2011.   (Song Depo. (App. Ex. D) 57:14-60:3; 62:8-17; 82:17- 83:7; Maciel Decl. (App. Ex. C) ¶ 28; App. Ex. EE).

**41.**   Ms. Song understood that Plaintiffs and Phoenix Fibers had reached an agreement with respect to the shredding of Plaintiffs' denim products into shoddy fiber before any products were shipped to Phoenix Fibers, and that Plaintiffs' executive management, and Phoenix Fibers' General Manager, had approved the agreement.   (Salzmann Decl. ¶8, Ex. F (Song 28:10-29:3; 58:4-60:3; 64:3-8; 65:21-66:3; 67:11-24; 77:3-24; 85:11-86:1); *see also* Choi Decl. ¶8).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely wholly on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.   (*See* Dkt. No. 98 [Def.'s Objections] at 7-8, 20, 28, 56-57.)   No material factual dispute that Plaintiffs and Phoenix Fibers did not form an agreement.   (Song Depo. (App. Ex. D) 62:19-63:16.)

**42.**   When asked at her deposition for her understanding of the agreement between Plaintiffs and Phoenix Fibers at the time the first shipment of Plaintiffs' products was made to Phoenix Fibers, Ms. Song stated:

My understanding was that we would send the inventory that we needed to --

1    that we wanted to use as part of our -- one of our green initiative programs.

2    Phoenix Fibers would break down the inventory sent to them, shred it and

3    create insulation that they would pass along to Bonded Logic, who insulated

4    houses in need.

5    (Salzmann Decl. ¶8, Ex. F (Song 67:11-24; 28:10-29:3) (emphasis added)).

6    **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

7    rely wholly on evidence that is inadmissible based on a lack of authenticity,

8    lack of personal knowledge, and hearsay.   (*See* Dkt. No. 98 [Def.'s

9    Objections] at 20, 28, 56-57.)  No material factual dispute that Plaintiffs and

10   Phoenix Fibers did not form an agreement.   (Song Depo. (App. Ex. D)

11   62:19-63:16.)

12   **43.**   There was never any discussion between Ms. Song and Mr. Graham

13   regarding Phoenix Fibers' recycling of Plaintiffs' denim products in any other

14   manner, including the sale of such products as credential or otherwise.  The term

15   "credential" does not appear in any of the communications between Ms. Song and

16   Mr. Graham.

17   **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

18   do not rely on evidence for this statement.  Plaintiffs cannot fulfill their

19   burden of demonstrating there is a genuine dispute of material fact by *failing*

20   *to cite any evidence*.  *See generally, Celotex Corp. v. Catrett*, 477 U.S. 317

21   (1986).

22   **44.**   Ms. Kim and Mr. Choi understood, in November 2011, that there was

23   a contract between Phoenix Fibers, on the one hand, and Plaintiffs, on the other

24   hand, whereby (a) Plaintiffs would deliver unfinished, damaged and otherwise

25   second-quality MISS ME and ROCK REVIVAL denim products to Phoenix

26   Fibers' Chandler, Arizona facility, at no cost to Phoenix Fibers, and (b) Phoenix

27   Fibers would shred such products into shoddy fiber, which would then be used by

28   Phoenix Fibers' affiliate, Bonded Logic, to manufacture environmentally friendly

1  products such as insulation.  (Salzmann Decl. ¶6, Ex. D (Kim 33:24-34:3); Kim
2  Decl. ¶¶12, 14; Choi Decl. ¶¶8, 10).

3      **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs
4  rely on evidence that is inadmissible based on a lack of authenticity, lack of
5  personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 7-
6  8, 13- 14, 20, 27, 45-46.)  Further, Plaintiffs concede that Ms. Kim does not
7  have personal knowledge of any of the communications that Plaintiffs had
8  with Phoenix Fibers regarding the alleged contract.  (*See* Dkt. No. 96
9  [Plaintiffs' Statement] at 18 ["Undisputed" that "Plaintiffs have no evidence
10  that Ms. Kim, the General Counsel, has any personal knowledge of the
11  formation of, or terms of, the Alleged Contract].)  And, Mr. Choi is not an
12  individual that has personal knowledge of any communications between
13  Plaintiffs and Phoenix Fibers, as is evident by Plaintiffs' failure to identify
14  him as having such information in their initial disclosure.  (O'Neill Decl. ¶¶
15  2-3, Exs. A-C.)  As such, this statement is irrelevant in determining the
16  existence of, or the terms of, any contract between Plaintiffs and Phoenix
17  Fibers.

18      Plaintiffs' 30(b)(6) witness admitted: "I don't know if the word
19  'destroyed' was used in the verbal discussions" between Ms. Song and Mr.
20  Graham. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:13-19.)  Moreover,
21  Plaintiffs do not know if, and cannot prove that, during verbal discussions,
22  Phoenix Fibers ever agreed to destroy all items that Plaintiffs donated to
23  Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-
24  19; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14;
25  51:5-52:3; 52:11-17; 61:21-62:1.) Maciel Decl. (App. Ex. C) ¶¶ 32-33; App.
26  Ex. II-JJ.)

27      No material factual dispute that Plaintiffs and Phoenix Fibers did not
28  form an agreement.  (Song Depo. (App. Ex. D) 62:19-63:16.)

**45.**     By email dated January 27, 2012, Mr. Graham confirmed to Ms. Song that Phoenix Fibers had received two additional loads of Plaintiffs' products, and stated that "Phoenix Fibers is very happy to be working with your company." (Salzmann Decl. ¶21, Ex. S (SP/RCRV005617)).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 22, 32.)

**46.**     Thereafter, on March 8, 2012, after Plaintiffs had already shipped multiple tractor-trailer loads of MISS ME and ROCK REVIVAL denim products to Phoenix Fibers for destruction and recycling into shoddy fiber, Ms. Song told Mr. Graham that "it would be nice to show the executives pictures of what you guys do with the denim and also show employees the insulation we make for the houses," and asked if Mr. Graham if he could provide a sample.  (Salzmann Decl. ¶22, Ex. T (SP/RCRV005624)).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 22, 32.)  Further, the evidence Plaintiffs cite does not support that statement that, by March 8, 2012, "Plaintiffs had already shipped multiple tractor-trailer loads of MISS ME and ROCK REVIVAL denim products to Phoenix Fibers for destruction and recycling into shoddy fiber."

No material factual dispute that Plaintiffs and Phoenix Fibers did not form an agreement.  (Song Depo. (App. Ex. D) 62:19-63:16.)

**47.**     That same day Mr. Graham responded, stating that he would send Ms. Song "samples of the final product" that day.  Hours later, Ms. Song responded to Mr. Graham and further requested that he send "some pictures of the houses that we are insulating", and inquired as to the name of the company to which Phoenix

1  Fibers was distributing the insulation.  (Salzmann Decl. ¶23, Ex. U
2  (SP/RCRV005628)).

3      **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs
4  rely on evidence that is inadmissible based on a lack of authenticity, lack of
5  personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at
6  22, 33.)  Further, there is no material factual dispute that this purported
7  email does not contain a portion of any contract or a contract itself because
8  Plaintiffs believe that any contract between Plaintiffs and Phoenix Fibers
9  was entered into prior to November 7, 2011.  (Song Depo. (App. Ex. D)
10  57:14-60:3; 62:8-17; 82:17- 83:7; Maciel Decl. (App. Ex. C) ¶ 28; App. Ex.
11  EE).

12      No material factual dispute that Plaintiffs and Phoenix Fibers did not
13  form an agreement.  (Song Depo. (App. Ex. D) 62:19-63:16.)

14      **48.**  Mr. Graham promptly provided the following response:  "Phoenix
15  Fibers converts the jeans into fiber that gets sent to our affiliate company, Bonded
16  Logic which in turn, manufactures the end products.  We don't get involved with
17  the actual distribution of the material.  I would direct you to their web site for
18  additional information. www.bondedlogic.com."  (Salzmann Decl. ¶24, Ex. V
19  (SP/RCRV005629) (emphasis added)).

20      **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs
21  rely on evidence that is inadmissible based on a lack of authenticity, lack of
22  personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at
23  22, 33.)  Further, there is no material factual dispute that this purported
24  email does not contain a portion of any contract or a contract itself because
25  Plaintiffs believe that any contract between Plaintiffs and Phoenix Fibers
26  was entered into prior to November 7, 2011.  (Song Depo. (App. Ex. D)
27  57:14-60:3; 62:8-17; 82:17- 83:7; Maciel Decl. (App. Ex. C) ¶ 28; App. Ex.
28  EE).

No material factual dispute that Plaintiffs and Phoenix Fibers did not form an agreement.  (Song Depo. (App. Ex. D) 62:19-63:16.)

49.    Thereafter, Ms. Song received a sample of Bonded Logic's UltraTouch Denim insulation from Phoenix Fibers.  (Salzmann Decl. ¶25, Ex. W (SP/RCRV000072)).    Eric Choi was so proud of Plaintiffs' partnership with Phoenix Fibers, and of having found an environmentally sound solution for the disposal of Plaintiffs' second-quality products, that Plaintiffs prominently displayed the samples in the conference rooms at Plaintiffs' headquarters, as an examples of the companies' commitment to the environment.  (Choi Decl. ¶ 9).  A photograph of one such display case appears below:



(Choi Decl. ¶9; Salzmann Decl. ¶25, Ex. W (SP/RCRV000072)).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 8, 23, 33.)   Further, there is no material factual dispute that this purported email does not contain a portion of any contract or a contract itself because Plaintiffs believe that any contract between Plaintiffs and Phoenix Fibers was entered into prior to November 7, 2011.  (Song Depo. (App. Ex. D) 57:14-60:3; 62:8-17; 82:17- 83:7; Maciel Decl. (App. Ex. C) ¶ 28; App. Ex. EE).

