1  JOHN C. ULIN (State Bar No. 165524)
   John.Ulin@apks.com
2  ERIC D. MASON (State Bar No. 259233)
   Eric.Mason@apks.com
3  LOUIS S. EDERER (*Pro Hac Vice*)
   Louis.Ederer@apks.com
4  MATTHEW T. SALZMANN (*Pro Hac Vice*)
   Matthew.Salzmann@apks.com
5  ARNOLD & PORTER KAYE SCHOLER LLP
6  777 South Figueroa Street, 44th Floor
   Los Angeles, California 90017-5844
7  Telephone: (213) 243-4000; Facsimile: (213) 243-4199

8  *Attorneys for Plaintiffs*

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11                  **WESTERN DIVISION**

12
   SWEET PEOPLE APPAREL, INC. d/b/a )   Case No.:  2:16-cv-00940-TJH-JC
13 MISS ME, a California corporation, et al., )
                                           )   Hon. Terry J. Hatter Jr.
14            Plaintiffs,                   )
                                           )   **PLAINTIFFS' MEMORANDUM**
15      v.                                  )   **OF CONTENTIONS OF FACT**
                                           )   **AND LAW**
16 PHOENIX FIBERS, INC., an Arizona         )
17 corporation, et al.,                     )   Pretrial Conf. Date: March 27, 2016
                                           )
18            Defendants.                   )   Trial Date: TBD
                                           )
19 _____ )

20      Pursuant to Local Rule 16-4, Plaintiffs Sweet People Apparel, Inc. d/b/a MISS

21 ME ("Sweet People") and RCRV, Inc. d/b/a ROCK REVIVAL ("RCRV")

22 (collectively, "Plaintiffs") respectfully submit the following memorandum of

23 contentions of fact and law.

24                      **INTRODUCTION**

25      This suit arises out of Plaintiffs' desire to destroy its defective products in an

26 environmentally friendly manner.  Defendant Phoenix Fibers, Inc. ("Phoenix Fibers")

27 agreed to provide such a service, but instead sold Plaintiffs' second-quality MISS ME

28 and ROCK REVIVAL products out the back door for profit.  All of the Defendants

benefited from this scam, while Plaintiffs and consumers were irreparably harmed by the confusion it undoubtedly caused in the marketplace.  Such misconduct should not be tolerated.

Plaintiffs manufacture, promote, sell and distribute high-quality denim and apparel products throughout the United States under the well-known MISS ME and ROCK REVIVAL brand names, each of which is the subject of numerous federal trademark registrations.  Plaintiffs' MISS ME and ROCK REVIVAL products have achieved substantial sales success and received extensive media coverage.  Moreover, Plaintiffs' products are widely recognized for their superior quality, a reputation they have earned by maintaining strict policies that ensure that only the highest quality goods enter the stream of commerce.

As a result of their strict quality control procedures, Plaintiffs deem certain MISS ME and ROCK REVIVAL denim products unfit for sale to consumers.  Prior to November 2011, Plaintiffs took great care to dispose of such products either by incinerating them at their overseas factories, or cutting them up and depositing them in a landfill.  However, in light of the potentially negative environmental impact of these disposal methods, finding an environmentally friendly way to dispose of their second-quality denim products became a high priority for Plaintiffs.

In November 2011, Plaintiffs' representative, Lisa Song, on the instruction of her superiors, contacted Bonded Logic, Inc. ("Bonded Logic"), Phoenix Fibers' commonly-owned affiliate, about its program of using denim to manufacture environmentally friendly insulation products, and was referred to Phoenix Fibers.  Ms. Song, operating under the supervision of Plaintiffs' then-General Counsel, Lilly Kim, engaged in a series of communications with Phoenix Fibers' then-General Manager, Matt Graham.  Ms. Song explained to Mr. Graham Plaintiffs' desire to dispose of their second-quality products in an environmentally friendly way, while Mr. Graham pitched to Ms. Song Phoenix Fibers' business of converting denim into shoddy fiber for Bonded Logic's use in producing insulation and other products.

1    Shortly thereafter, the parties arrived at a mutually beneficial agreement —

2  Plaintiffs would deliver their second-quality MISS ME and ROCK REVIVAL

3  products to Phoenix Fibers' facility at no cost, and Phoenix Fibers would shred (*i.e.*,

4  destroy) Plaintiffs' products and convert them into shoddy fiber, which its affiliate

5  Bonded Logic would then use to manufacture environmentally friendly insulation

6  products.   Plaintiffs delivered their first load of second-quality denim products to

7  Phoenix Fibers for shredding at the end of November 2011.

8    Thereafter, from November 2011 through September 2015, Plaintiffs shipped

9  approximately one million pounds of second-quality MISS ME and ROCK

10  REVIVAL denim products to Phoenix Fibers for destruction and conversion into

11  shoddy fiber.  At no time during this entire period did Phoenix Fibers ever indicate,

12  or even imply, that it was doing (or had the right to do) anything with Plaintiffs'

13  second-quality goods other than destroy them in accordance with the parties'

14  agreement.  To the contrary, Phoenix Fibers continued to represent that Plaintiffs'

15  products were being shredded into shoddy fiber.

16    In the summer of 2015, Plaintiffs learned that significant quantities of second-

17  quality MISS ME and ROCK REVIVAL denim products, which Plaintiffs had never

18  authorized to be sold to consumers, were being offered for sale in secondary

19  consumer trade channels.  Plaintiffs' investigation revealed that these were products

20  that had been delivered to Phoenix Fibers for conversion into shoddy fiber under the

21  parties' 2011 agreement.

22    Accordingly, in October 2015, Ms. Kim contacted Phoenix Fibers to express

23  Plaintiffs' concern that second-quality products were finding their way out of

24  Phoenix Fibers' warehouse and into consumer trade channels.  Both Tod Kean (CEO

25  of Phoenix Fibers and co-founder of Bonded Logic) and Steven Johnson (Phoenix

26  Fibers' then-Plant Manager) told Ms. Kim that the problem was the result of

27  "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.  In fact, however, as

28  Messrs. Kean and Johnson well knew, Phoenix Fibers had sold these products to

3

1   Defendant U.S. General Export, Inc. ("U.S. General").  In other words, Phoenix

2   Fibers repeatedly lied to Plaintiffs, and continued to do so for months; even denying

3   the existence of any such sales in its Answer filed in this action five months later.

4        Having received only dishonest responses from Phoenix Fibers, in early

5   December 2015 Plaintiffs hired a private investigator, at significant expense, to

6   determine the source of the second-quality MISS ME and ROCK REVIVAL denim

7   products that were flooding consumer trade channels.  Between December 2015 and

8   February 2016, Plaintiffs' investigators purchased over 29,000 units of such products

9   from Defendants Comak Trading, Inc. and Lydia Evilsa Terrazas Cho, and SAC

10   International Traders, Inc. and Shaukat Ali Chohan, at a cost of nearly $200,000.

11   Unfortunately, those units turned out to be only the tip of the iceberg.  Discovery has

12   established that all of these goods had been sourced from Defendant U.S. General,

13   which in turn had purchased them from Phoenix Fibers in cash sales brokered by Mr.

14   Johnson.  Thus, apparently for years, the consumer market has been, and continues to

15   be flooded with poor quality MISS ME and ROCK REVIVAL products that were

16   never intended to be sold to the public, but which observers in the post-sale market

17   will inevitably believe are Plaintiffs' first-quality goods.

## L.R. 16-4.1 CLAIMS AND DEFENSES

### I. Plaintiffs' Claims

20      Claim 1: Phoenix Fibers' unauthorized distribution and/or sale of Plaintiffs'

21   second-quality goods constitutes a breach of Phoenix Fibers' agreement with

22   Plaintiffs only to shred Plaintiffs' donated second-quality goods and convert them

23   into shoddy fiber.

24      Claim 2: Defendants' unauthorized distribution and/or sale of Plaintiffs'

25   second-quality goods constitutes infringement of Plaintiffs' federally registered MISS

26   ME and ROCK REVIVAL trademarks, in violation of 15 U.S.C. § 1114.

27

28

Claim 3: Defendants' unauthorized distribution and/or sale of Plaintiffs' second-quality goods constitutes false designation of origin and unfair competition, in violation of 15 U.S.C. § 1125(a).

Claim 4: Defendants' unauthorized distribution and/or sale of Plaintiffs' second-quality goods constitutes unfair competition, in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

Claim 5: Defendants' unauthorized distribution and/or sale of Plaintiffs' second-quality goods constitutes trademark dilution, in violation of Cal. Bus. & Prof. Code § 14247.

Claim 6: Defendants' unauthorized distribution and/or sale of Plaintiffs' second-quality goods constitutes trademark infringement and unfair competition under California common law.

## II.     Elements Required to Establish Plaintiffs' Claims

A.     Elements Required to Establish Plaintiffs' Breach of Contract Claim

The following elements are required to establish Plaintiffs' claim for breach of contract:

1.     The existence of a contract between Plaintiffs and Phoenix Fibers;

2.     Plaintiffs' performance under the contract;

3.     Phoenix Fibers' breach of the contract; and

4.     Plaintiffs were damaged as a result of Phoenix Fibers' breach.

*See Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).  *See generally* CACI No. 303, Breach of Contract—Essential  Factual Elements.

In California, the required elements demonstrating the existence of a contract are:

1.     The parties are capable of contracting;

2.     The parties gave consent;

3.     The contract had a lawful object; and

4.     Sufficient consideration was exchanged.

5

*See* Cal. Civ. Code § 1550 (West).  *See generally* CACI No. 302, Contract

Formation—Essential Factual Elements.

      B.    <u>Elements Required to Establish Plaintiffs' Trademark Infringement Claim</u>

            <u>Under 15 U.S.C. § 1114</u>

      The following elements are required to establish Plaintiffs' claim for trademark

infringement under the Lanham Act:

      1.    Plaintiffs own valid and protectable interests in the MISS ME and/or

            ROCK REVIVAL marks; and

      2.    Defendants used Plaintiffs' MISS ME and/or ROCK REVIVAL marks

            without consent, and in a manner that was likely to cause confusion

            among ordinary consumers, including those who observe such product in

            the post-sale marketplace, as to the source, sponsorship, affiliation, or

            approval of the goods.

*See* Ninth Circuit Manual of Model Civil Jury Instructions 15.6; *AOP Ventures, Inc. v.*

*Steam Distribution, LLC*, 2016 WL 7336730, at \*4 (C.D. Cal. Oct. 11, 2016) (citing

*Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1072 (C.D. Cal. 2004));

*Karl Storz Endoscopy Am., Inc. v. Surgical Tech., Inc.*, 285 F.3d 848, 854 (9th Cir.

2002) ("The law in the Ninth Circuit is clear that 'post-purchase' confusion, *i.e.*,

confusion on the part of someone other than the purchaser who, for example, simply

sees the item after it has been purchased, can establish the required likelihood of

confusion ….").

      C.    <u>Elements Required to Establish Plaintiffs' False Designation of Origin</u>

            <u>and Unfair Competition Claim Under 15 U.S.C. § 1125(a)</u>

      The following elements are required to establish Plaintiffs' claim for false

designation of origin under the Lanham Act:

      1.    Plaintiffs own valid and protectable interests in the MISS ME and/or

            ROCK REVIVAL marks; and

1       2.     Defendants used Plaintiffs' MISS ME and/or ROCK REVIVAL marks

2           without consent, and in a manner that was likely to cause confusion

3           among ordinary consumers, including those who observe such product in

4           the post-sale marketplace, as to the source, sponsorship, affiliation, or

5           approval of the goods.