No material factual dispute that Plaintiffs and Phoenix Fibers did not form an agreement.  (Song Depo. (App. Ex. D) 62:19-63:16.)

1    **50.** Later that month, on March 29, 2012, Mr. Graham visited Plaintiffs'

2    Los Angeles, California facility, and met with Lisa Song and Steve Kim, Sweet

3    People's then-COO. (Salzmann Decl. ¶26, Ex. X (SP/RCRV005630-5639)).

4    **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

5    rely on evidence that is inadmissible based on a lack of authenticity, lack of

6    personal knowledge, and hearsay. (*See* Dkt. No. 98 [Def.'s Objections] at

7    23, 34.) Plaintiffs submitted evidence does not support the fact that on

8    March 29, 2012, Mr. Graham visited Plaintiffs' Los Angeles, California

9    facility, and met with Lisa Song and Steve Kim, Sweet People's then-COO.

10   **51.** Shortly thereafter, on April 9, 2012, Mr. Graham sent an email to Ms.

11   Song following up on their March 29, 2012 in-person meeting. In his email, Mr.

12   Graham wrote: "Some of our new machinery I told you about has just arrived.

13   Once we have it set up and running, I will send you a video of us running your

14   jeans." (Salzmann Decl. ¶27, Ex. Y (SP/RCRV005640) (emphasis added)).

15   **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

16   rely on evidence that is inadmissible based on a lack of authenticity, lack of

17   personal knowledge, and hearsay. (*See* Dkt. No. 98 [Def.'s Objections] at

18   23, 34.)

19   Further, there is no material factual dispute that this purported email

20   does not contain a portion of any contract or a contract itself because

21   Plaintiffs believe that any contract between Plaintiffs and Phoenix Fibers

22   was entered into prior to November 7, 2011. (Song Depo. (App. Ex. D)

23   57:14-60:3; 62:8-17; 82:17- 83:7; Maciel Decl. (App. Ex. C) ¶ 28; App. Ex.

24   EE).

25   No material factual dispute that Plaintiffs and Phoenix Fibers did not

26   form an agreement. (Song Depo. (App. Ex. D) 62:19-63:16.)

27   **52.** Once Plaintiffs reached an agreement with Phoenix Fibers, in

28   November 2011, for the shredding and recycling of their second-quality denim

1   products into shoddy fiber, Plaintiffs began importing their unfinished or second-

2   quality apparel products from their Asian factories for ultimate shipment to

3   Phoenix Fibers, rather than having them incinerated by the factories.   This

4   involved a significant expense, but it was an expense Plaintiffs were willing to

5   incur in order to dispose of their second-quality denim products in an

6   environmentally safe manner.   (Salzmann Decl. ¶6, Ex. D (Kim 98:24-100:10);

7   Kim Decl. ¶14).

8      **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

9      rely on evidence that is inadmissible based on a lack of authenticity, lack of

10     personal knowledge, and hearsay.   (*See* Dkt. No. 98 [Def.'s Objections] at

11     14, 20, 27.)   Further, Plaintiffs concede that Ms. Kim does not have personal

12     knowledge of any of the communications that Plaintiffs had with Phoenix

13     Fibers regarding the alleged contract.   (*See* Dkt. No. 96 [Plaintiffs'

14     Statement] at 18 ["Undisputed" that "Plaintiffs have no evidence that Ms.

15     Kim, the General Counsel, has any personal knowledge of the formation of,

16     or terms of, the Alleged Contract].)   As such, this statement is irrelevant in

17     determining the existence of, or the terms of, any contract between Plaintiffs

18     and Phoenix Fibers.

19        Plaintiffs' 30(b)(6) witness admitted: "I don't know if the word

20     'destroyed' was used in the verbal discussions" between Ms. Song and Mr.

21     Graham. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:13-19.)   Moreover,

22     Plaintiffs do not know if, and cannot prove that, during verbal discussions,

23     Phoenix Fibers ever agreed to destroy all items that Plaintiffs donated to

24     Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-

25     19; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14;

26     51:5-52:3; 52:11-17; 61:21-62:1.) Maciel Decl. (App. Ex. C) ¶¶ 32-33; App.

27     Ex. II-JJ.)

28        No material factual dispute that Plaintiffs and Phoenix Fibers did not

1    form an agreement.  (Song Depo. (App. Ex. D) 62:19-63:16.)

2    **53.**    Plaintiffs did not believe it was necessary to request certificates of

3    destruction from Phoenix Fibers for the second-quality goods they had donated to

4    Phoenix Fibers for that purpose, because they "assumed that the goods were being

5    recycled [into shoddy fiber] as [they] were told they were."  (Salzmann Decl. ¶6,

6    Ex. D (Kim 168:12-19; 26:23-28:5; 39:5-22); Kim Decl. ¶13; Choi Decl. ¶11).

7    **__Phoenix Fibers' Response:__** No material factual dispute because Plaintiffs

8    rely on evidence that is inadmissible based on a lack of authenticity, lack of

9    personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 8-

10   9, 13, 20, 27, 43-44, 46, 54.)   Moreover, Plaintiffs' evidence does not

11   support the statement that Plaintiffs "assumed that the goods were being

12   recycled into shoddy fiber" or that they were told that the goods would be

13   recycled into shoddy fiber.

14   Further, Plaintiffs concede that Ms. Kim does not have personal

15   knowledge of any of the communications that Plaintiffs had with Phoenix

16   Fibers regarding the alleged contract.   (*See* Dkt. No. 96 [Plaintiffs'

17   Statement] at 18 ["Undisputed" that "Plaintiffs have no evidence that Ms.

18   Kim, the General Counsel, has any personal knowledge of the formation of,

19   or terms of, the Alleged Contract].)  And, Mr. Choi is not an individual that

20   has personal knowledge of any communications between Plaintiffs and

21   Phoenix Fibers, as is evident by Plaintiffs' failure to identify him as having

22   such information in their initial disclosure.  (O'Neill Decl. ¶¶ 2-3, Exs. A-

23   C.)  As such, this statement is irrelevant in determining the existence of, or

24   the terms of, any contract between Plaintiffs and Phoenix Fibers.

25   Plaintiffs' 30(b)(6) witness admitted: "I don't know if the word

26   'destroyed' was used in the verbal discussions" between Ms. Song and Mr.

27   Graham. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:13-19.)  Moreover,

28   Plaintiffs do not know if, and cannot prove that, during verbal discussions,

1  Phoenix Fibers ever agreed to destroy all items that Plaintiffs donated to

2  Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-

3  19; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14;

4  51:5-52:3; 52:11-17; 61:21-62:1.) Maciel Decl. (App. Ex. C) ¶¶ 32-33; App.

5  Ex. II-JJ.)

6      No material factual dispute that Plaintiffs and Phoenix Fibers did not

7  form an agreement.  (Song Depo. (App. Ex. D) 62:19-63:16.)

8  **54.**    Over the next four years, during the period November 2011 through

9  September 2015, Plaintiffs donated hundreds of thousands of pounds of second-

10  quality MISS ME and ROCK REVIVAL denim products to Phoenix Fibers for

11  shredding into shoddy fiber.  It cost Plaintiffs approximately $1,000 per shipping

12  container to transport MISS ME and ROCK REVIVAL denim products from their

13  facility in Los Angeles, California to Phoenix Fibers' facility in Chandler, Arizona.

14  (Kim Decl. ¶15).

15  **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

16  rely on evidence that is inadmissible based on a lack of authenticity, lack of

17  personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at

18  14.)

19      Further, Plaintiffs concede that Ms. Kim does not have personal

20  knowledge of any of the communications that Plaintiffs had with Phoenix

21  Fibers regarding the alleged contract.  (*See* Dkt. No. 96 [Plaintiffs'

22  Statement] at 18 ["Undisputed" that "Plaintiffs have no evidence that Ms.

23  Kim, the General Counsel, has any personal knowledge of the formation of,

24  or terms of, the Alleged Contract].)  As such, her statement is irrelevant in

25  determining the existence of, or the terms of, any contract between Plaintiffs

26  and Phoenix Fibers.

27      Plaintiffs' 30(b)(6) witness admitted: "I don't know if the word

28  'destroyed' was used in the verbal discussions" between Ms. Song and Mr.

Graham. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:13-19.)  Moreover, Plaintiffs do not know if, and cannot prove that, during verbal discussions, Phoenix Fibers ever agreed to destroy all items that Plaintiffs donated to Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-19; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:5-52:3; 52:11-17; 61:21-62:1.) Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)

No material factual dispute that Plaintiffs and Phoenix Fibers did not form an agreement.  (Song Depo. (App. Ex. D) 62:19-63:16.)

**55.**   Prior to this litigation, Mr. Kean was not aware of any of Mr. Graham's communications with Ms. Song (Salzmann Decl. ¶5, Ex. C (Kean 80:3-6)), and did not know when Plaintiffs first started to deliver MISS ME and ROCK REVIVAL products to Phoenix Fibers (Salzmann Decl. ¶5, Ex. C (Kean 64:10-12)).