6   *See* Ninth Circuit Manual of Model Civil Jury Instructions 15.5 cmt & 15.6; *New W.*

7   *Corp. v. NYM Co. of California*, 595 F.2d 1194, 1201 (9th Cir. 1979); *AOP Ventures,*

8   *Inc.*, 2016 WL 7336730, at *4 (citing *Phillip Morris USA Inc.*, 352 F. Supp. 2d at

9   1072); *Fed'n of Telugu Ass'ns of S. California v. Telugu Ass'n of S. California*, 2016

10  WL 1588479, at *8 (C.D. Cal. Apr. 20, 2016); *Karl Storz Endoscopy Am., Inc.*, 285

11  F.3d at 854 ("The law in the Ninth Circuit is clear that 'post-purchase' confusion, *i.e.*,

12  confusion on the part of someone other than the purchaser who, for example, simply

13  sees the item after it has been purchased, can establish the required likelihood of

14  confusion ….").

15      D.    <u>Elements Required to Establish Plaintiffs' Unfair Competition Claim</u>

16          <u>Under Cal. Bus. & Prof. Code §§ 17200 *et seq.*</u>

17      The following elements are required to establish Plaintiffs' claim for unfair

18  competition under California law:

19      1.     Plaintiffs own valid and protectable interests in the MISS ME and/or

20          ROCK REVIVAL marks; and

21      2.     Defendants used Plaintiffs' MISS ME and/or ROCK REVIVAL marks

22          without consent, and in a manner that was likely to cause confusion

23          among ordinary consumers, including those who observe such product in

24          the post-sale marketplace, as to the source, sponsorship, affiliation, or

25          approval of the goods.

26  *See* Ninth Circuit Manual of Model Civil Jury Instructions 15.6; *Acad. of Motion*

27  *Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir.

28  1991); *AOP Ventures, Inc.*, 2016 WL 7336730, at *4 (citing *Phillip Morris USA Inc.*,

352 F. Supp. 2d at 1072); *Fed'n of Telugu Ass'ns of S. California v. Telugu Ass'n of S. California*, 2016 WL 1588479, at *8 (C.D. Cal. Apr. 20, 2016); *Karl Storz Endoscopy Am., Inc.*, 285 F.3d at 854 ("The law in the Ninth Circuit is clear that 'post-purchase' confusion, *i.e.*, confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion ….").

      E.     <u>Elements Required to Establish Plaintiffs' Trademark Dilution Claim Under Cal. Bus. & Prof. Code § 14247</u>

      The following elements are required to establish Plaintiffs' claim for trademark dilution under California law:

      1.     Plaintiffs' MISS ME and/or ROCK REVIVAL marks are famous and distinctive in the State of California;

      2.     Defendants are using identical or nearly identical marks in commerce;

      3.     Defendants' use began after the marks became famous; and

      4.     Defendants' use is likely to cause dilution of Plaintiffs' marks, such as by (a) blurring or (b) tarnishment.

*See Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1089–90 (9th Cir. 2010); *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008); *Lions Gate Entm't Inc. v. TD Ameritrade Holding Corp.*, 2016 WL 4134495 (C.D. Cal. Aug. 1, 2016).

      F.     <u>Elements Required to Establish Plaintiffs' Trademark Infringement and Unfair Competition Claim Under California Common Law</u>

      The following elements are required to establish Plaintiffs' claim for trademark infringement or unfair competition under California common law:

      1.     Plaintiffs own valid and protectable interests in the MISS ME and/or ROCK REVIVAL marks; and

      2.     Defendants used Plaintiffs' MISS ME and/or ROCK REVIVAL marks without consent, and in a manner that was likely to cause confusion among ordinary consumers, including those who observe such product in

1    the post-sale marketplace, as to the source, sponsorship, affiliation, or

2    approval of the goods.

3  *See* Ninth Circuit Manual of Model Civil Jury Instructions 15.6; *KCI Newport, Inc. v.*

4  *Smoke Tokes, LLC*, 2016 WL 2885859, at *7 (C.D. Cal. May 17, 2016); *Kleven v.*

5  *Hereford*, 2016 WL 4424964, at *7 (C.D. Cal. Feb. 18, 2016); *AOP Ventures, Inc.*,

6  2016 WL 7336730, at *4 (citing *Phillip Morris USA Inc.*, 352 F. Supp. 2d at 1072);

7  *Fed'n of Telugu Ass'ns of S. California v. Telugu Ass'n of S. California*, 2016 WL

8  1588479, at *8 (C.D. Cal. Apr. 20, 2016); *Karl Storz Endoscopy Am., Inc.*, 285 F.3d at

9  854 ("The law in the Ninth Circuit is clear that 'post-purchase' confusion, *i.e.*,

10  confusion on the part of someone other than the purchaser who, for example, simply

11  sees the item after it has been purchased, can establish the required likelihood of

12  confusion ….").

13  **III.**   **Key Evidence in Support of Plaintiffs' Claims**

14       A.   Key Evidence in Support of Plaintiffs' Breach of Contract Claim

15       The following is a brief description of the key evidence Plaintiffs intend to rely

16  on in support of this claim:

17       1.   Testimony and/or documents demonstrating that Lisa Song represented

18            Plaintiffs in her discussions with Matt Graham of Phoenix Fibers,

19            inquiring as to a means of destroying Plaintiffs' second-quality goods.

20       2.   Testimony and/or documents demonstrating that Matt Graham was the

21            Plant Manager and General Manager for Phoenix Fibers.

22       3.   Testimony and/or documents demonstrating that Ms. Song (on behalf of

23            Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that

24            Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no

25            charge, in exchange for which Phoenix Fibers would shred those goods

26            and convert them into shoddy fiber for use in creating end products such

27            as insulation.

28

4.   Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

5.   Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

6.   Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs that were being sold in the secondary consumer market was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

7.   Testimony and/or documents regarding Phoenix Fibers' sale of Plaintiffs' second-quality goods to U.S. General.

8.   Testimony and/or documents regarding U.S. General's sale of Plaintiffs' second-quality goods to SAC International Traders, Inc. ("SAC International"), who in turn sold such goods to consumers and/or to the other Defendants, who in turn sold them to consumers.

9.   Testimony and/or documents demonstrating that Plaintiffs spent nearly $200,000 in order to recover certain of their second-quality goods that were improperly sold into the secondary consumer market by Phoenix Fibers and the other Defendants.

10.   Samples of Plaintiffs' second-quality goods that Defendants sold into the secondary consumer market.

B.   <u>Key Evidence in Support of Plaintiffs' Trademark Infringement Claim Under 15 U.S.C. § 1114</u>

The following is a brief description of the key evidence Plaintiffs intend to rely on in support of this claim:

1.    Plaintiffs' trademark registrations and Trademark Office file wrappers for their MISS ME and ROCK REVIVAL trademarks.

2.    Testimony and/or documents regarding Plaintiffs' use of their MISS ME and ROCK REVIVAL trademarks.

3.    Testimony and/or documents regarding the likelihood of confusion, including confusion among post-sale observers, arising from Defendants' offer for sale and sale of Plaintiffs' second-quality goods.

4.    Testimony and/or documents regarding the strength of Plaintiffs' MISS ME and ROCK REVIVAL trademarks.

5.    Testimony and/or documents regarding the types of Plaintiffs' goods that bear the MISS ME and ROCK REVIVAL trademarks, and the degree of care likely to be exercised by the post-sale observer.

6.    Testimony and/or documents regarding the channels through which Plaintiffs sell their goods that bear the MISS ME and ROCK REVIVAL trademarks.

7.    Testimony and/or documents regarding Defendants' bad faith and willfulness in offering for sale and selling Plaintiffs' second-quality goods into the secondary consumer marketplace.

8.    Testimony and/or documents demonstrating that Lisa Song represented Plaintiffs in her discussions with Matt Graham of Phoenix Fibers, inquiring as to a means of destroying Plaintiffs' second-quality goods.

9.    Testimony and/or documents demonstrating that Matt Graham was the Plant Manager and General Manager for Phoenix Fibers.

10.    Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods

and convert them into shoddy fiber for use in creating end products such as insulation.

11. Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

12. Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

13. Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs that were being sold in the secondary consumer market was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

14. Testimony and/or documents regarding Phoenix Fibers' sale of Plaintiffs' second-quality goods to Defendant U.S. General Export.

15. Testimony and/or documents regarding U.S. General Export's sale of Plaintiffs' second-quality goods to SAC International Traders, Inc., who in turn sold such goods to consumers, and/or to the other Defendants, who in turn sold them to consumers.

16. Testimony and/or documents demonstrating that Plaintiffs spent nearly $200,000 in order to recover certain of their second-quality goods that were improperly sold into the secondary consumer market by Phoenix Fibers and the other Defendants.

17. Samples of Plaintiffs' second-quality goods that Defendants sold into the secondary consumer market.

C.  <u>Key Evidence in Support of Plaintiffs' False Designation of Origin and Unfair Competition Claim Under 15 U.S.C. § 1125(a)</u>

The following is a brief description of the key evidence Plaintiffs intend to rely on in support of this claim:

1.  Testimony and/or documents demonstrating that Lisa Song represented Plaintiffs in her discussions with Matt Graham of Phoenix Fibers, inquiring as to a means of destroying Plaintiffs' second-quality goods.

2.  Testimony and/or documents demonstrating that Matt Graham was the Plant Manager and General Manager for Phoenix Fibers.

3.  Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

4.  Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

5.  Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

6.  Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs that were being sold in the secondary consumer market was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

7.  Testimony and/or documents regarding Phoenix Fibers' sale of Plaintiffs' second-quality goods to U.S. General.

13

8.    Testimony and/or documents regarding U.S. General's sale of Plaintiffs' second-quality goods to SAC International, who in turn sold such goods to consumers, and/or to the other Defendants, who in turn sold them to consumers.

9.    Testimony and/or documents demonstrating that Plaintiffs spent nearly $200,000 in order to recover certain of their second-quality goods that were improperly sold into the secondary consumer market by Phoenix Fibers and the other Defendants.

10.   Samples of Plaintiffs' second-quality goods that Defendants sold into the secondary consumer market.

11.   Plaintiffs' trademark registrations and Trademark Office file wrappers for their MISS ME and ROCK REVIVAL trademarks.

12.   Testimony and/or documents regarding Plaintiffs' use of their MISS ME and ROCK REVIVAL trademarks.

13.   Testimony and/or documents regarding the likelihood of confusion, including confusion among post-sale observers, arising from Defendants' offer for sale and sale of Plaintiffs' second-quality goods.

14.   Testimony and/or documents regarding the strength of Plaintiffs' MISS ME and ROCK REVIVAL trademarks.

15.   Testimony and/or documents regarding the types of Plaintiffs' goods that bear the MISS ME and ROCK REVIVAL trademarks, and the degree of care likely to be exercised by the post-sale observer.

16.   Testimony and/or documents regarding the channels through which Plaintiffs sell their goods that bear the MISS ME and ROCK REVIVAL trademarks.

17.   Testimony and/or documents regarding Defendants' bad faith and willfulness in offering for sale and selling Plaintiffs' second-quality goods into the secondary consumer marketplace.

D.      Key Evidence in Support of Plaintiffs' Unfair Competition Claim Under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

The following is a brief description of the key evidence Plaintiffs intend to rely on in support of this claim:

1.      Plaintiffs' trademark registrations and Trademark Office file wrappers for their MISS ME and ROCK REVIVAL trademarks.

2.      Testimony and/or documents regarding Plaintiffs' use of their MISS ME and ROCK REVIVAL trademarks.

3.      Testimony and/or documents regarding the likelihood of confusion, including confusion among post-sale observers, arising from Defendants' offer for sale and sale of Plaintiffs' second-quality goods.

4.      Testimony and/or documents regarding the strength of Plaintiffs' MISS ME and ROCK REVIVAL trademarks.

5.      Testimony and/or documents regarding the types of Plaintiffs' goods that bear the MISS ME and ROCK REVIVAL trademarks, and the degree of care likely to be exercised by the post-sale observer.