**<u>Phoenix Fibers' Response:</u>** No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26-27.)

**56.**   Phoenix Fibers has made no attempt to locate Mr. Graham in connection with this litigation (Salzmann Decl. ¶5, Ex. C (Kean 34:1-3)), and further claims that Mr. Graham "maliciously destroyed" all of his emails when he was terminated in 2013 because Phoenix Fibers "couldn't afford his position" (Salzmann Decl. ¶5, Ex. C (Kean 30:6-11; 31:7-22)).

**<u>Phoenix Fibers' Response:</u>** No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26-27.)

**Phoenix Fibers' Sale of Miss Me and Rock Revival**

1    **Denim Products to U.S. General**

2       **57.**    Although it was uncommon for customers purchasing credential from

3    Phoenix Fibers to visit Phoenix Fibers' warehouse to select such credential

4    (Salzmann Decl. ¶5, Ex. C (Kean 17:6-14)), starting in 2015, Kamel Mroueh, the

5    President of Defendant U.S. General Export, Inc. ("U.S. General"), visited Phoenix

6    Fibers' warehouse on multiple occasions to select credential for purchase.  During

7    these visits, Mr. Johnson would accompany Mr. Mroueh as he walked the

8    warehouse floor and selected pallets of denim products that he wanted to purchase

9    (Salzmann Decl. ¶4, Ex. B (Johnson 34:2-10)).

10      <u>**Phoenix Fibers' Response**</u>: No material factual dispute because Plaintiffs

11      rely on evidence that is inadmissible based on a lack of authenticity, lack of

12      personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at

13      20, 26-27.)  Undisputed that Mr. Mroueh visited Phoenix Fibers' warehouse.

14      **58.**    Mr. Johnson concedes that on a number of occasions in 2015, Mr.

15   Mroueh selected pallets of second-quality MISS ME and ROCK REVIVAL denim

16   products.   Mr. Johnson specifically recalls Mr. Mroueh selecting these pallets

17   because the boxes contained on those pallets clearly displayed the Sweet People

18   and/or RCRV business names, and/or the MISS ME and/or ROCK REVIVAL

19   trademarks and logos.  (Salzmann Decl. ¶4, Ex. B (Johnson 39:13-16; 71:5-14)).

20      <u>**Phoenix Fibers' Response**</u>: No material factual dispute because Plaintiffs

21      rely on evidence that is inadmissible based on a lack of authenticity, lack of

22      personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at

23      20, 26.)  Undisputed that U.S. General purchased boxes of items donated to

24      Phoenix Fibers by Plaintiffs.

25      **59.**    Mr. Johnson signed the Bill of Lading that corresponded with a

26   Packing List for certain second-quality MISS ME and ROCK REVIVAL denim

27   products Phoenix Fibers sold to U.S. General in May 2015.  The Packing List was

28   filled out by a Phoenix Fibers employee, and recorded the sale of "Miss Me 3,473

1   lbs" and "RR [Rock Revival] 3,294."  (Salzmann Decl. ¶4, Ex. B (Johnson 82:8-
2   19; 84:11-85:8; 85:24-86:2); ¶29, Ex. AA (US GEN EXPORT 000001-27)).
3   While this document was created by Phoenix Fibers, neither it, nor any other
4   transactional document relating to the multiple sales of pallets of MISS ME and
5   ROCK REVIVAL denim products that Mr. Johnson brokered on Phoenix Fibers'
6   behalf, have been produced in discovery by Phoenix Fibers.

7          **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs
8          rely on evidence that is inadmissible based on a lack of authenticity, lack of
9          personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at
10         20, 23, 26, 34-35, 39-40.)

11         **60.**   Prior to Phoenix Fibers' sales of pallets of MISS ME and ROCK
12  REVIVAL denim products to U.S. General in 2015, Phoenix Fibers concedes that
13  all of the MISS ME and ROCK REVIVAL denim products that Plaintiffs donated
14  to Phoenix Fibers were either recycled into shoddy fiber, or retrieved by Plaintiffs
15  in December 2015.  (Johnson Decl. ¶¶9, 17).

16         **Phoenix Fibers' Response:** No material factual dispute because the
17         evidence cited by Plaintiffs does not support the statement that "[p]rior to
18         Phoenix Fibers' sales of pallets of MISS ME and ROCK REVIVAL denim
19         products to U.S. General in 2015, Phoenix Fibers concedes that all of the
20         MISS ME and ROCK REVIVAL denim products that Plaintiffs donated to
21         Phoenix Fibers were either recycled into shoddy fiber, or retrieved by
22         Plaintiffs in December 2015."

23         **61.**   Mr. Johnson cannot recall any other instance where Phoenix Fibers
24  sold denim products that a brand owner had delivered to it free of charge as
25  credential.  (Salzmann Decl. ¶4, Ex. B (Johnson 64:16-22; 41:23-42:1)).

26         **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs
27         rely on evidence that is inadmissible based on a lack of authenticity, lack of
28         personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at

1     20, 26.)

2     **Plaintiffs Discover Large Quantities of Second-Quality Miss Me and Rock**

3     **Revival Denim Products in Secondary Channels of Trade**

4     **62.** In or around the summer of 2015, Plaintiffs began to receive

5 complaints from their sales representatives, authorized retail accounts, and others,

6 regarding the availability of second-quality MISS ME and ROCK REVIVAL

7 denim products for online and wholesale purchase. (Salzmann Decl. ¶6, Ex. D

8 (Kim 106:25-107:11; 108:10-25; 67:2-13); Kim Decl. ¶16).

9     <u>**Phoenix Fibers' Response:**</u> No material factual dispute because Plaintiffs

10     rely on evidence that is inadmissible based on a lack of authenticity, lack of

11     personal knowledge, and hearsay. (*See* Dkt. No. 98 [Def.'s Objections] at

12     15, 20, 27, 47-48.)

13     **63.** Thereafter, Ms. Kim oversaw the purchase of approximately 9,000

14 units of second-quality MISS ME and ROCK REVIVAL denim products from

15 certain resellers who were selling such goods on eBay and Facebook. Upon

16 examination of the products, Ms. Kim and others within the companies were able

17 to determine that such products had previously been delivered to Phoenix Fibers

18 for shredding and recycling into shoddy fiber. (Salzmann Decl. ¶6, Ex. D (Kim

19 108:22-109:20; 115:18-116:12); Kim Decl. ¶17).

20     <u>**Phoenix Fibers' Response:**</u> No material factual dispute because Plaintiffs

21     rely on evidence that is inadmissible based on a lack of authenticity, lack of

22     personal knowledge, and hearsay. (*See* Dkt. No. 98 [Def.'s Objections] at

23     15, 20, 27, 48-49.)

24

25

26

27

28     **Plaintiffs Contact Phoenix Fibers Regarding the Availability of Plaintiffs'**

**Products in Secondary Channels of Trade, and Phoenix Fibers Fabricates a**

**Story to Cover Up Its Sales of Such Products**

64.     In or around the last week of October 2015, Ms. Kim called Mr. Johnson, Phoenix Fibers' Plant Manager, to inquire as to how Phoenix Fibers was storing Plaintiffs' second-quality MISS ME and ROCK REVIVAL denim products before shredding them into shoddy fiber.  During that call, Mr. Johnson explained to me that Plaintiffs' goods were received and placed in a secure cage until they were ready to be shredded, at which time they would be removed from the secure cage and shredded into shoddy fiber.  (Salzmann Decl. ¶6, Ex. D (Kim 148:19-149:8); Kim Decl. ¶18).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 15, 20, 27, 51.)   No material factual dispute that Plaintiffs were not contractually obligated to shred items donated by Plaintiffs.  (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-19; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:5-52:3; 52:11-17; 61:21-62:1; 62:19-63:16.) Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)

65.     Thereafter, on October 27, 2015, Ms. Kim sent an email to Mr. Kean stating that an issue had come up that she would like to discuss with him at his earliest convenience.  (Salzmann Decl. ¶33, Ex. EE (PHX000005)).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections] at 24, 36.)

66.     Ms. Kim subsequently spoke with Mr. Kean and advised him that Plaintiffs "had found goods [they] believed were possibly coming from his location, that had been sent there for destruction and recycling."  In response, Mr. Kean stated that he would look into it, and mentioned the possibility that there may

1   have been "leakage" (*i.e.*, theft) from the Phoenix Fibers warehouse.  Specifically,

2   Mr. Kean explained that on occasion, the cage where Plaintiffs' products were

3   stored would be full, and certain products would be left outside of the cage, thus

4   being susceptible to theft.  At the end of the call, Mr. Kean referred Ms. Kim to

5   Mr. Johnson, who, he stated, would be able to answer Ms. Kim's questions

6   regarding security issues and the possible "leakage" of Plaintiffs' products from

7   Phoenix Fibers' warehouse.  (Salzmann Decl. ¶6, Ex. D (Kim 145:20-148:3); Kim

8   Decl. ¶¶19-20).

9   **<u>Phoenix Fibers' Response:</u>** No material factual dispute because Plaintiffs

10   rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections]

11   at 15-16, 20, 27, 49-50.)

12   Further, Plaintiffs concede that Ms. Kim does not have personal

13   knowledge of any of the communications that Plaintiffs had with Phoenix

14   Fibers regarding the alleged contract.  (*See* Dkt. No. 96 [Plaintiffs'

15   Statement] at 18 ["Undisputed" that "Plaintiffs have no evidence that Ms.

16   Kim, the General Counsel, has any personal knowledge of the formation of,

17   or terms of, the Alleged Contract].)  As such, her statement is irrelevant in

18   determining the existence of, or the terms of, any contract between Plaintiffs

19   and Phoenix Fibers.