6.      Testimony and/or documents regarding the channels through which Plaintiffs sell their goods that bear the MISS ME and ROCK REVIVAL trademarks.

7.      Testimony and/or documents regarding Defendants' bad faith and willfulness in offering for sale and selling Plaintiffs' second-quality goods into the secondary consumer marketplace.

8.      Testimony and/or documents demonstrating that Lisa Song represented Plaintiffs in her discussions with Matt Graham of Phoenix Fibers, inquiring as to a means of destroying Plaintiffs' second-quality goods.

9.      Testimony and/or documents demonstrating that Matt Graham was the Plant Manager and General Manager for Phoenix Fibers.

10.    Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

11.    Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

12.    Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

13.    Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs that were being sold in the secondary consumer market was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

14.    Testimony and/or documents regarding Phoenix Fibers' sale of Plaintiffs' second-quality goods to Defendant U.S. General.

15.    Testimony and/or documents regarding U.S. General's sale of Plaintiffs' second-quality goods to SAC International Traders, Inc., who in turn sold such goods to consumers, and/or to the other Defendants, who in turn sold them to consumers.

16.    Testimony and/or documents demonstrating that Plaintiffs spent nearly $200,000 in order to recover certain of their second-quality goods that were improperly sold into the secondary consumer market by Phoenix Fibers and the other Defendants.

16

17.      Samples of Plaintiffs' second-quality goods that Defendants sold into the secondary consumer market.

E.      <u>Key Evidence in Support of Plaintiffs' Trademark Dilution Claim Under Cal. Bus. & Prof. Code § 14247</u>

The following is a brief description of the key evidence Plaintiffs intend to rely on in support of this claim:

1.      Plaintiffs' trademark registrations and Trademark Office file wrappers for their MISS ME and ROCK REVIVAL trademarks.

2.      Testimony and/or documents regarding Plaintiffs' use of their MISS ME and ROCK REVIVAL trademarks.

3.      Testimony and/or documents regarding the fame and distinctiveness of Plaintiffs' MISS ME and/or ROCK REVIVAL.

4.      Testimony and/or documents regarding the likelihood of dilution by blurring and/or tarnishment arising from Defendants' offer for sale and sale of Plaintiffs' second-quality goods.

5.      Testimony and/or documents regarding the high quality of Plaintiffs' goods that bear the MISS ME or ROCK REVIVAL marks, and the low quality of Plaintiffs' second-quality goods sold to consumers by Defendants.

6.      Testimony and/or documents regarding the strength of Plaintiffs' MISS ME and ROCK REVIVAL trademarks.

7.      Testimony and/or documents regarding the types of Plaintiffs' goods that bear the MISS ME and ROCK REVIVAL trademarks, and the degree of care likely to be exercised by the post-sale observer.

8.      Testimony and/or documents regarding the channels through which Plaintiffs sell their goods that bear the MISS ME and ROCK REVIVAL trademarks.

9.     Testimony and/or documents regarding Defendants' bad faith and willfulness in offering for sale and selling Plaintiffs' second-quality goods into the secondary consumer marketplace.

10.    Testimony and/or documents demonstrating that Lisa Song represented Plaintiffs in her discussions with Matt Graham of Phoenix Fibers, inquiring as to a means of destroying Plaintiffs' second-quality goods.

11.    Testimony and/or documents demonstrating that Matt Graham was the Plant Manager and General Manager for Phoenix Fibers.

12.    Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

13.    Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

14.    Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

15.    Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs that were being sold in the secondary consumer market was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

16.    Testimony and/or documents regarding Phoenix Fibers' sale of Plaintiffs' second-quality goods to Defendant U.S. General.

17.  Testimony and/or documents regarding U.S. General's sale of Plaintiffs' second-quality goods to SAC International Traders, Inc., who in turn sold such goods to consumers, and/or to the other Defendants, who in turn sold them to consumers.

18.  Testimony and/or documents demonstrating that Plaintiffs spent nearly $200,000 in order to recover certain of their second-quality goods that were improperly sold into the secondary consumer market by Phoenix Fibers and the other Defendants.

19.  Samples of Plaintiffs' second-quality goods that Defendants sold into the secondary consumer market.

F.  <u>Key Evidence in Support of Plaintiffs' Trademark Infringement and Unfair Competition Claim Under California Common Law</u>

The following is a brief description of the key evidence Plaintiffs intend to rely on in support of this claim:

1.  Plaintiffs' trademark registrations and Trademark Office file wrappers for their MISS ME and ROCK REVIVAL trademarks.

2.  Testimony and/or documents regarding Plaintiffs' use of their MISS ME and ROCK REVIVAL trademarks.

3.  Testimony and/or documents regarding the likelihood of confusion, including confusion among post-sale observers, arising from Defendants' offer for sale and sale of Plaintiffs' second-quality goods.

4.  Testimony and/or documents regarding the strength of Plaintiffs' MISS ME and ROCK REVIVAL trademarks.

5.  Testimony and/or documents regarding the types of Plaintiffs' goods that bear the MISS ME and ROCK REVIVAL trademarks, and the degree of care likely to be exercised by the post-sale observer.

6.  Testimony and/or documents regarding the channels through which Plaintiffs sell their goods that bear the MISS ME and ROCK REVIVAL trademarks.

7.  Testimony and/or documents regarding Defendants' bad faith and willfulness in offering for sale and selling Plaintiffs' second-quality goods into the secondary consumer marketplace.

8.  Testimony and/or documents demonstrating that Lisa Song represented Plaintiffs in her discussions with Matt Graham of Phoenix Fibers, inquiring as to a means of destroying Plaintiffs' second-quality goods.

9.  Testimony and/or documents demonstrating that Matt Graham was the Plant Manager and General Manager for Phoenix Fibers.

10. Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

11. Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

12. Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

13. Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs that were being sold in the secondary consumer market was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

14.     Testimony and/or documents regarding Phoenix Fibers' sale of Plaintiffs' second-quality goods to Defendant U.S. General.

15.     Testimony and/or documents regarding U.S. General's sale of Plaintiffs' second-quality goods to SAC International Traders, Inc., who in turn sold such goods to consumers, and/or to the other Defendants, who in turn sold them to consumers.

16.     Testimony and/or documents demonstrating that Plaintiffs spent nearly $200,000 in order to recover certain of their second-quality goods that were improperly sold into the secondary consumer market by Phoenix Fibers and the other Defendants.

17.     Samples of Plaintiffs' second-quality goods that Defendants sold into the secondary consumer market.

## IV.   <u>Defendants' Affirmative Defenses</u>

<u>Phoenix Fibers' Affirmative Defense ("Aff. Def.") 1</u>:[1] Phoenix Fibers alleges that Plaintiffs' complaint fails to state a claim upon which relief may be granted. Plaintiffs understand that Phoenix Fibers is abandoning this defense.

<u>Phoenix Fibers' Aff. Def. 2</u>: Phoenix Fibers alleges that Plaintiffs' claims are barred by estoppel.  Plaintiffs understand that Phoenix Fibers is abandoning this defense.

--------

[1] Phoenix Fibers' Answer to Plaintiffs' Complaint asserted only five affirmative defenses.  Dkt. 22.  Although Plaintiffs served their First Amended Complaint on May 18, 2016 (Dkt. 32), Phoenix Fibers did not answer until three days ago, on March 3, 2017.  Dkt. 105.  This new answer has asserted an additional five affirmative defenses — (1) first sale doctrine; (2) statute of limitations; (3) laches; (4) mutual mistake; and (5) failure to mitigate.  *Compare* Dkt. 105 *with* Dkt. 22.  As indicated below, Plaintiffs anticipate moving to strike Phoenix Fibers' belated answer once they are able to comply with the meet and confer requirements set forth in the Local Rules.

**Phoenix Fibers' Aff. Def. 3**: Phoenix Fibers alleges that Plaintiffs' claims are barred by waiver.

**Phoenix Fibers' Aff. Def. 4**: Phoenix Fibers alleges that Plaintiffs' breach of contract claim fails for lack of consideration.

**Phoenix Fibers' Aff. Def. 5**: Phoenix Fibers alleges that Plaintiffs' breach of contract claim is barred due to a lack of mutuality of obligation.  Plaintiffs understand that Phoenix Fibers is abandoning this defense.

**Phoenix Fibers' Aff. Def. 6**: Phoenix Fibers alleges that Plaintiffs' claims are barred by the first sale doctrine.

**Phoenix Fibers' Aff. Def. 7**: Phoenix Fibers alleges that Plaintiffs' claims are barred by the relevant statutes of limitations.

**Phoenix Fibers' Aff. Def. 8**: Phoenix Fibers alleges that Plaintiffs' claims are barred by the doctrine of laches.

**Phoenix Fibers' Aff. Def. 9**: Phoenix Fibers alleges that Plaintiffs' breach of contract claim fails for mutual mistake of fact.

**Phoenix Fibers' Aff. Def. 10**: Phoenix Fibers alleges that Plaintiffs' claims for damages are barred due to Plaintiffs' failure to mitigate.

**U.S. General's Aff. Def. 1**:[2] U.S. General alleges that Plaintiffs' complaint fails to state a claim upon which relief may be granted.

**U.S. General's Aff. Def. 2**: U.S. General alleges that Plaintiffs have not suffered any harm or monetary damage.

**U.S. General's Aff. Def. 3**: U.S. General alleges that Plaintiffs caused their own damage by their conduct, misconduct, or failure to mitigate.

_____

[2] U.S. General did not enumerate its affirmative defenses, but instead asserted a variety of defenses over the course of several paragraphs of text.  *See* Dkt. No. 46 at 11–12. Plaintiffs have attempted herein to separate and enumerate U.S. General's defenses.

1     U.S. General's Aff. Def. 4: U.S. General alleges that its conduct did not cause
2 any damage to Plaintiffs.

3     Comak's Aff. Def. 1: Comak alleges that Plaintiffs' complaint is frivolous.

4     Comak's Aff. Def. 2: Comak alleges that Plaintiffs' complaint fails to state a
5 claim upon which relief may be granted.

6     Comak's Aff. Def. 3: Comak alleges that Plaintiffs caused their own damage
7 by their conduct, misconduct, or failure to mitigate.

8     Comak's Aff. Def. 4: Comak alleges that Plaintiffs have not suffered any
9 legally cognizable damages.

10     Comak's Aff. Def. 5: Comak alleges that its conduct did cause any damage to
11 Plaintiffs.

12     Comak's Aff. Def. 6: Comak alleges that any remedies or relief are limited by
13 the limitation of remedies and liability.

14     Comak's Aff. Def. 7: Comak reserves the right to raise additional defenses.

15     Defendant Tiffany Alana Wolff d/b/a Miss V Lane ("Wolff")'s Aff. Def. 1:
16 Wolff alleges that Plaintiffs' complaint fails to state a claim upon which relief may be
17 granted.

18     Wolff's Aff. Def. 2: Wolff alleges that Plaintiffs' claims are barred by the
19 relevant statutes of limitations.

20     Wolff's Aff. Def. 3: Wolff alleges that Plaintiffs are barred from recovering
21 damages by their failure to mitigate.

22     Wolff's Aff. Def. 4: Wolff alleges that Plaintiff's claims are barred by waiver.

23     Wolff's Aff. Def. 5: Wolff alleges that Plaintiffs' claims are barred by
24 estoppel.

25     Wolff's Aff. Def. 6: Wolff alleges that Plaintiffs' claims are barred by the
26 doctrine of unclean hands.

27     Wolff's Aff. Def. 7: Wolff alleges that Plaintiffs' claims are barred by the
28 doctrine of laches.

1  **Wolff's Aff. Def. 8**: Wolff alleges that her conduct did cause any damage to
2  Plaintiffs.