20   Plaintiffs' 30(b)(6) witness admitted: "I don't know if the word

21   'destroyed' was used in the verbal discussions" between Ms. Song and Mr.

22   Graham. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:13-19.)  Moreover,

23   Plaintiffs do not know if, and cannot prove that, during verbal discussions,

24   Phoenix Fibers ever agreed to destroy all items that Plaintiffs donated to

25   Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-

26   19; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14;

27   51:5-52:3; 52:11-17; 61:21-62:1.) Maciel Decl. (App. Ex. C) ¶¶ 32-33; App.

28   Ex. II-JJ.)

1         No material factual dispute that Plaintiffs and Phoenix Fibers did not

2         form an agreement.  (Song Depo. (App. Ex. D) 62:19-63:16.)

3     **67.**     At no time during Ms. Kim's call with Mr. Kean, or at any time

4 thereafter, did Mr. Kean state that Phoenix Fibers had sold Plaintiffs' second-

5 quality MISS ME and ROCK REVIVAL denim products to anyone as credential,

6 nor did he state that it was Phoenix Fibers' position under the parties' agreement

7 that Phoenix Fibers was entitled to sell Plaintiffs' products as credential or

8 otherwise.  (Kim Decl. ¶21).

9     **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

10     rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections]

11     at 16.)

12     **68.**     Later that same day, Ms. Kim called Mr. Johnson and told him what

13 she had previously explained to Mr. Kean, namely, that Plaintiffs were seeing

14 significant quantities of second-quality MISS ME and ROCK REVIVAL denim

15 products being offered for sale in secondary channels of trade, and that Plaintiffs

16 had examined these products and believed that they had previously been delivered

17 to Phoenix Fibers for destruction and recycling into shoddy fiber.  In response, Mr.

18 Johnson acknowledged the possibility that Plaintiffs' products had "leaked" from

19 Phoenix Fibers' warehouse, stated Phoenix Fibers was adding security cameras in

20 its warehouse, and further stated that he would personally investigate the issue and

21 report back to Ms. Kim.  (Salzmann Decl. ¶6, Ex. D (Kim 151:15-152:24); Kim

22 Decl. ¶22).

23     **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

24     rely on evidence that is inadmissible based on a lack of authenticity, lack of

25     personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at

26     16-17, 20, 27, 51-52.)

27         Further, Plaintiffs concede that Ms. Kim does not have personal

28     knowledge of any of the communications that Plaintiffs had with Phoenix

Fibers regarding the alleged contract. (*See* Dkt. No. 96 [Plaintiffs' Statement] at 18 ["Undisputed" that "Plaintiffs have no evidence that Ms. Kim, the General Counsel, has any personal knowledge of the formation of, or terms of, the Alleged Contract].)  As such, her statement is irrelevant in determining the existence of, or the terms of, any contract between Plaintiffs and Phoenix Fibers.

Plaintiffs' 30(b)(6) witness admitted: "I don't know if the word 'destroyed' was used in the verbal discussions" between Ms. Song and Mr. Graham. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 27:13-19.)  Moreover, Plaintiffs do not know if, and cannot prove that, during verbal discussions, Phoenix Fibers ever agreed to destroy all items that Plaintiffs donated to Phoenix Fibers. (Rule 30(b)(6) Depo. (Kim) (App. Ex. E) 18:4-19:15; 27:13-19; 28:12-29:14; Song Depo. (App. Ex. D) 31:5-33:5; 33:9-20; 35:21-36:14; 51:5-52:3; 52:11-17; 61:21-62:1.) Maciel Decl. (App. Ex. C) ¶¶ 32-33; App. Ex. II-JJ.)

No material factual dispute that Plaintiffs and Phoenix Fibers did not form an agreement.  (Song Depo. (App. Ex. D) 62:19-63:16.)

**69.**     Mr. Johnson engaged in these conversations with Ms. Kim knowing full well that he was lying to her, and that, in particular, Phoenix Fibers had sold a substantial number of pallets of MISS ME and ROCK REVIVAL products to Mr. Mroueh of U.S. General only months earlier:

Q.  Okay.  And during that initial conversation, did you advise Ms. Kim that Phoenix Fibers had been selling its products to Mr. Mroueh?

A.  No.

Q.  But you knew that that was the case at that time; is that right?

A.  Yes.

(Salzmann Decl. ¶4, Ex. B (Johnson 100:23-101:4; *see also* 35:2-8; 70:25-71:10; 99:19-101:8)).

1

**Phoenix Fibers' Response**: No material factual dispute because Plaintiffs rely on evidence that is inadmissible based on a lack of authenticity, lack of personal knowledge, and hearsay.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26.)

**70.**    At no time during Ms. Kim's conversation with Mr. Johnson, or at any time thereafter, did Mr. Johnson disclose the fact he had personally overseen the sale of many pallets of second-quality MISS ME and ROCK REVIVAL denim products to Defendant U.S. General, or state that it was Phoenix Fibers' position that Phoenix Fibers was entitled to sell Plaintiffs' products to anyone as credential or otherwise.  (Kim Decl. ¶23.)

**Phoenix Fibers' Response**: No material factual dispute because Plaintiffs rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections] at 17.)

**71.**    Mr. Johnson testified that, notwithstanding his failure to so advise Ms. Kim, he "probably" first advised Mr. Kean that he had overseen the sale of pallets of MISS ME and ROCK REVIVAL products to Mr. Mroueh at U.S. General "right after we were notified" by Plaintiffs—*i.e.*, in or around October 27, 2015. (Salzmann Decl. ¶4, Ex. B (Johnson 103:23-104:5; 106:12-18)).

**Phoenix Fibers' Response**: No material factual dispute because Plaintiffs rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26.)

**72.**    Mr. Kean, however, was unable to recall when, or in what context, Mr. Johnson first told him that Mr. Johnson had overseen the sale of pallets of MISS ME and ROCK REVIVAL products to Mr. Mroueh at U.S. General (Salzmann Decl. ¶5, Ex. C (Kean 10:17-22; 12:7-16)), but believes that the conversation must have taken place prior to May 18, 2016, the date on which Plaintiffs' First Amended Complaint was filed:

1    Q.    Well, do you recall whether or not you had that conversation

2    with Mr. Johnson before the complaint was filed in this case?

3    A.  I don't recall.

4    Q.  Okay.  Do you recall whether or not you had that conversation

5    with Mr. Johnson before the answer was filed?

6    A.  I don't recall.  I don't know when the answer was filed, so I'd

7    need to look at a document.

8    Q.  March 29th, 2016.

9    A.  I don't recall.

10    Q.  Okay.  How about as of May 18th, 2016?

11    A.  I would make an assumption, yes, I had spoken to him by May.

12  (Salzmann Decl. ¶5, Ex. C (Kean 42:10-22)).

13    **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

14    rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections]

15    at 20, 26-27, 40-41.)

16    **73.**    After Mr. Johnson advised Mr. Kean that he had overseen Phoenix

17  Fibers' sale of an unknown number of pallets of MISS ME and ROCK REVIVAL

18  denim products to Mr. Mroueh at U.S. General, there was never any discussion

19  between them as to whether or not Phoenix Fibers should advise Plaintiffs that it

20  had resold their products.  (Salzmann Decl. ¶4, Ex. B (Johnson 107:22-25)).  In

21  fact, there was no further discussion between Mr. Johnson and Mr. Kean about this

22  issue until Phoenix Fibers was preparing its discovery responses in this action in

23  late May 2016.  (Salzmann Decl. ¶4, Ex. B (Johnson 109:24-110:4)).

24    **Phoenix Fibers' Response:** No material factual dispute because

25    Plaintiffs rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s

26    Objections] at 20, 26.)

27    **74.**    Instead, Mr. Kean and Phoenix Fibers continued to ignore the fact that

28  Mr. Johnson, Phoenix Fibers' Plant Manager, had personally overseen the sale of

CONSOLIDATED SEPARATE STATEMENT

1    an unknown number of pallets of MISS ME and ROCK REVIVAL products to Mr.

2    Mroueh at U.S. General, and had withheld such information from Plaintiffs when

3    Ms. Kim directly raised the issue.

4          **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

5          do not present any evidence.

6          **75.**    Although Mr. Johnson had advised Ms. Kim in late October or early

7    November 2015 that he would look into the possibility that certain MISS ME and

8    ROCK REVIVAL denim products had been stolen from Phoenix Fibers

9    warehouse, and then report back to her, Ms. Kim received no further information

10   or response of any kind from Mr. Johnson or Mr. Kean.  (Salzmann Decl. ¶6, Ex.

11   D (Kim 155:1-6); Kim Decl. ¶24).

12         **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

13         rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections]

14         at 17, 20, 27, 52-53.)

15         **76.**    When Mr. Johnson spoke to Mr. Kean about his conversation with

16   Ms. Kim, he advised Mr. Kean that he mentioned to Ms. Kim that "he would

17   immediately look into any theft issues."  Mr. Kean recalls Mr. Johnson looking

18   into the issue of theft, but Mr. Johnson did not report back to him to advise what he

19   had determined.  (Salzmann Decl. ¶5, Ex. C (Kean 8:14-9:9)).