3  **Wolff's Aff. Def. 9**: Wolff alleges that Plaintiffs assumed the risk as it relates
4  to their action.

5  **Wolff's Aff. Def. 10**: Wolff alleges that her conduct did cause any damage to
6  Plaintiffs.

7  **Wolff's Aff. Def. 11**: Wolff reserves the right to raise additional defenses.

8  **Defendants Lydia Evilsa Terrazas Cho and Myung Kwon Cho (jointly, "Cho")**
9  **Aff. Def. 1**: Cho alleges that Plaintiffs' complaint is frivolous.

10  **Cho's Aff. Def. 2**: Cho alleges that Plaintiffs' complaint fails to state a claim
11  upon which relief may be granted.

12  **Cho's Aff. Def. 3**: Cho alleges that Plaintiffs caused their own damage by their
13  conduct, misconduct, or failure to mitigate.

14  **Cho's Aff. Def. 4**: Cho alleges that Plaintiffs have not suffered any legally
15  cognizable damages.

16  **Cho's Aff. Def. 5**: Cho alleges that her conduct did not cause any damage to
17  Plaintiffs.

18  **Cho's Aff. Def. 6**: Cho alleges that any remedies or relief are limited by the
19  limitation of remedies and liability.

20  **Cho's Aff. Def. 7**: Cho reserves the right to raise additional defenses.

21  **V.**    **Elements Required to Establish Defendants' Affirmative Defenses**

22  A.    **Phoenix Fibers' Aff. Def. 1 — Failure to State a Claim**

23  Plaintiffs understand that Phoenix Fibers is abandoning this defense.
24  Moreover, this is not an affirmative defense, but rather a denial that Plaintiffs have
25  adequately pleaded the elements of their claims. *See Vogel v. Huntington Oaks*
26  *Delaware Partners, LLC*, 291 F.R.D. 438, 442 (C.D. Cal. 2013); *Quintana v. Baca*,
27  233 F.R.D. 562, 564 (C.D. Cal. 2005).

28

B.     Phoenix Fibers' Aff. Def. 2 — Estoppel

Plaintiffs understand that Phoenix Fibers is abandoning this defense.  To the extent it is maintained, however, in order to establish this defense, Phoenix Fibers must prove that:

1.     Plaintiffs knew that Phoenix Fibers was selling Plaintiffs' second-quality goods;

2.     Plaintiffs intended that Phoenix Fibers would believe that Plaintiffs did not intend to enforce their rights against Phoenix Fibers, or that Phoenix Fibers had a right to believe that Plaintiffs so intended;

3.     Phoenix Fibers did not know the Plaintiffs actually objected to the sale of Plaintiffs' second-quality goods; and

4.     Due to its reliance on the Plaintiffs' actions, Phoenix Fibers will be materially prejudiced if Plaintiffs are allowed to proceed with their claims.

*In re Associated Vintage Grp., Inc.*, 283 B.R. 549, 567 (B.A.P. 9th Cir. 2002) (listing the basic elements of equitable estoppel); *AirWair Int'l Ltd. v. Schultz*, 84 F. Supp. 3d 943, 958 (N.D. Cal. 2015) (addressing trademark infringement specifically).

C.     Phoenix Fibers' Aff. Def. 3 — Waiver

In order to establish this defense, Phoenix Fibers must prove that:

1.     Plaintiffs intentionally relinquished their known right to bring their claims with knowledge of the claims' existence; and

2.     Plaintiffs had the intent to relinquish the right.

*See United States v. King Features Entm't, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988).

D.     Phoenix Fibers' Aff. Def. 4 — Lack of Consideration

In order to establish this defense, Phoenix Fibers must prove that the parties did not exchange good consideration, defined by California law as "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be

25

suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise." Cal. Civ. Code § 1605 (West); *see also* Cal. Civ. Code § 1615 (West) (party claiming lack of consideration bears the burden of proof).

E.   Phoenix Fibers' Aff. Def. 5 — Lack of Mutuality of Obligation

Plaintiffs understand that Phoenix Fibers is abandoning this defense. Moreover, this defense is duplicative of Phoenix Fibers' defense regarding lack of consideration. *See Mattei v. Hopper*, 330 P.2d 625, 626 (Cal. 1958) ("Without this mutuality of obligation, the agreement lacks consideration and no enforceable contract has been created."); *Fireman's Fund Ins. Co. v. Sizzler USA Real Prop., Inc.*, 169 Cal. App. 4th 415, 421 (Cal. Ct. App. 2008) ("The consideration for the leases, including all of their covenants, comprised the mutual promises of the parties, as a whole."); *see also* Restatement (2d) of Contracts § 79 (1981) ("If the requirement of consideration is met, there is no additional requirement of … 'mutuality of obligation.'").

F.   Phoenix Fibers' Aff. Def. 6 — First Sale Doctrine

In order to establish this defense, Phoenix Fibers must prove that:

1.   Plaintiffs authorized a first sale of its second-quality denim products; and

2.   Plaintiffs' second-quality denim products were not materially different from Plaintiffs' first-quality denim products.

*See Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085–87 (9th Cir. 1998); *Microban Prod. Co. v. API Indus., Inc.*, 2014 WL 1856471, at **9–10 (S.D.N.Y. May 8, 2014).

G.   Phoenix Fibers' Aff. Def. 7— Statute of Limitations

In order to establish this defense, Phoenix Fibers must prove that Plaintiffs' claimed harm accrued before February 10, 2012. *See* Cal. Code Civ. Proc. § 343 (providing for a four-year statute of limitations for state claims, where not otherwise

provided for); *AirWair Int'l Ltd.*, 84 F. Supp. 3d at 959 (four-year statutes of limitation govern Lanham Act claims, state trademark claims, state unfair competition claims, and common law unfair competition claims); *DC Comics v. Towle*, 989 F. Supp. 2d 948, 971 (C.D. Cal. 2013) ("As trademark infringement is a "continuing" wrong, the statute of limitations bars only monetary relief for the period outside the statute of limitations…. However, Plaintiff is free to pursue monetary and equitable relief for the time within the limitations period." (citing *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002)), *aff'd*, 802 F.3d 1012 (9th Cir. 2015).

H.    Phoenix Fibers' Aff. Def. 8 — Laches

In order to establish this defense, Phoenix Fibers must prove that:

1.    Plaintiffs unreasonably delayed in asserting their claims; and

2.    Plaintiffs' delay prejudiced Phoenix Fibers.

*See Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000).

I.    Phoenix Fibers' Aff. Def. 9 — Mutual Mistake

In order to establish this defense, Phoenix Fibers must prove that:

1.    Both parties made a material mistake of fact or law in entering into the agreement; and

2.    Phoenix Fibers would not have agreed to enter into this contract if it had known about the mistake.

*See* CACI No. 331 (Affirmative Defense—Bilateral Mistake); Cal. Civ. Code §§ 1576–78, 1689(b)(1).

J.    Phoenix Fibers' Aff. Def. 10 — Failure to Mitigate

In order to establish this defense, Phoenix Fibers must prove that:

1.    Plaintiffs' damages could have been avoided; and

2.    Plaintiffs failed to take reasonable steps to avoid the damage.

*See Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978); *Steelduct Co. v. Henger-Seltzer Co.*, 160 P.2d 804, 812 (Cal. 1945) ("Plaintiff cannot recover for loss which by reasonable means it could have avoided ….").

K.   U.S. General's Aff. Def. 1 — Failure to State a Claim

This is not an affirmative defense, but rather a denial that Plaintiffs have adequately pleaded the elements of their claims. *See Vogel*, 291 F.R.D. at 442; *Quintana*, 233 F.R.D. at 564.

L.   U.S. General's Aff. Def. 2 — No Injury

This is not an affirmative defense, but rather a denial that Plaintiffs have adequately pleaded the elements of their claims. *See J&J Sports Prods., Inc. v. Juarez*, 2016 WL 795891, at *1 (S.D. Cal. Mar. 1, 2016) (finding that "lack of … damages" is "not [an] affirmative defense" but rather "merely den[ies] elements of" the claims); *Vogel*, 291 F.R.D. at 442 (defense "alleging 'no damage or injury' is also not an affirmative defense"); *Hernandez v. Dutch Goose, Inc.*, 2013 WL 5781476, at *7 (N.D. Cal. Oct. 25, 2013) (dismissing "defenses" of "lack of standing" and that "Plaintiff suffered no injury" because they "are not actually affirmative defenses at all").

M.   U.S. General's Aff. Def. 3 — Failure to Mitigate

In order to establish this defense, U.S. General must prove that:

1.   Plaintiffs' damages could have been avoided; and

2.   Plaintiffs failed to take reasonable steps to avoid the damage.

*See Sias*, 588 F.2d at 696; *Steelduct Co.*, 160 P.2d at 812 ("Plaintiff cannot recover for loss which by reasonable means it could have avoided ….").

N.   U.S. General's Aff. Def. 4 — Lack of Causation

U.S. General attempts to assert the defense that its actions were not the proximate cause of Plaintiffs' injuries. This is not a valid defense, but merely denies an element of Plaintiffs' claims. *See J&J Sports Prods., Inc.*, 2016 WL 795891, at *1

1  (finding that "lack of causation" is "not [an] affirmative defense" but rather "merely

2  den[ies] elements of" the claims).

3        O.     <u>Comak's Aff. Def. 1 — Frivolous Complaint</u>

4        This is not a valid affirmative defense, as it does not attempt to excuse conduct

5  alleged in the First Amended Complaint.  *See Hiramanek v. Clark*, 2015 WL 693222,

6  at *3 (N.D. Cal. Feb. 18, 2015) (citing *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080,

7  1088 (9th Cir. 2002)); *Thornton v. Solutionone Cleaning Concepts, Inc.*, 2007 WL

8  210586, at *4 (E.D. Cal. Jan. 26, 2007); *see also City and Cnty. of San Francisco v.

9  Kihagi*, 2016 WL 7174532, at *2 (Cal. Super. Nov. 14, 2016) (frivolity is not a proper

10  affirmative defense).

11        P.     <u>Comak's Aff. Def. 2 — Failure to State a Claim</u>

12        This is not an affirmative defense, but rather a denial that Plaintiffs have

13  adequately pleaded the elements of their claims.  *See Vogel*, 291 F.R.D. at 442;

14  *Quintana*, 233 F.R.D. at 564.

15        Q.     <u>Comak's Aff. Def. 3 — Failure to Mitigate</u>

16        In order to establish this defense, Comak must prove that:

17        1.     Plaintiffs' damages could have been avoided; and

18        2.     Plaintiffs failed to take reasonable steps to avoid the damage.

19  *See Sias*, 588 F.2d at 696; *Steelduct Co.*, 160 P.2d at 812 ("Plaintiff cannot recover for

20  loss which by reasonable means it could have avoided ….").

21        R.     <u>Comak's Aff. Def. 4 — No Injury</u>

22        This is not an affirmative defense, but rather a denial that Plaintiffs have

23  adequately pleaded the elements of their claims.  *See J&J Sports Prods., Inc.*, 2016

24  WL 795891, at *1 (finding that "lack of … damages" is "not [an] affirmative

25  defense" but rather "merely den[ies] elements of" the claims); *Vogel*, 291 F.R.D. at

26  442 (defense "alleging 'no damage or injury' is also not an affirmative defense");

27  *Hernandez*, 2013 WL 5781476, at *7 (dismissing "defenses" of "lack of standing"

28

1    and that "Plaintiff suffered no injury" because they "are not actually affirmative

2    defenses at all").