20         **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

21         rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections]

22         at 20, 26-27.)

23         **77.**    In the weeks that followed, Plaintiffs continued to see increasing

24   numbers of second-quality MISS ME and ROCK REVIVAL denim products being

25   made available online for purchase in secondary channels of trade.  Finally, in mid-

26   November 2015, Ms. Kim instructed Plaintiffs' outside counsel to contact Mr.

27   Kean, in order to ensure that Plaintiffs' donated products were being properly

28   handled and secured prior to being shredded and recycled into shoddy fiber.  At the

1  time, Plaintiffs had no idea that these products had found their way out of Phoenix
2  Fibers' warehouse in any way other than through "leakage" (*i.e.*, theft).  (Kim
3  Decl. ¶25).

4     **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs
5     rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections]
6     at 18.)

7     **78.**   The November 17, 2015 letter from Plaintiffs' counsel further stated
8  that Plaintiffs desired to "resolve th[e] matter in an amicable and business-like
9  manner" so that the parties could "continue their valued relationship," and asked
10 that Phoenix Fibers provide Plaintiffs with a written protocol for securely handling
11 their MISS ME and ROCK REVIVAL products going forward.  (Salzmann Decl.
12 ¶34, Ex. FF (PHX001040-1041)).

13    **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs
14    rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections]
15    at 24, 36.)

16    **79.**   On December 3, 2015, Plaintiffs' outside counsel received a response
17 to its November 17, 2015 letter from Phoenix Fibers' then-outside counsel, Charles
18 Wirken, Esq., of the firm of Gust & Rosenfeld.  Mr. Wirken's December 3, 2015
19 letter, on which Mr. Kean was copied, denied that Phoenix Fibers had any
20 knowledge of Plaintiffs' products being "removed from the main warehouse floor,"
21 by way of sale of otherwise, and stated that if any such products had been
22 removed, "it was done without the knowledge and consent of Phoenix Fibers."
23 (Salzmann Decl. ¶35, Ex. GG (PHX001042–001043) (emphasis added); Kim Decl.
24 ¶26).

25    **Phoenix Fibers' Response:** Undisputed for purposes of this motion.

26    **80.**   Mr. Wirken's letter further advised that Phoenix Fibers would no
27 longer accept the donation of Plaintiffs' MISS ME and ROCK REVIVAL denim
28 products.  As for the inventory of Plaintiffs' products that Phoenix Fibers had on

1  hand, Mr. Wirken advised that Phoenix Fibers "will either process them as usual,

2  taking them from the 'cage' and processing them through the machinery on the

3  warehouse floor, or allow [Plaintiffs] to reclaim the unprocessed products at their

4  expense." (Salzmann Decl. ¶35, Ex. GG (PHX001042–001043) (emphasis added);

5  Kim Decl. ¶26).   Once again, no mention was made that any of the goods in

6  question had been sold as credential, in direct violation of the parties' agreement.

7      **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs rely on

8      evidence that is inadmissible based on a lack of relevance and lack of

9      authenticity.   (*See* Dkt. No. 98 [Def.'s Objections] at 18.) This statement

10     does not create a genuine dispute of material fact as to the existence of a

11     contract between Phoenix Fibers and either, or both, Plaintiffs.

12     **81.**   In particular, at no point did Phoenix Fibers or its then-counsel, Mr.

13  Wirken, (a) disclose to Plaintiffs the fact that Mr. Johnson, Phoenix Fibers' Plant

14  Manager, had personally overseen Phoenix Fibers' sale of an unknown quantity of

15  MISS ME and ROCK REVIVAL denim products to Mr. Mroueh at U.S. General,

16  or (b) take the position that Phoenix Fibers had the right to resell Plaintiffs' denim

17  products as credential.  Salzmann Decl. ¶35, Ex. GG (PHX001042–001043); ¶37,

18  Ex. II (SP/RCRV000056-60)).

19     **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs rely on

20     Salzmann Declaration Exhibit II, but it is inadmissible based on a lack of

21     authentication, a lack of relevance, inadmissible hearsay, and lack of a

22     foundation in personal knowledge.  (*See* Dkt. No. 98 [Def.'s Objections] at

23     24, 36-37.)

24     **82.**   By letter dated December 7, 2015, Plaintiffs' outside counsel

25  requested that Mr. Wirken advise as to "the volume of unprocessed Sweet People

26  and/or RCRV products currently maintained" at Phoenix Fibers' facility, so that

27  Plaintiffs could assess the possibility of reclaiming their unprocessed products.

28  (Salzmann Decl. ¶36, Ex. HH (SP/RCRV000055)).

**Phoenix Fibers' Response:** No material factual dispute. The statements in this paragraph are irrelevant to any matter in this dispute.

**83.** The following day, Mr. Wirken advised Plaintiffs' outside counsel that Phoenix Fibers possessed 125 pallets of Plaintiffs' products, with an estimated weight of 125,000 to 130,000 pounds. Mr. Wirken further advised that "[t]hese numbers are decreasing as the product is processed." Once again, no mention was made that any products had been or were being resold as credential, or that anything else was being done with them other than shredding them for processing into shoddy fiber. That same day, Plaintiffs' outside counsel advised Mr. Wirken that Plaintiffs would reclaim all remaining inventory, and requested that Phoenix Fibers cease processing Plaintiffs' products. In response, Mr. Wirken represented that the remaining inventory represented "whatever your clients sent [to Phoenix Fibers] and was not previously processed." (Salzmann Decl. ¶37, Ex. II (SP/RCRV000056-60) (emphasis added)).

**Phoenix Fibers' Response:** No material factual dispute. Plaintiffs rely on Salzmann Declaration Exhibit II, but it is inadmissible based on a lack of authentication, a lack of relevance, inadmissible hearsay, and lack of a foundation in personal knowledge. (*See* Dkt. No. 98 [Def.'s Objections] at 24, 36-37.)

**84.** Mr. Johnson testified that the term "processed," as used by Phoenix Fibers, refers to denim "put on the line to be turned into shoddy." (Salzmann Decl. ¶4, Ex. B (Johnson 21:20-25; 76:15-25)).

**Phoenix Fibers' Response:** No material factual dispute. Plaintiffs rely on Salzmann Declaration Exhibit B, but it is inadmissible based on a lack of authentication. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26.) The statements in this paragraph are irrelevant to any matter in this dispute.

**85.** Mr. Wirken's representations, however, were not true or accurate, given that Mr. Johnson, Phoenix Fibers' Plant Manager, had personally overseen

Phoenix Fibers' sale of an unknown quantity of MISS ME and ROCK REVIVAL denim products to Mr. Mroueh at U.S. General.   (Salzmann Decl. ¶4, Ex. B (Johnson 39:13-16; 71:5-14)).

**Phoenix Fibers' Response:** No material factual dispute. Plaintiffs rely on Salzmann Declaration Exhibit B, but it is inadmissible based on a lack of authentication. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26.)

**86.**   Shortly thereafter, in mid-December 2015, Plaintiffs reclaimed approximately 125 pallets of their unprocessed/unsold second-quality MISS ME and ROCK REVIVAL denim products from Phoenix Fibers' warehouse in Chandler, Arizona.   (Salzmann Decl. ¶6, Ex. D (Kim 25:17-26:11); Kim Decl. ¶27).

**Phoenix Fibers' Response:** Undisputed. However, Plaintiffs rely on Salzmann Declaration Exhibit D, but it is inadmissible based on a lack of authentication. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 27, 42, 43.)

**87.**   Once the products were returned to Plaintiffs' warehouse in Los Angeles, California, at Ms. Kim's direction Plaintiffs' warehouse staff conducted a review of the reclaimed products.   That review revealed that among the reclaimed goods were denim products that Plaintiffs had delivered to Phoenix Fibers for recycling into shoddy fiber as early as 2012.   (Salzmann Decl. ¶6, Ex. D (Kim 25:17-26:11); Kim Decl. ¶28).

**Phoenix Fibers' Response:** Plaintiffs do not create a material factual dispute. Plaintiffs rely on Salzmann Declaration Exhibit D, but it is inadmissible based on a lack of authentication. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 27, 42-43.) Plaintiffs also rely on Kim Declaration ¶ 28, but it is inadmissible based on inadmissible hearsay and lack of a foundation in personal knowledge.   (*See* Dkt. No. 98 [Def.'s Objections] at 19.) Plaintiffs therefore cannot establish a material factual dispute regarding their contention that the reclaimed goods were denim products that Plaintiffs had

1    delivered to Phoenix Fibers for recycling into shoddy fiber as early as 2012.

2    **88.**    In addition, many of the reclaimed boxes of MISS ME and ROCK

3    REVIVAL denim products had been cut open in one corner, and had apparently

4    been rummaged through.   After viewing certain of these cut-open boxes, it was

5    Ms. Kim's belief that the boxes were opened in this manner to determine the

6    quality and/or saleability of the MISS ME and ROCK REVIVAL denim products

7    contained inside.  (Salzmann Decl. ¶6, Ex. D (Kim 181:18-25); Kim Decl. ¶29).