3         S.    Comak's Aff. Def. 5 — Lack of Causation

4         Comak attempts to assert the defense that its actions were not the proximate

5    cause of Plaintiffs' injuries.  This is not a valid defense, but merely denies an element

6    of Plaintiffs' claims.  *See J&J Sports Prods., Inc.*, 2016 WL 795891, at *1 (finding

7    that "lack of causation" is "not [an] affirmative defense" but rather "merely den[ies]

8    elements of" the claims).

9         T.    Comak's Aff. Def. 6 — Limitation of Remedies and Liability

10        This defense is incomprehensible, and therefore not a valid defense.  To the

11   extent that Comak intends to refer to a contractual limitation of remedies, that "is not

12   an affirmative defense."  *Flagship W., LLC v. Excel Realty Partners LP*, 337 F. App'x

13   679, 681 (9th Cir. 2009).

14        U.    Comak's Aff. Def. 7 — Reservation of Rights

15        This is not an affirmative defense, but simply a reservation of "the right to assert

16   unspecified defenses later."  *Vogel*, 291 F.R.D. at 442 ("This is not a defense at all,

17   affirmative or otherwise.").

18        V.    Wolff's Aff. Def. 1 — Failure to State a Claim

19        This is not an affirmative defense, but rather a denial that Plaintiffs have

20   adequately pleaded the elements of their claims.  *See Vogel*, 291 F.R.D. at 442;

21   *Quintana*, 233 F.R.D. at 564.

22        W.    Wolff's Aff. Def. 2 — Statute of Limitations

23        In order to establish this defense, Wolff must prove that Plaintiffs' claimed

24   harm accrued before February 10, 2012.  *See*  Cal. Code Civ. Proc. § 343 (providing

25   for a four-year statute of limitations for state claims, where not otherwise provided

26   for); *AirWair Int'l Ltd.*, 84 F. Supp. 3d at 959 (four-year statutes of limitation govern

27   Lanham Act claims, state trademark claims, state unfair competition claims, and

28   common law unfair competition claims); *DC Comics v. Towle*, 989 F. Supp. 2d at

971 ("As trademark infringement is a "continuing" wrong, the statute of limitations bars only monetary relief for the period outside the statute of limitations…. However, Plaintiff is free to pursue monetary and equitable relief for the time within the limitations period." (citing *Jarrow Formulas, Inc.*, 304 F.3d at 837), *aff'd*, 802 F.3d 1012 (9th Cir. 2015).

      X.     <u>Wolff's Aff. Def. 3 — Failure to Mitigate</u>

      In order to establish this defense, Wolff must prove that:

      1.     Plaintiffs' damages could have been avoided; and

      2.     Plaintiffs failed to take reasonable steps to avoid the damage.

*See Sias*, 588 F.2d at 696; *Steelduct Co.*, 160 P.2d at 812 ("Plaintiff cannot recover for loss which by reasonable means it could have avoided ….").

      Y.     <u>Wolff's Aff. Def. 4 — Waiver</u>

      In order to establish this defense, Wolff must prove that:

      1.     Plaintiffs intentionally relinquished their known right to bring their claims with knowledge of the claims' existence; and

      2.     Plaintiffs had the intent to relinquish the right.

*See King Features Entm't, Inc.*, 843 F.2d at 399.

      Z.     <u>Wolff's Aff. Def. 5 — Estoppel</u>

      In order to establish this defense, Wolff must prove that:

      1.     Plaintiffs knew that Wolff was selling Plaintiffs' second-quality goods;

      2.     Plaintiffs intended that Wolff would believe that Plaintiffs did not intend to enforce their rights against Wolff, or that Wolff had a right to believe that Plaintiffs so intended;

      3.     Wolff did not know that Plaintiffs actually objected to the sale of Plaintiffs' second-quality goods; and

      4.     Due to her reliance on the Plaintiffs' actions, Wolff will be materially prejudiced if Plaintiffs are allowed to proceed with their claims.

*In re Associated Vintage Grp., Inc.*, 283 B.R. at 567 (listing the basic elements of equitable estoppel); *AirWair Int'l Ltd.*, 84 F. Supp. 3d at 958 (addressing trademark infringement specifically).

      AA.   Wolff's Aff. Def. 6 — Unclean Hands

      In order to establish this defense, Wolff must prove that:

      1.     Plaintiffs engaged in inequitable conduct;

      2.     Plaintiffs' conduct directly relates to the claims they have asserted against Wolff; and

      3.     Plaintiffs' conduct injured Wolff.

*See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1223 (C.D. Cal. 2007).

      BB.   Wolff's Aff. Def. 7 — Laches

      In order to establish this defense, Wolff must prove that:

      1.     Plaintiffs unreasonably delayed in asserting their claims; and

      2.     Plaintiffs' delay prejudiced Wolff.

*See Couveau*, 218 F.3d at 1083.

      CC.   Wolff's Aff. Def. 8 — Lack of Causation

      Wolff attempts to assert the defense that its actions were not the proximate cause of Plaintiffs' injuries.  This is not a valid defense, but merely denies an element of Plaintiffs' claims.  *See J&J Sports Prods., Inc.*, 2016 WL 795891, at *1 (finding that "lack of causation" is "not [an] affirmative defense" but rather "merely den[ies] elements of" the claims).

      DD.   Wolff's Aff. Def. 9 — Assumption of Risk

      This defense is inapplicable to this case, since it is based on a theory of contributory negligence, even though no claims of negligence have been pleaded. *See generally* 2 Cal. Affirmative Def. § 48:24 (2d ed.); *see also Curry*, 367 F.2d at 928 ("The general rule is that contributory negligence is a defense only to actions grounded on negligence….").

EE.   Wolff's Aff. Def. 10 — Lack of Causation

This defense (like Wolff's eighth affirmative defense) asserts that Wolff's actions were not the proximate cause for Plaintiffs' injuries.  This is not a valid defense, but merely denies an element of Plaintiffs' claims.  *See J&J Sports Prods., Inc.*, 2016 WL 795891, at *1 (finding that "lack of causation" is "not [an] affirmative defense" but rather "merely den[ies] elements of" the claims).

FF.   Wolff's Aff. Def. 11 — Reservation of Rights

This is not an affirmative defense, but simply a reservation of "the right to assert unspecified defenses later."  *Vogel*, 291 F.R.D. at 442 ("This is not a defense at all, affirmative or otherwise.").

GG.   Cho's Aff. Def. 1 — Frivolous Complaint

This is not a valid affirmative defense, as it does not attempt to excuse conduct alleged in the First Amended Complaint.  *See Hiramanek*, 2015 WL 693222, at *3 (citing *Zivkovic*, 302 F.3d at 1088); *Thornton*, 2007 WL 210586, at *4; *see also City and Cnty. of San Francisco*, 2016 WL 7174532, at *2 (frivolity is not a proper affirmative defense).

HH.   Cho's Aff. Def. 2 — Failure to State a Claim

This is not an affirmative defense, but rather a denial that Plaintiffs have adequately pleaded the elements of their claims.  *See Vogel*, 291 F.R.D. at 442; *Quintana*, 233 F.R.D. at 564.

II.   Cho's Aff. Def. 3 — Failure to Mitigate

In order to establish this defense, Cho must prove that:

1.   Plaintiffs' damages could have been avoided; and

2.   Plaintiffs failed to take reasonable steps to avoid the damage.

*See Sias*, 588 F.2d at 696; *Steelduct Co.*, 160 P.2d at 812 ("Plaintiff cannot recover for loss which by reasonable means it could have avoided ….").

33

JJ.    <u>Cho's Aff. Def. 4 — No Injury</u>

This is not an affirmative defense, but rather a denial that Plaintiffs have adequately pleaded the elements of their claims.  *See J&J Sports Prods., Inc.*, 2016 WL 795891, at *1 (finding that "lack of … damages" is "not [an] affirmative defense" but rather "merely den[ies] elements of" the claims); *Vogel*, 291 F.R.D. at 442 (defense "alleging 'no damage or injury' is also not an affirmative defense"); *Hernandez*, 2013 WL 5781476, at *7 (dismissing "defenses" of "lack of standing" and that "Plaintiff suffered no injury" because they "are not actually affirmative defenses at all").

KK.    <u>Cho's Aff. Def. 5 — Lack of Causation</u>

Cho attempts to assert the defense that its actions were not the proximate cause of Plaintiffs' injuries.  This is not a valid defense, but merely denies an element of Plaintiffs' claims.  *See J&J Sports Prods., Inc.*, 2016 WL 795891, at *1 (finding that "lack of causation" is "not [an] affirmative defense" but rather "merely den[ies] elements of" the claims).

LL.    <u>Cho's Aff. Def. 6 — Limitation of Remedies and Liability</u>

This defense is incomprehensible, and therefore not a valid defense.  To the extent that Cho intends to refer to a contractual limitation of remedies, that also "is not an affirmative defense."  *Flagship W., LLC*, 337 F. App'x at 681.

MM.  <u>Cho's Aff. Def. 7 — Reservation of Rights</u>

This is not an affirmative defense, but simply a reservation of "the right to assert unspecified defenses later."  *Vogel*, 291 F.R.D. at 442 ("This is not a defense at all, affirmative or otherwise.").

**VI.    <u>Key Evidence in Opposition to Defendants' Affirmative Defenses</u>**

A.    <u>Improper Defenses</u>

No evidence is necessary to oppose the following "defenses," since, as set forth above, they are not proper affirmative defenses: Phoenix Fibers' first affirmative defense; U.S. General's first, second, and fourth affirmative defenses;

1   Comak's first, second, fourth, fifth, sixth, and seventh affirmative defenses; Wolff's

2   first, eighth, ninth, tenth, and eleventh affirmative defenses; and Cho's first, second,

3   fourth, fifth, sixth, and seventh affirmative defenses.

4       B.      Key Evidence in Opposition to Phoenix Fibers' Aff. Def. 2 — Estoppel

5       Plaintiffs understand that Phoenix Fibers is abandoning this defense.  To the

6   extent it is maintained, however, the following is a brief description of the key

7   evidence Plaintiffs intend to rely on in opposition to this defense, on an element-by-

8   element basis:

9          *Evidence in Opposition to Element 1: Plaintiffs knew that Phoenix Fibers*

10         *was selling Plaintiffs' second-quality goods*

11      1.     Testimony and/or documents demonstrating that Ms. Song (on behalf of

12             Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that

13             Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no

14             charge, in exchange for which Phoenix Fibers would shred those goods

15             and convert them into shoddy fiber for use in creating end products such

16             as insulation.

17      2.     Testimony and/or documents demonstrating that Mr. Graham repeatedly

18             represented that Phoenix Fibers would shred Plaintiffs' goods and convert

19             them into shoddy fiber.

20      3.     Testimony and/or documents regarding Plaintiffs' discovery that second-

21             quality goods sent to Phoenix Fibers were being offered for sale in

22             secondary consumer trade channels.

23      4.     Testimony and/or documents demonstrating that Plaintiffs promptly

24             contacted Phoenix Fibers regarding their discovery of Defendants'

25             wrongful sales, in which Plaintiffs also expressed their continuing

26             objection to such sales.

27      5.     Testimony and/or documents demonstrating that Phoenix Fibers'

28             representatives intentionally and repeatedly lied to Plaintiffs, claiming

1    that any second-quality goods of Plaintiffs' that were being sold in

2    secondary channels was the result of "leakage" — *i.e.*, theft — from

3    Phoenix Fibers' warehouse.

6.   Testimony and/or documents demonstrating that Plaintiffs engaged

investigators to determine the source of the second-quality goods being

sold by Defendants, and to attempt to purchase all such available goods

that had been wrongfully sold into secondary channels.