8        **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs rely on

9        Salzmann Declaration Exhibit D, but it is inadmissible based on a lack of

10       authentication. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 27.) Plaintiffs

11       also rely on Kim Declaration ¶ 29, but it is inadmissible based on a lack of a

12       foundation in personal knowledge and because it offers an improper lay

13       opinion regarding the reason why the boxes were cut open. (*See* Dkt. No. 98

14       [Def.'s Objections] at 19.) Plaintiffs therefore cannot establish a material

15       factual dispute regarding their contention that the boxes of reclaimed goods

16       were opened to determine the quality and/or saleability of the MISS ME and

17       ROCK REVIVAL denim products contained inside.

18   **89.**    Realizing that they had received no forthright responses from Phoenix

19   Fibers about how their second-quality products were finding their way out of

20   Phoenix Fibers' warehouse, in or around early December 2015 Plaintiffs hired, at

21   significant expense, a private investigator to help identify the source of the second-

22   quality MISS ME and ROCK REVIVAL denim products that were continuing to

23   flood secondary channels of trade.  (Kim Decl. ¶30).

24       **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs rely on

25       Kim Declaration ¶ 30, but it is inadmissible based on lack of relevance and

26       also because the contention is argumentative.  (*See* Dkt. No. 98 [Def.'s

27       Objections] at 19.)

28   **90.**    In an effort to mitigate the incalculable harm to the MISS ME and

CONSOLIDATED SEPARATE STATEMENT

1  ROCK REVIVAL brands that was being caused by the widespread availability of
2  second-quality MISS ME and ROCK REVIVAL denim products, which Plaintiffs
3  had always taken strict measures to prevent, Ms. Kim authorized Plaintiffs'
4  investigators to purchase as many of such products as possible. (Kim Decl. ¶31.)

5  **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs rely on
6  Kim Declaration ¶ 31, but it is inadmissible based on a lack of a foundation
7  in personal knowledge, because it offers an improper lay opinion, and
8  because it is based on hearsay. (*See* Dkt. No. 98 [Def.'s Objections] at 19.)

9  **91.**     Between December 30, 2015 and February 9, 2016 (the day before
10  Plaintiffs commenced this action), Plaintiffs' investigators purchased over 29,000
11  units of second-quality MISS ME and ROCK REVIVAL denim products from
12  Defendants SAC International Traders, Inc., Shaukat Ali Chohan, Comak Trading,
13  Inc. and Lydia Evilsa Terrazas Cho, at a cost of over $190,000.   Documents
14  produced in discovery in this action establish that these goods were sourced by
15  these parties from Defendant U.S. General Export, Inc. who, in turn, purchased
16  them from Phoenix Fibers in sales brokered by Mr. Johnson. (Kim Decl. ¶31.)

17  **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs
18  cannot support their contentions with any admissible evidence. Plaintiffs
19  rely on Kim Declaration ¶ 31, but it is inadmissible based on a lack of a
20  foundation in personal knowledge, because it offers an improper lay opinion,
21  and because it is based on hearsay. (*See* Dkt. No. 98 [Def.'s Objections] at
22  19.)   Moreover, Plaintiffs' purported evidence does not support the
23  statement that "[d]ocuments produced in discovery in this action establish
24  that these goods were sourced by these parties from Defendant U.S. General
25  Export, Inc. who, in turn, purchased them from Phoenix Fibers in sales
26  brokered by Mr. Johnson." Nor does Plaintiffs' purported evidence does not
27  support that statement that it cost $190,000 for the investigator's services.

28  **92.**     To this day, as a direct result of Phoenix Fibers' conduct, second-

1   quality MISS ME and ROCK REVIVAL denim products improperly sold by
2   Phoenix Fibers are being offered for sale in secondary channels, and are continuing
3   to be sold by downstream customers through eBay and social media platforms such
4   as Facebook.  Phoenix Fibers' inexplicable sale of these products, which Plaintiffs
5   would never have authorized for distribution to consumers at any level, has caused
6   irreparable harm to Plaintiffs and their MISS ME and ROCK REVIVAL brands.
7   (Kim Decl. ¶32; Choi Decl. ¶¶12-13; Salzmann Decl. ¶31, Ex. CC
8   (SP/RCRV001366-1367); ¶32, Ex. DD (SP/RCRV005756-5757)).

9   **<u>Phoenix Fibers' Response</u>:** No material factual dispute because Plaintiffs
10   cannot support their contentions with any admissible evidence. Plaintiffs
11   rely on Kim Declaration ¶ 32, but the declaration contains no such
12   paragraph, and so it cannot establish a material factual dispute regarding
13   Plaintiffs' contentions. Plaintiffs also rely on Choi Declaration ¶¶ 12-13, but
14   it is inadmissible based on a lack of a foundation in personal knowledge.
15   (*See* Dkt. No. 98 [Def.'s Objections] at 9-10.)   Plaintiffs also rely on
16   Salzmann Declaration Exhibits CC and DD, but those exhibits are both
17   inadmissible based on a lack of relevance, a lack of foundation in personal
18   knowledge, inadmissible hearsay, and lack of authentication. (*See* Dkt. No.
19   98 [Def.'s Objections] at 24, 35-36.)

20   **93.**   In its Answer to Plaintiffs' Complaint, filed on March 29, 2016—
21   nearly five months after Ms. Kim first contacted Mr. Kean, and long after Mr.
22   Johnson conceded that he "probably advised" Mr. Kean of the sale of Plaintiffs'
23   products to U.S. General—Phoenix Fibers repeatedly and expressly denied
24   Plaintiffs' allegations, stating that "Defendant lacks any record of Defendant's
25   donated goods being distributed or sold by Defendant in the same form as donated
26   by Plaintiffs [i.e., as credential] and on that basis specifically denies such
27   allegation."  (Salzmann Decl. ¶11, Ex. I (Phoenix Fibers' Answer) at ¶¶ 4-6, 32,
28   37, 41-42, 46-50, 58-65, 67-73, 75-79, 83-94 (emphasis added)).

1    **Phoenix Fibers' Response:** The statements in this paragraph are irrelevant

2    to any matter in this dispute.

3    94.    On May 13, 2016—over six months after Ms. Kim first contacted Mr.

4    Kean, and long after Mr. Johnson conceded that he "probably advised" Mr. Kean

5    of his sale of Plaintiffs' products to U.S. General—Phoenix Fibers served its Initial

6    Disclosures.  Those disclosures continued to perpetuate the charade that Phoenix

7    Fibers had not resold Plaintiffs' products, and identified no documents relating to,

8    or witnesses with knowledge of such sales of Plaintiffs' products, despite the fact

9    that Mr. Johnson, the individual who had personally overseen the sale of pallets of

10   Plaintiffs' MISS ME and ROCK REVIVAL products to U.S. General, was

11   identified by Phoenix Fibers as a witness with knowledge of relevant facts.

12   (Salzmann Decl. ¶43, Ex. OO (Defendant Phoenix Fibers Initial Disclosures)).  To

13   date, Phoenix Fibers has not amended its Initial Disclosures.

14   **Phoenix Fibers' Response:** No material fact exists that Phoenix Fibers sold

15   credential to U.S. General.

16   95.    Five days later, on May 18, 2016, Plaintiffs filed their First Amended

17   Complaint.  (Salzmann Decl. ¶12, Ex. J (Plaintiffs' First Amended Complaint)).

18   Phoenix Fibers has not filed an answer to Plaintiffs' First Amended Complaint.

19   **Phoenix Fibers' Response:** Undisputed.  There is no general dispute of fact

20   that Phoenix Fibers was not required to file an answer to Plaintiffs' First

21   Amended Complaint.

22                    **Likelihood of Post-Sale Confusion**

23   96.    Observers of Plaintiffs' second-quality products, initially sold into

24   secondary trade channels by Phoenix Fibers, being worn by purchasers of such

25   products in the post-sale marketplace, are likely to be confused and believe that

26   such inferior quality products were authorized for sale by Plaintiffs as first-quality

27   products.  (Choi Decl. ¶¶12-13; Kim Decl. ¶32).

28

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs cannot support their contentions with any admissible evidence. Plaintiffs rely on Kim Declaration ¶ 32, but the declaration contains no such paragraph, and so it cannot establish a material factual dispute regarding Plaintiffs' contentions. Plaintiffs also rely on Choi Declaration ¶¶ 12-13, but it is inadmissible based on a lack of a foundation in personal knowledge. (*See* Dkt. No. 98 [Def.'s Objections] at 9-10.)

**"Factual" Statements in the Declarations of Tod Kean and Steve Johnson That Are Inconsistent with Their Deposition Testimony**

**97.** Phoenix Fibers did not have an operational website when the company launched in July 2011, and Tod Kean does not know when the website went live, stating at his deposition that he "would want to check the dates on the [Wayback] machine." (Salzmann Decl. ¶5, Ex. C (Kean 101:5-25)). Had Mr. Kean checked the Wayback Machine, he would have learned that the first screen capture of the phxfibers.com website is from September 13, 2012, more than a year after Phoenix Fibers commenced its business. (Salzmann Decl. ¶42, Ex. NN (printout of Wayback Machine screen capture)). Moreover, Phoenix Fibers did not "purchase" Plaintiffs' products, and when Mr. Kean was specifically asked how this statement—"The items we do not use in our shredding process are resold to other recycling companies"—which refers to the resale or reselling of products, related Phoenix Fibers' sale of Plaintiffs' products, Mr. Kean was unable to identify any first or initial "sale" of products by Plaintiffs that preceded Phoenix Fibers' "resale." (Salzmann Decl. ¶5, Ex. C (Kean 102:1-23)).

**Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible. (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26-27.) Moreover, there is no material factual dispute that the statements by Mr. Kean are consistent.