*Evidence in Opposition to Element 2: Plaintiffs intended that Phoenix*

*Fibers would believe that Plaintiffs did not intend to enforce their rights*

*against Phoenix Fibers, or that Phoenix Fibers had a right to believe that*

*Plaintiffs so intended*

1.   Testimony and/or documents demonstrating that Ms. Song (on behalf of

Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that

Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no

charge, in exchange for which Phoenix Fibers would shred those goods

and convert them into shoddy fiber for use in creating end products such

as insulation.

2.   Testimony and/or documents demonstrating that Plaintiffs promptly

contacted Phoenix Fibers regarding their discovery of Defendants'

wrongful sales, in which Plaintiffs also expressed their continuing

objection to such sales.

*Evidence in Opposition to Element 3: Phoenix Fibers did not know the*

*Plaintiffs actually objected to the sale of Plaintiffs' second-quality goods*

1.   Testimony and/or documents demonstrating that Ms. Song (on behalf of

Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that

Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no

charge, in exchange for which Phoenix Fibers would shred those goods

and convert them into shoddy fiber for use in creating end products such as insulation.

2. Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

3. Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

4. Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

5. Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

*Evidence in Opposition to Element 4: Due to its reliance on the Plaintiffs' actions, Phoenix Fibers will be materially prejudiced if Plaintiffs are allowed to proceed with their claims*

1. Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2.      Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3.      Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4.      Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5.      Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6.      Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7.      Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

C.      <u>Key Evidence in Opposition to Phoenix Fibers' Aff. Def. 3 — Waiver</u>

The following is a brief description of the key evidence Plaintiffs intend to rely on in opposition to this defense, on an element-by-element basis:

> *Evidence in Opposition to Element 1: Plaintiffs intentionally relinquished their known right to bring their claims with knowledge of the claims' existence*

1.     Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2.     Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3.     Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4.     Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5.     Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6.     Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7.     Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

*Evidence in Opposition to Element 2: Plaintiffs had the intent to relinquish the right*

1.  Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2.  Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3.  Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4.  Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5.  Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6.  Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7.      Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

D.      Key Evidence in Opposition to Phoenix Fibers' Aff. Def. 4 — Lack of Consideration

The following is a brief description of the key evidence Plaintiffs intend to rely on in opposition to this defense, with respect to its sole element — that the parties did not exchange good consideration:

1.      Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

E.      Key Evidence in Opposition to Phoenix Fibers' Aff. Def. 6 — First Sale Doctrine:

The following is a brief description of the key evidence Plaintiffs intend to rely on in opposition to this defense, on an element-by-element basis:

*Evidence in Opposition to Element 1: Plaintiffs authorized a first sale of its second-quality denim products*

1.      Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2. Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3. Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4. Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5. Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6. Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

*Evidence in Opposition to Element 2: Plaintiffs' second-quality denim products were not materially different from Plaintiffs' first-quality denim products*

1. Testimony and/or documents regarding the likelihood of dilution by blurring and/or tarnishment arising from Defendants' offering for sale and sale of Plaintiffs' second-quality goods.

2. Testimony and/or documents regarding the high quality of Plaintiffs' goods that bear the MISS ME or ROCK REVIVAL marks, and the low quality of Plaintiffs' goods sold to consumers by Defendants.

1      F.     <u>Key Evidence in Opposition to Phoenix Fibers' Aff. Def. 7 — Statute of</u>

2             <u>Limitations</u>:

3             The following is a brief description of the key evidence Plaintiffs intend to rely

4      on in opposition to this defense, with respect to its sole element — that Plaintiffs'

5      claimed harm accrued before February 10, 2012:

6             1.     Testimony and/or documents regarding Plaintiffs' discovery in 2015 that

7                    second-quality MISS ME and ROCK REVIVAL goods sent to Phoenix

8                    Fibers were being offered for sale in secondary consumer trade channels.

9      G.     <u>Key Evidence in Opposition to Phoenix Fibers' Aff. Def. 8 — Laches</u>:

10            The following is a brief description of the key evidence Plaintiffs intend to rely

11     on in opposition to this defense, on an element-by-element basis:

12            <u>*Evidence in Opposition to Element 1: Plaintiffs unreasonably delayed in*</u>

13            <u>*asserting their claims*</u>

14            1.     Testimony and/or documents demonstrating that Ms. Song (on behalf of

15                   Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that

16                   Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no

17                   charge, in exchange for which Phoenix Fibers would shred those goods

18                   and convert them into shoddy fiber for use in creating end products such

19                   as insulation.

20            2.     Testimony and/or documents demonstrating that Mr. Graham repeatedly

21                   represented that Phoenix Fibers would shred Plaintiffs' goods and convert

22                   them into shoddy fiber.

23            3.     Testimony and/or documents regarding Plaintiffs' discovery that second-

24                   quality goods sent to Phoenix Fibers were being offered for sale in

25                   secondary consumer trade channels.

26            4.     Testimony and/or documents demonstrating that Plaintiffs promptly

27                   contacted Phoenix Fibers regarding their discovery of Defendants'

28

wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5.    Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6.    Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7.    Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

*Evidence in Opposition to Element 2: Plaintiffs' delay prejudiced Wolff*

1.    Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2.    Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3.    Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4.      Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5.      Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6.      Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7.      Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

H.      <u>Key Evidence In Opposition to Phoenix Fibers' Aff. Def. 9 — Mutual Mistake</u>:

The following is a brief description of the key evidence Plaintiffs intend to rely on in opposition to this defense, on an element-by-element basis:

*Evidence in Opposition to Element 1: Both parties made a material mistake of fact or law in entering into the agreement*

1.      Testimony and/or documents demonstrating that Lisa Song represented Plaintiffs in her discussions with Matt Graham of Phoenix Fibers, inquiring as to a means of destroying Plaintiffs' second-quality goods.

2.      Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no

charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

3.  Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

4.  Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs that were being sold in the secondary consumer market was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

*Evidence in Opposition to Element 2: Phoenix Fibers would not have agreed to enter into this contract if it had known about the mistake*

1.  Testimony and/or documents demonstrating that Lisa Song represented Plaintiffs in her discussions with Matt Graham of Phoenix Fibers, inquiring as to a means of destroying Plaintiffs' second-quality goods.

2.  Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

3.  Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

I.  <u>Phoenix Fibers' Aff. Def. 10  — Failure to Mitigate</u>:

The following is a brief description of the key evidence Plaintiffs intend to rely on in opposition to this defense, on an element-by-element basis:

46

*Evidence in Opposition to Element 1: Plaintiffs' damages could have been avoided*

1.  Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2.  Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3.  Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4.  Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5.  Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6.  Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7.     Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

*Element in Opposition to Element 2: Plaintiffs failed to take reasonable steps to avoid the damage*

1.     Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2.     Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3.     Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4.     Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5.     Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6.     Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being

1    sold by Defendants, and to attempt to purchase all such available goods

2    that had been wrongfully sold into secondary channels.

3    7.    Testimony and/or documents demonstrating that Plaintiffs commenced

4          this action within four months after discovering Defendants' wrongful

5          sales activities.

6    J.    Key Evidence in Opposition to U.S. General's Aff. Def. 3 — Failure to

7          Mitigate

8    The following is a brief description of the key evidence Plaintiffs intend to rely

9    on in opposition to this defense, on an element-by-element basis:

10   *Evidence in Opposition to Element 1: Plaintiffs' damages could have been*

11   *avoided*

12   8.    Testimony and/or documents demonstrating that Ms. Song (on behalf of

13         Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that

14         Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no

15         charge, in exchange for which Phoenix Fibers would shred those goods

16         and convert them into shoddy fiber for use in creating end products such

17         as insulation.

18   9.    Testimony and/or documents demonstrating that Mr. Graham repeatedly

19         represented that Phoenix Fibers would shred Plaintiffs' goods and convert

20         them into shoddy fiber.

21   10.   Testimony and/or documents regarding Plaintiffs' discovery that second-

22         quality goods sent to Phoenix Fibers were being offered for sale in

23         secondary consumer trade channels.

24   11.   Testimony and/or documents demonstrating that Plaintiffs promptly

25         contacted Phoenix Fibers regarding their discovery of Defendants'

26         wrongful sales, in which Plaintiffs also expressed their continuing

27         objection to such sales.

28

12.   Testimony and/or documents demonstrating that Phoenix Fibers'
representatives intentionally and repeatedly lied to Plaintiffs, claiming
that any second-quality goods of Plaintiffs' that were being sold in
secondary channels was the result of "leakage" — *i.e.*, theft — from
Phoenix Fibers' warehouse.

13.   Testimony and/or documents demonstrating that Plaintiffs engaged
investigators to determine the source of the second-quality goods being
sold by Defendants, and to attempt to purchase all such available goods
that had been wrongfully sold into secondary channels.

14.   Testimony and/or documents demonstrating that Plaintiffs commenced
this action within months after discovering Defendants' wrongful sales
activities.

*Element in Opposition to Element 2: Plaintiffs failed to take reasonable*
*steps to avoid the damage*

15.   Testimony and/or documents demonstrating that Ms. Song (on behalf of
Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that
Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no
charge, in exchange for which Phoenix Fibers would shred those goods
and convert them into shoddy fiber for use in creating end products such
as insulation.

16.   Testimony and/or documents demonstrating that Mr. Graham repeatedly
represented that Phoenix Fibers would shred Plaintiffs' goods and convert
them into shoddy fiber.

17.   Testimony and/or documents regarding Plaintiffs' discovery that second-
quality goods sent to Phoenix Fibers were being offered for sale in
secondary consumer trade channels.

18.   Testimony and/or documents demonstrating that Plaintiffs promptly
contacted Phoenix Fibers regarding their discovery of Defendants'

1   wrongful sales, in which Plaintiffs also expressed their continuing

2   objection to such sales.

3   19.   Testimony and/or documents demonstrating that Phoenix Fibers'

4   representatives intentionally and repeatedly lied to Plaintiffs, claiming

5   that any second-quality goods of Plaintiffs' that were being sold in

6   secondary channels was the result of "leakage" — *i.e.*, theft — from

7   Phoenix Fibers' warehouse.

8   20.   Testimony and/or documents demonstrating that Plaintiffs engaged

9   investigators to determine the source of the second-quality goods being

10   sold by Defendants, and to attempt to purchase all such available goods

11   that had been wrongfully sold into secondary channels.

12   21.   Testimony and/or documents demonstrating that Plaintiffs commenced

13   this action within four months after discovering Defendants' wrongful

14   sales activities.

15   K.   Key Evidence in Opposition to Comak's Aff. Def. 3 — Failure to

16   Mitigate

17   The following is a brief description of the key evidence Plaintiffs intend to rely

18   on in opposition to this defense, on an element-by-element basis:

19   *Evidence in Opposition to Element 1: Plaintiffs' damages could have been*

20   *avoided*

21   1.   Testimony and/or documents demonstrating that Ms. Song (on behalf of

22   Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that

23   Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no

24   charge, in exchange for which Phoenix Fibers would shred those goods

25   and convert them into shoddy fiber for use in creating end products such

26   as insulation.

27

28

51

2. Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3. Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4. Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5. Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6. Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7. Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

*Element in Opposition to Element 2: Plaintiffs failed to take reasonable steps to avoid the damage*

1. Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods

and convert them into shoddy fiber for use in creating end products such as insulation.

2. Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3. Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4. Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5. Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6. Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7. Testimony and/or documents demonstrating that Plaintiffs commenced this action within four months after discovering Defendants' wrongful sales activities.

1    L.    Key Evidence in Opposition to Wolff's Aff. Def. 2 — Statute of
2          Limitations

3        The following is a brief description of the key evidence Plaintiffs intend to rely
4    on in opposition to this defense, with respect to its sole element — that Plaintiffs'
5    claimed harm accrued before February 10, 2012:

6    1.    Testimony and/or documents regarding Plaintiffs' discovery in 2015 that
7          second-quality MISS ME and ROCK REVIVAL goods sent to Phoenix
8          Fibers were being offered for sale in secondary consumer trade channels.