**98.** Phoenix Fibers has produced no evidence to substantiate Mr. Kean's

1   claim that the phxfibers.com website has been active "[s]ince [the company's]
2   inception" in July 2011.  (Kean Decl. ¶9).

3   **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs
4   clearly misconstrue Mr. Kean's declaration statement.  Further, Plaintiffs
5   have the burden of producing evidence to survive summary judgment, not
6   Phoenix Fibers. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Moreover,
7   there is no material factual dispute that the statements by Mr. Kean are
8   consistent.

9   **99.**   When Mr. Johnson was asked at his deposition whether it was his
10   understanding that "U.S. General Export is a recycling company," his response
11   was "I have no idea."  (Salzmann Decl. ¶4, Ex. B (Johnson 98:6-8)).  Yet now, Mr.
12   Johnson unequivocally states in his declaration that "U.S. General Exports [sic] …
13   is a clothing recycler," and downplays Phoenix Fibers' involvement in the
14   shredding of denim products and their conversion into shoddy fiber.  (Johnson
15   Decl. ¶8).

16   **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs
17   rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections]
18   at 20, 26.) Moreover, there is no material factual dispute that the statements
19   by Mr. Johnson are consistent.   And, Plaintiffs cited evidence does not
20   support the fact that Mr. Johnson "downplay[ed] Phoenix Fibers'
21   involvement in the shredding of denim products and their conversion into
22   shoddy fiber."

23   **100.**   When Mr. Johnson was asked at his deposition whether Phoenix
24   Fibers was doing business with Kamel Mroueh, the owner of U.S. General, at the
25   time he came on board as Plant Manager in September 2013, his response was "I
26   honestly don't know, but I'm -- yeah, I don't know.  I don't know when the
27   relationship started."  (Salzmann Decl. ¶4, Ex. B (Johnson 33:5-10)).  However,
28   Mr. Johnson now unequivocally states in his declaration that "[t]o my knowledge,

based on my job and a review of records, Phoenix Fibers did not sell any credential to U.S. General prior to 2013." (Johnson Decl. ¶8).  Furthermore, whatever Phoenix Fibers "records" Mr. Johnson is referring to in his declaration have not been produced in this litigation.

> **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections] at 20, 26, 39.) Moreover, there is no material factual dispute that the statements by Mr. Johnson are consistent.  Plaintiffs fail to cite any evidence to support the statement that "whatever Phoenix Fibers 'records' Mr. Johnson is referring to in his declaration have not been produced in this litigation."

**101.**   When Mr. Johnson was asked at his deposition whether he knew how Phoenix Fibers was able to determine the dates of its sales of Plaintiffs' products to U.S. General, as disclosed in Phoenix Fibers' Responses to Sweet People's First Set of Interrogatories (*i.e.*, "between early Spring 2015 — early Fall 2015"), he testified that he did not know, and could not recall if he had discussed the range of those dates with Mr. Kean prior to the time Mr. Kean verified the accuracy of the response.   (Salzmann Decl. ¶4, Ex. B (Johnson 92:25-93:7); ¶44, Ex. PP (Defendant Phoenix Fibers, Inc.'s Responses to First Set of Interrogatories From Plaintiff Sweet People Apparel, Inc.)).  In his declaration, however, Mr. Johnson now states that "[b]ased on my review of Phoenix Fibers' records and my recollection, Phoenix Fibers sold certain products donated by Sweet People and RCRV to U.S. General, as credential, in bulk, and by the pound beginning in 2015." (Johnson Decl. ¶9).  As for the "records" Mr. Johnson is referring to, at his deposition Mr. Johnson testified that Mr. Mroueh "always" paid in cash, and therefore the only transactional documents that would exist were handwritten sales slips that he would have prepared.  (Salzmann Decl. ¶4, Ex. B (Johnson 37:18-19; 47:20-48:5)).  It is therefore unclear what "Phoenix Fibers records" Mr. Johnson is

1    referring to, as Phoenix Fibers has produced no such records relating to its sales of

2    Plaintiffs' denim products to U.S. General.

3        **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

4    rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections]

5    at 20, 26, 40.)  Moreover, there is no material factual dispute that the

6    statements by Mr. Johnson are consistent.

7        **102.**   When Mr. Johnson was asked at his deposition if he had "a sense of

8    the percentage of donated Miss Me and Rock Revival product that was converted

9    into shoddy as opposed to sold," his response was "I have no idea."  When further

10   asked whether anyone at Phoenix Fibers would know the answer to that question,

11   Mr. Johnson's response was "No."  (Salzmann Decl. ¶4, Ex. B (Johnson 70:19-

12   24)).  However, Mr. Johnson now states definitively in his declaration that "[p]rior

13   to 2015, items donated by Sweet People and RCRV were converted into shoddy

14   fiber." (Johnson Decl. ¶9).

15       **Phoenix Fibers' Response:** No material factual dispute because Plaintiffs

16   rely on evidence that is inadmissible.  (*See* Dkt. No. 98 [Def.'s Objections]

17   at 20, 26.)  Moreover, there is no material factual dispute that the statements

18   by Mr. Johnson are consistent.

19                    **Plaintiffs Have Not Completed Certain Fact Discovery**

20   **Required to Oppose Phoenix Fibers' Motion, and Fact Discovery Remains**

21                              **Open for Two More Months**

22       **103.**   Fact discovery in this action closes on March 13, 2017.  (Salzmann

23   Decl. ¶47).

24       **Phoenix Fibers' Response:** Undisputed.

25       **104.**   Plaintiffs have diligently attempted to schedule the deposition of U.S.

26   General since September 2016.  Plaintiffs' counsel first contacted U.S. General's

27   counsel, Eugene Alkana, on September 16, 2016, to inquire about scheduling the

28   deposition of U.S. General's President, Kamel Mroueh.   That same day, Mr.

1  Alkana advised that he believed that Mr. Mroueh "currently resides in the Congo,"
2  that he would "talk to him about his travel plans" and would provide Plaintiffs'
3  counsel with an update during the week of September 26, 2016.  (Salzmann Decl.
4  ¶48).

5  **Phoenix Fibers' Response:** No material factual dispute that Plaintiffs failed
6  to diligently attempt to schedule the deposition of U.S. General *prior to*
7  *September 2016*.  No material factual dispute that, overall, Plaintiffs have
8  failed to diligently attempt to schedule the deposition of U.S. General.
9  Plaintiffs' contention is insufficient to establish a need for discovery.

10  **105.** Plaintiffs' counsel thereafter followed up with Mr. Alkana on
11  September 26, to again inquire as to Mr. Mroueh's availability, further stating:
12  "To the extent Mr. Mroueh will not be returning to the U.S., we would like to
13  depose Ms. [Nellie] Sanchez.  Also we would like to depose an appropriate
14  corporate representative(s) to address the topics set forth in the attached draft Rule
15  30(b)(6) notice.  We will serve formal notices once we are able to work out dates."
16  (Salzmann Decl. ¶49).

17  **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs'
18  contention is insufficient to establish a need for discovery.

19  **106.** In response, on September 29, 2016, Mr. Alkana advised that Mr.
20  Mroueh "will not return to the U.S. [until] June 2017," and offered to explore the
21  possibility of conducting a video deposition of Mr. Mroueh from the Congo.  After
22  exploring this possibility, it was determined to be unfeasible, and on October 5,
23  2016, Plaintiffs' counsel sent an email to Mr. Alkana advising him of the same,
24  and reiterating Plaintiffs' counsel's position that Plaintiffs "are entitled to depose a
25  knowledgeable corporate representative of U.S. General (whether it is Mr. Mroueh
26  or someone else) in California where U.S. General is registered to do business and
27  maintains its principal place of business."  (Salzmann Decl. ¶50, Ex. SS).

28  **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs'

CONSOLIDATED SEPARATE STATEMENT

1 contention is insufficient to establish a need for discovery.

2 **107.** That same day (October 5, 2016), Plaintiffs' counsel served Plaintiffs'

3 Rule 30(b)(6) notice of deposition on U.S. General, calling for the deposition to

4 take place on October 28, 2016.  (Salzmann Decl. ¶51, Ex. TT).

5 **Phoenix Fibers' Response:**  No material factual dispute.  Plaintiffs'

6 contention is insufficient to establish a need for discovery.

7 **108.** Thereafter, on October 14, 2016, U.S. General served Objections and

8 Designations in response to Plaintiffs' Rule 30(b)(6) deposition notice, identifying

9 Ms. Sanchez as U.S. General's corporate representative, and indicating that "[t]he

10 date currently set for deposition is not acceptable as counsel for U.S. General is not

11 available on that date," yet offering no alternative dates.  (Salzmann Decl. ¶52).

12 **Response:** No material factual dispute. Plaintiffs' contention is insufficient

13 to establish a need for discovery. Plaintiffs' cannot sufficiently demonstrate

14 that the discovery is necessary, or that they were diligent in obtaining it by

15 waiting for counsel for U.S. General to propose dates instead of just doing it

16 themselves.

17 **109.** On November 14, 2016, Plaintiffs' counsel sent an email to Mr.