9    M.    Key Evidence in Opposition to Wolff's Aff. Def. 3 — Failure to Mitigate

10       The following is a brief description of the key evidence Plaintiffs intend to rely
11   on in opposition to this defense, on an element-by-element basis:

12       *Evidence in Opposition to Element 1: Plaintiffs' damages could have been*
13       *avoided*

14   1.    Testimony and/or documents demonstrating that Ms. Song (on behalf of
15         Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that
16         Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no
17         charge, in exchange for which Phoenix Fibers would shred those goods
18         and convert them into shoddy fiber for use in creating end products such
19         as insulation.

20   2.    Testimony and/or documents demonstrating that Mr. Graham repeatedly
21         represented that Phoenix Fibers would shred Plaintiffs' goods and convert
22         them into shoddy fiber.

23   3.    Testimony and/or documents regarding Plaintiffs' discovery that second-
24         quality goods sent to Phoenix Fibers were being offered for sale in
25         secondary consumer trade channels.

26   4.    Testimony and/or documents demonstrating that Plaintiffs promptly
27         contacted Phoenix Fibers regarding their discovery of Defendants'

28

1    wrongful sales, in which Plaintiffs also expressed their continuing
2    objection to such sales.

3    5.    Testimony and/or documents demonstrating that Phoenix Fibers'
4          representatives intentionally and repeatedly lied to Plaintiffs, claiming
5          that any second-quality goods of Plaintiffs' that were being sold in
6          secondary channels was the result of "leakage" — *i.e.*, theft — from
7          Phoenix Fibers' warehouse.

8    6.    Testimony and/or documents demonstrating that Plaintiffs engaged
9          investigators to determine the source of the second-quality goods being
10         sold by Defendants, and to attempt to purchase all such available goods
11         that had been wrongfully sold into secondary channels.

12   7.    Testimony and/or documents demonstrating that Plaintiffs commenced
13         this action within months after discovering Defendants' wrongful sales
14         activities.

15         *Element in Opposition to Element 2: Plaintiffs failed to take reasonable*
16         *steps to avoid the damage*

17   1.    Testimony and/or documents demonstrating that Ms. Song (on behalf of
18         Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that
19         Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no
20         charge, in exchange for which Phoenix Fibers would shred those goods
21         and convert them into shoddy fiber for use in creating end products such
22         as insulation.

23   2.    Testimony and/or documents demonstrating that Mr. Graham repeatedly
24         represented that Phoenix Fibers would shred Plaintiffs' goods and convert
25         them into shoddy fiber.

26   3.    Testimony and/or documents regarding Plaintiffs' discovery that second-
27         quality goods sent to Phoenix Fibers were being offered for sale in
28         secondary consumer trade channels.

4.      Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5.      Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6.      Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7.      Testimony and/or documents demonstrating that Plaintiffs commenced this action within four months after discovering Defendants' wrongful sales activities.

N.      <u>Key Evidence in Opposition to Wolff's Aff. Def. 4 — Waiver</u>

The following is a brief description of the key evidence Plaintiffs intend to rely on in opposition to this defense, on an element-by-element basis:

*Evidence in Opposition to Element 1: Plaintiffs intentionally relinquished their known right to bring their claims with knowledge of the claims' existence*

1.      Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2.  Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3.  Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4.  Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5.  Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6.  Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7.  Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

*Evidence in Opposition to Element 2: Plaintiffs had the intent to relinquish the right*

1.  Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods

and convert them into shoddy fiber for use in creating end products such as insulation.

2.  Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3.  Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4.  Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5.  Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6.  Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7.  Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

O.  <u>Key Evidence in Opposition to Wolff's Aff. Def. 5 — Estoppel</u>

The following is a brief description of the key evidence Plaintiffs intend to rely on in opposition to this defense, on an element-by-element basis:

*Evidence in Opposition to Element 1: Plaintiffs knew that Phoenix Fibers*
*was selling Plaintiffs' second-quality goods*

1. Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2. Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3. Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4. Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5. Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6. Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

*Evidence in Opposition to Element 2: Plaintiffs intended that Phoenix Fibers would believe that Plaintiffs did not intend to enforce their rights against Phoenix Fibers, or that Phoenix Fibers had a right to believe that Plaintiffs so intended*

1.    Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2.    Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

*Evidence in Opposition to Element 3: Phoenix Fibers did not know the Plaintiffs actually objected to the sale of Plaintiffs' second-quality goods*

1.    Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2.    Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

3.    Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming

that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

4.     Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

5.     Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

*Evidence in Opposition to Element 4: Due to its reliance on the Plaintiffs' actions, Phoenix Fibers will be materially prejudiced if Plaintiffs are allowed to proceed with their claims*

1.     Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2.     Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3.     Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4.     Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants'

1    wrongful sales, in which Plaintiffs also expressed their continuing
2    objection to such sales.

3    5.    Testimony and/or documents demonstrating that Phoenix Fibers'
4          representatives intentionally and repeatedly lied to Plaintiffs, claiming
5          that any second-quality goods of Plaintiffs' that were being sold in
6          secondary channels was the result of "leakage" — *i.e.*, theft — from
7          Phoenix Fibers' warehouse.

8    6.    Testimony and/or documents demonstrating that Plaintiffs engaged
9          investigators to determine the source of the second-quality goods being
10         sold by Defendants, and to attempt to purchase all such available goods
11         that had been wrongfully sold into secondary channels.

12   7.    Testimony and/or documents demonstrating that Plaintiffs commenced
13         this action within months after discovering Defendants' wrongful sales
14         activities.

15   P.    <u>Key Evidence in Opposition to Wolff's Aff. Def. 6 — Unclean Hands</u>

16         The following is a brief description of the key evidence Plaintiffs intend to rely
17   on in opposition to this defense, on an element-by-element basis:

18         *<u>Evidence in Opposition to Element 1: Plaintiffs engaged in inequitable</u>*
19         *<u>conduct</u>*

20   1.    Testimony and/or documents demonstrating that Ms. Song (on behalf of
21         Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that
22         Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no
23         charge, in exchange for which Phoenix Fibers would shred those goods
24         and convert them into shoddy fiber for use in creating end products such
25         as insulation.

26   2.    Testimony and/or documents demonstrating that Mr. Graham repeatedly
27         represented that Phoenix Fibers would shred Plaintiffs' goods and convert
28         them into shoddy fiber.

3.  Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4.  Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5.  Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6.  Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7.  Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

*Evidence in Opposition to Element 2: Plaintiffs' conduct directly relates to the claims they have asserted against Wolff*

1.  Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

2.    Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

3.    Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

4.    Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

5.    Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

6.    Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being sold by Defendants, and to attempt to purchase all such available goods that had been wrongfully sold into secondary channels.

7.    Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

*Evidence in Opposition to Element 3: Plaintiffs' conduct injured Wolff*

1.    Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods

1    and convert them into shoddy fiber for use in creating end products such
2    as insulation.

3    2.    Testimony and/or documents demonstrating that Mr. Graham repeatedly
4          represented that Phoenix Fibers would shred Plaintiffs' goods and convert
5          them into shoddy fiber.

6    3.    Testimony and/or documents regarding Plaintiffs' discovery that second-
7          quality goods sent to Phoenix Fibers were being offered for sale in
8          secondary consumer trade channels.

9    4.    Testimony and/or documents demonstrating that Plaintiffs promptly
10         contacted Phoenix Fibers regarding their discovery of Defendants'
11         wrongful sales, in which Plaintiffs also expressed their continuing
12         objection to such sales.

13   5.    Testimony and/or documents demonstrating that Phoenix Fibers'
14         representatives intentionally and repeatedly lied to Plaintiffs, claiming
15         that any second-quality goods of Plaintiffs' that were being sold in
16         secondary channels was the result of "leakage" — *i.e.*, theft — from
17         Phoenix Fibers' warehouse.

18   6.    Testimony and/or documents demonstrating that Plaintiffs engaged
19         investigators to determine the source of the second-quality goods being
20         sold by Defendants, and to attempt to purchase all such available goods
21         that had been wrongfully sold into secondary channels.

22   7.    Testimony and/or documents demonstrating that Plaintiffs commenced
23         this action within four months after discovering Defendants' wrongful
24         sales activities.

25   Q.    Key Evidence in Opposition to Wolff's Aff. Def. 7 — Laches

26         The following is a brief description of the key evidence Plaintiffs intend to rely

27   on in opposition to this defense, on an element-by-element basis:

28

65

1   *Evidence in Opposition to Element 1: Plaintiffs unreasonably delayed in*
2   *asserting their claims*

3   8.   Testimony and/or documents demonstrating that Ms. Song (on behalf of
4        Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that
5        Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no
6        charge, in exchange for which Phoenix Fibers would shred those goods
7        and convert them into shoddy fiber for use in creating end products such
8        as insulation.

9   9.   Testimony and/or documents demonstrating that Mr. Graham repeatedly
10       represented that Phoenix Fibers would shred Plaintiffs' goods and convert
11       them into shoddy fiber.

12  10.  Testimony and/or documents regarding Plaintiffs' discovery that second-
13       quality goods sent to Phoenix Fibers were being offered for sale in
14       secondary consumer trade channels.

15  11.  Testimony and/or documents demonstrating that Plaintiffs promptly
16       contacted Phoenix Fibers regarding their discovery of Defendants'
17       wrongful sales, in which Plaintiffs also expressed their continuing
18       objection to such sales.

19  12.  Testimony and/or documents demonstrating that Phoenix Fibers'
20       representatives intentionally and repeatedly lied to Plaintiffs, claiming
21       that any second-quality goods of Plaintiffs' that were being sold in
22       secondary channels was the result of "leakage" — *i.e.*, theft — from
23       Phoenix Fibers' warehouse.

24  13.  Testimony and/or documents demonstrating that Plaintiffs engaged
25       investigators to determine the source of the second-quality goods being
26       sold by Defendants, and to attempt to purchase all such available goods
27       that had been wrongfully sold into secondary channels.

28

14.   Testimony and/or documents demonstrating that Plaintiffs commenced this action within months after discovering Defendants' wrongful sales activities.

*Evidence in Opposition to Element 2: Plaintiffs' delay prejudiced Wolff*

15.   Testimony and/or documents demonstrating that Ms. Song (on behalf of Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no charge, in exchange for which Phoenix Fibers would shred those goods and convert them into shoddy fiber for use in creating end products such as insulation.

16.   Testimony and/or documents demonstrating that Mr. Graham repeatedly represented that Phoenix Fibers would shred Plaintiffs' goods and convert them into shoddy fiber.

17.   Testimony and/or documents regarding Plaintiffs' discovery that second-quality goods sent to Phoenix Fibers were being offered for sale in secondary consumer trade channels.

18.   Testimony and/or documents demonstrating that Plaintiffs promptly contacted Phoenix Fibers regarding their discovery of Defendants' wrongful sales, in which Plaintiffs also expressed their continuing objection to such sales.

19.   Testimony and/or documents demonstrating that Phoenix Fibers' representatives intentionally and repeatedly lied to Plaintiffs, claiming that any second-quality goods of Plaintiffs' that were being sold in secondary channels was the result of "leakage" — *i.e.*, theft — from Phoenix Fibers' warehouse.

20.   Testimony and/or documents demonstrating that Plaintiffs engaged investigators to determine the source of the second-quality goods being

1    sold by Defendants, and to attempt to purchase all such available goods

2    that had been wrongfully sold into secondary channels.

3    21.    Testimony and/or documents demonstrating that Plaintiffs commenced

4    this action within months after discovering Defendants' wrongful sales

5    activities.

6    R.    Key Evidence in Opposition to Cho's Aff. Def. 3 — Failure to Mitigate

7    The following is a brief description of the key evidence Plaintiffs intend to rely

8    on in opposition to this defense, on an element-by-element basis:

9    *Evidence in Opposition to Element 1: Plaintiffs' damages could have been*

10   *avoided*

11   1.    Testimony and/or documents demonstrating that Ms. Song (on behalf of

12   Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that

13   Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no

14   charge, in exchange for which Phoenix Fibers would shred those goods

15   and convert them into shoddy fiber for use in creating end products such

16   as insulation.