18 Alkana requesting that he provide "Ms. Sanchez's availability for deposition

19 during the week of December 5."  Having received no response from Mr. Alkana,

20 Plaintiffs' counsel sent him another email on November 23, 2016, again requesting

21 that he advise of Ms. Sanchez's availability for deposition during the week of

22 December 5, 2016.  That same day, Mr. Alkana responded, stating only: "I will

23 inquire."   Again, having not received a further response from Mr. Alkana,

24 Plaintiffs' counsel sent him another email on December 7, 2016 inquiring as to Ms.

25 Sanchez's availability.  Mr. Alkana responded the same day, stating "I will get

26 dates for Ms. Sanchez and report to [you] on Monday."  However, Mr. Alkana has

27 yet to propose any dates for Ms. Sanchez's deposition. (Salzmann Decl. ¶53, Ex.

28 UU).

CONSOLIDATED SEPARATE STATEMENT

**Phoenix Fibers' Response**: No material factual dispute. Plaintiffs' contention is insufficient to establish a need for discovery. Plaintiffs' cannot sufficiently demonstrate that the discovery is necessary, or that they were diligent in obtaining it by waiting for Mr. Alkana to propose dates instead of just doing it themselves.

**110.** Accordingly, despite Plaintiffs' diligent efforts to schedule the Rule 30(b)(6) deposition of U.S. General, the party that most immediately purchased Plaintiffs' Donated Products from Phoenix Fibers—and therefore the party in the best position to testify as to the representations made by Phoenix Fibers about such products and sales—Plaintiffs have not yet been able to complete that important discovery. (Salzmann Decl. ¶54).

**Phoenix Fibers' Response**: No material factual dispute. Plaintiffs' contention is insufficient to establish a need for discovery. Plaintiffs' cannot sufficiently demonstrate that the discovery is necessary, or that they were diligent in obtaining it.

**111.** Mr. Johnson has submitted a declaration in support of Phoenix Fibers' motion wherein he characterizes the nature of U.S. General's business (Johnson Decl. ¶8), his communications with Mr. Mroueh (Johnson Decl. ¶¶10-12), and Phoenix Fibers' sale of MISS ME and ROCK REVIVAL products to U.S. General (Johnson Decl. ¶¶9, 13-16).

**Phoenix Fibers' Response**: No material factual dispute. Plaintiffs' contention is insufficient to establish a need for discovery.

**112.** To this date, Plaintiffs have not had the opportunity to inquire of a U.S. General representative as to the veracity of those alleged communications. (Salzmann Decl. ¶55).

**Phoenix Fibers' Response**: No material factual dispute. Plaintiffs' contention is insufficient to establish a need for discovery. Plaintiffs have not demonstrated that they have diligently sought the opportunity to depose

1    a U.S. General representative.

2    **113.** Defendant Shaukat Ali Chohan, the owner of Defendant SAC

3    International Traders, Inc.—a party that purchased approximately 60,000 units of

4    MISS ME and ROCK REVIVAL products from Phoenix Fibers' direct customer

5    U.S. General (Salzmann Decl. ¶30, Ex. BB (US GEN EXPORT 000028-33))—left

6    the United States in or around January or February 2016.  (Salzmann Decl. ¶9, Ex.

7    G (Wolff 43:25-44:6; 101:13-102:15)).

8    **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs'

9    contention is insufficient to establish a need for discovery.

10   **114.** The Clerk entered a default against Mr. Chohan in this case on March

11   28, 2016.  (Salzmann Decl. ¶57).

12   **Phoenix Fibers' Response:** Undisputed.

13   **115.** Mr. Chohan operated his business in close partnership with

14   Defendants Lydia Evilsa Terrazas Cho and Comak Trading, Inc., and collectively

15   they engaged in the resale of MISS ME and ROCK REVIVAL products that SAC

16   International Traders purchased from U.S. General.  (Salzmann Decl. ¶9, Ex. G

17   (Wolff 73:22-76:17); ¶45, Ex. QQ (Plaintiff Sweet People Apparel, Inc.'s First Set

18   of Interrogatories Directed to Defendant Tiffany Alana Wolff); ¶46, Ex. RR

19   (Wolff's Responses to RCRV's Interrogatories); ¶58).

20   **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs'

21   contention is insufficient to establish a need for discovery.

22   **116.** Although the two individuals most directly involved in the

23   distribution of MISS ME and ROCK REVIVAL products sold by Phoenix

24   Fibers—Mr. Mroueh (U.S. General) and Mr. Chohan (SAC International

25   Traders)—left the United States shortly following the commencement of this

26   action, Ms. Cho, Mr. Chohan's associate from Comak Trading, remains in

27   California.  (Salzmann Decl. ¶59; ¶9, Ex. G (Wolff 43:25-44:6; 73:22-76:17;

28   101:13-102:15)).

1     **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs'

2     contention is insufficient to establish a need for discovery.

3     **117.** Plaintiffs' counsel served a notice of deposition on Ms. Cho on

4 November 14, 2016, calling for her deposition to take place in December 9, 2016.

5 Thereafter, on November 30, 2016, Plaintiffs' counsel sent an email to Ms. Cho

6 requesting that she confirm her availability for deposition on December 9, 2016 as

7 noticed. Having received no response from Ms. Cho, Plaintiffs' counsel sent an

8 email to Ms. Cho and all counsel of record adjourning her deposition. (Salzmann

9 Decl. ¶60, Ex. VV).

10     **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs'

11     contention is insufficient to establish a need for discovery.

12     **118.** Thereafter, on December 6, 2016, Plaintiffs' counsel received a call

13 from a representative of Ms. Cho, stating that she was in the process of attempting

14 to retain new counsel for purposes of her deposition, and requesting that her

15 deposition be further adjourned until January 2017. (Salzmann Decl. ¶61).

16     **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs'

17     contention is insufficient to establish a need for discovery.

18     **119.** The depositions of U.S. General and Ms. Cho will be critical to

19 providing the complete picture as to the nature and scope of Phoenix Fibers'

20 relationship with U.S. General and Comak Trading, and other defendants up the

21 chain, which is essential to the question whether Defendants are joint tortfeasors.

22 In addition, this long-awaited discovery will provide important information about

23 the manner in which Plaintiffs' second-quality goods were and are being

24 improperly distributed, including how Phoenix Fibers presented them to U.S.

25 General. (Salzmann Decl. ¶62).

26     **Phoenix Fibers' Response:** No material factual dispute. Plaintiffs'

27     contentions do not bear on the issues in Phoenix Fibers' summary judgment

28     motion. Even if they did, Plaintiffs' claim that further discovery is needed to

1    determine whether the defendants are joint tortfeasors is belied by Plaintiffs'

2    argument in Opposition to Phoenix Fibers' Motion that Phoenix Fibers is a

3    joint tortfeasor simply by virtue of being "in the distribution chain," (Dkt.

4    No. 97 at 18-21 [Opp.]), and by describing that distribution chain in

5    Statement 115 above, among other places. Similarly, Plaintiffs' claim that

6    they need to develop a "complete picture as to the nature and scope of

7    Phoenix Fibers' relationship with U.S. General" is belied by their assertion

8    in the Opposition that "[c]ertainly, the evidence demonstrates that Phoenix

9    Fibers and U.S. General . . . had a close and unique relationship." (*Id.* at 20.)

10   Plaintiffs further fail to support their claim that any of the referenced

11   discovery is "long-awaited," unless Plaintiffs are referring to the long time

12   that they waited before even attempting to notice the depositions of U.S.

13   General and Ms. Cho. (Dkt. No. 93 at 8, 10 [Salzmann Decl.].)

16   DATED:  January 13, 2017              HAYNES AND BOONE, LLP

18                                         By:  */s/ Kenneth G. Parker*
                                             Kenneth G. Parker
19                                           Attorneys for Defendant
                                             Phoenix Fibers, Inc.

CONSOLIDATED SEPARATE STATEMENT

1

## **CERTIFICATE OF SERVICE**

2

3      I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 600 Anton Boulevard, Suite 700, Costa Mesa, California 92626.

4

5      I hereby certify that on January 13, 2016, I served the foregoing documents described as ***CONSOLIDATED SEPARATE STATEMENT*** on the following individuals:

6

7

| | |
|---|---|
| Louis S. Ederer, Esq.<br>Matthew T. Salzmann, Esq.<br>ARNOLD AND PORTER LLP<br>399 Park Avenue<br>New York, NY  90022<br><br>[Attorneys for Plaintiffs]<br>[Served Electronically] | John C. Ulin, Esq.<br>Eric D. Mason, Esq.<br>ARNOLD AND PORTER LLP<br>777 South Figueroa Street, 44th Fl.<br>Los Angeles, CA  90017-5844<br><br>[Attorneys for Plaintiffs]<br>[Served Electronically] |
| Eugene S Alkana<br>Eugene S Alkana Law Office<br>131 North El Molino Avenue Suite 310<br>Pasadena, CA 91101<br><br>[Attorneys for U.S. General Export]<br>[Served Electronically] | J T Fox<br>Law Offices of JT Fox and Associates<br>556 South Fair Oaks Avenue Suite 444<br>Pasadena, CA 91105<br><br>[Attorneys for Tiffany Alana Wolff]<br>[Served Electronically] |
| Lydia Evilsa Terrazas Cho<br>702 N Crescent Drive<br>Beverly Hills, CA 90210<br>*Pro Se*<br><br>[Served via U.S. Mail] | Comak Trading<br>2550 S Soto St,<br>Vernon, CA 90058<br><br><br>[Served via U.S. Mail] |

      I declare that I am a member of the bar of this Court.

      Executed on January 13, 2016, at Costa Mesa, California.


                              */s/ Christopher B. Maciel*
                              Christopher B. Maciel

---

112