17   2.    Testimony and/or documents demonstrating that Mr. Graham repeatedly

18   represented that Phoenix Fibers would shred Plaintiffs' goods and convert

19   them into shoddy fiber.

20   3.    Testimony and/or documents regarding Plaintiffs' discovery that second-

21   quality goods sent to Phoenix Fibers were being offered for sale in

22   secondary consumer trade channels.

23   4.    Testimony and/or documents demonstrating that Plaintiffs promptly

24   contacted Phoenix Fibers regarding their discovery of Defendants'

25   wrongful sales, in which Plaintiffs also expressed their continuing

26   objection to such sales.

27   5.    Testimony and/or documents demonstrating that Phoenix Fibers'

28   representatives intentionally and repeatedly lied to Plaintiffs, claiming

1  that any second-quality goods of Plaintiffs' that were being sold in

2  secondary channels was the result of "leakage" — *i.e.*, theft — from

3  Phoenix Fibers' warehouse.

6.  Testimony and/or documents demonstrating that Plaintiffs engaged

5  investigators to determine the source of the second-quality goods being

6  sold by Defendants, and to attempt to purchase all such available goods

7  that had been wrongfully sold into secondary channels.

7.  Testimony and/or documents demonstrating that Plaintiffs commenced

9  this action within months after discovering Defendants' wrongful sales

10  activities.

*Element in Opposition to Element 2: Plaintiffs failed to take reasonable*

*steps to avoid the damage*

1.  Testimony and/or documents demonstrating that Ms. Song (on behalf of

14  Plaintiffs) and Mr. Graham (on behalf of Phoenix Fibers) agreed that

15  Plaintiffs would deliver their second-quality goods to Phoenix Fibers at no

16  charge, in exchange for which Phoenix Fibers would shred those goods

17  and convert them into shoddy fiber for use in creating end products such

18  as insulation.

2.  Testimony and/or documents demonstrating that Mr. Graham repeatedly

20  represented that Phoenix Fibers would shred Plaintiffs' goods and convert

21  them into shoddy fiber.

3.  Testimony and/or documents regarding Plaintiffs' discovery that second-

23  quality goods sent to Phoenix Fibers were being offered for sale in

24  secondary consumer trade channels.

4.  Testimony and/or documents demonstrating that Plaintiffs promptly

26  contacted Phoenix Fibers regarding their discovery of Defendants'

27  wrongful sales, in which Plaintiffs also expressed their continuing

28  objection to such sales.

5.      Testimony and/or documents demonstrating that Phoenix Fibers'
        representatives intentionally and repeatedly lied to Plaintiffs, claiming
        that any second-quality goods of Plaintiffs' that were being sold in
        secondary channels was the result of "leakage" — *i.e.*, theft — from
        Phoenix Fibers' warehouse.

6.      Testimony and/or documents demonstrating that Plaintiffs engaged
        investigators to determine the source of the second-quality goods being
        sold by Defendants, and to attempt to purchase all such available goods
        that had been wrongfully sold into secondary channels.

7.      Testimony and/or documents demonstrating that Plaintiffs commenced
        this action within months after discovering Defendants' wrongful sales
        activities.

## VII.  Evidentiary Issues

During summary judgment briefing, Phoenix Fibers raised numerous issues relating to the authenticity of various documents cited by Plaintiffs. This motion has yet to be decided by the Court. While Plaintiffs do not agree that any evidentiary issues exist, Plaintiffs anticipate that any documents offered into evidence at trial will be properly authenticated.

Given that discovery is ongoing, the Parties have agreed and stipulated that any motions *in limine* should be filed closer in time to the commencement of trial, and on a date to be determined at the Final Pretrial Conference, currently scheduled for March 27, 2017. Currently, Plaintiffs anticipate filing a number of motions *in limine*, including without limitation a motion to exclude the testimony to be offered by Defendant Phoenix Fibers' expert Jana M. Hawley. Plaintiffs also understand that Phoenix Fibers anticipates that it will file a number of Motions *in Limine*, as well as a *Daubert* Motion under Federal Rule of Evidence 702 with respect to certain portions of the testimony to be offered by Plaintiffs' expert Juli Saitz.

1    **VIII.  Legal Issues**

2          Plaintiffs anticipate that there will be at least one issue of law regarding the

3    correct interpretation of the Lanham Act.  Phoenix Fibers has asserted in its pending

4    summary judgment motion that its wrongful sales of Plaintiffs' second-quality MISS

5    ME and ROCK REVIVAL products are covered by the first sale doctrine.  As

6    Plaintiffs explained in their opposition brief, however, the first sale doctrine does not

7    apply where — like here — post-sale confusion is at issue.  *See* Dkt. No. 97 at 17

8    (citing *Au-Tomotive Gold v. Volkswagen of Am.*, 603 F.3d 1133 (9th Cir. 2010)).  As

9    the Ninth Circuit explained in *Au-Tomotive Gold*: "Post-purchase confusion creates a

10   free-rider problem….  When a producer purchases a trademarked product, that

11   producer is not purchasing the trademark….  If a producer profits from a trademark

12   because of post-purchase confusion about the product's origin, the producer is, to that

13   degree, a free-rider."  *Au-Tomotive Gold*, 603 F.3d at 1138–39.

14         Plaintiffs anticipate that additional issues may be discovered as the parties

15   exchange proposed jury charges.

16                          **L.R. 16-4.3 BIFURCATION OF ISSUES**

17         Plaintiffs do not make a request for bifurcation.  Plaintiffs understand that

18   Phoenix Fibers intends to file a motion to sever the cross-claims of U.S. General and

19   Wolff against Phoenix Fibers.  Plaintiffs also understand that Phoenix Fibers intends

20   to file a motion to sever the trial of Plaintiffs' claims against all other Defendants in

21   this matter, so that those claims are heard in a separate, subsequent trial.  Plaintiffs do

22   not consent to either of Phoenix Fibers' anticipated motions, and intend to oppose

23   them.

24                               **L.R. 16-4.4 JURY TRIAL**

25         Defendants have demanded a jury trial with respect to legal issues.  Less than

26   all issues, however, are triable to a jury, as set forth below.

27   **IX.   Issues Triable to the Jury**

28         The following issues are triable to the jury:

1.     Whether a contract existed between Plaintiffs and Phoenix Fibers, *see, e.g.*, *Vita Planning & Landscape Architecture, Inc. v. HKS Architects, Inc.*, 192 Cal. Rptr. 3d 838, 844 (Cal. App. 2015), *review denied* (Jan. 13, 2016).

2.     Whether Phoenix Fibers breached the parties' contract, *see, e.g.*, *Palmiero v. Spada Distrib. Co.*, 217 F.2d 561, 565 (9th Cir. 1954).

3.     Whether Plaintiffs' MISS ME and ROCK REVIVAL trademarks are valid and protectable, *see, e.g.*, *Mophie, Inc. v. Shah*, 2014 WL 10988347, at *19 (C.D. Cal. Nov. 12, 2014).

4.     Whether there is a likelihood of confusion among consumers who observe such product in the post-sale marketplace, as to the source, sponsorship, affiliation, or approval of the goods, *see, e.g.*, *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1265 (9th Cir. 2001).

5.     Whether Defendants acted willfully, *see, e.g.*, *N. Face Apparel Corp. v. Dahan*, 2014 WL 12558010, at *18 (C.D. Cal. Oct. 6, 2014).

6.     Whether Plaintiffs' MISS ME and ROCK REVIVAL trademarks are famous in the State of California, *see, e.g.*, *Acad. of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.*, 2015 WL 12684340, at *9 (C.D. Cal. Apr. 10, 2015); *Eszlinger v. United Studios of Self Defense, Inc.*, 2012 WL 12336801, at *4 (Cal. Super. Feb. 28, 2012).

7.     Whether there is a likelihood of dilution, *see, e.g.*, *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010).

8.     The amount of damages, *see, e.g.*, *Young v. Wideawake Death Row Entm't LLC*, 2011 WL 12565250, at *12 (C.D. Cal. Apr. 19, 2011).

9.     Whether Plaintiffs' claims are barred by the unclean hands doctrine, *see, e.g.*, *Fnbn-Rescon I LLC v. Citrus El Dorado LLC*, 2015 WL 11416171, at *8 (C.D. Cal. Feb. 6, 2015).

10.    Whether Plaintiffs' claims are barred by the laches doctrine, *see, e.g.*, *id.*

**X.** **Issues Triable to the Court**

The following issues are triable to the Court:

1. Plaintiffs' claims for restitution and injunctive relief, *see, e.g.*, 5 U.S.C. § 1116(a); Cal. Bus. & Prof. Code §§ 14247, 17200 *et seq.*

2. Plaintiffs' claims for the disgorgement of Defendants' wrongful profits, *see, e.g.*, *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015).

3. The parties' claims for attorneys' fees under applicable law, *see, e.g.*, 15 U.S.C. § 1117(a).

4. Whether Plaintiffs are estopped from maintaining their claims, *see, e.g.*, *Platt Pac., Inc. v. Andelson*, 862 P.2d 158, 166 (Cal. 1993) ("Generally, the determination of either waiver or estoppel is a question of fact .... When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law ....").

5. Whether Plaintiffs waived their rights to maintain their claims, *see, e.g.*, *Platt Pac., Inc.*, 862 P.2d at 166 ("Generally, the determination of either waiver or estoppel is a question of fact ....  When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law ....").

6. Whether Plaintiffs' claims are barred by the statute of limitations, *see, e.g.*, *B. Braun Med., Inc. v. Rogers*, 163 F. App'x 500, 504 (9th Cir. 2006) ("'While resolution of the  statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference,' a court may determine a statute of limitations issue as a matter of law.").

7. Whether Plaintiffs failed to reasonably mitigate their damages, *see, e.g.*, *Green v. Smith*, 67 Cal. Rptr. 796, 801 (Cal. Ct. App. 1968) (while failure

73

1    to mitigate is usually a question of fact, it may be resolved as a matter of

2    law where the underlying facts are undisputed).

3                        **L.R. 16-4.5 ATTORNEYS' FEES**

4         Plaintiffs seek to recover their attorneys' fees pursuant to 15 U.S.C. § 1117(a).

5    Section 1117(a) provides that the court may award such fees to the prevailing party in

6    "exceptional cases."  *Id.*  "Exceptional cases include cases in which the infringement

7    is malicious, fraudulent, deliberate, or willful."  *Horphag Research Ltd. v. Pellegrini*,

8    337 F.3d 1036, 1042 (9th Cir. 2003).  As described above, Plaintiffs intend to offer

9    evidence demonstrating Defendants' bad faith and willfulness in offering for sale and

10   selling Plaintiffs' second-quality MISS ME and ROCK REVIVAL products.

11                 **L.R. 16-4.6 ABANDONMENT OF ISSUES**

12        Plaintiffs are not abandoning any of their claims.  Plaintiffs understand that

13   Phoenix Fibers is abandoning its first, second, and fifth affirmative defenses.  Other

14   than Phoenix Fibers, Plaintiffs are not aware of whether Defendants have abandoned

15   any of their defenses.

16

17   Dated:  March 6, 2017              ARNOLD & PORTER KAYE SCHOLER LLP

18
                                        By:   /s/  Matthew T. Salzmann
19                                            John C. Ulin
20                                            Eric D. Mason
                                              Louis S. Ederer
21                                            Matthew T. Salzmann
22                                            *Attorneys for Plaintiffs*

23

24

25

26

27

28